**THIERMAN BUCK LLP**
MARK R. THIERMAN, ESQ., Nev. Bar No. 8285
mark@thiermanbuck.com
JOSHUA D. BUCK, ESQ., Nev. Bar No. 12187
josh@thiermanbuck.com
LEAH L. JONES, ESQ., Nev. Bar No. 13161
leah@thiermanbuck.com
JOSHUA H. HENDRICKSON, Nev. Bar No. 12225
joshh@thiermanbuck.com
7287 Lakeside Drive
Reno, Nevada 89511
Telephone: (775) 284-1500
Facsimile: (775) 703-5027

**FAIRMARK PARTNERS, LLP**
JAMIE CROOKS, ESQ. (*Pro Hac Vice forthcoming*)
jamie@fairmarklaw.com
1825 7th St NW, #821
Washington, DC 20001

**TOWARDS JUSTICE**
DAVID H. SELIGMAN, ESQ. (*Pro Hac Vice forthcoming*)
NATASHA VITERI, ESQ. (*Pro Hac Vice forthcoming*)
ALEXANDER HOOD, ESQ. (*Pro Hac Vice forthcoming*)
david@towardsjustice.org
natasha@towardsjustice.org
alex@towardsjustice.org
2840 Fairfax Street, Suite 220
Denver, CO 80207
*Attorneys for Plaintiff and the Putative Class*

**THIERMAN BUCK LLP**
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com  www.thiermanbuck.com

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| CIRILO UCHARIMA ALVARADO, On Behalf of Himself and All Others Similarly Situated, | Case No.: |
| | **CLASS ACTION COMPLAINT** |
| Plaintiff, | **SHERMAN ACT, 15 U.S.C. § 1 *et seq*** |
| vs. | |
| | **JURY TRIAL DEMANDED** |
| WESTERN RANGE ASSOCIATION, | |
| Defendant. | |

COME NOW Plaintiff Cirilo Ucharima Alvarado ("Plaintiff") individually, and on behalf of all others similarly situated, brings this action against Defendant Western Range Association

**THERMAN BUCK LLP**
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thermanbuck.com  www.thermanbuck.com

1   ("WRA" or "Defendant"). All allegations in this Complaint are based upon information and belief

2   except for those allegations that pertain to the Plaintiff named herein and his counsel. Each

3   allegation in this Complaint either has evidentiary support or is likely to have evidentiary support

4   after a reasonable opportunity for further investigation and discovery.

5   **I.      JURISDICTION AND VENUE**

6          1.      This Court has jurisdiction over all claims pursuant to 28 U.S.C. § 1331 and 15

7   U.S.C. § 15(a).

8          2.      Venue is proper pursuant to 28 U.S.C. § 1391, 18 U.S.C. § 1965(a), 15 U.S.C.

9   §§ 15(b) & 22. Mr. Ucharima Alvarado was placed by the WRA at a WRA member ranch in

10  Nevada. The WRA transacts business in Nevada, and a substantial part of the events or omissions

11  giving rise to the claims against the Defendant occurred in Nevada.

12         3.      The Court has *in personam* jurisdiction over Defendant because it, among other

13  things: (a) transacted business in the United States, including in this District; (b) worked with its

14  members to artificially fix and suppress the wages of Plaintiff and members of the Classes

15  (defined herein) throughout the United States, including in this District; or (c) had substantial

16  aggregate contacts with the United States as a whole, including in this District.

17  **II.     INTRODUCTORY STATEMENT**

18         4.      In this Sherman Act action, 15 U.S.C. § 1 *et seq.*, Plaintiff seeks class-wide

19  damages, as well as injunctive and declaratory relief related to the WRA's unlawful restraint of

20  trade.

21         5.      Sheep ranches in the western United States raise sheep to produce meat and wool,

22  which generate roughly $600 million per year for the industry.

23         6.      The industry depends upon thousands of highly-skilled sheepherders, employed

24  by ranches, to tend to the sheep herds, including by providing complicated and professional

25  medical care to sheep that requires substantial experience and training.

26         7.      Yet sheepherders work for some of the lowest wages in the American economy—

27  many earn around $4-$5 per hour, for grueling work of 80-90 hours per week. While on the range,

28  they are isolated from human contact in remote and windswept corners of the West, often living

in small, dilapidated one-room trailers without heating or air conditioning and surviving off canned foods and potatoes. Some, including Plaintiff, are subject to abusive practices by their employers, designed to make them feel even more trapped and isolated in their jobs.

8.     Notwithstanding the profits these workers generate for sheep producers, they have no meaningful opportunity to shop between ranches for better treatment or decent wages.

9.     This case principally concerns Sherman Act violations that have had the effect of illegally withholding millions of dollars from thousands of sheepherders, most of whom come from Peru, who work in the American West on temporary agricultural visas, commonly called H-2A visas.

10.     Sheep ranchers suppress sheepherder wages and undermine sheepherder bargaining power through, with the aid of, and in conjunction with the WRA. The sheep ranch industry is dominated by ranches that are members of the WRA.

11.     Like all employers, ranches have a legal obligation to compete for labor in an open market, free from unlawful restraints or collusion between competitors. They do not.

12.     Instead, they use the WRA to suppress the wages ranches offer to sheepherders across the industry—for both domestic ***and*** foreign sheepherders—and hold them predominantly at or near the precise wage floor set by the United States Department of Labor (the "DOL") for foreign sheepherders working in the United States on temporary, H-2A visas.

13.     The ranchers who comprise the WRA consciously commit to this wage suppression scheme by choosing to delegate the setting of wages to the WRA with the knowledge that the WRA uniformly fixes the wages for sheepherders.

14.     Moreover, the WRA and its members further their wage-suppression scheme by agreeing not to compete with each other for sheepherders. When a worker applies to work for the WRA, the WRA assigns them to a ranch. There is no opportunity to shop between ranches to seek out those who may offer better pay and treatment.

15.     The WRA continues to undermine sheepherders' bargaining power by preventing them from moving between ranches in search of better treatment and wages even after sheepherders are brought to the United States and assigned to a ranch. The WRA requires

THERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thermanbuck.com   www.thermanbuck.com

THERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thermanbuck.com www.thermanbuck.com

sheepherders to sign an attestation saying they will not move between ranches even if they desire to do so. This attestation appears to prevent workers from moving between ranches even between seasonal or temporary visas, which sometimes last only a few months.

16.    By effectively dividing the market in this manner and agreeing not to hire sheepherders from each other, the WRA and its members artificially depress sheepherders' wages and exacerbate the risk of dangerous and exploitative working conditions because sheepherders end up in effectively permanent indentured servitude for a single ranch.

17.    The concerted conduct creating these conditions includes but is not limited to: (1) agreements between the WRA and its members as to the wages predominantly offered—at or near the DOL minimum; (2) indemnification of the WRA by its members for any claims against the former related to wages and/or overtime; (3) the WRA's policy of assigning sheepherders to specific ranchers while prohibiting the sheepherders from seeking employment at other ranches; and (4) the collusion of WRA members in this market allocation conspiracy.

18.    Because of the ranchers' collusion in setting wages offered sheepherders at levels that are strikingly low even relative to the most low-wage employment opportunities in the rest of the American economy, few domestic workers desire to work as sheepherders and non-immigrant guestworker sheepherders earn poverty wages notwithstanding the important and skilled work they provide to ranches.

19.    This artificially created shortage of domestic workers allows the sheep ranching industry to rely on the importation of foreign H-2A sheepherders whose immigration status only increases their risk of exploitation. The ranchers' collusion with the WRA in assigning sheepherders to certain ranches and preventing competition over wages ensures that these subminimum wage workers have no ability to shop between ranches for decent treatment and pay, notwithstanding the value of their services to sheep ranches.

20.    Plaintiff Cirilo Ucharima Alvarado was a victim of such exploitation. Mr. Ucharima Alvarado had decades of experience sheepherding before he was assigned a ranch by the WRA. Notwithstanding his expertise, he had no opportunity to shop between ranches for decent wages—all of the ranches offered precisely the minimum allowable in their state, and in

THERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thermanbuck.com  www.thermanbuck.com

all cases that amount was less than the federal minimum hourly wage. And he could not shop between ranches because the WRA assigned him a ranch. He was bound to that ranch, indentured no matter how badly he was treated.

21. Mr. Ucharima Alvarado's treatment was horrendous. On more than one occasion, his employers required him to sleep out in the open, exposed to the elements while herding sheep, gave him expired food to eat, and refused to provide clothing and medical attention when he needed it most.

22. Mr. Ucharima Alvarado's employer threatened him constantly with physical violence and sending him back to Peru before the end of his contract term. Mr. Ucharima Alvarado was forced to endure this poor treatment because he feared that he would not be paid if he left his placement, and had no opportunity to leave even if he had wanted to. His host ranch confiscated his passport and visa to ensure he could not leave.

23. Without this Court's intervention, the WRA will continue to depress wages and create conditions that allow for the persistent exploitation of this vulnerable labor market.

III. **PARTIES**

A. **Plaintiff**

24. Plaintiff Cirilo Ucharima Alvarado is a Peruvian sheepherder from Centro Poblado de Chala in the Junín region of Peru.

25. Plaintiff is a Peruvian citizen and came to the United States on a temporary H-2A visa to work as a sheepherder on the Little Ranch in Spring Creek, Nevada from July 4, 2020 until December 2020. At all material times, Plaintiff was a resident of and was domiciled in Nevada.

26. All of the work performed by the Plaintiff for the WRA member ranch at which he worked occurred in the state of Nevada.

B. **Defendant**

27. Defendant WRA is a California non-profit corporation with its principal place of business at 1245 Brickyard Rd., Salt Lake City, Utah, 84106. The WRA transacts business in Nevada by, among other things, recruiting sheepherders and setting wages for several of its member ranches in the State, including the ranch at which Plaintiff worked.

THERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thermanbuck.com   www.thermanbuck.com

## IV.     STATEMENT OF FACTS

### A.     <u>Regulatory Scheme Governing Importation of Foreign Sheepherder Labor</u>

28.     The H-2A Visa Program is an agricultural guest worker visa program administered by the DOL that allows for the issuance of work visas to foreign workers to fill positions that employers cannot fill through the domestic labor market.

29.     Pursuant to the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, before issuing H-2A visas, the DOL is charged with ensuring that there is in fact a shortage of American workers willing and able to fill the positions that employers seek to fill with foreign H-2A workers.

30.     Specifically, before permitting the importation of foreign workers under H-2A visas, the INA requires the DOL to certify that:

> (A)     there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition, and
>
> (B)     the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed.

31.     To implement its statutory duty under the INA, the DOL has promulgated regulations. *See* 20 C.F.R. §§ 655.100 *et seq.*

32.     Under the regulations, before a foreign worker can be imported under an H-2A visa, an employer must first offer the job to domestic workers through State Workforce Agencies. *Id.* § 655.121. Because H-2A visas are only issued for positions that cannot be filled by the domestic labor market, DOL regulations prescribe that employers offer domestic workers "no less than the same benefits, wages, and working conditions that the employer is offering, intends to offer, or will provide to H-2A workers." 20 C.F.R. § 655.122(a).

33.     Additionally, ranchers or membership associations acting on their behalf must offer domestic workers, among other things, "at least the AEWR [Adverse Effect Wage Rate], the prevailing hourly wage rate, the prevailing piece rate, the agreed-upon collective bargaining rate, or the Federal or State minimum wage rate, in effect at the time work is performed,

THERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thermanbuck.com www.thermanbuck.com

whichever is highest, for every hour or portion thereof worked during a pay period." 20 C.F.R. § 655.122(l).

34.     These job offers to domestic workers are called "job orders."

35.     Only if domestic workers do not accept a position offered through a job order can the employer submit an Application for Temporary Employment Certification (an "H-2A Application") to the DOL for certification.

36.     The DOL can promulgate exceptions to the H-2A Visa Program, known as "special procedures," for particular agricultural industries.

37.     The DOL has implemented special procedures in the sheep and goat herding industries. The DOL implemented one set of special procedures in 2011 that were in effect until November 16, 2015. *See* 76 Fed. Reg. 47,256 (issued Aug. 4, 2011). As of November 16, 2015, the wage floor for most H-2A shepherds was raised by the DOL to $1,206.31 per month. *See Labor Certification Process for the Temporary Employment of Aliens in Agriculture in the United States: Adverse Effect Wage Rate for Range Occupations Through 2016*, 80 Fed. Reg. 70840, 70840 (the "2015 Special Procedures"). This monthly wage floor has been raised in subsequent guidance DOL has issued. The wage floor can be higher in individual states, such as California, Nevada, and Oregon, based on higher state-level minimum-wage laws. Currently, per the DOL's most recent guidance, the minimum for most H-2A sheepherders is approximately $1,807.23 per month.

38.     While previously the DOL could grant repeated 364-day visas for sheepherders—resulting in sheepherders working in the U.S. for years or decades on work that was purportedly seasonal or temporary—pursuant to a 2019 Settlement Agreement with the DOL, the DOL will no longer authorize visas lasting 364 days for sheepherders and will scrutinize every visa for temporary or seasonal need. All employers applying for temporary agricultural labor certifications must individually demonstrate that their need for the agricultural labor or services to be performed is temporary or seasonal in nature, regardless of occupation.

39.     Although "[t]he employer's job offer must offer to U.S. workers no less than the same benefits, wages, and working conditions that the employer is offering, intends to offer, or

THERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thermanbuck.com  www.thermanbuck.com

will provide to H-2A workers," 20 C.F.R. § 655.122(a), the converse is not true: Ranchers are permitted to offer higher wages to the domestic workers in the job orders than they do to H-2A workers in the H-2A Applications.

40.     Furthermore, although the DOL sets wage floors for sheepherders working on an H-2A visa, there is no statute, regulation, or special procedure preventing ranchers from offering higher wages to those workers. Indeed, on information and belief, individual ranchers on occasion do offer individual sheepherders more than the minimum, and more would do so absent the agreement among WRA members to offer the minimum.

41.     Moreover, nothing in the above-described DOL regulations provides for or condones employers colluding to fix wages and agreeing not to compete with one another for H-2A workers. While DOL's regulations allow membership organizations to fill out applications on behalf of their members, the regulations do not contemplate employers who are members of an organization like the WRA to agree *ex ante* on the wage they will all pay and allocate the market for workers between each other. Put differently, DOL's regulations do not in any way seek to displace or lessen competition between employers for H-2A workers.

**B.     Allegations Regarding the WRA-led Wage Suppression**

*1.     WRA, its Member Ranches, and their Collusive Relationship*

42.     The sheep ranching industry is highly concentrated under the WRA and similar associations. In recent years, the WRA hired approximately two thirds of all open range sheepherders on H-2A visas in the United States.

43.     Although ranches compete in the sale of their products, principally meat and wool, the ranches that are members of the WRA have conspired to fix one of their principal costs: sheepherders' wages.

44.     The WRA's members do not share profits or distribute losses, but through the WRA they collude to fix sheepherder wages at or near precisely the wage floor set by the DOL. They do so through agreements with the WRA and with each other to offer the wage floor to workers instead of bidding for workers in a competitive process.

THERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thermanbuck.com   www.thermanbuck.com

45.     The agreements between the WRA and its member ranches include the following indemnification provision:   "[The ranch employer] agrees to defend, indemnify and hold the [WRA] harmless from any claim, demand, or lawsuit *arising out of or related to the employment of the [sheepherder], including but not limited to any claim by the [sheepherder] for wages or damages or any kind and any claim by any third-party or any governmental entity for damages or equitable relief*." (emphasis added).

46.     The fixing and suppression of sheepherder wages results in a windfall for WRA members and causes sheepherders to work for shockingly low wages without any meaningful opportunity to bargain for more.

47.     Absent this unreasonable restraint of trade resulting from the wage-fixing conspiracy, the ranchers currently conspiring to fix the wages of sheepherders would compete in the sheepherder labor market, both in their initial hiring of sheepherders under the H-2A program and while sheepherders are on contract in the U.S., to compete for workers who wish to return on future visas. Absent the WRA's scheme, ranches would compete in the labor market for the best sheepherders, and sheepherders would compete in the labor market for the best sheepherding jobs. This competition would put an upward pressure on wages.

48.      Mr. Ucharima Alvarado came to the United States on a temporary H-2A visa with the hope of using his extensive experience and knowledge as a sheepherder to make a decent living for himself and his children and grandchildren. Mr. Ucharima Alvarado had been a sheepherder since he was a school-aged child. He herded sheep, cows, and other livestock for decades in his home country of Peru. When he discovered he could do what he knew best in another country for what he believed to be better pay, he decided to apply to work with the WRA.

49.     As part of the application process with the WRA, Mr. Ucharima Alvarado completed all the steps necessary to secure an H-2A visa. He made the long journey from his home province of Concepcion to Lima, the capital city of Peru, where WRA offices are located. He went through the process of securing his passport, interviewing for his visa, presenting his marriage license and all of his children's birth certificates, and making other necessary

**THERMAN BUCK LLP**
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thermanbuck.com  www.thermanbuck.com

1  preparations for his journey to the United States. Mr. Ucharima Alvarado paid for most of these

2  costs himself, including transportation and document fees.

3        50.    When Mr. Ucharima Alvarado was applying to work with the WRA, he had heard

4  from other sheepherders about their experiences on different ranches in the United States. He

5  knew that both wages and treatment varied between placements. He did not know if ranch pay

6  varied based on the state in which the ranch was located. He hoped to be assigned to a ranch that

7  would treat him with dignity and respect, and appreciate the vast amount of experience he would

8  bring to his post. But he did not have any control over what ranch he was placed with by the

9  WRA. WRA placed him with a ranch in Nevada.

10        51.    It was not until he arrived in Nevada that he learned about the poor treatment other

11  sheepherders on the ranch were forced to endure. Mr. Ucharima Alvarado soon came to

12  understand why his fellow sheepherders were not only unhappy with their assignment, but feared

13  their employer.

14        52.    If Mr. Ucharima Alvarado had been given the opportunity to offer his invaluable

15  and lengthy herding experience to different ranches, his experience participating in the H-2A visa

16  program would have been very different. Mr. Ucharima Alvarado could have leveraged his

17  knowledge to secure a placement with a ranch of his own choosing that would have given him

18  the tools he needed to succeed and fulfill the promises of the visa he went through so much to

19  obtain. Instead, the structure of the sheepherder labor market, shaped by the WRA-led collusion

20  between WRA members, left him indentured and vulnerable to abuse at the hands of employers

21  who paid him substantially less than minimum wage.

22        ***2.    Concerted Conduct to Fix Wages Offered to Domestic Sheepherders***

23        53.    With respect to the recruitment of domestic sheepherders, the WRA acts as an

24  illegal combination of competitors.

25        54.    In this role, one of the WRA's principal purposes is to create job orders for and on

26  behalf of its members, including setting the wage its members will offer to the sheepherders the

27  members will employ, both for domestic sheepherders through job orders and for foreign

28  sheepherders through the H-2A visa program.

THERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thermanbuck.com  www.thermanbuck.com

55.   With respect to the recruitment of domestic sheepherders, member ranchers of the WRA maintain membership in the organization and enlist its services in preparing job orders. The member ranches knowingly allocate decisions regarding the wages offered to domestic sheepherders to the WRA, which is constituted of competitor ranchers. The ranchers do so with the knowledge that the WRA uses job orders to illegally fix sheepherder wages predominantly at the wage floor in each state.

56.   Additionally, these job orders evidence concerted conduct among the WRA and its members to offer to compensate domestic sheepherders at the wage floor set by the DOL for foreign sheepherders—known as the Adverse Effect Wage Rate, or AEWR—or by state minimum wage requirements.

57.   Based upon a review of recent job orders associated with WRA H-2A Applications, the job orders to U.S workers that preceded these H-2A Applications offered the same wages as the H-2A Applications and therefore offered exactly the DOL H-2A wage floors for each state as a fixed wage to potential U.S. workers.

58.   In a review of all 148 current sheepherder job orders posted by WRA, only one guaranteed a wage higher than the minimum at all worksites, 125 guaranteed exactly the minimum wage, and fourteen offered wages below the legal minimum allowed.

59.   At least fifteen recent job orders have worksites in states with differing minimum wages due to state minimum wage laws. Each job order is for a single ranch with multiple worksites. These job orders clearly show WRA's commitment to offering exactly the minimum wage. In the job orders, WRA writes: "Wages will be paid in accordance to the state in which the work is done." Each order proceeds to promise exactly the minimum wage at worksites in each state. For example, one order reads: "Washington, Idaho and Montana wages will be $1807.23 and Oregon wages will be $2080.00."

///

///

///

THERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thermanbuck.com   www.thermanbuck.com

| 8b.  Wage Offer * | 8c.  Per * | 8d.  Piece Rate Offer § | 8e.  Piece Rate Units/Special Pay Information § |
|---|---|---|---|
| $ ___1807__.__23__ | ☐ HOUR<br>☑ MONTH | $ ___00__.__00__ | Employer shall provide housing and board in accordance with the rules and regulations of the federal government of the United States of America. Discretionary performance-based bonuses may be available. Payroll advances may be available |

| 9.  Is a completed **Addendum A** providing additional information on the crops or agricultural activities and wage offers attached to this job offer? * | ☐ Yes  ☑ No |
|---|---|

| 10.  Frequency of Pay. *   ☐ Weekly   ☐ Biweekly   ☐ Monthly   ☑ Other (specify): SEMI-MONTHLY |
|---|

11.  State all deduction(s) from pay and, if known, the amount(s). *
*(Please begin response on this form and use Addendum C if additional space is needed.)*
Social Security, Federal and State Income Tax withholding's may be deducted from wages.

Wages will be paid in accordance to the state in which the work is done. Washington, Idaho and Montana wages will be $1807.23 and Oregon wages will be $2080.00. State Income Tax will be withheld for workers while they are working in the State of Idaho, Montana and Oregon. When the workers are working in the State of Washington there is no State Income Tax withheld

| Form ETA-790A | FOR DEPARTMENT OF LABOR USE ONLY | | | Page 1 of 8 |
|---|---|---|---|---|
| H-2A Case Number: H-300-22041-894099 | Case Status: Full Certification | Determination Date: 03/15/2022 | Validity Period: _____ to _____ | |

**C.  Place of Employment Information**

| 1.  Address/Location *<br>738 RYDER LN |
|---|

| 2.  City *<br>WHITE BIRD | 3.  State *<br>Idaho | 4.  Postal Code *<br>83530 | 5.  County *<br>Idaho |
|---|---|---|---|

6.  Additional Place of Employment Information *(If no additional information, enter "NONE" below)* *
Multiple worksites in Idaho, Benewah and Kootenai Counties Idaho, Benton County, Walla Walla County, and Adams County Washington, Wheatland and Gallatin Counties Montana and Umatilla County Oregon will be used. Worksites locations varies depending on season, weather and grazing rotation. Please contact the employer at the headquarters address listed above for specific directions to the current worksite.

| 7.  Is a completed **Addendum B** providing additional information on the places of employment and/or agricultural businesses who will employ workers, or to whom the employer will be providing workers, attached to this job order? * | ☑ Yes  ☐ No |
|---|---|

60.     Other job orders contain similar offers of differing minimum wages: "Nevada wages will $1807.23 and California wages will be $2488.97." Still others go as far as to specify the minimum wage down to the county level in Oregon, where the legal minimum wage varies between urban and rural areas. These orders read: "Wages will be paid based upon the county in which the work will be performed. Non-urban counties will be $2080.00 per month plus room and board.  Standard counties will be $2210.00 per month plus room and board."

61.     As most of these orders explain, "Worksites locations varies [sic] depending on season, weather, and grazing rotation." This means, for example, a sheepherder who stepped across the border from Nevada to California—due to weather, season, or normal grazing rotations—would face a nearly 50% difference in wage. A sheepherder in Oregon could similarly experience a drop in wages simply by crossing a county line.

THERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thermanbuck.com   www.thermanbuck.com

62.     In a competitive market, and absent the wage fixing, ranchers would offer through these job orders at the very least a nominally higher wage to U.S. workers than they do H-2A workers to account for the additional cost of bringing an H-2A worker to the U.S. from another country (normally Peru). H-2A workers are more costly to employers because, pursuant to the H-2A regulations, such workers must be paid by their employers for travel to and from the place of recruitment in their home country. But due to the WRA's wage-fixing scheme, that is not true in the job market for foreign sheepherders. Instead, the WRA and its members fix wages for domestic workers predominantly at the DOL-set wage floor for foreign workers, and when those job orders do not result in domestic sheepherders taking the job, the WRA and its members offer the same depressed wage to H-2A sheepherders. This ensures the unavailability of domestic workers and, instead, the open access to a vulnerable labor market at a below-competitive rate. Moreover, it depresses wages across the industry for both foreign and domestic sheepherders.

63.     As discussed above, at the time of the filing, the minimum for most H-2A sheepherders is $1,807.23 per month for most range workers. And, yet, in the absence of the WRA members' combination and agreement to fix sheepherder wages, ranchers would negotiate with available range workers and the average wage would increase to something like the minimum wage for domestic ranch hands, general ranch farmworkers, or closed range herders. All these employees earn substantially more than H-2A sheepherders, and, unlike H-2A sheepherders, these employees receive differing wages commensurate with multiple variables, including skill, job location, experience, and work environment, as would be expected in a competitive labor market.

64.     Furthermore, freely negotiated wages would be reflected in the wage surveys upon which the government will rely in setting the wage floor for H-2A range occupations in future years, thus increasing the meager wage floor for H-2A sheepherders.

65.     The WRA sets wages offered to domestic sheepherders at low levels because its members know that if the positions are not filled domestically, they can look to an international market for foreign workers with little to no power to advocate for higher wages or safer working conditions. These workers are willing to work for wages that are aberrational in the U.S. labor

THERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thermanbuck.com  www.thermanbuck.com

market and that, due to the WRA-led conspiracy, are artificially depressed to the bare minimum allowable by law.

66.     Further, under the laws governing the H-2A visa program, members of the WRA are required to disclose the precise wage terms—including bonuses—that they intend to pay to the workers they hire. In other words, if they intend to offer higher wages than those required by the DOL-imposed wage floor or if they intend to offer a particular incentive bonus, they must disclose these facts in the job offers made to domestic workers.

67.     It is a violation of the laws governing the H-2A program to fail to disclose such intended higher wages and the existence of such bonuses.

68.     The WRA's members, however, sometimes violate this law. They make an offer of lower wages even though they intend to offer some foreign workers higher wages than what is in the job order. And they never disclose the amount of bonuses they offer to their workers. Obscuring bonuses furthers the WRA's goal of maintaining an artificial shortage of domestic workers so that more sheepherders can be hired through the H-2A system where the WRA's members have more control.

69.     This practice, which further demonstrates the WRA's members' disregard for the law, can result from, *inter alia*, familiarity with a recurring worker.

70.     Even though WRA member ranches sometimes do offer such bonuses, the total compensation received by sheepherders, including those who receive bonuses, are nonetheless artificially depressed by this unlawful scheme, because the baseline wage level sheepherders working under an H-2A visas are paid is lower than it would be in a competitive market. That is, even with the occasional departures (through bonuses) from the agreed-upon wage, setting the baseline impedes normal competitive pressures and results in wages across the industry lower than would be offered absent the WRA's wage-fixing scheme. Moreover, on information and belief, bonuses are paid infrequently and are not the industry standard.

71.     The result of the collusion between WRA members regarding domestic job orders and the wages offered to H-2A sheepherders is the effective wholesale elimination of the domestic

THERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thermanbuck.com   www.thermanbuck.com

sheepherder workforce in regions where the WRA has a significant presence and an artificially depressed wage level for H-2A workers in the industry.

### 3. Concerted Conduct to Fix Wages Offered to Foreign Sheepherders

72.     With respect to the recruitment of foreign sheepherders, the WRA acts as an illegal combination of competitors.

73.     Among other things, one of the principal purposes of the WRA is to file with the DOL H-2A applications on behalf of its members.

74.     With respect to the recruitment of foreign sheepherders, the WRA's members maintain their membership and enlist the organization's services in preparing H-2A applications for the purpose of allocating decisions regarding foreign sheepherder wages to an association constituted of competitor ranchers, and with the knowledge that the WRA uses job orders to fix sheepherder wages illegally at or near the DOL-set wage floor for each state.

75.     Additionally, these H-2A Applications evidence concerted conduct among the WRA and its members to predominantly offer foreign sheepherders wages at or near the wage floor set by the DOL for each state.

76.     The DOL releases statistics each year on H-2A utilization. The latest period for which the DOL has released complete annual data runs from October 1, 2020 to September 29, 2021.

77.     In that time period, the WRA submitted on behalf of its members H-2A Applications for approximately 1,400 sheepherders. The vast majority of these WRA H-2A Applications offered at or near the DOL-prescribed H-2A wage floors as the relevant wage term.

78.     In the absence of a conspiracy whose members have committed to the scheme, the joint decision by the WRA and its members to always or almost always offer the minimum wage required by law to H-2A sheepherders would be irrational. In a free market, ranchers would negotiate with H-2A sheepherders who would, therefore, receive differing wages commensurate with multiple variables, including skill, job location, experience, and work environment. Each rancher would obtain a sufficient number of sheepherders with the skill and experience that the rancher was willing to pay for in the form of wages.

79.     Plaintiff Cirilo Ucharima Alvarado was deprived of the opportunity to pursue a higher wage that reflected his experience and skill. When Mr. Ucharima Alvarado applied to work as a sheepherder in the United States, he was offered a contract that paid him precisely the minimum wage allowed by law at the time.

### 4.     WRA Sets Sheepherder Wages

80.     The WRA sets wages for H-2A sheepherders at or near the minimum allowable by the DOL when the association submits H-2A applications to DOL for its members. The wages publicly offered are the nationwide minimum set by DOL, or the higher state minimum wage where applicable.

81.     On information and belief, the WRA requires an employment attestation from its H-2A applicants that locks them into an agreement with the WRA that the worker will accept the minimum allowable wage.

82.     On information and belief, the attestation requires a sheepherder to agree that they are to be assigned to a place of work that they cannot change or transfer, even after the visa expires, and that they will be paid the DOL minimum wage for that region.

83.     This makes clear that it is the WRA—and not any individual rancher—that secures a commitment from each individual sheepherder at a very early stage in his employment that the sheepherder will be "assigned" the minimum wage.

84.     Finally, there can be little doubt that the WRA sets wages for its members because that is exactly what WRA says it does in a handbook provided to all its members. On information and belief, the WRA handbook outlines the "wage rate" that WRA instructs its members to pay to sheepherders. The wage rate established in the WRA handbook is the same as the AEWR offered to predominantly all H-2A sheepherders, as detailed above.

85.     On information and belief, the wage rate established in the WRA handbook is the minimum wage allowed by DOL for H-2A sheepherders.

86.     On information and belief, the WRA handbook similarly establishes that members will use the minimum wage as the rate they use to pay to their sheepherders. WRA members further agree with the WRA and each other, orally and otherwise, that this wage will be offered.

THERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thermanbuck.com  www.thermanbuck.com

THERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thermanbuck.com  www.thermanbuck.com

87.     Indeed, WRA members have admitted as much. In a 2021 deposition, the former Executive Director of the WRA, Dennis Richins, was questioned about how the WRA and its member ranches set wages.

88.     Richins testified that the WRA filled out the wage portion of the job orders, and that it always put in the minimum required by law.

89.     He also stated that as a member he received "a letter saying what the wage would be." When asked whether WRA members understand and agree that this is the wage they will pay he answered in the affirmative.

90.     Richins also stated that he understood that all of the job orders for H-2A sheepherders offered the minimum wage, and that all of the WRA's members agreed to offer the same fixed minimum wage.

### 5. *It Is Irrational to Pay the Same Wage to Experienced and Inexperienced Sheepherders, Even Though Ranches Represent to DOL that All Sheepherders Make the Same Wage Regardless of Experience*

91.     The fixed wage rates established in the WRA's form employment contracts and in membership handbooks are designed to suppress the pay of skilled sheepherders who are critically important to the industry.

92.     Sheepherding is a skilled profession learned essentially from childhood. The WRA concedes as much in comments on the H-2A rulemaking, where, in conjunction with Mountain Plains Agricultural Service, another association of ranches, the WRA noted that, "unlike some farmworker jobs in crop agriculture, for which no experience is required or a brief training session would suffice, the unique skills required of this job make it impossible for someone to walk off the street and begin working. The H-2A workers who comprise the current workforce have grown up doing this work, riding horses, tending herds, and living in the mountains."

93.     These skilled workers only become more valuable to their employers as they gain experience in managing the large flocks in their charge in the Western United States.

94.     Through the WRA, WRA member ranches predominantly offer wages at or near the government-set wage floor for each sheepherder, whether the sheepherder has fifteen years of

experience or one year and whether the sheepherder retains 90 percent of his flock or 70 percent of his flock through the summer herding season.

95.     While it may be tempting to think that there is no reason for a rancher to offer more than the legal minimum if a sufficient supply of qualified laborers is available at that wage, this is not the case.

96.     From an economic standpoint, offering a higher wage would attract a larger pool of additional qualified sheepherders, which would in turn increase the profits of each ranch that more qualified sheepherders would work at. This is because each worker would bring in revenue surpassing the costs of paying them, and because there is a wide variety between sheepherders in terms of skill—some sheepherders are better than others due to their experience, and these sheepherders will perform better and generate more profits for their ranches than less talented sheepherders. Absent the WRA's unlawful scheme, ranches would still never pay sheepherders more than they earned for the ranch in revenue—instead, ranches would only hire additional sheepherders if those sheepherders would bring in more revenue than they cost to employ. Thus, the more laborers a ranch can retain at rates that maximize its profits, the more it should do so based purely upon profit-motive.

97.     Failure to compete for sheepherders on wages, particularly in light of the high-skilled nature of the job, evidences anticompetitive behavior to keep wages artificially low, compounded by the collaboration discussed herein.

98.     Moreover, the WRA-led wage-fixing conspiracy between WRA members is economically rational for each rancher involved even though it depresses the labor costs of its competitors—in the same way in which it is economically rational for a seller of goods to enter a price-fixing conspiracy even though it raises the profits of the seller's competitors. All members of a wage-fixing conspiracy enjoy higher profits at the expense of all of the workers affected by the conspiracy.

///

///

THERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thermanbuck.com  www.thermanbuck.com

THERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thermanbuck.com  www.thermanbuck.com

**6.      *Revealing Their Conscious Commitment to the Wage-Fixing Scheme, WRA Members Illegally Pay Sheepherders Higher Wages Than They Offer to Domestic Workers***

99.     A bedrock principle of the H-2A visa program is that employers of H-2A workers "must offer to U.S. workers no less than the same benefits, wages, and working conditions that the employer is offering, intends to offer, or will provide to H-2A workers." 20 C.F.R. § 655.122(a).

100.     The DOL strictly enforces this provision. Every year, DOL fines H-2A employers thousands—and sometimes millions—of dollars for offering or paying less to domestic workers than what they offer or pay to similarly situated H-2A workers.[1]

101.     An H-2A employer can even be debarred from the H-2A program for substantially violating a material term or condition of a temporary labor certification, such as the promise to offer equal or higher pay and benefits to domestic workers than to H-2A workers. See 29 C.F.R. § 501.20.

102.     Because predominantly all job offers to H-2A sheepherders are at the minimum wage, in order to comply with this DOL regulation and avoid incurring potential liability for serious and costly fines, employers of H-2A sheepherders would have to offer to domestic sheepherders at least the same wages in fact paid to H-2A sheepherders.

103.     Some H-2A employers of sheepherders, however, violate this requirement of the H-2A rules. These sheepherder employers continue to ***offer*** the minimum wage to predominantly all sheepherders, but in recognition, for example, of the added value brought by an experienced sheepherder, these ranches sometimes ***pay*** these workers ***more*** than the wage offered to domestic sheepherders. Yet these higher payments, through bonuses, are not reflected in either the job

---

[1] *See, e.g., In Re: Overdevest Nurseries,* LP, 2015-TAE-00008 (Feb. 18, 2016) (announcing a fines of hundreds of thousands of dollars for H-2A employers' failure to pay domestic workers the same as H-2A workers), *available at* twtr.to/8Vjz; News Brief, Department of Labor Wage and Hour Division, Vegetable Supplier to Major Grocery Chains Assessed over $1.M in Civil Money Penalties After Two-Year Federal Investigation (May 12, 2016), *available at* twtr.to/FZkx.

THERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thermanbuck.com   www.thermanbuck.com

orders offered to domestic sheepherders at these ranches, nor are they subsequently reflected in the wage surveys conducted by the DOL.

104. These actions constitute a violation of, *inter alia*, 20 C.F.R. § 655.122(a). But they also demonstrate that the WRA's wage-fixing scheme has led to an artificially depressed wage for H-2A sheepherders. All things equal, it would be economically rational for WRA members to pay domestic sheepherders more than H-2A sheepherders, given the costs of transporting the latter to the United States. The fact that some WRA members pay more to H-2A sheepherders than *all* WRA members offer to *all* domestic workers (through the WRA's job orders) indicates that the wages WRA lists in the job orders and subsequent H-2A Applications are below what the market would bear.

105. This illegal practice is also a plainly established practice of the WRA, as discussed below.

### 7. Other Workers Performing the Same Work as H-2A Sheepherders Are Paid Significantly More

106. The WRA and its members' concerted action to suppress wages is all the more evident when one compares the wages of sheepherders in regions dominated by the WRA-led wage-fixing cartel with the wages of sheepherders in regions where the cartel has less influence.

107. Sheepherders outside of regions controlled by the WRA are paid more than sheepherders within the WRA's sphere of influence.

108. This stands to reason—absent the WRA members' wage suppression, sheepherders are better able to negotiate for appropriate wages and to receive fair wage offers commensurate with experience level.

### 8. DOL Sets Only the Minimum Wage, and Ranches are Free to Offer a Higher Wage

109. There is no statute or regulation that prevents ranchers from offering H-2A workers in excess of the minimum wage established by DOL.

110.    To the contrary, DOL has maintained a regulatory policy that explicitly recognizes—and even encourages—offering foreign workers more than the minimum wage established by DOL.

111.    In fact, the WRA acknowledged in comments to the DOL that the AEWR "constitute[s] a wage floor, but many of the H-2A workers have been returning to the same ranches for years or decades and are paid significantly higher amounts than this minimum requirement." This comment exaggerates how frequently WRA members pay H-2A sheepherders above the DOL minimum, but it demonstrates WRA's understanding that its members are allowed to pay more.

112.    This view of the AEWR as a minimum is confirmed by DOL's own interpretation of the regulations. As DOL similarly stated in enacting the current H-2A rules, "[t]he AEWR is the minimum wage rate that agricultural employers seeking nonimmigrant foreign workers must offer to and pay their U.S. and foreign workers." In other words, "[t]he AEWR is a wage floor, and its existence does not prevent the worker from seeking, or the employer from paying, a higher wage." *Temporary Agricultural Employment of H-2A Aliens in the United States*, 75 Fed. Reg. 6,884, 6,891 (Feb. 12, 2010).

113.    Further, in 2015 DOL unequivocally reiterated that principle in the context of H-2A sheepherders, noting that "[t]he terms and conditions of herder employment established in this Final Rule are intended as a floor and not a ceiling." *Temporary Agricultural Employment of H-2A Foreign Workers in the Herding or Production of Livestock on the Range in the United States*, 80 Fed. Reg. 62,958, 62,962 n.9 (Oct. 16, 2015) (codified at 20 C.F.R. pt. 655).

114.    The only requirement when offering in excess of the minimum, of course, is to offer the same salary and benefits to domestic workers that is offered to H-2A workers. On information and belief, if any WRA member ranches offer bonuses, this higher amount is not reflected either in the job orders offered to domestic workers or in subsequent wage surveys performed by DOL to determine how much H-2A sheepherders are in fact paid.

///

THERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com   www.thiermanbuck.com

THERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thermanbuck.com   www.thermanbuck.com

*9.    Effects of the Anti-Competitive Conspiracy on DOL's Wage Determinations*

115.    By agreeing to cap the amount that WRA member ranches offer their sheepherders exactly at or near the minimum DOL wage floor, the members ranches' conspiracy creates an artificial ceiling on wages that would otherwise increase under normal market forces. As a consequence of this wage stagnation, the DOL's wage surveys reflect an artificially low wage for sheepherders. Put differently, absent the WRA's wage-fixing conspiracy, the minimum wages set by DOL would have increased over the years and would today by significantly higher than they currently are.

116.    The unique manner in which DOL determined sheepherder minimum wages—i.e., through the surveys of workers—provided a powerful motive to ranchers to fix wages at the DOL minimum. By agreeing to fix offered wages at the minimum with the knowledge that DOL would rely on surveys of workers to determine new wages, ranches were able to benefit from the stagnation of minimum wage rates. So too would WRA members benefit from paying bonuses to H-2A sheepherders but not reporting them either in domestic job orders or wage surveys.

117.    While wages in other similar industries have continued to rise with normal inflation, the wages for sheepherders had until 2017 remained stagnant, in some cases at less than half of the federal minimum wage for covered workers. Since 2017, they have continued to lag behind the wages of comparable agriculture laborers.

118.    The wage-fixing scheme's downward pressure on the DOL's wage floors, and therefore on the fixed wage, has led to absurdly low wages for sheepherders. When the Industrial Welfare Commission of the State of California examined sheepherder wages in 2000, it determined that "the wages paid to sheepherders may be inadequate to supply the cost of proper living and that the hours and working conditions of sheepherders may be prejudicial to their health and welfare." It then voted to substantially modify the sheepherder exemption from California's minimum wage.

119.    The artificially low level of DOL's H-2A wage floor for sheepherders reflects the success of the WRA's and its members' wage-fixing conspiracy. It also is a primary motive for

THERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thermanbuck.com   www.thermanbuck.com

the continuation of this unlawful scheme, because it continues to artificially depress the legal minimum they are required to pay.

### 10. The WRA's Market Allocation Scheme Contributes to Ongoing Depression of Wages

120.    The WRA divides the market for foreign H-2A sheepherders by assigning them to ranches.

121.    The WRA offers the same wages to all domestic sheepherders in a given State without regard to the differences between the various ranches.

122.    The WRA interviews and hires sheepherders and assigns them to employer ranches without regard to the differences between the various ranches.

123.    Indeed, on information and belief, the WRA requires an employment attestation from its H-2A sheepherders that states that once a sheepherder is placed at a WRA member ranch, that sheepherder will not seek employment elsewhere, including from a competing ranch that could offer a higher wage. On information and belief, this limitation extends beyond the term of the sheepherder's visa.

124.    One such agreement is that the sheepherder "will be assigned to a place of work (ranch) that [the sheepherder] will not be able to change or transfer because [the sheepherder] desire[s] to do so."

125.    Nothing in the relevant regulations authorizes or provides for such naked market division. The WRA is not a joint employer or staffing agency. It is an ongoing contract, combination, or conspiracy among competitors.

126.    On information and belief, WRA members agree not to poach employees from one another, even beyond the prohibition mentioned above and after sheepherders' visa terms expire.

127.    On information and belief, WRA members monitor compliance with this agreement and report violators to the WRA.

128.    On information and belief, this agreement is usually adhered to and, when it is not, the WRA threatens to and indeed sometimes does terminate the membership of violators.

129.   On information and belief, this agreement is ongoing and involves concerted action between the WRA and members, the substantial terms of which were that the WRA would allocate sheepherders among its members, that sheepherders would be prohibited from transferring their place of employment, and that WRA members would not solicit each other's sheepherders even after the visa term expired.

130.   On information and belief, the WRA members discussed these terms at WRA meetings.

### 11.   *The Resulting Restraint of Trade and Antitrust Injuries*

131.   The WRA members' wage-suppression conspiracy has unreasonably restrained trade in the United States labor market for sheepherders generally, as well as in the markets for domestic sheepherders and H-2A sheepherders separately.

132.   With regard to the market for sheepherders generally, the result of this conspiracy is artificially depressed and historically stagnant wages for all sheepherders in the United States. As a consequence, sheepherders working on U.S. sheep ranches are deprived of the reasonable fruits of their labor and there is little incentive for the labor pool to expand.

133.   The WRA's wage-suppression scheme has also artificially depressed the number of domestic sheepherders, who are effectively deprived of their right to work as sheepherders in the domestic labor market because WRA-affiliated ranches know they can obtain cheaper labor through their unlawful scheme.

134.   Ranchers historically have claimed that there is an insufficient supply of domestic sheepherders and, therefore, that they must look to the foreign labor market to recruit workers. While there was a true labor shortage during the Second World War which gave rise to the Bracero program (a precursor to today's H-2A visa program), the dearth of domestic sheepherders today is not the result of an unwilling or incapable workforce; rather, the cause is the WRA members' concerted efforts to suppress wages well below the fair market value of a sheepherders' work.

135.   In this distorted labor market, the WRA's members rely on foreign sheepherders, over whom the ranches can exert substantial and anachronistic control, including through attempts to prevent "runaways" and by abusing employees whose lack of familiarity with English and the

**THERMAN BUCK LLP**
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thermanbuck.com  www.thermanbuck.com

United States legal system renders them less likely to complain about their deplorable working conditions.

**C.      Class Definition**

136.    Plaintiff incorporates by reference all previous paragraphs of this Complaint as if realleged herein.

137.    Pending any modifications necessitated by discovery, the named Plaintiff defines the "Wage Suppression Class" as follows:

ALL PERSONS WHO WORKED OR APPLIED TO WORK AS A SHEEPHERDER FOR THE WRA OR ANY OF THE MEMBER RANCHERS OF THE WRA

138.    The members of the putative class are so numerous that joinder of all potential classes members is impracticable. Plaintiff does not know the exact size of the classes because that information is within the control of the WRA. However, WRA claims to recruit a substantial portion of the roughly 2,000 to 2,500 sheepherders employed in the United States each year.

139.    There are questions of law or fact common to the classes that predominate over any individual issues that might exist. Common questions include, but are not limited to, whether the WRA and its members conspire to suppress sheepherder wages through unlawful agreements not to compete for labor and through the operation of joint ventures that recruit workers and set wages at the minimum required by law.

140.    The class claims asserted by Plaintiff are typical of the claims of all of the potential members of the classes because all potential class members suffered suppressed wages as a consequence of the WRA-led wage fixing and market allocation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because numerous identical lawsuits alleging similar or identical causes of action would not serve the interests of judicial economy.

141.    Plaintiff will fairly and adequately protect and represent the interests of the class. Plaintiff's wages were artificially depressed in the same way that those of all class members were depressed, as a result of the same conspiracy.

THERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thermanbuck.com  www.thermanbuck.com

- 25 -

**THERMAN BUCK LLP**
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com   www.thiermanbuck.com

142.     Plaintiff is represented by counsel experienced in litigation on behalf of low-wage workers and in class actions.

143.     The prosecution of separate actions by the individual potential class members would create a risk of inconsistent or varying adjudications with respect to individual potential class members that would establish incompatible standards of conduct for the WRA's members.

144.     Plaintiff is unaware of any members of the putative classes who are interested in presenting their claims in a separate action.

145.     Plaintiff is unaware of any pending litigation commenced by members of the putative classes concerning the instant controversies.

146.     It is desirable to concentrate this litigation in this forum because many of the WRA's members, as well as Plaintiff and many other class members, are located in or do business in Nevada, and H-2A sheepherders operate exclusively in the Western United States.

147.     This class action will not be difficult to manage due to the uniformity of claims among the class members and the susceptibility of the claims to class litigation and the use of representative testimony and representative documentary evidence.

148.     The contours of the classes will be easily defined by reference to WRA records and government records.

## CAUSES OF ACTION

## COUNT I: HORIZONTAL WAGE-FIXING AGREEMENT

## (RESTRAINT OF TRADE, 15 U.S.C. §§ 1, ET SEQ.)

### Plaintiff and the Wage Suppression Class

149.     Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully re-written herein.

150.     As set forth above, Plaintiff asserts this count on Plaintiff's own behalf and on behalf of all other similarly situated employees pursuant to Fed. R. Civ P. 23(b)(3).

151.     The conduct of the WRA, as described herein, substantially affected interstate and international commerce and caused antitrust injury.

- 26 -

152.    The WRA's members are competitors in the labor market and should be competing with each other to attract the most capable sheepherders. They do not share profits or risk of loss, other than through their agreement to indemnify the WRA for claims related to the wages paid to sheepherders.

153.    But through the collusive conduct described herein, the WRA's members offer all sheepherders wages collectively fixed at or near the minimum required by DOL regulations, with any variance attributable almost entirely to the state in which the ranch is located.

154.    The WRA and its members conspired and agreed to fix the wages offered to sheepherders predominantly at the minimum DOL wage floor. This fixed rate is artificially low, and the fixing of wages through the operation of the WRA amounts to a per se violation of the Sherman Antitrust Act.

155.    The WRA and its members conspired and agreed to fix wages offered to sheepherders at the DOL wage floors through the WRA's filing of (a) job offers for domestic workers, and (b) applications for certifications of H-2A workers that both predominantly offered exactly or nearly the same wage set at exactly the wage floors set by the DOL. The fixing of wages amounts to a per se violation of the Sherman Antitrust Act, and the fixed rate set by the WRA has remained artificially low because it has continually put downward pressure on the DOL's wage surveys and, thus, the basis for the fixed wages the WRA's member ranches pay.

156.    In the alternative, Plaintiff alleges that the WRA's wage-fixing agreement is anticompetitive and illegal under the Rule of Reason. For purposes of the Rule of Reason, the relevant geographic market for the claim alleged in this Count is the United States, and the relevant markets consist of (a) the labor market for animal husbandry workers in the United States; (b) the labor market for sheepherders in the United States; (c) the labor market for domestic sheepherders in the United States; and (d) the labor market for immigrant, H-2A sheepherders in the United States.

157.    The WRA's relevant conduct—wage fixing in its role as a recruiter for its members—unreasonably restrains trade in the sheepherder labor market. The wage fixing is not essential to the H-2A program and has no procompetitive virtues.

THERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thermanbuck.com  www.thermanbuck.com

158.    The WRA and its members' collusive activity had and has the effect of:

- fixing the compensation of sheepherder Plaintiff and the Wage Suppression Class at an artificially low level;

- eliminating, to a substantial degree, competition for sheepherder labor, particularly among potential domestic sheepherders;

- driving certain Class Members and domestic sheepherders from the sheepherder labor market;

- restraining trade in that sheepherders are not able to negotiate their wage rates above the DOL wage floors; and

- restraining trade by artificially lowering the H-2A sheepherder wage floors resulting from the DOL's surveys.

159.    The WRA's unreasonable restraint or restraints of trade have damaged the Plaintiff and the members of the Wage Suppression Class.

160.    As a result, Plaintiff and those similarly situated suffered injuries and are entitled to treble damages, attorneys' fees, and costs as set forth by law.

161.    Plaintiff and those similarly situated are also entitled to injunctive relief to end the wage-fixing scheme, and to force the WRA to take affirmative steps to correct the market.

## COUNT II: HORIZONTAL MARKET ALLOCATION
## (RESTRAINT OF TRADE, 15 U.S.C. §§ 1, ET SEQ.)
### Plaintiff and the Wage Suppression Class

162.    Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully re-written herein.

163.    As set forth above, Plaintiff asserts this count on Plaintiff's own behalf and on behalf of all other similarly situated employees pursuant to Fed. R. Civ P. 23(b)(3).

164.    The conduct of the WRA, as described herein, substantially affected interstate and international commerce and caused antitrust injury.

165.    The horizontal agreement between competitors not to compete for sheepherder labor is a per se violation of the Sherman Act.

THERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thermanbuck.com   www.thermanbuck.com

166.    The WRA's members are competitors in the labor market and absent an unlawful agreement would be competing with each other to attract the most capable sheepherders. They do not share profits or risk of loss, other than through their agreement to indemnify the WRA for claims related to the wages paid to sheepherders.

167.    But through the collusive conduct described herein, the WRA and its members ensure that sheepherders are assigned to specific ranches and the WRA members avoid competing for labor.

168.    The WRA and its members conspired and agreed to avoid competing for labor, coercing sheepherders into agreements which remove sheepherders' ability to negotiate for better wages or wages commensurate with their experience, or to seek employment at other ranches. This market allocation scheme amounts to a per se violation of the Sherman Antitrust Act.

169.    The WRA and its members conspired and agreed to this scheme through the WRA's assignment of sheepherders to ranches and the restraint the WRA places on sheepherders' ability to seek alternate employment. In effect, WRA members have agreed, through the WRA and its policies, not to compete for labor.

170.    The WRA accomplished this agreement, *inter alia*, through its interviewing, hiring, and assigning of shepherds and its stringent prohibitions against sheepherders seeking alternative employment, including, on information and belief, after a sheepherder's visa term expires.

171.    The WRA's members conspire and assent to this conduct through meetings and through membership in the WRA.

172.    In the alternative, Plaintiff alleges that the WRA-led wage-suppression agreement is anticompetitive and illegal under the Rule of Reason. For purposes of the Rule of Reason, the relevant geographic market for the claim alleged in this Count is the United States, and the relevant markets consist of (a) the labor market for animal husbandry workers in the United States; (b) the labor market for sheepherders in the United States; (c) the labor market for domestic sheepherders in the United States; and (d) the labor market for immigrant, H-2A sheepherders in the United States.

THERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thermanbuck.com www.thermanbuck.com

173.   The WRA's relevant conduct—market division in its role as a recruiter for its members—unreasonably restrains trade in the sheepherder labor market. The market division is not essential to the H-2A program and has no procompetitive virtues.

174.   The collusive activity between the WRA and its members had and has the effect of:

- fixing the compensation of sheepherder Plaintiff and the Wage Suppression Class at an artificially low level;
- eliminating, to a substantial degree, competition for foreign sheepherder labor;
- driving certain class members and domestic sheepherders from the sheepherder labor market;
- restraining trade in that sheepherders are not able to negotiate their wage rates above the DOL wage floors; and
- restraining trade by removing incentives for employers to compete for labor, artificially lowering the H-2A sheepherder wage floors resulting from the DOL's surveys.

175.   The WRA's unreasonable restraint of trade has damaged the Plaintiff and the members of the Wage Suppression Class.

176.   As a result, Plaintiff and those similarly situated suffered injuries and are entitled to treble damages, attorneys' fees, and costs as set forth by law.

177.   Plaintiff and those similarly situated are also entitled to injunctive relief to end the market allocation scheme, and to force the WRA to take affirmative steps to correct the market.

**PLAINTIFF DEMANDS A JURY TRIAL**

**PRAYER FOR RELIEF**

178.   WHEREFORE, Plaintiff respectfully requests that judgment be entered in Plaintiff's favor and in favor of those similarly situated as follows:

179.   Certifying and maintaining this action as a class action, with Plaintiff as designated class representatives and with their counsel appointed as class counsel;

180. Declaring the WRA in violation of each of the counts set forth above;

181. Awarding treble damages for antitrust injuries to Plaintiff and those similarly situated;

182. Awarding pre-judgment, post-judgment, and statutory interest;

183. Awarding attorneys' fees;

184. Awarding costs;

185. Ordering equitable relief, including a judicial determination of the rights and responsibilities of the parties;

186. Awarding such other and further relief as the Court may deem just and proper.

Dated: June 1, 2022                     Respectfully Submitted,

                                        THIERMAN BUCK LLP


                                        By: */s/ Leah L. Jones*
                                        MARK R. THIERMAN, ESQ., Nev. Bar No. 8285
                                        mark@thiermanbuck.com
                                        JOSHUA D. BUCK, ESQ., Nev. Bar No. 12187
                                        josh@thiermanbuck.com
                                        LEAH L. JONES, ESQ., Nev. Bar No. 13161
                                        leah@thiermanbuck.com
                                        JOSHUA H. HENDRICKSON, Nev. Bar No. 12225
                                        joshh@thiermanbuck.com
                                        7287 Lakeside Drive
                                        Reno, Nevada 89511
                                        Telephone: (775) 284-1500
                                        Facsimile: (775) 703-5027

                                        FAIRMARK PARTNERS, LLP
                                        JAMIE CROOKS, ESQ.
                                        (*Pro Hac Vice forthcoming*)
                                        jamie@fairmarklaw.com
                                        1825 7th St NW, #821
                                        Washington, DC 20001

                                        TOWARDS JUSTICE
                                        DAVID H. SELIGMAN, ESQ. (*Pro Hac Vice forthcoming*)
                                        NATASHA VITERI, ESQ. (*Pro Hac Vice forthcoming*)
                                        ALEXANDER HOOD, ESQ. (*Pro Hac Vice forthcoming*)

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

david@towardsjustice.org
natasha@towardsjustice.org
alex@towardsjustice.org
2840 Fairfax Street, Suite 220
Denver, CO 80207

***Attorneys for Plaintiff and the Putative Class***

**THERMAN BUCK LLP**
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thermanbuck.com  www.thermanbuck.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28