# EXHIBIT 1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 1

## DECLARATION OF ELLEN JEAN WINOGRAD, ESQ.

I, Ellen Jean Winograd, declare under the penalty of perjury the following:

1. Declarant is an attorney duly licensed to practice in the State of Nevada and is Counsel for Western Range Association in the instant matter. Declarant is general counsel for Western Range Association and was so in 2015, when the putative class action case of *Rafael De La Cruz, Leovegildo Vilchez Guerra, Liber Vilchez Guerra, Esliper Huaman and Rodolfo Llacua, v. Western Range Association, Mountain Plains Agricultural Service, Martin Auza Sheep Corporation, Nottingham Land and Livestock, LLP, Two Bar Sheep Corporation, LLC, Ball Brothers Sheep Company, Estill Ranch, LLC, Cunningham Sheep Company, Dennis Richins dba Dennis Richins Livestock; and Child Ranch, LLC*, Case No. 15-CV-01889 was first filed in the Federal District Court for the District of Colorado.

2. As is evident from a review of the Second Amended Complaint in the *Llacua v. Western Range Association, et al.,* case there were Restraint of Trade, RICO and "wage fixing" claims contained therein. Also evident is the fact that one or more of the attorneys involved in the *Llacua* case is now bringing nearly identical claims in Nevada Federal District Court in the instant matter.

3. The Colorado Federal District Court case in *Llacua v. Western Range et al.*, was dismissed <u>as to Western Range and all other defendants</u>. *See* Magistrate's Recommendation for Order and Order Adopting Recommendation to Dismiss, filed herewith as Exhibits 3 and 4.

4. Plaintiffs appealed the *Llacua* Dismissal to the 10th Circuit Court of Appeals on March 7, 2017, In the case captioned *Rafael De La Cruz, Leovegildo Vilchez Guerra, Liber Vilchez Guerra, Esliper Huaman and Rodolfo Llacua, v. Western Range Association, Mountain Plains Agricultural Service, Martin Auza Sheep Corporation, Nottingham Land and Livestock, LLP, Two Bar Sheep Corporation, LLC, Ball Brothers Sheep Company, Estill Ranches, LLC, Cunningham Sheep Company and Dennis Richins dba Dennis Richins Livestock*, 10th Circuit Docket Number 17-1113. The 10th Circuit Court of Appeals affirmed the dismissal as to Western Range and all but one individual Defendant, specifically on the Restraint of Trade, "wage fixing" claims.

5. All documents attached to Western Range Associations Motion to Dismiss (which are public record or published decision documents) are true and correct copies of the documents they purport to be.

See also Defendant's request that this Court take judicial notice of certain *Llacua* pleadings, filed concurrently with this dismissal motion.

6. Declarant is informed that the former Western Range Executive Director Dennis Richins, referenced in the instant Alvarado Complaint [Doc #1 ¶¶ 86-89] is and all times pertinent hereto was, a resident of the State of Utah. Declarant is informed that Mr. Richins is over 80 years of age.

7. Declarant is informed Western Range has dealings with several Federal and State agencies.

- United States Department of Labor (DOL);
- United States Department of Labor, Wage and Hour Division (DOL-WHD);
- United States Department of Labor, Employment Training Administration (DOL-ETA);
- United States Citizenship and Immigration Services (USCIS);
- United States Department of Immigration and Customs Enforcement (ICE);
- United States Embassies and Consulates;
- Peruvian Embassy;
- United States Homeland Security;
- United States Bureau of Land Management (BLM);
- United States Department of Forestry; and
- Federal Equal Opportunity Employment Commission (EEOC).

8. Declarant is informed that Western Range Association currently has over 100 member ranches in 13 states, including:

- Arizona
- California
- Colorado
- Idaho
- Montana
- Nebraska
- Oklahoma
- Oregon
- South Dakota
- Utah
- Washington
- Wyoming

9. To illustrate that Plaintiff's allegations (dismissed by the Colorado Federal District Court and Affirmed by the Tenth Circuit Court of Appeals) were essentially identical to those alleged in the instant matter *Alavardo v. Western Range Association*, Defendant provides the below chart which dramatically demonstrates that many of the allegations appear to have been simply duplicated, in some cases verbatim, in the *Alvarado* matter, a case which is not within the Tenth Circuit.

| Alvarado v. Western Range Association | Llacua, et al., v. Western Range Association |
|---|---|
| "Under the regulations, before a foreign worker can be imported under an H-2A visa, an employer must first offer the job to domestic workers through State Workforce Agencies. *Id.* § 655.121. Because H-2A visas are only issued for positions that cannot be filled by the domestic labor market, DOL regulations prescribe that employers offer domestic workers "no less than the same benefits, wages, and working conditions that the employer is offering, intends to offer, or will provide to H–2A workers." 20 C.F.R. § 655.122(a)." Alvarado Complaint [Doc #1, ¶ 32] | "Under the regulations, before a foreign worker can be imported under an H-2A visa, an employer must first offer the job to U.S. workers through State Workforce Agencies. *Id.* § 655.121. Because H-2A visas are only issued for positions that cannot be filled by the domestic labor market, DOL regulations prescribe that employers offer domestic workers "no less than the same benefits, wages, and working conditions that the employer is offering, intends to offer, or will provide to H–2A workers." 20 C.F.R. § 655.122(a)." *Llacua SAC ¶ 48* |
| "Additionally, ranchers or membership associations acting on their behalf must offer domestic workers, among other things, "at least the AEWR [Adverse Effect Wage Rate], the prevailing hourly wage rate, the prevailing piece rate, the agreed-upon collective bargaining rate, or the Federal or State minimum wage rate, in effect at the time work is performed, whichever is highest, for every hour or portion thereof worked during a pay period." 20 C.F.R. § 655.122(l)." Alvarado Complaint [Doc #1, ¶ 33] | "Additionally, ranchers or membership associations acting on their behalf must offer, among other things, the "worker at least the AEWR [Adverse Effect Wage Rate], the prevailing hourly wage rate, the prevailing piece rate, the agreed-upon collective bargaining rate, or the Federal or State minimum wage rate, in effect at the time work is performed, whichever is highest, for every hour or portion thereof worked during a pay period." 20 C.F.R. § 655.122(l)." *Llacua SAC ¶ 49* |
| "These job offers to domestic workers are called 'job orders.'" Alvarado Complaint [Doc #1, ¶ 34] | "These job offers to domestic workers are called 'job orders.'" *Llacua SAC ¶ 50* |
| "Only if domestic workers do not accept a position offered through a job order can the employer submit an Application for Temporary Employment Certification (an "H-2A Application") to the DOL for certification." Alvarado Complaint [Doc #1, ¶ 35] | "Only if American workers do not accept a position offered through a job order can the employer submit an Application for Temporary Employment Certification (an "H-2A Application") to the DOL for certification." *Llacua SAC ¶ 51* |

| Alvarado v. Western Range Association | Llacua, et al., v. Western Range Association |
|---|---|
| "The DOL can promulgate exceptions to the H-2A Visa Program, known as "special procedures," for particular agricultural industries." Alvarado Complaint [Doc #1, ¶ 36] | "The DOL can promulgate exceptions to the H-2A Visa Program, known as "special procedures," for particular agricultural industries." *Llacua SAC ¶ 52* |
| "The DOL has implemented special procedures in the sheep and goat herding industries. The DOL implemented one set of special procedures in 2011 that were in effect until November 16, 2015. *See* 76 Fed. Reg. 47,256 (issued Aug. 4, 2011)." Alvarado Complaint [Doc #1, ¶ 37] | "The DOL has implemented special procedures in the sheepherding industry. The DOL implemented one set of special procedures in 2011 that were in effect until November 16, 2015. *See* 76 Fed. Reg. 47,256 (issued Aug. 4, 2011)." *Llacua SAC ¶ 53* |
| "As of November 16, 2015, the wage floor for most H-2A shepherds was raised by the DOL to $1,206.31 per month. *See Labor Certification Process for the Temporary Employment of Aliens in Agriculture in the United States: Adverse Effect Wage Rate for Range Occupations Through 2016,* 80 Fed. Reg. 70840, 70840 (the "2015 Special Procedures") . . . The wage floor can be higher in individual states, such as California, Nevada, and Oregon, based on higher state-level minimum-wage laws…" Alvarado Complaint [Doc #1, ¶ 37] | "As of November 16, 2015, the wage floor for H-2A shepherds was raised by the Department of Labor to $1206.31 per month. *See Labor Certification Process for the Temporary Employment of Aliens in Agriculture in the United States: Adverse Effect Wage Rate for Range Occupations Through 2016,* 80 Fed. Reg. 70,840, 70840 (the "2015 Special Procedures"). This wage floor can be higher in individual states, such as California and Oregon, based on higher state-level minimum-wage laws." *Llacua SAC ¶ 55* |
| "Although "[t]he employer's job offer must offer to U.S. workers no less than the same benefits, wages, and working conditions that the employer is offering, intends to offer, or will provide to H-2A workers," 20 C.F.R. § 655.122(a), the converse is not true: Ranchers are permitted to offer higher wages to the domestic workers in the job orders than they do to H-2A workers in the H-2A Applications." Alvarado Complaint [Doc #1, ¶ 39] | "Although "[t]he employer's job offer must offer to U.S. workers no less than the same benefits, wages, and working conditions that the employer is offering, intends to offer, or will provide to H-2A workers," 20 C.F.R. § 655.122(a), there is no statute, regulation, or special procedure preventing ranchers from offering higher wages to the domestic workers in the job orders than they do to H-2A workers in the H-2A Applications." *Llacua SAC ¶ 57* |
| "Furthermore, although the DOL sets wage floors for sheepherders working on an H-2A visa, there is no statute, regulation, or special procedure preventing ranchers from offering higher wages to those workers…" Alvarado Complaint [Doc #1, ¶ 40] | "Furthermore, although the DOL sets wage floors for foreign H-2A shepherds, there is no statute, regulation, or special procedure preventing ranchers from offering higher wages to some or all foreign shepherds working in the United States on H-2A visas." *Llacua SAC ¶ 58* |

| Alvarado v. Western Range Association | Llacua, et al., v. Western Range Association |
|---|---|
| B. Allegations Regarding the WRA-led Wage Suppression<br>1. WRA, its Member Ranches, and their Collusive Relationship<br>Alvarado Complaint<br>[Doc #1, p. 8] | V. Allegations Regarding Defendants' Wage Fixing<br>Association Defendants, Rancher Defendants, and their Collusive Relationships<br>*Llacua* SAC, p. 13 |
| "The sheep ranching industry is highly concentrated under the WRA and similar associations. In recent years, the WRA hired approximately two thirds of all open range sheepherders on H-2A visas in the United States."<br>Alvarado Complaint<br>[Doc #1, ¶ 42] | "The sheep ranching industry is highly concentrated under Association Defendants. From October 1, 2013, to October 1, 2014, the WRA hired roughly 55% of all open range shepherds hired in the United States. From October 1, 2013, to October 1, 2014, the MPAS hired roughly 36% of all open range shepherds hired in the United States."<br>*Llacua* SAC ¶ 59 |
| "Although ranches compete in the sale of their products, principally meat and wool, the ranches that are members of the WRA have conspired to fix one of their principal costs: sheepherders' wages."<br>Alvarado Complaint<br>[Doc #1, ¶ 43] | "Although ranches compete in the sale of their products, principally meat and wool, the ranches that are members of the WRA and MPAS have conspired to fix one of their principal costs: shepherd wages."<br>*Llacua* SAC ¶ 62 |
| "The WRA's members do not share profits or distribute losses, but through the WRA they collude to fix sheepherder wages at or near precisely the wage floor set by the DOL. They do so through agreements with the WRA and with each other to offer the wage floor to workers instead of bidding for workers in a competitive process."<br>Alvarado Complaint<br>[Doc #1, ¶ 44] | "Rancher Defendants and other members of Association Defendants do not share profits or distribute losses, but through the WRA and MPAS they collude to fix shepherd wages at precisely the wage floor set by the DOL."<br>*Llacua* SAC ¶ 63 |
| "The fixing and suppression of sheepherder wages results in a windfall for WRA members and causes sheepherders to work for shockingly low wages without any meaningful opportunity to bargain for more."<br>Alvarado Complaint<br>[Doc #1, ¶ 46] | "The fixing and suppression of shepherd wages results in a windfall for MPAS and WRA members and causes shepherds to work for shockingly low wages without any opportunity to bargain for more."<br>*Llacua* SAC ¶ 65 |

| Alvarado v. Western Range Association | Llacua, et al., v. Western Range Association |
|---|---|
| "Absent this unreasonable restraint of trade resulting from the wage-fixing conspiracy, the ranchers currently conspiring to fix the wages of sheepherders would compete in the sheepherder labor market, both in their initial hiring of sheepherders under the H-2A program and while sheepherders are on contract in the U.S., to compete for workers who wish to return on future visas. Absent the WRA's scheme, ranches would compete in the labor market for the best sheepherders, and sheepherders would compete in the labor market for the best sheepherding jobs. This competition would put an upward pressure on wages." <br> Alvarado Complaint [Doc #1, ¶ 47] | "Absent this unreasonable restraint of trade resulting from the price fixing conspiracy or conspiracies, the ranchers currently conspiring to fix the wages of shepherds would compete in the shepherd labor market for shepherds. Similarly, absent the price fixing, shepherds would compete in the shepherd labor market for the best sheepherding jobs, putting normal upward pressure on wages." <br> *Llacua* SAC ¶ 66 |
| "With respect to the recruitment of domestic sheepherders, the WRA acts as an illegal combination of competitors." <br> Alvarado Complaint [Doc #1, ¶ 53] | "With respect to the recruitment of domestic shepherds, the WRA and the MPAS each act as illegal combinations of competitors." <br> *Llacua* SAC ¶ 67 |
| "In this role, one of the WRA's principal purposes is to create job orders for and on behalf of its members, including setting the wage its members will offer to the sheepherders the members will employ, both for domestic sheepherders through job orders and for foreign sheepherders through the H-2A visa program." <br> Alvarado Complaint [Doc #1, ¶ 54] | "In this role, among other things, the WRA's and the MPAS's principal purpose is to create job orders for and on behalf of their members." <br> *Llacua* SAC ¶ 68 |

| Alvarado v. Western Range Association | Llacua, et al., v. Western Range Association |
|---|---|
| "With respect to the recruitment of domestic sheepherders, member ranchers of the WRA maintain membership in the organization and enlist its services in preparing job orders. The member ranches knowingly allocate decisions regarding the wages offered to domestic sheepherders to the WRA, which is constituted of competitor ranchers. The ranchers do so with the knowledge that the WRA uses job orders to illegally fix sheepherder wages predominantly at the wage floor in each state."<br>Alvarado Complaint<br>[Doc #1, ¶ 55] | "With respect to the recruitment of domestic shepherds, member ranchers—including Rancher Defendants—maintain membership in the WRA and the MPAS and enlist their services in preparing job orders for the purpose of allocating decisions regarding wages offered to domestic shepherds to associations constituted by competitor ranchers, and with the knowledge that the Association Defendants use job orders to illegally fix shepherd wages at the DOL-set wage floor for each state."<br>*Llacua SAC ¶ 69* |
| "Additionally, these job orders evidence concerted conduct among the WRA and its members to offer to compensate domestic sheepherders at the wage floor set by the DOL for foreign sheepherders—known as the Adverse Effect Wage Rate, or AEWR—or by state minimum wage requirements."<br>Alvarado Complaint<br>[Doc #1, ¶ 56] | "Additionally, these job orders evidence concerted conduct among the WRA and its members and the MPAS and its members to offer domestic shepherds at precisely the wage floor set by the Department of Labor for foreign shepherds."<br>*Llacua SAC ¶ 70* |
| "Based upon a review of recent job orders associated with WRA H-2A Applications, the job orders to U.S workers that preceded these H-2A Applications offered the same wages as the H-2A Applications and therefore offered exactly the DOL H-2A wage floors for each state as a fixed wage to potential U.S. workers."<br>Alvarado Complaint<br>[Doc #1, ¶ 57] | "Based upon a review of the WRA job orders associated with WRA H-2A Applications filed between October 1, 2013 and October 1, 2014, the job orders to U.S. workers that preceded these H-2A Applications offered the same wages as the H-2A Applications and therefore almost always offered exactly the DOL H-2A wage floors for each state as a fixed wage to potential U.S. workers."<br>*Llacua SAC ¶ 71* |

| Alvarado v. Western Range Association | Llacua, et al., v. Western Range Association |
|---|---|
| "In a competitive market, and absent the wage fixing, ranchers would offer through these job orders at the very least a nominally higher wage to U.S. workers than they do H-2A workers to account for the additional cost of bringing an H-2A worker to the U.S. from another country (normally Peru). H-2A workers are more costly to employers because, pursuant to the H-2A regulations, such workers must be paid by their employers for travel to and from the place of recruitment in their home country. But due to the WRA's wage-fixing scheme, that is not true in the job market for foreign sheepherders. Instead, the WRA and its members fix wages for domestic workers predominantly at the DOL-set wage floor for foreign workers, and when those job orders do not result in domestic sheepherders taking the job, the WRA and its members offer the same depressed wage to H-2A sheepherders. This ensures the unavailability of domestic workers and, instead, the open access to a vulnerable labor market at a below-competitive rate. Moreover, it depresses wages across the industry for both foreign and domestic sheepherders. Alvarado Complaint [Doc #1, ¶ 62] | "The irrationality of Defendants' conduct provides further evidence of these conspiracies. In a competitive market, and absent the price fixing, ranchers would offer at the very least a nominally higher wage to U.S. workers than they do H-2A workers to account for the additional cost of bringing an H-2A worker to the country normally from Peru. H-2A workers are more costly to employers because, pursuant to the H-2A regulations, they must be reimbursed by their employers for travel to and from the place of recruitment in their home country. Instead, Defendants fix wages for domestic workers at the DOL-set wage floor for foreign workers to ensure the unavailability of domestic workers and the stagnation of the DOL-set wage floor."

*Llacua* SAC ¶ 80 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| Alvarado v. Western Range Association | Llacua, et al., v. Western Range Association |
|---|---|
| "As discussed above, at the time of the filing, the minimum for most H-2A sheepherders is $1,807.23 per month for most range workers. And, yet, in the absence of the WRA members' combination and agreement to fix sheepherder wages, ranchers would negotiate with available range workers and the average wage would increase to something like the minimum wage for domestic ranch hands, general ranch farmworkers, or closed range herders. All these employees earn substantially more than H-2A sheepherders, and, unlike H-2A sheepherders, these employees receive differing wages commensurate with multiple variables, including skill, job location, experience, and work environment, as would be expected in a competitive labor market." Alvarado Complaint [Doc #1, ¶ 63] | "In most states, the DOL-set wage floor for most H-2A shepherds used to be only $2 to $3 per hour. At the time of the filing of this Second Amended Complaint, it is approximately $4.50 per hour or $1206.30 per month for most workers. And, yet, in the absence of the ranchers' combination or agreement to fix shepherd wages, ranchers would negotiate with available range workers and the average wage would increase to something similar to the minimum wage for domestic ranch hands, general ranch farmworkers, or closed range herders. All of these employees earn substantially more than H-2A shepherds and, unlike H-2A shepherds, these employees receive differing wages commensurate with multiple variables, including skill, job location, experience, and work environment, as would be expected in a competitive labor market." Llacua SAC ¶ 81 |
| "Furthermore, freely negotiated wages would be reflected in the wage surveys upon which the government will rely in setting the wage floor for H-2A range occupations in future years, thus increasing the meager wage floor for H-2A sheepherders." Alvarado Complaint [Doc #1, ¶ 64] | "Furthermore, freely negotiated wages would be reflected in the wage surveys upon which the government will rely in setting a wage floor for foreign laborers in future years, thus increasing the meager wage floor for H-2A shepherds." Llacua SAC ¶ 82 |
| "The WRA sets wages offered to domestic sheepherders at low levels because its members know that if the positions are not filled domestically, they can look to an international market for foreign workers with little to no power to advocate for higher wages or safer working conditions. These workers are willing to work for wages that are aberrational in the U.S. labor market and that, due to the WRA-led conspiracy, are artificially depressed to the bare minimum allowable by law." Alvarado Complaint [Doc #1, ¶ 65] | "Defendants set wages offered to domestic shepherds at low levels because Rancher Defendants know that if the positions are not filled domestically, the Immigration and Nationality Act allows them to look to an international market for vulnerable and desperate immigrants. These immigrants are willing to work for wages that are aberrational in the American labor market and that, for the reasons set out below, Defendants agree to fix at the bare minimum allowable by law." Llacua SAC ¶ 83 |

| Alvarado v. Western Range Association | Llacua, et al., v. Western Range Association |
|---|---|
| "The result of the collusion between WRA members regarding domestic job orders and the wages offered to H-2A sheepherders is the effective wholesale elimination of the domestic sheepherder workforce in regions where the WRA has a significant presence and an artificially depressed wage level for H-2A workers in the industry." <br><br> Alvarado Complaint [Doc #1, ¶ 71] | "Instead, Defendants fix wages for domestic workers at the DOL-set wage floor for foreign workers to ensure the unavailability of domestic workers and the stagnation of the DOL-set wage floor." <br> "By agreeing to a cap on the amount that Defendant ranchers pay their shepherds at exactly the minimum DOL wage floor, the result of Defendants' conspiracy is an artificial ceiling on wages that would otherwise increase under normal market forces. As a consequence of this wage stagnation, the DOL's wage surveys reflect an artificially low wage for shepherds." <br><br> "Because the Defendants' wage fixing has artificially depressed wages in the shepherd labor market, it has also artificially depressed the DOL's wage floors, the very same minimum wage that Defendants rely on in fixing wages paid to their workers." <br><br> *Llacua* SAC ¶¶¶ 80, 102, 103 |
| "With respect to the recruitment of foreign sheepherders, the WRA acts as an illegal combination of competitors." <br> Alvarado Complaint [Doc #1, ¶ 72] | "With respect to the recruitment of foreign shepherds, the WRA and the MPAS each act as illegal combinations of competitors." <br> *Llacua* SAC ¶ 85 |
| "Among other things, one of the principal purposes of the WRA is to file with the DOL H-2A applications on behalf of its members." <br> Alvarado Complaint [Doc #1, ¶ 73] | "Among other things, one of the principal purposes of the WRA and the MPAS is to file H-2A applications on behalf of their members with the DOL." <br> *Llacua* SAC ¶ 86 |
| "With respect to the recruitment of foreign sheepherders, the WRA's members maintain their membership and enlist the organization's services in preparing H-2A applications for the purpose of allocating decisions regarding foreign sheepherder wages to an association constituted of competitor ranchers, and with the knowledge that the WRA uses job orders to fix sheepherder wages illegally at or near the DOL-set wage floor for each state." <br> Alvarado Complaint [Doc #1, ¶ 74] | "With respect to the recruitment of foreign ranchers, member ranchers—including Rancher Defendants—maintain membership in the WRA and the MPAS, and enlist their services in preparing H-2A applications, for the purpose of allocating decisions regarding foreign shepherd wages to associations constituted by competitor ranchers, and with the knowledge that the Association Defendants use job orders to illegally fix shepherd wages at the DOL-set wage floor for each state." <br> *Llacua* SAC ¶ 87 |

| Alvarado v. Western Range Association | Llacua, et al., v. Western Range Association |
|---|---|
| "Additionally, these H-2A Applications evidence concerted conduct among the WRA and its members to predominantly offer foreign sheepherders wages at or near the wage floor set by the DOL for each state." Alvarado Complaint [Doc #1, ¶ 75] | "Additionally, these H-2A Applications evidence concerted conduct among the WRA and its members and the MPAS and its members to pay foreign shepherds exactly the wage floor set by the DOL for each state." *Llacua* SAC ¶ 88 |
| "The DOL releases statistics each year on H-2A utilization. The latest period for which the DOL has released complete annual data runs from October 1, 2020 to September 29, 2021." Alvarado Complaint [Doc #1, ¶ 76] | "The DOL releases statistics each year for the shepherd H-2A program. The latest year for which the DOL has released complete data runs from October 1, 2013 to October 1, 2014." *Llacua* SAC ¶ 89 |
| "In that time period, the WRA submitted on behalf of its members H-2A Applications for approximately 1,400 sheepherders. The vast majority of these WRA H-2A Applications offered at or near the DOL-prescribed H-2A wage floors as the relevant wage term." Alvarado Complaint [Doc #1, ¶ 77] | "In that time period, the WRA submitted, on behalf of its members, H-2A Applications for approximately 1,214 H-2A shepherds. All of these WRA H-2A Applications offered exactly the DOL-prescribed H-2A wage floors as the relevant wage term." *Llacua* SAC ¶ 90 |
| "In the absence of a conspiracy whose members have committed to the scheme, the joint decision by the WRA and its members to always or almost always offer the minimum wage required by law to H-2A sheepherders would be irrational. In a free market, ranchers would negotiate with H-2A sheepherders who would, therefore, receive differing wages commensurate with multiple variables, including skill, job location, experience, and work environment. Each rancher would obtain a sufficient number of sheepherders with the skill and experience that the rancher was willing to pay for in the form of wages." Alvarado Complaint [Doc #1, ¶ 78] | "In the absence of a conspiracy, Defendants' conduct in fixing wages for H-2A shepherds would be irrational. In a free market, ranchers would negotiate with H-2A shepherds who would, therefore, receive differing wages commensurate with multiple variables, including skill, job location, experience, and work environment." *Llacua* SAC ¶ 100 |

| Alvarado v. Western Range Association | Llacua, et al., v. Western Range Association |
|---|---|
| "There is no statute or regulation that prevents ranchers from offering H-2A workers in excess of the minimum wage established by DOL."<br>Alvarado Complaint<br>[Doc #1, ¶ 109] | "Furthermore, although the DOL sets wage floors for foreign H-2A shepherds, there is no statute, regulation, or special procedure preventing ranchers from offering higher wages to some or all foreign shepherds working in the United States on H-2A visas."<br><br>*Llacua* SAC ¶ 58 |
| "By agreeing to cap the amount that WRA member ranches offer their sheepherders exactly at or near the minimum DOL wage floor, the members ranches' conspiracy creates an artificial ceiling on wages that would otherwise increase under normal market forces. As a consequence of this wage stagnation, the DOL's wage surveys reflect an artificially low wage for sheepherders. Put differently, absent the WRA's wage-fixing conspiracy, the minimum wages set by DOL would have increased over the years and would today by significantly higher than they currently are."<br>Alvarado Complaint<br>[Doc #1, ¶ 115] | "By agreeing to a cap on the amount that Defendant ranchers pay their shepherds at exactly the minimum DOL wage floor, the result of Defendants' conspiracy is an artificial ceiling on wages that would otherwise increase under normal market forces. As a consequence of this wage stagnation, the DOL's wage surveys reflect an artificially low wage for shepherds."<br>*Llacua* SAC ¶ 102 |
| "The unique manner in which DOL determined sheepherder minimum wages—i.e., through the surveys of workers—provided a powerful motive to ranchers to fix wages at the DOL minimum. By agreeing to fix offered wages at the minimum with the knowledge that DOL would rely on surveys of workers to determine new wages, ranches were able to benefit from the stagnation of minimum wage rates. So too would WRA members benefit from paying bonuses to H-2A sheepherders but not reporting them either in domestic job orders or wage surveys."<br>Alvarado Complaint<br>[Doc #1, ¶ 116] | "Because the Defendants' wage fixing has artificially depressed wages in the shepherd labor market, it has also artificially depressed the DOL's wage floors, the very same minimum wage that Defendants rely on in fixing wages paid to their workers."<br>*Llacua* SAC ¶ 103 |

| Alvarado v. Western Range Association | Llacua, et al., v. Western Range Association |
|---|---|
| "While wages in other similar industries have continued to rise with normal inflation, the wages for sheepherders had until 2017 remained stagnant, in some cases at less than half of the federal minimum wage for covered workers. Since 2017, they have continued to lag behind the wages of comparable agriculture laborers."<br>Alvarado Complaint<br>[Doc #1, ¶ 117] | "While wages in other similar industries have continued to rise with normal inflation, the wages for shepherds—until recently—were stuck, in some cases at less than half of the federal minimum wage for covered workers."<br>*Llacua* SAC ¶ 104 |
| "The wage-fixing scheme's downward pressure on the DOL's wage floors, and therefore on the fixed wage, has led to absurdly low wages for sheepherders. When the Industrial Welfare Commission of the State of California examined sheepherder wages in 2000, it determined that "the wages paid to sheepherders may be inadequate to supply the cost of proper living and that the hours and working conditions of sheepherders may be prejudicial to their health and welfare." It then voted to substantially modify the sheepherder exemption from California's minimum wage."<br>Alvarado Complaint<br>[Doc #1, ¶ 118] | "The price fixing's downward pressure on the DOL's wage floors, and therefore on the fixed wage, has led to absurdly low wages for shepherds. When the Industrial Welfare Commission of the State of California examined shepherd wages in 2000, it determined that "the wages paid to shepherds may be inadequate to supply the cost of proper living and that the hours and working conditions of shepherds may be prejudicial to their health and welfare." It then voted to remove the shepherd exemption from California's minimum wage."<br>*Llacua* SAC ¶ 105 |
| "The artificially low level of DOL's H-2A wage floor for sheepherders reflects the success of the WRA's and its members' wage-fixing conspiracy. It also is a primary motive for the continuation of this unlawful scheme, because it continues to artificially depress the legal minimum they are required to pay."<br>Alvarado Complaint<br>[Doc #1, ¶ 119] | "The stagnation of DOL's H-2A wage floor represents both a motive for Defendants' wage fixing and one of the market distortions resulting from Defendants' wage-fixing conspiracies in a highly regulated labor market."<br>*Llacua* SAC ¶ 106 |

| Alvarado v. Western Range Association | Llacua, et al., v. Western Range Association |
|---|---|
| "The WRA members' wage-suppression conspiracy has unreasonably restrained trade in the United States labor market for sheepherders generally, as well as in the markets for domestic sheepherders and H-2A sheepherders separately."<br><br>Alvarado Complaint [Doc #1, ¶ 131] | "Defendants' wage-fixing conspiracy has artificially restrained trade in the United States labor market for shepherds, generally, as well as in the markets for domestic shepherds and H-2A shepherds separately."<br><br>*Llacua* SAC ¶ 107 |
| "With regard to the market for sheepherders generally, the result of this conspiracy is artificially depressed and historically stagnant wages for all sheepherders in the United States. As a consequence, sheepherders working on U.S. sheep ranches are deprived of the reasonable fruits of their labor and there is little incentive for the labor pool to expand."<br>Alvarado Complaint [Doc #1, ¶ 132] | "With regard to the market for shepherds generally, the result of Defendants' conspiracies is suppressed, stagnated wages for all shepherds in the United States. As a consequence, shepherds working on U.S. sheep ranches are deprived of the normal fruits of their labor and have very little incentive to become better shepherds."<br>*Llacua* SAC ¶ 108 |
| "The WRA's wage-suppression scheme has also artificially depressed the number of domestic sheepherders, who are effectively deprived of their right to work as sheepherders in the domestic labor market because WRA-affiliated ranches know they can obtain cheaper labor through their unlawful scheme."<br>Alvarado Complaint [Doc #1, ¶ 133] | "The fixed wages entice relatively few domestic shepherds, who are effectively deprived of their right to work as shepherds in the domestic labor market."<br>*Llacua* SAC ¶ 109 |
| "Ranchers historically have claimed that there is an insufficient supply of domestic sheepherders and, therefore, that they must look to the foreign labor market to recruit workers. While there was a true labor shortage during the Second World War which gave rise to the Bracero program (a precursor to today's H-2A visa program), the dearth of domestic sheepherders today is not the result of an unwilling or incapable workforce; rather, the cause is the WRA members' concerted efforts to suppress wages well below the fair market value of a sheepherders' work."<br>Alvarado Complaint [Doc #1, ¶ 134] | "Ranchers historically have claimed that there is an insufficient supply of domestic shepherds and, therefore, that they must look to the foreign labor market to recruit workers. While there was a true labor shortage during the Second World War which gave rise to the Bracero program (a precursor to today's H-2A visa program), the dearth of domestic shepherds today is not the result of an unwilling or incapable workforce, but rather the Defendants' concerted efforts to suppress wages below the fair market value of the shepherds' work."<br>*Llacua* SAC ¶ 110 |

| Alvarado v. Western Range Association | Llacua, et al., v. Western Range Association |
|---|---|
| "In this distorted labor market, the WRA's members rely on foreign sheepherders, over whom the ranches can exert substantial and anachronistic control, including through attempts to prevent "runaways" and by abusing employees whose lack of familiarity with English and the United States legal system renders them less likely to complain about their deplorable working conditions."<br>Alvarado Complaint<br>[Doc #1, ¶ 135] | "In this distorted labor market, Defendants rely on foreign shepherds, over whom Defendants can exert substantial and even anachronistic control, including by preventing "runaways" and abusing employees whose lack of familiarity with English and the United States legal system renders less likely to complain about their deplorable working conditions."<br>Llacua SAC ¶ 111 |
| "Pending any modifications necessitated by discovery, the named Plaintiff defines the "Wage Suppression Class" as follows:<br><br>ALL PERSONS WHO WORKED OR APPLIED TO WORK AS A SHEEPHERDER FOR THE WRA OR ANY OF THE MEMBER RANCHERS OF THE WRA."<br>Alvarado Complaint<br>[Doc #1, ¶ 137] | "Pending any modifications necessitated by discovery, the named Plaintiffs define the "WRA Price Fixed Class" as follows:<br><br>ALL PERSONS WHO WORKED OR APPLIED TO WORK AS A SHEPHERD FOR THE WRA OR ANY OF THE WRA MEMBER RANCHERS BEGINNING ON 9/1/11."<br>Llacua SAC ¶ 162 |
| "The members of the putative class are so numerous that joinder of all potential classes members is impracticable. Plaintiff does not know the exact size of the classes because that information is within the control of the WRA. However, WRA claims to recruit a substantial portion of the roughly 2,000 to 2,500 sheepherders employed in the United States each year."<br>Alvarado Complaint<br>[Doc #1, ¶ 138] | "The members of the putative class are so numerous that joinder of all potential classes members is impracticable. Plaintiffs do not know the exact size of the classes because that information is within the control of the Defendants. However, WRA and the MPAS claim to recruit "nearly all" of the roughly 2000 to 2500 shepherds employed in the United States each year."<br>Llacua SAC ¶ 164 |
| "There are questions of law or fact common to the classes that predominate over any individual issues that might exist. Common questions include, but are not limited to, whether the WRA and its members conspire to suppress sheepherder wages through unlawful agreements not to compete for labor and through the operation of joint ventures that recruit workers and set wages at the minimum required by law."<br>Alvarado Complaint<br>[Doc #1, ¶ 139] | "There are questions of law or fact common to the classes that predominate over any individual issues that might exist. Common questions include, but are not limited to whether the WRA and the MPAS and their respective members fix shepherd wages through the operation of joint ventures that recruit workers and set wages."<br>Llacua SAC ¶ 165 |

| Alvarado v. Western Range Association | Llacua, et al., v. Western Range Association |
|---|---|
| "The class claims asserted by Plaintiff are typical of the claims of all of the potential members of the classes because all potential class members suffered suppressed wages as a consequence of the WRA-led wage fixing and market allocation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because numerous identical lawsuits alleging similar or identical causes of action would not serve the interests of judicial economy." Alvarado Complaint [Doc #1, ¶ 140] | "The class claims asserted by Plaintiffs are typical of the claims of all of the potential members of the classes because all potential class members suffered suppressed wages as a consequence of Defendants' price fixing. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because numerous identical lawsuits alleging similar or identical causes of action would not serve the interests of judicial economy." *Llacua SAC ¶ 166* |
| "Plaintiff will fairly and adequately protect and represent the interests of the class. Plaintiff's wages were artificially depressed in the same way that those of all class members were depressed, as a result of the same conspiracy." Alvarado Complaint [Doc #1, ¶ 141] | "Plaintiffs will fairly and adequately protect and represent the interests of the class. Plaintiffs' wages were artificially kept at the same low level as other shepherds as a result of the same conspiracy." *Llacua SAC ¶ 167* |
| "Plaintiff is represented by counsel experienced in litigation on behalf of low-wage workers and in class actions." Alvarado Complaint [Doc #1, ¶ 142] | "Plaintiffs are represented by counsel experienced in litigation on behalf of low-wage workers and in class actions." *Llacua SAC ¶ 168* |
| "The prosecution of separate actions by the individual potential class members would create a risk of inconsistent or varying adjudications with respect to individual potential class members that would establish incompatible standards of conduct for the WRA's members." Alvarado Complaint [Doc #1, ¶ 143] | "The prosecution of separate actions by the individual potential Class Members would create a risk of inconsistent or varying adjudications with respect to individual potential Class Members that would establish incompatible standards of conduct for Defendants." *Llacua SAC ¶ 169* |
| "Plaintiff is unaware of any members of the putative classes who are interested in presenting their claims in a separate action." Alvarado Complaint [Doc #1, ¶ 144] | "Plaintiffs are unaware of any members of the putative classes who are interested in presenting their claims in a separate action." *Llacua SAC ¶ 170* |

| Alvarado v. Western Range Association | Llacua, et al., v. Western Range Association |
|---|---|
| "Plaintiff is unaware of any pending litigation commenced by members of the putative classes concerning the instant controversies."<br>Alvarado Complaint<br>[Doc #1, ¶ 145] | "Plaintiffs are unaware of any pending litigation commenced by members of the putative classes concerning the instant controversies."<br>*Llacua* SAC ¶ 171 |
| "It is desirable to concentrate this litigation in this forum because many of the WRA's members, as well as Plaintiff and many other class members, are located in or do business in Nevada, and H-2A sheepherders operate exclusively in the Western United States."<br>Alvarado Complaint<br>[Doc #1, ¶ 146] | "It is desirable to concentrate this litigation in this forum because many of the Defendants and Plaintiffs are located in, or do business in, Colorado and H-2A shepherds operate exclusively in the western United States."<br>*Llacua* SAC ¶ 172 |
| "This class action will not be difficult to manage due to the uniformity of claims among the class members and the susceptibility of the claims to class litigation and the use of representative testimony and representative documentary evidence."<br>Alvarado Complaint<br>[Doc #1, ¶ 147] | "This class action will not be difficult to manage due to the uniformity of claims among the Class Members and the susceptibility of the claims to class litigation and the use of representative testimony and representative documentary evidence."<br><br>*Llacua* SAC ¶ 173 |
| "The contours of the classes will be easily defined by reference to WRA records and government records."<br>Alvarado Complaint<br>[Doc #1, ¶ 148] | "The contours of the classes will be easily defined by reference to Defendants' records and government records."<br>*Llacua* SAC ¶ 174 |
| **CAUSES OF ACTION**<br>**COUNT I: HORIZONTAL WAGE-FIXING AGREEMENT**<br>**(RESTRAINT OF TRADE, 15 U.S.C. §§ 1, ET SEQ.)**<br>Alvarado Complaint<br>[Doc #1, p. 26 ] | **COUNT I: RESTRAINT OF TRADE IN VIOLATION OF 15 U.S.C. §§ 1 *ET SEQ.***<br>*Llacua*, SAC, p. 42 |
| "The conduct of the WRA, as described herein, substantially affected interstate and international commerce and caused antitrust injury."<br>Alvarado Complaint<br>[Doc #1, ¶ 151] | "The conduct of the Defendants, as described herein, substantially affected interstate and international commerce and caused antitrust injury."<br>*Llacua* SAC ¶ 217 |

| Alvarado v. Western Range Association | Llacua, et al., v. Western Range Association |
|---|---|
| "The WRA's members are competitors in the labor market and should be competing with each other to attract the most capable sheepherders. They do not share profits or risk of loss, other than through their agreement to indemnify the WRA for claims related to the wages paid to sheepherders." Alvarado Complaint [Doc #1, ¶ 152] | "Defendant ranchers are competitors in the industry and should be competing with each other to attract the most capable shepherds." "They do not share profits or risk of loss." *Llacua SAC* ¶¶ 218, 219 |
| "But through the collusive conduct described herein, the WRA's members offer all sheepherders wages collectively fixed at or near the minimum required by DOL regulations, with any variance attributable almost entirely to the state in which the ranch is located." Alvarado Complaint [Doc #1, ¶ 153] | "But, through collusive conduct, they offer all shepherds price-fixed wages that vary solely based on the state in which the ranch is located." *Llacua SAC* ¶ 220 |
| "The WRA and its members conspired and agreed to fix the wages offered to sheepherders predominantly at the minimum DOL wage floor. This fixed rate is artificially low, and the fixing of wages through the operation of the WRA amounts to a per se violation of the Sherman Antitrust Act." Alvarado Complaint [Doc #1, ¶ 154] | "The WRA, the MPAS, and their members, including Defendant Ranchers, conspired and agreed to fix the wages offered and paid to shepherds at the minimum DOL wage floor. This fixed rate is artificially low, and the fixing of wages through the operation of Defendant membership associations, the WRA and the MPAS, amounts to a *per se* violation of the Sherman Antitrust Act." *Llacua SAC* ¶ 222 |
| "The WRA and its members conspired and agreed to fix wages offered to sheepherders at the DOL wage floors through the WRA's filing of (a) job offers for domestic workers, and (b) applications for certifications of H-2A workers that both predominantly offered exactly or nearly the same wage set at exactly the wage floors set by the DOL. The fixing of wages amounts to a per se violation of the Sherman Antitrust Act, and the fixed rate set by the WRA has remained artificially low because it has continually put downward pressure on the DOL's wage surveys and, thus, the basis for the fixed wages the WRA's member ranches pay." Alvarado Complaint [Doc #1, ¶ 155] | "The WRA and its members conspired and agreed to fix wages offered and paid to shepherds at the DOL wage floors through the WRA's filing of (a) job offers for domestic workers, and (b) applications for certifications of H-2A workers that both offered exactly the same wage set at exactly the wage floors set by the DOL. The fixing of wages amounts to a *per se* violation of the Sherman Antitrust Act, and the fixed rate set by Defendants has remained artificially low because it has continually put downward pressure on the DOL's wage surveys and, thus, the basis for Defendants' price-fixed wages." *Llacua SAC* ¶ 224 |

| Alvarado v. Western Range Association | Llacua, et al., v. Western Range Association |
|---|---|
| "In the alternative, Plaintiff alleges that the WRA's wage-fixing agreement is anticompetitive and illegal under the Rule of Reason. For purposes of the Rule of Reason, the relevant geographic market for the claim alleged in this Count is the United States, and the relevant markets consist of (a) the labor market for animal husbandry workers in the United States; (b) the labor market for sheepherders in the United States; (c) the labor market for domestic sheepherders in the United States; and (d) the labor market for immigrant, H-2A sheepherders in the United States." Alvarado Complaint [Doc #1, ¶ 156] | "In the alternative, Plaintiffs allege that the Defendants' price-fixing agreement is anticompetitive and illegal under the Rule of Reason. For purposes of the Rule of Reason, the relevant geographic market for the claim alleged in this Count is the United States, and the relevant markets consist of (a) the labor market for shepherds in the United States; (b) the labor market for domestic shepherds in the United States; and (c) the labor market for immigrant, H-2A shepherds in the United States." Llacua SAC ¶ 226 |
| "The WRA's relevant conduct—wage fixing in its role as a recruiter for its members—unreasonably restrains trade in the sheepherder labor market. The wage fixing is not essential to the H-2A program and has no procompetitive virtues." Alvarado Complaint [Doc #1, ¶ 157] | "The WRA's and MPAS's relevant conduct—price fixing in their role as a recruiter for their members—unreasonably restrains trade in the shepherd labor market. The price fixing is not essential to the H-2A program and has no procompetitive virtues." Llacua SAC ¶ 227 |
| "The WRA and its members' collusive activity had and has the effect of: • fixing the compensation of sheepherder Plaintiff and the Wage Suppression Class at an artificially low level; • eliminating, to a substantial degree, competition for sheepherder labor, particularly among potential domestic sheepherders; • driving certain Class Members and domestic sheepherders from the sheepherder labor market; • restraining trade in that sheepherders are not able to negotiate their wage rates above the DOL wage floors; and • restraining trade by artificially lowering the H-2A sheepherder wage floors resulting from the DOL's surveys." Alvarado Complaint [Doc #1, ¶ 158] | "Defendants' collusive activity had and has the effect of – (a) fixing the compensation of shepherd Plaintiffs and the Price Fixed Class at an artificially low level; (b) eliminating, to a substantial degree, competition for shepherd labor, particularly among potential domestic shepherds; (c) driving Plaintiffs and other workers from the shepherd labor market; (d) restraining trade in that shepherds are not able to negotiate their wage rates above the DOL wage floors; and (e) restraining trade by artificially lowering the H-2A shepherd wage floors resulting from the DOL's surveys." Llacua SAC ¶ 227 |

DECLARATION OF ELLEN JEAN WINOGRAD IN
SUPPORT OF MOTION TO DISMISS PLAINTIFF'S
COMPLAINT OR IN THE ALTERNATIVE MOTION
TO TRANSFER VENUE (Signature Page)

Case No. 3:22-cv-00249-MMD-CLB

Declarant further sayeth not.

DATED this ___*16*___ day of August, 2022.

_Ellen Jean Winograd_
ELLEN JEAN WINOGRAD, ESQ.