# EXHIBIT 2

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-1889-REB-CBS

RODOLFO LLACUA, *et al.,*

          Plaintiffs,

v.

WESTERN RANGE ASSOCIATION, *et al.,*

          Defendants.

---

RECOMMENDATION ON DEFENDANTS' MOTIONS TO DISMISS THE SECOND
AMENDED COMPLAINT

---

Craig B. Shaffer, Magistrate Judge

This case comes before the court on six motions[1] to dismiss the Plaintiffs' Second

Amended Complaint (Doc. 73) (the "SAC"). Judge Robert E. Blackburn referred the motions to

this Magistrate Judge for a recommendation pursuant to 28 U.S.C. § 636(c) and D.C. COLO.

LCivR 72.2. All Defendants move to dismiss pursuant to Federal Rule of Civil Procedure

12(b)(6) for failure to state a claim.[2] Plaintiffs oppose the motions.[3] On April 1, 2016, the court

---

[1] *See* Defendant Martin Auza Sheep Company ("Auza")'s motion to dismiss and reply (Doc. 83,
106); Defendant Cunningham Sheep Company ("Cunningham")'s motion and reply (Doc. 86,
104); Defendant Western Range Association ("WRA")'s motion and reply (Doc. 87, 107);
Defendant Nottingham Land and Livestock, LLLP ("Nottingham") and Two Bar Sheep Co.,
LLC ("Two Bar")'s motion and reply (Doc. 88, 108); Defendant Dennis Richins d/b/a Dennis
Richins Livestock ("Richins")'s motion and reply (Doc. 89, 109). Defendant Mountain Plains
Agricultural Service ("MPAS")'s motion and reply (Doc. 91, 105). Mr. Richins' briefs were
filed with three other ranches whom Plaintiffs subsequently dismissed without prejudice: Ball
Brothers Sheep Company; Child Ranch, LLC; and Estill Ranches, LLC. Doc. 116.
[2] At oral argument, Richins waived his motions regarding personal jurisdiction and venue under
Rule 12(b)(2) and (3). Richins did not waive his Rule 12(b)(7) argument for failure to join an

1

heard oral argument and took the motions under advisement.

Based on the analysis that follows, this court concludes that Plaintiffs do not plausibly allege federal antitrust and civil racketeering claims under 15 U.S.C. § 1 and 18 U.S.C. § 1964(c), respectively. The court therefore recommends dismissing with prejudice Plaintiffs' federal law claims (Counts I-V). The court further recommends that the district court decline to exercise supplemental jurisdiction over Plaintiffs' state law claims and dismiss those claims (Counts VI-VIII) without prejudice. 28 U.S.C. § 1367(c)(3).

## I.      STATEMENT OF THE CASE

The court draws the following allegations and regulatory background from the SAC.

Five named Plaintiffs bring this lawsuit: Messrs. Llacua, Huaman, Leovegildo Vilchez Guerra, [4] Liber Vilchez Guerra, and De La Cruz. SAC ¶¶ 16-20. They assert claims on behalf of themselves and, pursuant to Federal Rule of Civil Procedure 23, on behalf of those similarly situated in several classes. SAC ¶¶ 16-20 (identifying the named plaintiffs), 160-214 (class action allegations). Each of the named Plaintiffs alleges that he is "originally from Peru" and worked as an "H-2A shepherd." *Id.* ¶¶ 16-20.

Plaintiffs assert claims against (a) two associations, Western Range Association ("WRA") and Mountain Plains Agricultural Service ("MPAS") (referred to collectively as the "Association Defendants)" that represent ranches, in among other things, recruiting and

---

indispensable party, but given its conclusion on the Rule 12(b)(6) arguments, the court does not reach that issue.

[3] Plaintiffs filed a combined response (Doc. 96) opposing all of the motions to dismiss. The court permitted Plaintiffs to surreply (Doc. 115), and Plaintiffs filed two notices of supplemental authority (Docs. 110, 118).

[4] The SAC generally identifies one of the plaintiffs as Leovegildo Vilchez Guerra (SAC caption, ¶¶ 146-148) but elsewhere as Leovegildo Vilchez. *Id.* ¶ 18. For purposes of this ruling, the court assumes that the latter is a typographical error.

employing shepherds, (b) five ranches referred to collectively as the "Rancher Defendants,"[5] and (c) the Individual Defendant, Dennis Richins, whom Plaintiffs also sue in his former capacity as executive director for one of the Association Defendants.[6]  SAC ¶¶ 16-33.  Plaintiffs bring federal claims under the Sherman Act 15 U.S.C. § 1, the Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. § 1964(c), and several claims under state laws.

A.    *Federal Regulatory Background*

According to Plaintiffs, H-2A shepherds are foreign shepherds permitted to work in the United States under temporary H-2 visas authorized by the United States Department of Labor ("DOL").  *Id.* ¶¶ 4, 44-58.  "The H-2A Visa Program is an agricultural guest worker visa program administered by the DOL that allows for the issuance of work visas to foreign workers to fill positions that employers cannot fill through the domestic labor market."  *Id.* ¶ 44.  The regulations require employers to "offer domestic workers 'no less than the same benefits, wages, and working conditions that the employer is offering, intends to offer, or will provide to H-2A workers."  *Id.* ¶ 48 (quoting 20 C.F.R. § 655.122(a)).

The employer must offer the "worker at least the AEWR [Adverse Effect Wage rate], the prevailing hourly wage rate … or the Federal or State minimum wage rate, in effect at the time work is performed, whichever is highest, for every hour or portion thereof worked during a pay period."  *Id.* ¶ 49 (quoting 20 C.F.R. § 655.122(l)).  For convenience, the court will refer to the rate required in 20 C.F.R. § 655.122(l) as the minimum wage.

---

[5] The Rancher Defendants are Defendants Auza, Cunningham, Nottingham, Two Bar, and Richins.
[6] Plaintiffs sue Defendant Dennis Richins d/b/a Dennis Richins Livestock as a Rancher Defendant for purposes of antitrust claims (SAC ¶ 34, Counts I, II) and as the former executive director, board member, and president of WRA for purposes of their civil RICO claim.  *Id.* ¶¶ 112-115, Count IV.

The Plaintiffs refer to the job offers extended to domestic workers as "job orders." *Id.* ¶ 50. Plaintiffs attach to the SAC copies of several job orders. *See, e.g.,* Doc. 73-2 through 73-4, and in part, 73-7 through 73-9 (Exs. A, B, in part Ex. E to SAC). If no domestic workers accept a job order, the employer submits an H-2A application for the DOL to certify. *Id.* ¶¶ 51, 56. Plaintiffs attach to the SAC copies of several H-2A applications. Doc. 73-5 through 73-6, and in part 73-7 through 73-9 (Exs. C, D, in part Ex. E to SAC).

According to Plaintiffs, "[t]he DOL can promulgate exceptions to the H-2A Visa Program, known as "special procedures," for particular agricultural industries. … The DOL has implemented special procedures in the sheepherding industry." SAC ¶¶ 52, 53. Plaintiffs further allege that

> [t]he DOL implemented one set of special procedures in 2011 that were in effect until November 16, 2015. See 76 Fed. Reg. 47,256 (issued Aug. 4, 2011).
>
> Prior to November 16, 2015, the wage floor established by DOL was as follows:

| State(s) | Wage Floor ($/Month) |
|---|---|
| Colorado, Idaho, Montana, New Mexico, North Dakota, Oklahoma, Texas, Utah, and Wyoming | $750 |
| Arizona and Washington | $750 |
| Nevada | $800 |
| California | $1,422.55 |
| Oregon | $1,277 |

> As of November 16, 2015, the wage floor for H-2A shepherds was raised by the Department of Labor to $1206.31 per month. See Labor Certification Process for the Temporary Employment of Aliens in Agriculture in the United States: Adverse Effect Wage Rate for Range Occupations Through 2016, 80 Fed. Reg. 70,840, 70840 (the "2015 Special Procedures"). This wage floor can be higher in individual states, such as California and Oregon, based on higher state-level minimum-wage laws.

SAC ¶¶ 53-55.

The District Court for the District of Columbia recently recounted the litigation history

that led to this change in the DOL's minimum wage for shepherds:

> [O]n October 7, 2011, a group of Americans, who were formerly open-range agricultural workers, brought an action against the United States Secretary of Labor and United States Department of Labor ("DOL"), challenging the validity of two Training and Employment Guidance Letters ("TEGLs") issued in 2011 for failing to comply with the notice-and-comment requirements of the Administrative Procedural Act ("APA"), 5 U.S.C. § 553.  *Mendoza v. Solis,* 924 F. Supp. 2d 307, 310 (D.D.C. 2013).  These TEGLs provide special procedures for hiring foreign temporary workers on general agricultural H–2A visas to work as cattle, goat and sheep herders on the open range on terms intended to avoid adversely affecting the wages and working conditions of U.S. workers similarly employed.  Almost three years later, the D.C. Circuit reversed this Court's finding that the plaintiffs lacked standing and, on the merits, held that the 2011 TEGLs were subject to the APA's notice-and-comment requirements and, thus, were procedurally invalid.  *Mendoza v. Perez,* 754 F.3d 1002, 1024 (D.C.Cir. 2014).  On remand, this Court entered a remedial order, directing the government to promulgate a new rule according to notice-and comment procedures and, with the consent of all parties, required vacatur of the invalid 2011 TEGLS upon the effective date of the new rule. *Mendoza v. Perez,* 72 F. Supp. 3d 168, 175 (D.D.C. 2014) ("Remedial Order").
>
> * * *
>
> The challenged component of the 2011 Sheepherder TEGL outlines the methodology to be used by DOL in determining the minimum offered wage rate required for DOL's certification of employer applications for H–2A visas for foreign sheep and goatherders.  This methodology is entirely changed in a new rule, which was published on October 16, 2015, and becomes effective on November 16, 2015.  *See* Temporary Agricultural Employment of H–2A Foreign Workers in the Herding or Production of Livestock on the Range in the United States ("2015 Rule"), 80 Fed. Reg. 62,958 (Oct. 16, 2015) (to be codified at 20 CFR pt 655).  Under this new rule, the new monthly prevailing wage rate will be phased in over two years and will be determined by using the base federal minimum wage of $7.25 per hour, multiplied by 48 hours per week, multiplied by 4.333 weeks in a month, multiplied by 80% for the first year, resulting in a new monthly wage of $1206.31 as of the effective date.  2015 Rule, 80 Fed. Reg. at 63,014 n.62.

*Hispanic Affairs Project v. Perez,* No. CV 15-CV-01562 (BAH), -- F. Supp. 3d --, 2015 WL

6692192, at *1-2 (D.D.C. Oct. 31, 2015) (note omitted; denying preliminary injunction).

B.      *The Defendants.*

1.      The Association Defendants: WRA and MPAS.

WRA and MPAS, the Association Defendants, are membership associations for sheep ranchers. SAC ¶ 3. WRA and MPAS recruit and hire shepherds for their member ranches. *Id.* ¶¶ 22-23, 59. WRA characterizes itself as a joint employer on job orders and H-2A Applications. *See, e.g.,* Doc. 73-2 at 9, 15, 16 (job order by "Western Range Association a joint employer," for work sites referencing the list of member ranches for whom WRA filed the job order); Doc. 73-5 at 14 (WRA filed H-2A application as employer). MPAS characterizes itself as an agent for its member ranches. *See, e.g.,* Doc. 73-2 at 2, 7 (describing Auza Ranches UC as the employer and MPAS as agent); Doc. 73-5 at 3-4 (MPAS filed H-2A application as agent). The DOL expressly contemplates that "agents" and "associations acting as agent" can file job orders ("Agricultural and Food Processing Clearance Order ETA Form 790") and H-2A applications on behalf of employers. *See, e.g.,* Doc. 73-2 at 2 (job order at block 1); Doc. 73-5 at 4 (H-2A application at block E.1).

Plaintiffs specifically focus on WRA and MPAS' recruitment and hiring of "open range" shepherds. *Id.* ¶ 59. *See also Id.* ¶ 38 ("All of the Rancher Defendants produce sheep on the open range"); ¶ 39 ("most sheep raised on the open range are moved to feedlots for finishing, and … the major sheep feedlots … are … in Colorado"). Plaintiffs contrast this to "closed range" herders, who "earn substantially more than H-2A shepherds and … receive differing wages commensurate with multiple variables." *Id.* ¶ 81. "From October 1, 2013, to October 1, 2014, the WRA hired roughly 55% of all open range shepherds hired in the United States. From October 1, 2013, to October 1, 2014, the MPAS hired roughly 36% of all open range shepherds hired in the United States." *Id.* ¶ 59.

WRA and MPAS submitted job orders to DOL for domestic workers on behalf of the Rancher Defendants. *See, e.g.,* Doc. 73-2, 73-3, 73-4 (SAC Exhibits A, B, C); 73-7 (Ex. E in part, at 11-50). WRA and MPAS also submitted H-2A applications to DOL on behalf of the Rancher Defendants. Doc. 73-5, 73-6, 73-7 (at 1-10), 73-8 (at 46-50), 73-9.

2.      The Five Rancher Defendants.

Plaintiffs sue five ranches whom they allege are or were members of WRA or MPAS within the four years prior to the original complaint. SAC ¶ 35. According to the allegations, the Rancher Defendants are located in several states: Auza is in Arizona and California (*Id.* ¶ 25); Cunningham is in Oregon (*Id.* ¶ 30); Nottingham is in Colorado (*Id.* ¶ 26); Two Bar is in Colorado (*Id.* ¶ 27) and Richins is in Utah (*Id.* ¶ 31). Plaintiffs allege all of the Rancher Defendants sent their sheep to Colorado for "finishing."

Except as to Richins, Plaintiffs do not allege any facts that distinguish the Rancher Defendants from other members of WRA and/or MPAS whom Plaintiffs have not sued here.[7] For instance, Plaintiffs allege that they were each a "WRA employee," or in the case of Mr. De La Cruz an "MPAS employee," (SAC ¶¶ 16-20), but Plaintiffs do not identify the ranches for whom they worked. As noted above, Plaintiffs sue Richins as both a member of WRA and as a former executive director, board member and president of WRA. *Id.* ¶¶ 32, 113-114. After identifying each of the Rancher Defendants (SAC ¶¶ 25-33), the remainder of the SAC refers to these Defendants collectively.

---

[7] Plaintiffs do not allege how many members belong to WRA or MPAS, but the SAC recognizes that there are many more member ranches than the five that Plaintiffs are suing. *See, e.g.*, SAC ¶ 78 (alleging WRA job order for 18 member ranches); Doc. 73-3 at 24-26; Doc. 73-4 at 8-10; Doc. 73-9 at 6 (WRA job orders and H-2A applications that reflect numerous member ranches). Plaintiffs also allege that collectively the Association Defendants "claim to recruit 'nearly all' of the roughly 2000 to 2500 shepherds employed in the United States each year." SAC ¶ 164.

Plaintiffs further allege that the Rancher Defendants are directly or indirectly members of

another, non-party trade association, American Sheep Industry Association ("ASI") ( SAC ¶ 36)

and this "provide[s] ranchers with frequent opportunities to communicate about issues regarding

the employment of shepherds." SAC ¶¶ 37, 61. In opposing the motions, Plaintiffs do not

appear to rely on the allegations relating to ASI membership.

## II.    ANALYSIS

Rule 12(b)(6) states that a court may dismiss a complaint for "failure to state a claim

upon which relief can be granted."

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." … A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. … The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544

(2007)). In the Tenth Circuit,

> [t]he *Twombly/Iqbal* standard is a middle ground between heightened fact pleading, which is expressly rejected, and allowing complaints that are no more than labels and conclusions or formulaic recitation of the elements of a cause of action, which the Court stated will not do. In other words, Rule 8(a)(2) still lives.... Under Rule 8, specific facts are not necessary; the statement need only give the defendant fair notice of what the ... claim is and the ground upon which it rests.

*Pueblo of Jemez v. United States,* 790 F.3d 1143, 1172 (10th Cir. 2015) (internal brackets

omitted; quoting *Khalik v. United Air Lines,* 671 F.3d 1188, 1191-92 (10th Cir. 2012)).

"Determining whether a complaint states a plausible claim for relief will … be a context-

specific task that requires the reviewing court to draw on its judicial experience and common

sense." *Ashcroft*, 556 U.S. at 679; *see also Pueblo of Jemez*, 790 F.3d at 1172 ("[t]he nature and

specificity of the allegations required to state a plausible claim will vary based on context,"

internal quotation marks omitted).  The court must construe the fact allegations and any

reasonable inferences from them in the light most favorable to the non-moving party.  *Sanchez v.*

*Hartley,* 810 F.3d 750, 754 (10th Cir. 2016).  "Thus, a well-pleaded complaint may proceed even

if it strikes a savvy judge that actual proof of [the alleged] facts is improbable, and that a

recovery is very remote and unlikely."  *Id.* at 756 (quoting *Twombly*, 550 U.S. at 556).

A.     *Plaintiffs' Antitrust Claims I-III*

In Counts I-III, Plaintiffs assert an unlawful restraint of trade under Section 1 of the

Sherman Act.  That statute provides, in pertinent part, that "[e]very contract, combination in the

form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several

States, or with foreign nations, is hereby declared to be illegal."  15 U.S.C. § 1.  "The essence of

a claim of violation of Section 1 of the Sherman Act is the agreement itself."  *Champagne Metals*

*v. Ken-Mac Metals, Inc.,* 458 F.3d 1073, 1082 (10th Cir. 2006).[8]  "[T]he agreement that Plaintiffs

must allege is one 'designed unreasonably to restrain trade.'"  *Snyder v. ACORD Corp.,* No. 14-

cv-1736-JLK, 2016 WL 192270, at *10 (D. Colo. Jan. 15, 2016) (quoting *Abraham v.*

*Intermountain Health Care Inc.*, 461 F.3d 1249, 1257 (10th Cir. 2006)).

> Underlying § 1's emphasis on concerted action is the rationale that when two formerly separate entities combine for their common benefit, their activity is "fraught with anti-competitive risk" because it "deprives the marketplace of the independent centers of decisionmaking that competition assumes and demands." … For this reason, unilateral conduct, regardless of its anti-competitive effects, is not prohibited by § 1 of the Sherman Act.

*Gregory v. Fort Bridger Rendezvous Assoc.,* 448 F.3d 1195, 1200 (10th Cir. 2006) (quoting

---

[8] With one exception, Defendants do not raise issues regarding the other elements of a § 1 claim – unreasonable restraint of trade and antitrust injury. *See, e.g., Compliance Mktg., Inc. v. Drugtest, Inc.,* Case 09-cv-1241-JLK, 2010 WL 1416823, at *5-6 (D. Colo. Apr. 7, 2010); 15 U.S.C. § 4; SAC ¶¶ 108-11, 227 241, 255.  WRA argues in passing that there is no antitrust injury.  Doc. 87 at 7.  The court need not reach that issue unless it concludes that the claims plausibly describe an anticompetitive agreement or combination.  *See, e.g., Champagne Metals*, 458 F.3d at 1082.

*Copperweld Corp. v. Indep. Tube Corp.,* 467 U.S. 752, 768-69 (1984); other internal quotation marks omitted). *See also American Needle, Inc. v. Nat'l Football League,* 560 U.S. 183, 190 (2010) ("concerted action is discrete and distinct;" limiting the scope of § 1 "avoids judicial scrutiny of routine, internal business decisions"); *Native Am. Distrib. v. Seneca-Cayuga Tobacco Co.,* 546 F.3d 1288, 1297 (10th Cir. 2008) ("liability under § 1 requires concerted action."). Thus, "'[t]he crucial question' is whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express.'" *Twombly,* 550 U.S. at 553 (quoting *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.,* 346 U.S. 537, 540 (1954)).[9]

Much as the agreement itself can be either tacit or express, so too the facts showing the agreement can be direct or circumstantial. *Monsanto Co. v. Spray-Rite Serv. Corp.,* 465 U.S. 752, 764 (1984); *Champagne Metals,* 458 F.3d at 1082; *cf., Twombly,* 550 U.S. at 553, 564 (recognizing § 1 agreement can be shown by circumstantial evidence and distinguishing "independent allegation[s] of actual agreement"). Direct facts are "explicit and require[] no inferences." *Champagne Metals,* 458 F.3d at 1083 (quoted in *Beltran v. InterExchange, Inc.,* Case 14-cv-03074-CMA-KMT, – F. Supp. 3d –, 2016 WL 1253622, at *3 (D. Colo. Mar. 31, 2016)). *See also In re Ins. Brokerage Antitrust Litig.,* 618 F.3d 300, 323 (3d. Cir. 2010) ("Allegations of direct evidence of an agreement, if sufficiently detailed, are independently adequate"); *In re Text Messaging Antitrust Litig.,* 630 F.3d 622, 628-29 (7th Cir. 2010) (describing direct evidence as "the smoking gun in a price-fixing case"), *cert den'd,* 131 S. Ct. 2165 (2011). Direct evidence of a § 1 agreement may take the form of a written contract or

---

[9] WRA argues (Doc. 87 at 3) that "an express, manifested agreement, and thus an agreement involving actual, verbalized communication, must be proved in order for a price-fixing conspiracy to be actionable," quoting *In re High Fructose Corn Syrup Antitrust Litig.,* 295 F. 3d 651, 654 (7th Cir. 2002). *Twombly* appears to hold that a tacit price-fixing agreement, if plausibly alleged, does suffice. 550 U.S. at 553.

agreement, such as association rules,[10] or admissions of an agreement.[11]

In contrast, circumstantial facts require inferences to show an anti-competitive agreement exists. *Champagne Metals,* 458 F.3d at 1084.

> While a showing of parallel "business behavior is admissible circumstantial evidence from which the fact finder may infer agreement," it falls short of "conclusively establish[ing] agreement or ... itself constitut[ing] a Sherman Act offense." .... Even "conscious parallelism," a common reaction of "firms in a concentrated market [that] recogniz[e] their shared economic interests and their interdependence with respect to price and output decisions" is "not in itself unlawful."

*Twombly,* 550 U.S. at 553-554 (quoting *Theatre Enterprises,* 346 U.S. at 540–541, and *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 227 (1993)) (other citations omitted).

Here, Count I asserts that all Defendants "conspired and agreed to fix the wages offered and paid to shepherds at the minimum DOL wage floor." SAC ¶ 222. Count II asserts the same wage-fixing but only among WRA and its member-Rancher Defendants. *Id.* ¶ 238. Count III likewise asserts the same wage-fixing but only among MPAS and its member-Rancher Defendants. *Id.* ¶ 252. Plaintiffs expressly omit Nottingham and Richins from Count III. *Id.* (title of Count III).

    1.    Pleading § 1 Agreement to Restrain Trade, Post-*Twombly.*

Defendants argue that Plaintiffs fail to plausibly allege a § 1 agreement, relying heavily on *Twombly.* In that case, the Supreme Court addressed

> [t]he question in [a] ... putative class action [of] ... whether a § 1 complaint can survive a motion to dismiss when it alleges that major telecommunications providers engaged in certain parallel conduct unfavorable to competition, absent

---

[10] *O'Bannon v. Nat'l Collegiate Athletic Ass'n,* 802 F.3d 1049, 1054-55 (9th Cir. 2015), *pet'n for cert. filed* (U.S. Mar. 17, 2016); *Osborn v. Visa, Inc.,* 797 F.3d 1057, 1067 (D.C. Cir. 2015), *pet'n for cert. filed* (U.S. Jan. 29, 2016).

[11] *Champagne Metals,* 458 F.3d at 1083-84; *Beltran,* 2016 WL 1253622, at *4-5; *Text Messaging,* 630 F.2d at 628.

some factual context suggesting agreement, as distinct from identical, independent action. We hold that such a complaint should be dismissed.

*Twombly,* 550 U.S. at 548-49. Here, as in *Twombly,* Plaintiffs do not allege facts that directly establish a § 1 agreement. SAC ¶¶ 59-111; Counts I-III. Rather, Plaintiffs rely on circumstantial allegations of conspiracy. They allege "collusive conduct" between each Association Defendant and its member Rancher Defendants. SAC ¶¶ 220, 221, 236, 237, 250, 251. Plaintiffs also assert "tacit collusion" among WRA, MPAS and their respective members. SAC ¶¶ 64, 223. *See also* Doc. 96 (Plaintiffs' combined response to the motions to dismiss) at 14, 21 (indicating that Plaintiffs rely on circumstantial facts).

> *Twombly's* general principles for § 1 claims at the Rule 12 phase require:
>
> a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.

*Twombly,* 550 U.S. at 556 (footnote omitted). The question of what fact allegations "suggest[] agreement, as distinct from identical, independent action" (*Id.* at 549) turns on the caselaw defining Section 1 claims:

> In identifying facts that are suggestive enough to render a § 1 conspiracy plausible, we have the benefit of the prior rulings and … commentators … that lawful parallel conduct fails to bespeak unlawful agreement. … [A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality. Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.

*Twombly,* 550 U.S. at 556-557. Elucidating what "context" is suggestive of a § 1 agreement, the Supreme Court looks for some "further circumstance pointing toward a meeting of the minds,"

because without that "an account of a defendant's commercial efforts stays in neutral territory."

*Id.* at 557.

The Court in *Twombly* applied these principles to a complaint that recited the agreement element (*id.* at 564, n.9) and otherwise alleged only an

> "absence of any meaningful competition between [the incumbent telecom providers, "ILECs"] in one another's markets," "the parallel course of conduct that each ILEC engaged in to prevent competition from [new entrants, competitive telecom providers known as] CLECs," "and the other facts and market circumstances alleged earlier"; "in light of" these, the complaint concludes "that the ILECs have entered into a contract, combination or conspiracy to prevent competitive entry into their ... markets and have agreed not to compete with one another."

*Id.* at 565 (internal brackets omitted). Thus, the *Twombly* plaintiffs did not allege direct facts establishing an agreement to restrain trade (*Id.* at 565, n. 11) and relied solely on circumstantial facts of parallel behavior to suggest the agreement. *Id.* at 566-570. The "sufficiency [of such a complaint] turns on the suggestions raised by this conduct when viewed in light of common economic experience." *Id.* at 565 (footnote omitted). The "common economic experience" pertinent to the defendants' alleged conduct showed no suggestion of conspiracy:

> As to the ILECs' supposed agreement to disobey the 1996 Act and thwart the CLECs' attempts to compete ... nothing in the complaint intimates that the resistance to the upstarts was anything more than the natural, unilateral reaction of each ILEC intent on keeping its regional dominance. ... The economic incentive to resist [the 1996 Act's changes to their industry] was powerful, but resisting competition is routine market conduct, and even if the ILECs flouted the 1996 Act ... there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway ....
>
> The complaint ... claim[s] that collusion was necessary because success by even one CLEC in an ILEC's territory "would have revealed the degree to which competitive entry by CLECs would have been successful in the other territories." ... But, its logic aside, this general premise still fails to answer the point that there was just no need for joint encouragement to resist the 1996 Act.

*Twombly*, 550 U.S. at 566.

Meanwhile, the Court noted types of allegations that would pass muster under Rule 12:

Commentators have offered several examples of parallel conduct allegations that would state a § 1 claim under this standard. See, *e.g.,* 6 Areeda & Hovenkamp ¶ 1425, at 167–185 (discussing "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties"); Blechman, Conscious Parallelism, Signalling and Facilitating Devices: The Problem of Tacit Collusion Under the Antitrust Laws, 24 N.Y.L. S. L. Rev. 881, 899 (1979) (describing "conduct [that] indicates the sort of restricted freedom of action and sense of obligation that one generally associates with agreement"). The parties in this case agree that "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason," would support a plausible inference of conspiracy.

*Twombly*, 550 U.S. at 556, n.4.

The Tenth Circuit has not yet applied *Twombly* pleading standards to § 1 conspiracy claims. The court generally interprets *Twombly's* plausibility standard to "refer[] 'to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs have not nudged their claims across the line from conceivable to plausible." *Khalik*, 671 F.3d at 1191 (internal quotation marks omitted, quoting *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008); *Twombly*). In *Native American Distributing*, the court addressed the issue only in passing because the allegations of conspiracy were so conclusory. 546 F.3d at 1297-98. In an unofficially published opinion, the court applied *Twombly* to a civil conspiracy claim that likewise provided little reason to analyze *Twombly's* pleading standard. *Gowadia v. Stearns,* 596 F. App'x 667, 671 (10th Cir. 2014) ("oftentimes, [parallel action] is an expected result of innocent behavior and is thus just as consistent with independent actions as it is with conspiracy") (citing *Twombly*, 550 U.S. at 554).

[T]o the extent that restrictions on Gowadia's communications are consistent with a conspiracy to prevent him from going to the media, they are also consistent with a desire to prevent an offender with decades of experience working on advanced weapons systems and convicted of disclosing national defense information from doing so again in the future. Because of the existence of this equally—if not more—likely explanation for the imposition of the SAMs, their alleged

> restrictiveness is of no help to Gowadia in raising an inference of conspiracy. The specific facts pleaded in the complaint fail to establish the plausible existence of a conspiracy involving the ADX wardens.

*Gowadia*, 596 F. App'x at 672. The case confirms that when a plaintiff relies entirely on circumstantial fact allegations to plead a conspiracy, those allegations should not be just as easily explained by independent action.

Those circuit courts that have addressed motions to dismiss § 1 conspiracy claims after *Twombly* generally rely heavily on the distinction between conduct equally likely to result from independent action, and conduct that is unlikely to arise without an agreement. The latter type of facts are frequently referred to as "parallel-plus" or "plus factors." These are "economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." *In re Musical Instruments & Equip. Antitrust Litig.,* 798 F.3d 1186, 1194 (9th Cir. 2015). Plus factors "may include: a common motive to conspire, ... acts … against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *Mayor of Baltimore, Md. v. Citigroup, Inc.,* 709 F.3d 129, 136 (2d Cir. 2013). At the Rule 12 phase, "plus factors" are helpful for court's analysis, but their presence or absence is not in itself determinative. *Evergreen Partnering Group, Inc. v. Pactiv Corp.,* 720 F.3d 33, 47 (1st Cir. 2013). *See also SD3, LLC v. Black & Decker (U.S.) Inc.,* 801 F.3d 412, 424-25 (4th Cir. 2015), *as amended on reh'g in part* (Oct. 29, 2015), *petition for cert. filed,* (U.S. Jan. 26, 2016) (No. 15-492); *Text Messaging,* 630 F.3d at 628; *Ins. Brokerage,* 618 F.3d at 323 n.22.

This district court appears to have ruled on post-*Twombly* motions to dismiss in at least three cases which alleged § 1 conspiracies solely on circumstantial facts: *Compliance Marketing, Inc., v. Drugtest, Inc.,* Case No. 09-cv-1241-JLK, 2010 WL 1416823, at *6-7, 12-13 (D. Colo.

Apr. 7, 2010); *Kissing Camels Surgery Ctr., LLC v. Centura Health Corp.*, No. 12-CV-3012-WJM-BNB, 2014 WL 560462, at *8 (D. Colo. Feb. 13, 2014); and *Snyder*, 2016 WL 192270, at *10.

*Compliance Marketing* found an agreement to deal exclusively was plausibly alleged as to the defendants who purportedly required drug testing service companies to use a consortium's proprietary database, used "similar language in notifying" them of that requirement, and "directly contacted the Service Companies working with these ... Defendants to remind them of the requirement." 2010 WL 1416823, at *6.  But the court found that the allegations of an agreement to boycott failed: they alleged "past collaboration by some ... Defendants" or cooperation on "employee training and workplace management," and "statements by representatives ... acknowledging that they have a common workforce and common interests as well as a 'striking' similarity between letters sent by [several of the defendants] ... notifying their Service Companies of the requirement to use DISA."  These facts were insufficient because the plaintiffs "acknowledge plausible explanations for the conscious parallelism."  *Id.* at *13.

Similarly, *Kissing Camels* found the § 1 claim plausibly alleged only as to a defendant regarding whom they alleged direct evidence of the agreement:

> Plaintiffs describe an overt agreement between competing parties to put Plaintiffs out of business by influencing physicians and insurers not to do business with Plaintiffs, with the goal of reducing competition for their own respective hospitals and surgery centers.  Plaintiffs allege specific actions Centura took, both with the Insurers and directly with Kissing Camels, that support the alleged conspiratorial agreement between Centura and HCA.  These are factual, not conclusory, allegations that the Court must take as true when considering Centura's Motion.

*Kissing Camels*, 2014 WL 560462, at *5.  As to that defendant, the plaintiffs alleged for instance a specific meeting that solidified the agreement and conduct implementing it.  *Id.* at *4-5.  Meanwhile, as to other defendants, the claim failed because the plaintiffs alleged only "passive facilitation," not agreement; a role in and attendance at trade association meetings; a statement

by a defendant's representative that "he sought to put [the plaintiff] out of business," which "[i]n the context of [defendant's] belief … that [plaintiff's] billing practices violated state law," was insufficient to infer an agreement to do so; and conduct that the complaint itself recognized the defendants had "non-conspiratorial reasons" for doing. *Id.* at *6-9.[12]

Notwithstanding the aforementioned cases, Plaintiffs argue that as long as their fact allegations are consistent with conspiracy, this suffices, citing *Anderson News, L.L.C., v. Am. Media, Inc.,* 680 F.3d 162 (2ᵈ Cir. 2012). Doc. 96 at 14 (arguing that the claims can be dismissed "only if independent parallel conduct is the *sole* plausible explanation for uniform wages"). Plaintiffs' reliance is misplaced. *Anderson News* ruled that the question is not the relative plausibility of "diverging interpretations" of the alleged conduct, but rather whether the plaintiffs "provide 'some factual context suggesting [that the parties reached an] agreement,' not facts that would be 'merely consistent' with an agreement." *Id.* at 184 (quoting *Twombly*, 550 U.S. at 556, 549, 557). "The question at the pleading stage is not whether there is a plausible alternative to the plaintiff's theory; the question is whether there are sufficient factual allegations to make the complaint's claim plausible." *Anderson News*, 680 F.3d at 189.

In short, *Twombly* and the lower court cases applying it hold that when the claim relies solely on circumstantial facts of parallel behavior, the conspiracy is not plausible if in light of common economic experience the alleged conduct is equally likely to result from independent action. *See, e.g., Twombly,* 550 U.S. at 567-568 (conspiracy was not plausible where there was "an obvious alternative explanation" of the circumstantial facts, that the defendants were "sitting tight, expecting their neighbors to do the same thing"). To adequately state a §1 claim,

---

[12] The same is true of *Snyder:* it was insufficient to allege that the defendant insurance companies (and others) had conspired simply because their insurance policies used the same or similar contract term, and they either belonged to an industry association or were associated with it in a RICO enterprise. 2016 WL 192270, at *10.

Plaintiffs' fact allegations must be more than consistent with conspiracy; they must suggest conspiracy, as in facts that cannot be equally explained by independent action, such as "plus factors."

      2.     The SAC Does Not Contextualize the Alleged Agreement to Fix Wages to Make its Existence Plausible.

The SAC brings claims alleging several agreements to fix wages: between each individual member and its association; between each Association Defendant and all of its members; and between all Defendants – encompassing both of the Association Defendants and all of their members.  To infer those agreements, the SAC alleges five types of facts: (a) trade associations that recruit and hire shepherds for their members; (b) Defendants' opportunities to communicate regarding recruiting and hiring of shepherds, and one specific communication from WRA to members; (c) Defendants' job orders and H-2A applications all offer the minimum wages permitted by DOL, on state-wide bases; (d) common motives to depress these wages; and (e) wages for open range shepherds are unusually low for employees working in the United States.  Plaintiffs do not allege direct facts establishing any agreements to fix wages.

The foregoing fact allegations are "factually neutral:" setting aside Plaintiffs' conclusory assertions of conspiracy and collusion, the facts to which they point describe conduct equally likely to result from Defendants' independent, lawful action based on the  H-2A program and DOL regulations that established the minimum wage.

      a.     Membership in Agricultural Associations That Recruit and Hire for Their Members.

First, Plaintiffs infer conspiracies to fix wages by focusing on the fact that the Rancher Defendants are members of the Association Defendants that handle hiring for them:

     60. Association Defendants play a considerable role in the recruitment, hiring, and oversight of H-2A shepherds. * * *

62. Although ranches compete in the sale of their products, principally meat and wool, the ranches that are members of the WRA and MPAS have conspired to fix one of their principal costs: shepherd wages.

63. Rancher Defendants and other members of Association Defendants do not share profits or distribute losses, but through the WRA and MPAS they collude to fix shepherd wages at precisely the wage floor set by the DOL.

64. The members of the WRA and the members of the MPAS each entered into and implemented nearly identical price fixing conspiracies and, together, tacitly colluded to perpetuate both conspiracies.

65. The fixing and suppression of shepherd wages results in a windfall for MPAS and WRA members and causes shepherds to work for shockingly low wages without any opportunity to bargain for more.

SAC ¶¶ 60-65. Paragraphs 62-65 are conclusory assertions of collusion and conspiracy, not fact allegations. The court will ignore these conclusions for purposes of the pending motions. *Iqbal*, 556 U.S. at 679. Paragraph 66 then asserts that but for the alleged conspiracy, ranchers would compete for shepherds, and wages would thus increase. This is speculation, not an allegation of fact.

Plaintiffs next distinguish between the conspiracies to fix wages for *domestic* shepherds through job orders (*Id.* ¶¶ 67–84) and for *foreign* shepherds through H-2A applications. *Id.* ¶¶ 86-100.

With respect to the recruitment of domestic shepherds, member ranchers—including Rancher Defendants—maintain membership in the WRA and the MPAS and enlist their services in preparing job orders for the purpose of allocating decisions regarding wages offered to domestic shepherds to associations constituted by competitor ranchers, and with the knowledge that the Association Defendants use job orders to illegally fix shepherd wages at the DOL-set wage floor for each state.

SAC ¶ 69. *See also Id.* ¶ 87 (same assertions as to foreign shepherds). The assertion of members' knowledge that "Association Defendants use job orders to illegally fix shepherd wages" is conclusory.

After disregarding these conclusory allegations, the SAC asserts nothing more than that the Rancher Defendants belong to trade associations who handle their members' recruitment and

hiring of shepherds.  Plaintiffs do not dispute that (a) associations can lawfully represent

ranchers in recruiting and hiring (SAC ¶ 49); and (b) ranchers or associations on their behalf can

lawfully hire foreign employees by complying with the DOL's regulations.  SAC ¶ 44-58 (citing

*inter alia*, 8 U.S.C. § 1101 *et seq.,* 20 C.F.R. §§ 655.121, 122.  *See also* SAC at *e.g.,* Ex. A, p. 2

Box 1 (Doc. 73-2 at 2) (job order form asks for employer's name or agent's name) and Ex. C, p.

3 Box 17 (H-2A application provides five choices for the filer to describe its type of application,

including "Association – Sole Employer," "Association – Joint Employer," and "Association –

Filing as Agent").  Ranchers can lawfully allocate to associations the recruiting and hiring of

workers on their behalf.  29 U.S.C. §§ 1802(1) (defining an "agricultural association" as "any

nonprofit or cooperative association of … ranchers … which recruits, solicits, hires, employs,

furnishes, or transports any migrant or seasonal agricultural worker."), 1821, 1822 (establishing

requirements for *inter alia,* agricultural associations that employ migrant agricultural workers).

 Mere membership in a trade association is not suggestive of conspiracy.  *See, e.g.,*

*Osborn v. Visa Inc.,* 797 F.3d 1057, 1067 (D.C. Cir. 2015); *Ins. Brokerage,* 618 F.3d at 349

("neither defendants' membership in the [association], nor their common adoption of the trade

group's suggestions, plausibly suggest conspiracy") (citing *Twombly,* 550 U.S. at 567 n.12 as

analogous authority); *Kendall v. Visa U.S.A., Inc.,* 518 F.3d 1042, 1048 (9th Cir. 2008)

("[M]embership in an association does not render an association's members automatically liable

for antitrust violations committed by the association"); *Snyder,* 2016 WL 192270, at *10 (citing

*inter alia, Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp.,* 801 F. Supp. 2d 1163,

1197 (D.N.M. 2011), *recon. den'd,* 2012 WL 869000 (D.N.M. Mar. 8, 2012), 2012 WL

1132527, at *24 (D.N.M. Mar. 22, 2012)).  In short,

> [g]iven that mere membership in a trade group or attendance at a meeting cannot
> alone sufficiently plead agreement to a conspiracy, active participation, rather

than merely passive presence, becomes key in inferring agreement to the conspiracy and potential liability.

*In re Processed Egg Prods. Antitrust Litig.,* 821 F. Supp. 2d 709, 723 (E.D. Pa. 2011). *See also In re Fresh & Process Potatoes Antitrust Litig.,* 834 F. Supp. 2d 1141, 1160-61 (D. Idaho 2011) (claims that an association "was created to effectuate a pre-existing agreement to violate antitrust laws" and that the members "met and agreed to the scheme" suffice).

Plaintiffs contradict the foregoing law in arguing (a) "the inherent potential of trade and professional associations to violate antitrust laws," Doc. 96 at 4 (citing *N.C. St. Bd. Dental Examiners v. FTC,* 135 S. Ct. 1101 (2015)), and (b) at oral argument, where counsel suggested that his clients' claims are subject to essentially a lower pleading standard than other § 1 claims due to an "association standard." Plaintiffs' theory of an "association standard," *i.e.,* an inference of antitrust conspiracy when the defendants are members of a trade association, is incorrect. Each of the cases on which Plaintiffs rely found members' active participation in an association's allegedly anticompetitive conduct. *See, e.g., Dental Examiners,* 135 S. Ct. at 1114 (discussing "product standards set by such associations"); *Nat'l Soc'y of Prof'l Eng'rs v. United States,* 435 U.S. 679, 681 (1978) (association's express "canon of ethics prohibiting competitive bidding by its members" constituted § 1 agreement); *Osborn,* 797 F.3d at 1067 ("the rules of the former bankcard associations agreed to by the banks themselves" required anticompetitive conduct, and the "member banks appointed representatives to the ... associations' Boards of Directors, which in turn established the anticompetitive ... rules"); *Goldfarb v. Va. State Bar,* 421 U.S. 773, 781 (1975) (association set fee schedules that members had to follow or be subject to discipline under ethics opinions); *Anderson v. Shipowners' Ass'n of Pac. Coast,* 272 U.S. 359, 362 (1926) (associations expressly prohibited members from hiring outside of the associations or at wages other than what the association set).

Later in their Response Brief, Plaintiffs effectively admit that they must plead more than mere membership.  Doc. 96 at 10.  Plaintiffs argue the § 1 claim requires "plausibly stat[ing] that the 'association members, in their individual capacities, consciously committed themselves to a common scheme designed to achieve an unlawful objective;" "that members 'used their . . . associations to adopt and enforce' [a] supracompetive [sic] pricing regime;" or that the Association Defendants are "a "formalistic shell for ongoing concerted action."  Doc. 96 Response Brief at 10 (quoting respectively, *AD/SAT, Div. of Skylight, Inc. v. Associated Press,* 181 F.3d 216, 234 (2d Cir. 1999); *Osborn,* 797 F.3d at 1067; and *American Needle,* 560 U.S. at 200).

Plaintiffs' cited cases highlight the pleading deficiencies in the SAC.  *AD/SAT* recognizes that regardless that a § 1 claim involves trade associations, to infer conspiracy the plaintiff cannot rely on mere membership or conduct that is "as consistent with the defendant's legitimate, independent business interests as with an illegal combination in restraint of trade." *AD/SAT,* 181 F.3d at 235 (granting summary judgment to defendant).  In *Osborn*, the plaintiff alleged:

> [T]he member banks developed and adopted the Access Fee Rules when the banks controlled Visa and MasterCard. The rules served several purposes. First and foremost, the rules protected Visa and MasterCard from competition with lower-cost ATM networks, thereby permitting Visa and MasterCard to charge supra-competitive fees. …. The rules also benefited the banks, who were equity shareholders of the associations (and therefore financial beneficiaries of the deal). …. And the rules protected banks from competition with each other over the types of bugs offered on bank cards.

*Osborn*, 797 F.3d at 1066 (internal citations omitted).

Here, Plaintiffs do not point to any association rules or express instructions to members that would infer a conspiracy.  Rather, Plaintiffs offer only a conclusory allegation of such instructions.  SAC ¶ 5 (introducing their claims, Plaintiffs allege "WRA's and MPAS's explicit

communications to their members to adjust the wages … to precisely the DOL-set wage floor, but no more"). However, as factual support for that assertion, the SAC points to only a single email that by its very terms does not instruct the members to do such. SAC ¶ 99. See *infra* at 26-27. *American Needle* notes that associations could be merely shells for concerted action, but this only indicates the possibility of a § 1 agreement and does not dispense with the need for well-pleaded allegations of fact. 560 U.S. at 189, 195 (addressing "narrow issue" of whether members of an association were capable of conspiring and finding the "key is whether the alleged … conspiracy … joins together separate decisionmakers"). That case in fact puts to rest the notion that trade associations are subject to a different standard or analysis under antitrust law. *Id.* at 195-96.

Similarly, two cases that Plaintiffs cite for different issues make the same point: more is required than just membership and involvement in a trade association. In *Text Messaging*, the plaintiffs' claim survived Rule 12 because it alleged that

> defendants belonged to a trade association and exchanged price information directly at association meetings[,] … met with each other in an elite "leadership council" within the association—and the leadership council's stated mission was to urge its members to substitute "co-opetition" for competition.

630 F.3d at 628. In *Bolinger v. First Multiple Listing Service, Inc.,* 838 F. Supp. 2d 1340 (N.D. Ga. 2012), the court dismissed the § 1 claim in part because

> the [association] rules being challenged do not directly require concerted action that restrains competition …. Indeed, Plaintiffs do not make this argument. Instead, Plaintiffs ask the Court to infer from the [association] rules—rules that require the Defendant Brokers and Agents to pay a fee for [the association]'s services—that all Defendants have agreed or conspired to fix broker commissions. This inference, however, is not supported by fact or logic and is one that the Court—despite its searching analysis of the Amended Complaint—cannot draw.

*Id.* at 1360.

Plaintiffs further argue that their claims survive because they allege that the Rancher Defendants "allocat[e] decisions regarding wages" to the Association Defendants.  SAC ¶¶ 69, 87.

> [i]t might be permissible for Rancher Defendants each to communicate to Association Defendants that they desire to offer the minimum wage to all domestic and foreign shepherds. Even if the decision to offer this wage were based on ranchers' awareness that other ranchers were also offering the minimum, this conduct would likely not trigger liability under the antitrust laws. *Id.* [*In re Text Messaging Antitrust Litig.,* 782 F.3d 867, 871 (7th Cir. 2015)] (stating that "follow the leader pricing" does not amount to an agreement in restraint of trade). But Defendants do not even assert that they have a mechanism for independent decisionmaking.

Doc. 96 Response Brief at 11-12.  This argument fails because it presupposes that an association cannot lawfully handle recruiting and hiring for its members, *i.e.,* that the mere fact that members authorize an association to hire for them is sufficient for § 1 conspiracy.  It is not sufficient.  As noted *supra*, federal law expressly permits ranchers to do just that.  29 U.S.C. § 1802(1) *et seq.*

Thus, even taking as true Plaintiffs' allegation that the members allocate wage decisions to Association Defendants, and inferring that the members do not expressly instruct Association Defendants to offer the minimum wages, this does not plausibly suggest an agreement to fix wages.  It merely shows that Association Defendants will handle the hiring for their members, including the determination of what wages to offer.  Again, Plaintiffs do not allege any Association Defendant rules, requirements, or instructions that prohibit their members from offering more than the minimum wage.

The SAC alleges market concentration in the Association Defendants:

> The sheep ranching industry is highly concentrated under Association Defendants. From October 1, 2013, to October 1, 2014, the WRA hired roughly 55% of all open range shepherds hired in the United States. From October 1, 2013, to

October 1, 2014, the MPAS hired roughly 36% of all open range shepherds hired in the United States.

SAC ¶ 59. To the extent that Plaintiffs rely on the concentration of recruiting and hiring functions in the Association Defendants, this only shows that each Defendant's decisions regarding wages are interdependent, *i.e.,* consciously parallel. This "is not, without more, sufficient evidence of a § 1 violation, both because it is not an agreement within the meaning of the Sherman Act, and because it is resistant to judicial remedies." *Ins. Brokerage,* 618 F.3d at 321, n.19. "Even conscious parallelism, a common reaction of firms in a concentrated market that recognize their shared economic interests and their interdependence with respect to price and output decisions' is not in itself unlawful." *Twombly,* 550 U.S. at 553-54 (internal quotation marks and brackets omitted).

In short, the fact that the Association Defendants handle the recruiting and hiring of both domestic and foreign shepherds for their members do not suggest an agreement to fix wages.

      b.     Defendants' Opportunities to Communicate Regarding Recruiting and Hiring.

Plaintiffs also allege that the existence of the Association Defendants (and non-party ASI) and Rancher Defendants' memberships therein create opportunities for the Defendants to communicate regarding recruiting and hiring of shepherds. SAC ¶¶ 60, 61. This is effectively a restatement of the argument that trade associations are inherently anticompetitive, because alleging opportunities to communicate is not the same as alleging actual, conspiratorial communications. *See, e.g., Bolinger,* 838 F. Supp. 2d at 1362-63 ("opportunity" to conspire does not infer that the defendants actually did so); *Snyder,* 2016 WL 192270, at *10 (alleging that an industry association "provided some sort of forum through which Defendants reached agreement regarding the challenged practices" is insufficient). "Mere exchanges of information, even regarding price, are not necessarily illegal, in the absence of additional evidence that an

25

agreement … resulted from, or was a part of, the information exchange." *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 859 (10th Cir. 1999).  Given that members allocate hiring and recruiting to Association Defendants, the Association Defendants "have legitimate reasons to exchange information" with their members about shepherd wages, recruiting and hiring.  *Monsanto*, 465 U.S. at 762.

> The only specific communication that Plaintiffs allege is that
>
> in January 2015, the WRA instructed its members in Oregon to uniformly begin paying exactly the new DOL wage floor: "[B]eginning January 1, 2015 the wage rate for shepherds working in Oregon is $1,326.46." You "should immediately adjust your wage payments to [that] monthly wage amount."

SAC ¶ 99.  The alleged communication regards only WRA and its members located in Oregon (*i.e.*, Cunningham), not the other Rancher Defendants.[13]

Even as to Cunningham (and any other nonparty WRA members in Oregon), an interfirm communication does not suffice to infer conspiracy unless it suggests a meeting of minds.  *See, e.g., Mayor of Baltimore*, 709 F.3d at 139-40 (reading the allegations in the light most favorable to plaintiffs, the defendants' communications alleged in the complaint "suggest a high level of interfirm awareness," but this is insufficient to infer conspiracy).  Plaintiffs allege that the DOL requires Defendants to pay at least the minimum wage.  Plaintiffs further allege shepherds had always accepted WRA's offers of the minimum wages for its members, *i.e.*, WRA knew that the Oregon ranches were paying shepherds the minimum wage.  Informing the Oregon members to increase their wages to reflect a change in the minimum wage does not infer an instruction or

---

[13] Plaintiffs filed with their opposition brief an MPAS email sent apparently only to members in Oregon regarding the same state minimum wage increase as WRA's communication.  Doc. 96-1. However, "the sufficiency of a complaint must rest on its contents alone," *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010), and raising new materials in a response brief is impermissible. *See, e.g., Erikson v. BP Expl. & Prod. Inc.*, 567 F. App'x 637, 639 (10th Cir.), *cert. denied*, 135 S. Ct. 441 (2014), *reh'g denied*, 135 S. Ct. 1031 (2015).  The court also does not consider several factual materials that Defendants filed (or cited) that are not subject to exceptions to Rule 12(d). Docs. 87 at 6, n.2; 89; 104-1; and 109.

agreement that the members could not pay more than the minimum.  Given the facts that

Plaintiffs allege (a recent increase in Oregon minimum wage for shepherds, and the Association

Defendant's knowledge that their members offered the minimum wage to all their shepherd

employees), the WRA communication remains factually neutral.  *See, e.g., Kissing Camels*, 2014

WL 560462, at *7 (defendant's statement taken in the context of what it was alleged to believe

did not infer conspiracy); *Compliance Marketing,* 2010 WL 1416823, at *13 (defendants'

alleged statements did not infer conspiracy because plaintiffs "acknowledge plausible

[alternative, lawful] explanations for the conscious parallelism").

In short, Plaintiffs did not allege any communications among Defendants that would

plausibly demonstrate a § 1 conspiracy.

c.      Defendants Always Offer the Minimum Wage Permitted by DOL.

Plaintiffs next point to the fact that WRA and MPAS always offer the minimum wage in

their job orders and H-2A applications.  Doc. 96 at 6 ¶ (2).  Plaintiffs allege for instance:

> [T]hese job orders evidence concerted conduct among the WRA and its members
> and the MPAS and its members to offer [jobs to] domestic shepherds at precisely
> the wage floor set by the Department of Labor for foreign shepherds.
>      Based upon a review of the WRA job orders associated with WRA H-2A
> Applications filed between October 1, 2013 and October 1, 2014, the job orders to
> U.S. workers that preceded these H-2A Applications offered the same wages as
> the H-2A Applications and therefore almost always offered exactly the DOL H-
> 2A wage floors for each state as a fixed wage to potential U.S. workers.
>      Based upon a review of the MPAS job orders associated with the MPAS
> H-2A Applications filed between October 1, 2013 and October 1, 2014, the job
> orders to U.S. workers that preceded these H-2A Applications offered the same
> wages as the H-2A Applications and therefore almost always offered exactly the
> DOL H-2A wage floors for each state as a fixed wage to the U.S. workers.

SAC ¶¶ 70-72.  Plaintiffs emphasize that all of the job orders offer the same minimum wage on a

state-by-state basis, not individual wage rates based on ranch, skill, experience or work

environment.  *Id.* ¶¶ 73-79, 81, 90-97.

The SAC demonstrates why these allegations fail to plausibly establish a conspiracy. Wages are offered on state-wide bases because the minimum wage is the higher of the DOL's adverse effect wage or the applicable state's minimum wage. SAC ¶ 49. In their brief, Plaintiffs assert that "there is considerable variation between shepherds and between ranchers" regarding the job "conditions that shepherds face," and point out that if the market were competitive, those employees with the "more unpleasant jobs would demand higher wages." Doc. 96 at 22, citing SAC ¶ 100. This does not overcome the fundamental flaw in Plaintiffs' § 1 claims: all of the conduct that Plaintiffs allege is merely consistent with, not suggestive of, conspiracy because it is equally consistent with independently following the DOL's minimum wage and foreign hiring regulations. It is in each Defendant's interest to not pay more wages than are (a) legally required and (b) necessary to adequately fill their positions.

Plaintiffs point to a decision of the Eastern District of Washington, *Ruiz v. Fernandez*, 949 F. Supp. 2d 1055 (E.D. Wash. 2013), arguing that it "concluded … the WRA does not allow member ranchers to offer a different amount." Doc. 96 Response Brief at 6, 15.[14] That decision, however, does not support Plaintiffs' interpretation. Plaintiffs quote the court's statement that WRA's "Pre-Employment Notice of Rights and Obligations" to shepherds "generally describes … the wage rate that they will be paid." Doc. 96 at 15 (citing *Ruiz*, 949 F. Supp. 2d at 1066). That passage does not purport to find why or how the wage rates were set in the notices, nor even whether those rates were the minimum permitted by DOL. It certainly does not equate to a finding that WRA required its members to offer or pay no more than the minimum wage.

---

[14] It appears that none of the Plaintiffs in this case were parties in *Ruiz*. *Id.* at 1060. The order reflects that the shepherd plaintiffs brought claims against WRA under the Fair Labor Standards Act and various state law theories. *Id.* Except for a quantum meruit claim, the court found issues of material fact for trial. *Id.* at 1078-79.

      d.     Common Motives to Fix and Depress Wages.

Plaintiffs also allege "motives" for Defendants to agree to wage-fix.  First, they argue,

prior to the new rule of November 2015, Defendants had a motive to fix wages offered to

domestic shepherds so that the DOL's wage surveys would reflect only the current minimum

wage, and therefore the DOL would never raise the minimum wage.

> The DOL sets wage floors to prevent an "adverse effect" on the U.S. workers in the shepherd labor market and sets these floors by conducting wage surveys that review the wages paid to shepherds in the relevant market.
>
> By agreeing to a cap on the amount that Defendant ranchers pay their shepherds at exactly the minimum DOL wage floor, the result of Defendants' conspiracy is an artificial ceiling on wages that would otherwise increase under normal market forces.  As a consequence of this wage stagnation, the DOL's wage surveys reflect an artificially low wage for shepherds.
>
> Because the Defendants' wage fixing has artificially depressed wages in the shepherd labor market, it has also artificially depressed the DOL's wage floors, the very same minimum wage that Defendants rely on in fixing wages paid to their workers.
>
>                              * * *
>
> The stagnation of DOL's H-2A wage floor represents both a motive for Defendants' wage fixing and one of the market distortions resulting from Defendants' wage-fixing conspiracies in a highly regulated labor market.

SAC ¶¶ 101-03, 106.

Like Plaintiffs here, the complaint in *Twombly* alleged that the defendants' "'compelling

common motivatio[n]' to thwart the CLECs' competitive efforts naturally led them to form a

conspiracy," 550 U.S. at 551.  The Supreme Court found the allegation did not "answer the point

that there was just no need for joint encouragement" to do what each defendant would do

independently "regardless of the actions of … other[s]."  *Id.* at 566.  Similarly here, the alleged

common motive to fix wages is fully consistent with what each Defendant would do regardless

of what other ranches did:  each Defendant would offer wages no higher than necessary to fill its

shepherd jobs, and the minimum wage offered to foreign shepherds had apparently always

sufficed.  "[C]ommon motive does not suggest an agreement.  Any firm that believes that it

could increase profits by raising prices has a motive to reach an advance agreement with its competitors. Thus, alleging 'common motive to conspire' simply restates that a market is interdependent." *Musical Instruments,* 798 F. 3d at 1194-95. *See also Superior Offshore Int'l, Inc. v. Bristow Grp., Inc.,* 490 F. App'x 492, 499 (3d Cir. 2012) ("the first two 'plus factors,' motive and action contrary to self-interest, are not especially helpful in price-fixing cases where, as here, there are parallel price increases by competitors in a concentrated market."). The courts that refer to common motive to conspire as a plus factor also expressly point out being labeled a "plus factor" is not determinative. "Such factors in a particular case could lead to an equally plausible inference of mere interdependent behavior, i.e., actions taken by market actors who are aware of and anticipate similar actions taken by competitors, but which fall short of a tacit agreement." *Mayor of Baltimore,* 709 F.3d at 137 (internal quotation marks omitted). Accordingly, the allegations of "motive" to depress present wages so as to depress future wages do not infer an agreement.[15]

Plaintiffs also argue a motive to depress all offered wages (foreign and domestic) because of "friction in a labor market" where employees "cannot easily transition between industries." Doc. 96 at 17-18 (citing *In re Animation Workers Antitrust Litig.,* 123 F. Supp. 3d 1175 (N.D. Cal. 2015)). In other words, Plaintiffs argue that Defendants are motivated to offer the minimum wage because shepherds are unable to leave their jobs, and Defendants will therefore not have to pay more than the minimum wage.

*Animation Workers* does not stand for the proposition that skilled employees'

---

[15] The court takes judicial notice that the DOL announced the new rule on October 16, 2015, and that the new rule (a) replaces the 2011 methodology and (b) raises the minimum wage: DOL Employment and Training Administration, *Temporary Agricultural Employment of H-2A Foreign Workers in the Herding or Production of Livestock on the Range in the United States,* 80 Fed. Reg. 62958-01, 62986 (Oct. 16, 2015) (codified at 20 C.F.R. § 655 Subpart B) (copy filed, Doc. 83-1).

nontransferability infers a conspiracy among their employers to fix wages. Rather, the plaintiffs

in that case stated detailed allegations of meetings and communications whose specific purpose

was to ensure that none of the employers "poached" or paid more than the others had agreed to

pay their employees. *Id.* at 1209-10, 1213-14. The court recognizes that Plaintiffs allege

Defendants treat foreign shepherds as "in essence, indentured servants" whom Defendants

prevent (or attempt to prevent) from leaving their jobs as "runaways." SAC ¶¶ 9, 10, 111. But

deplorable work conditions do not equate to a conspiracy.[16] *Cf., Ins. Brokerage,* 618 F.3d at

335-336 (that the plaintiffs failed to state a § 1 claim did "does not mean that defendants' alleged

treatment of insurance purchasers was praiseworthy – or even lawful – but [only] that it fails to

plead a … violation of § 1"). The difficulty of moving to other jobs or other industries does not

infer that the employers are conspiring to take advantage of it, when they can achieve the same

effect (low wages) independently. These allegations are equally likely to result from

Defendants' parallel decisions as from a conspiracy.

   e.  The Wages Offered to Shepherds Were Very Low and Largely Stagnated
       Until the DOL's New Rule in November 2015.

Plaintiffs further contend that the depressed and stagnating wages for shepherds, and the

fact that employment offers to domestic shepherds were not higher than the minimum wage (to

reflect foreign shepherds' travel costs) suggest a wage-fixing agreement. Doc. 96 at 7, 23; SAC

¶ 80. Plaintiffs characterize the latter point as "irrational" and thus further proof that Defendants

agreed to fix wages. *Id.*

Wage survey results and wage stagnation are equally likely the result of parallel,

independent decisions to not pay wages higher than necessary to fill the jobs. *See, e.g.,*

---

[16] Plaintiffs' failure to state an antitrust claim does not leave them without redress under other
laws or before the DOL. *See, e.g., Ruiz* and the litigation history noted *supra* § I.A. that resulted
in significant changes to the DOL's applicable rules.

*Monsanto,* 465 U.S. at 762 ("[T]he economic effect of ... unilateral and concerted ... price

setting, agreements on price and nonprice restrictions ... is in many, but not all, cases similar or

identical"); *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 902-03 (2007)

(citing same). Plaintiffs' argument does not address the fact that the very low wages paid to

shepherds are just as likely to result from individual decisions to use the DOL's minimum wage

and H-2A program, i.e., from the regulatory structure of the industry. As for the fact that

Defendants do not offer nominally higher than the minimum wage to domestic shepherds, this is

equally consistent with independent action: the minimum wage for H-2A shepherds was so low

that adding "nominal amounts" would not attract domestic shepherds to fill the jobs. *See, e.g.,*

SAC ¶¶ 9 ("strikingly low even relative to the most low-wage employment opportunities in the

rest of the American economy"), 65 ("shockingly low wages" for open range shepherds); 81

("domestic ranch hands, general ranch farmworkers, or closed range herders ... earn

substantially more than H-2A shepherds").

Taking all of the allegations described above as a whole, the SAC does not allege facts

that plausibly support the conclusory assertions of an anti-competitive agreement. In every post-

*Twombly* case cited by the parties or found by this court that denied a Rule 12(b)(6) motion to

dismiss a § 1 conspiracy claim, the plaintiff alleged either: (a) non-conclusory direct facts of the

defendants' agreement or (b) facts that were not equally explainable by parallel conduct, *i.e.,*

suggesting an agreement to engage in the conduct. *See, e.g., Osborn,* 797 F.3d at 1066-67;

*Anderson News,* 680 F.3d at 187-89 (alleged actual agreement, specific meetings, and statements

that plausibly evinced the agreement); *Text Messaging*, 630 F.3d at 628 (alleged "anomalous

behavior" that was inexplicable without an agreement); *Starr v. Sony BMG Music Entm't,* 592

F.3d 314, 327 (2d Cir. 2010) ("not ... in ... self-interest to sell Internet Music at prices, and with

DRMs … so unpopular as to ensure that "nobody in their right mind" would want to purchase");

*Beltran,* 2016 WL 1253622, at *6-8 (alleged direct facts of agreement and parallel-plus facts);

*Arapahoe Surgery Ctr., LLC v. Cigna Healthcare, Inc.,* 80 F. Supp. 3d 1257, 1265 (D. Colo.

2015) (alleged direct facts of agreement); *Kissing Camels,* 2014 WL 560462, at *5 (part of claim

alleged direct facts of agreement).[17]

Plaintiffs' allegations are instead like the claims that *Twombly* and others dismiss as

conduct equally likely to result from independent action. *See, e.g., Twombly,* 550 U.S. at 564-

69; *Musical Instruments,* 798 F.3d at 1194-98 (agreement not plausible because allegations were

equally likely to be the result of lawful self-interest, parallel conduct); *Mayor of Baltimore,* 709

F.3d at 138-39; *Snyder,* 2016 WL 192270, at *10 (alleging defendants agreed to participate in

industry association and used the same or similar contract term in their insurance policies was

insufficient); *Kissing Camels,* 2014 WL 560462, at *6-9 (dismissing as to all but one defendant);

*Processed Egg,* 821 F. Supp. 2d at 752-53 (dismissing claim as to association because it "merely

rest[ed] upon allegations of common resources and membership between incorporated trade

groups"); *Compliance Marketing,* 2010 WL 1416823, at *12-13; *Bolinger,* 838 F. Supp. 2d at

1360-63. *Cf., Gowadia,* 596 F. App'x at 672.[18]

---

[17] *See also Black & Decker,* 801 F.3d at 430 ("detailed story" alleging agreement to boycott made at specific meeting by named individuals); *Evergreen Partnering Group, Inc. v. Pactiv Corp.,* 720 F.3d 33, 47-48 (1st Cir. 2013) (alleged "proactive destructive conduct … difficult to explain outside … of a conspiracy"); *Ins. Brokerage,* 618 F.3d at 336-337 ("detailed allegations of bid rigging" survived Rule 12); *Processed Egg,* 821 F. Supp. 2d at 730-31 (conduct inconsistent with independent self-interest); *Potatoes,* 834 F. Supp. 2d at 1160-64; *In re Packaged Ice Antitrust Litig.,* 723 F. Supp. 2d 987, 1007 (E.D. Mich. 2010) (allegations identified executives involved, specific time frames, regions, and agreements to "stay out of each others' territories, which … are the subject of … criminal guilty pleas").

[18] *See also Insulate SB, Inc. v. Advanced Finishing Sys., Inc.,* 797 F.3d 538, 546 (8th Cir. 2015) (the "complaint repeatedly asserts Graco and an unnamed set of distributors generally conspired to restrain trade [and that at least some communicated together], but these assertions are not enough."); *Erie County, Ohio v. Morton Salt, Inc.,* 702 F.3d 860, 870-73 (6th Cir. 2012) (allegations were equally consistent with independent conduct); *Burtch v. Milberg Factors, Inc.,*

Even before *Twombly*, Plaintiffs' claims would have been dismissed. *See, e.g., TV Commc'ns Network, Inc. v. Turner Network Television, Inc.,* 964 F.3d 1022, 1027 (10th Cir. 1992) (complaint alleged price fixing, but "no facts to support this conclusory assertion"); *Cayman Expl. Corp. v. United Gas Pipe Line Co.,* 873 F.2d 1357, 1361 (10th Cir. 1989) (claim of horizontal price-fixing pled no "facts which would support an inference that the alleged actions ... would be contrary to their economic interests absent an agreement" or otherwise inferred conspiracy).

In sum, "[b]ecause the plaintiffs here have not nudged their claims across the line from conceivable to plausible," *Twombly,* 550 U.S. at 570, the court recommends that Counts I-III should be dismissed.[19]

B.    *Civil Racketeering Influenced and Corrupt Organizations (RICO) Claims IV-V: Separate "Person" and "Enterprise"*

Plaintiffs bring two RICO claims: Count IV against WRA and Richins, and Count V against MPAS. These claims arise under 18 U.S.C. § 1962 which makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c) (emphasis added). "The elements of a civil RICO claim are (1) investment in, control of, or conduct of (2) an enterprise (3) through a pattern (4) of racketeering activity." *Dewey v.*

---

662 F.3d 212, 228-229 (3d Cir. 2011) (same); *Ins. Brokerage,* 618 F.3d at 327-336 (dismissing part of claim); *Jacobs v. Tempur-Pedic Int'l, Inc.,* 626 F.3d 1327, 1342-43 (11th Cir. 2010) (price fixing claim dismissed); *In re Elevator Antitrust Litig.,* 502 F.3d 47, 51 (2d Cir. 2007) (*per curiam*) ("similarities in contractual language, pricing, and equipment design" were insufficient); *Suture Exp., Inc. v. Cardinal Health 200, LLC,* 963 F. Supp. 2d 1212, 1225 (D. Kan. 2013) ("that a defendant could have chosen a different strategy does not ... infer ... that the choice of a strategy similar to that of a fellow competitor is a ... conspiracy").

[19] Because the court recommends dismissal for failure to plausibly allege antitrust conspiracy, the court does not reach Defendants' other arguments for dismissal of the antitrust claims.

*Lauer,* No. 08-cv-01734-WYD-KLM, 2009 WL 3234276, at *3 (D. Colo. Sep. 30, 2009)

(internal quotation marks omitted, quoting *Tal v. Hogan,* 453 F.3d 1244, 1261 (10th Cir. 2006)).

RICO defines an enterprise broadly as "any individual … corporation, association, … and

any … group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).

The latter type of enterprise, an "association-in-fact," is "'a group of persons associated together

for a common purpose of engaging in a course of conduct' and requires evidence 'of an ongoing

organization, formal or informal, and by evidence that the various associates function as a

continuing unit.'"  *Internet Archive v. Shell,* 505 F. Supp. 2d 755, 769 (D. Colo. 2007) (quoting

*inter alia United States v. Turkette,* 452 U.S. 576, 583 (1981)).  *See also Boyle v. United States,*

556 U.S. 938, 947-48 (2009) ("an association-in-fact enterprise is simply a continuing unit that

functions with a common purpose."); *United States v. Hutchinson*, 573 F.3d 1011, 1020-21 (10th

Cir. 2009).

> [T]o establish liability under § 1962(c) one must allege and prove the existence of
> two distinct entities: (1) a "person"; and (2) an "enterprise" that is not simply the
> same "person" referred to by a different name.  The statute's language, read as
> ordinary English, suggests that principle.  The Act says that it applies to
> "person[s]" who are "employed by or associated with" the "enterprise." §
> 1962(c).  In ordinary English one speaks of employing, being employed by, or
> associating with others, not oneself.  In addition, the Act's purposes are consistent
> with that principle.  Whether the Act seeks to prevent a person from victimizing,
> say, a small business, S. Rep. No. 91–617, p. 77 (1969), or to prevent a person
> from using a corporation for criminal purposes, ... the person and the victim, or
> the person and the tool, are different entities, not the same.

*Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161-62 (2001).  *See also Bd. of Cnty.*

*Comm'rs of San Juan Cnty. v. Liberty Grp.,* 965 F.2d 879, 885 (10th Cir. 1992) (cited with

approval in *Cedric Kushner*).

The RICO Defendants argue that Plaintiffs' allegations fail to satisfy the "enterprise"

element as follows.[20]   Plaintiffs allege three association-in-fact enterprises.  In Count IV, Plaintiffs define two enterprises: a "Richins Enterprise" comprised of an association-in-fact of WRA and Richins, its former executive director and president (SAC ¶¶ 112-115), and a "WRA Enterprise" comprised of an association-in-fact of WRA and its members.  *Id.* ¶¶ 116-121.  The "persons" sued as defendants in Count IV are WRA and Richins.  Count IV alleges in a single paragraph that both defendants are liable for damages because of their involvement in both enterprises.  *Id.* ¶ 265.  In Count V, Plaintiffs allege an "MPAS Enterprise" comprised of an association-in-fact of MPAS and its members.  *Id.* ¶¶ 122-127.  MPAS is the defendant person for Count V.  Plaintiffs do not allege that either Richins or the members of the Association Defendants conducted the Association Defendants' affairs through a pattern of RICO activity, *i.e.,* Plaintiffs do not allege that the Association Defendants are themselves RICO enterprises.

On their face, Counts IV and V allege the named Defendants are part of, not distinct from, the identified enterprises.  In response to the motions to dismiss, Plaintiffs argue that each RICO Defendant is distinct from the enterprise because (a) WRA and MPAS are respectively only part of the associations-in-fact, and (b) Richins as an officer is distinct from WRA.  But these are not sufficient distinctions for Plaintiffs' claims.

When a plaintiff attempts to hold an association or officer liable for an association-in-fact among the association, its members, or its officer, the claim fails.

> Several courts … have disallowed a § 1962(c) claim where the relationship among the members of the enterprise association is the relationship of parts to a whole.  That is, while the corporate or organizational defendant may itself be a member of the enterprise association, the member of the enterprise association

---

[20] Technically, MPAS framed this issue as a Federal Rule of Civil Procedure 9(b) issue of particularity in "the identity of the party making the false statements, and the consequences thereof."  However, the SAC's allegations of enterprises as to both WRA and MPAS are virtually identical.  *Compare*, SAC ¶¶ 116-121 to ¶¶ 122-127; Count IV to Count V.  If Plaintiffs fail to allege a person distinct from the enterprise as to MPAs, the court has no need to reach whether Rule 9 requires more particularity.

may not simply be subdivisions, agents, or members of the defendant
organization.

*Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local,* 883 F.2d 132, 141 (D.C. Cir.

1989), *rev'd in part on other issues on rehrg,* 913 F.2d 948, 956 (D.C. Cir. 1990) (*en banc*).

This is consistent with the court's ruling in *Internet Archive:*

> Enterprise liability under RICO "depends on showing that the defendant conducts
> or participates in the conduct of the enterprise's affairs, not just its own affairs." ...
> "A separate enterprise is not demonstrated by the mere showing that the
> corporation committed a pattern of predicate acts in the conduct of its own
> business."

*Internet Archive,* 505 F. Supp. 2d at 769 (quoting *Brannon v. Boatmen's First Nat. Bank of*

*Okla.,* 153 F.3d 1144, 1146 (10th Cir. 1998) and *Liberty Group,* 965 F. 2d at 885). *See also*

*Reves v. Ernst & Young,* 507 U.S. 170, 185 (1993) (§ 1962(c) claim "depends on showing that

the defendant[ ] conduct[s] or participat[es] in the conduct of the 'enterprise's affairs,' not just

[its] own affairs.").

Here, Plaintiffs allege the respective Association Defendants have associated-in-fact with

their members to submit fraudulent job orders and H-2A applications.  The only conduct that

Plaintiffs allege in support of this claim is the usual business interactions of the Association

Defendants with their members: submitting job orders and H-2A applications.  Plaintiffs allege

that "the WRA's and the MPAS's principal purpose is to create job orders for and on behalf of

their members," *Id.* ¶ 68, and likewise "to file H-2A applications on behalf of their members."

*Id.* ¶ 86.  Both of these allegations are incorporated by reference in the RICO claims.  *Id.* ¶¶ 259,

267.  This is the only conduct that Plaintiffs allege for the RICO claims.  SAC ¶¶ 129-150,

Counts IV, V.

*Yellow Bus* rejected this very type of "association-in-fact:"

[A]n organization cannot join with its own members to do that which it normally

does and thereby form an enterprise separate and apart from itself. Where, as here, the organization is named as defendant, and the organization associates with its member to form the enterprise "association-in-fact," the requisite distinctness does not obtain.

*Yellow Bus,* 883 F.2d at 141. Under *Internet Archive* and *Yellow Bus*, the WRA Enterprise and

MPAS Enterprise do not allege an enterprise sufficiently distinct from the Association

Defendants as the persons to be held liable.

As to the Richins Enterprise, as noted, Count IV on its face suffers from Plaintiffs' failure

to plead the WRA Enterprise and Richins Enterprise separately. As it stands, Plaintiffs sue both

Richins and WRA for their involvement in the Richins Enterprise.[21] SAC ¶ 265. Yet, as a

matter of law, a corporation and its officer cannot be a RICO association-in-fact[22] regarding

conduct undertaken in the corporation's regular business as an officer of the corporation.

> [T]he plaintiff in a RICO case must establish that "defendants were part of an enterprise which had an existence and purpose distinct from any one of them." ... It is for this reason that "officers and employees of an organization cannot, in the ordinary course of their duties, constitute an association in fact separate from the organization itself."

*George v. Urban Settlement Servs.,* No. 13-cv-01819-PAB-KLM, 2014 WL 4854576, at *8 (D.

Colo. Sep. 30, 2014) (quoting *Liberty Group,* 965 F.2d at 885-86). *See also Internet Archive,*

505 F. Supp. 2d at 770 (corporation and its directors were not an enterprise separate from the

---

[21] In their response brief, Plaintiffs assert that they "do not allege a RICO claim where the WRA is the Defendant and the WRA and Richins are the enterprise." Doc. 96 at 34 n.14. This is not, however, plain from Count IV as pled: "By participating in the Richins Enterprise and the WRA Enterprise, which engaged in patterns of racketeering and commission of the underlying predicate acts, Defendant Richins and the WRA injured Plaintiffs and the WRA Illegal Deduction Class." SAC ¶ 265. To the extent Plaintiffs sued WRA as the person for the Richins Enterprise, this fails to allege an enterprise distinct from WRA. *Yellow Bus,* 883 F.2d at 141 ("there is no difference between the union as an entity including [the individual defendant] as officer, and the union plus [the officer], since the whole is no different than the sum of its parts in this context") (internal quotation marks omitted).

[22] The SAC alleges that Richins was the executive director of WRA from 2001 "until sometime in 2014." Richins' other alleged roles with WRA predate the four year statute of limitation that Plaintiffs appear to recognize applies to the claim. SAC ¶¶ 113, 133 (alleging conduct in the four years prior to complaint).

corporation); *Dawson v. Goldman Sachs & Co.,* No. 13-CV-02030-CMA-KMT, 2014 WL 5465127, at *6-7 (D. Colo. Oct. 27, 2014) (dismissing RICO claim because the "'enterprise' identified by Plaintiff appears to be nothing more than Goldman and its subsidiary Litton" or subgroups of executives of Goldman or Litton); *Snyder*, 2016 WL 192270, at *9 (alleging involvement in operating or managing an entity (*i.e.,* WRA) that is part of an association-in-fact, as opposed to operating or managing the association-in-fact, is insufficient). *See also Tal,* 453 F.3d at 1270 (RICO claim requires alleging the defendant "participated in the operation or management of the RICO enterprise"); *Brannon*, 153 F.3d at 1147-49 (alleging association of parent and subsidiary as enterprise fails without additional allegations of how the parent made it easier to commit the complained-of fraud).[23]

All of the conduct that Plaintiffs allege for the Richins Enterprise is within Richins' role in operating or managing WRA, not of an enterprise between himself and WRA. Plaintiffs allege that Richins was substantially involved in WRA's alleged fraudulent policy of representing to state agencies and the DOL (as required under the H-2A program) that shepherds would be reimbursed their expenses and would not have unreasonable fees deducted from wages, knowing that this would not happen. SAC ¶¶ 114, 129-133, 136-144, 261-64.[24] As noted above,

---

[23] In their Response, Plaintiffs point out that the Tenth Circuit left open the possibility that "there are situations where a subsidiary and parent relationship, properly alleged, could state a claim for § 1962(c) liability." Doc. 96 at 34 (citing *Brannon*, 153 F.3d at 1149). More accurately, *Brannon* would "not exclude the possibility that, as the *Emery* court recognized," "in order to state a viable claim under § 1962(c) against a corporation for conducting the affairs of its parent corporation, a plaintiff must, at the very least, allege the parent 'somehow made it easier to commit or conceal the fraud of which the plaintiff complains.'" *Id.* at 1147 (citing *Emery v. Am. Gen. Fin., Inc.,* 134 F.3d 1321, 1324 (7th Cir. 1998)). Plaintiffs do not allege facts of that nature here.
[24] SAC ¶ 114 refers to *Ruiz*, 949 F. Supp. 2d at 1069, but the case adds little or nothing to the facts alleged here: "Western Range's executive director, Dennis Richins, testified that Western Range would pay a sheepherder's wages if the member ranch did not pay them, or if a gap in the sheepherder's employment with member ranches meant that the sheepherder was not being paid by a specific member ranch at a given time." *Id.*

Plaintiffs allege that one of WRA's primary activities is submitting the job orders and H-2A applications, and that Richins performed this function in his role as executive director of WRA. Signing and submitting the job orders and H-2A applications demonstrates Richins' involvement in operating or managing WRA, not an association-in-fact among himself and WRA. Simply put, the association-in-fact that Plaintiffs allege for the Richins Enterprise is not legally possible.

In response, Plaintiffs rely heavily on *Cedric Kushner*. The case is inapposite because it did not involve an overlapping association-in-fact.

> Petitioner sued Don King, the president and sole shareholder of Don King Productions, a corporation, claiming that King had conducted the boxing-related affairs of Don King Productions in part through a RICO "pattern," *i.e.,* through the alleged commission of at least two instances of fraud and other RICO predicate crimes.

*Cedric Kushner*, 533 U.S. at 160-61. The corporate employee and the corporation were sufficiently distinct because King was the person employed by the enterprise that he allegedly caused to engage in a RICO pattern of criminal activity. *Id.* at 163. The claim did not seek to make an enterprise by combining an employee and his corporation.

The Supreme Court expressly distinguished cases involving an association among a corporate entity and its employees or others who act for its benefit or as a single corporate mind.

> The earlier Second Circuit precedent concerned a claim that a corporation was the "person" and the corporation, together with all its employees and agents, were the "enterprise." … It is less natural to speak of a corporation as "employed by" or "associated with" this latter oddly constructed entity. And the Second Circuit's other precedent also involved significantly different allegations compared with the instant case. …. We do not here consider the merits of these cases, and note only their distinction from the instant case.

*Cedric Kushner,* 533 U.S. at 164 (internal citations omitted). One of the cases that the Supreme Court distinguished as involving "significantly different allegations," *Discon, Inc. v. NYNEX Corp.,* 93 F.3d 1055, 1064 (2d Cir. 1996), *vacated on other grounds,* 525 U.S. 128 (1998), ruled that alleging an association of a parent and its subsidiaries failed for the same reasons as an

association of a company and its employees or agents: "the individual defendants were acting

within the scope of a single corporate structure, guided by a single corporate consciousness." *Id.*

at 1064 (citing *Riverwoods Chappaqua Corp. v. Marine Midland Bank,* 30 F.3d 339, 344 (2d

Cir. 1994)).  Given the Supreme Court's reasoning and distinctions, lower courts have declined

to extend *Cedric Kushner* beyond its specific factual scenario.  *See, e.g., George*, 2014 WL

4854576, at *9 ("the Supreme Court specifically limited its discussion to cases where a corporate

employee is the person and the corporation is the enterprise," internal quotation marks omitted).

Here, Plaintiffs do not allege that Richins was acting other than in his capacity as

executive director of WRA in the regular business of WRA.  Plaintiffs also do not allege that

Richins took over or influenced WRA so as to obtain an appearance of propriety for job orders or

applications, nor to engage in criminal conduct that could not be as easily discovered as if

Richins submitted job orders or applications on behalf of only his own ranch.  *See, e.g., Cedric

Kushner*, 533 U.S. at 162 (RICO is intended to "prevent a person from victimizing, say, a small

business … or to prevent a person from using a corporation for criminal purposes."); *George,*

2014 WL 4854576, at *8 (quoting *Fitzgerald v. Chrysler Corp.,* 116 F.3d 225, 227 (7th Cir.

1997)).

In short, because Plaintiffs do not allege any enterprise distinct from the persons alleged

to have engaged in them, Counts IV and V fail as a matter of law.  Given this conclusion, the

court does not reach WRA, MPAS and Richins' other arguments regarding the RICO claims.

### III.    CONCLUSION

The court RECOMMENDS dismissing Plaintiffs' federal claims (Counts I-V) for failure

to state a claim.

Having concluded that the federal law claims fail, the court further RECOMMENDS

dismissing the state law claims (Counts VI-VIII) without prejudice.  "The district courts may

decline to exercise supplemental jurisdiction over a claim under subsection (a) if * * * the district

court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).

The court has jurisdiction over the Plaintiffs' state law claims only by supplemental jurisdiction

under 28 U.S.C. § 1367. Plaintiffs do not assert diversity. SAC ¶ 13. In addition, except for Mr.

Llacua, Plaintiffs do not allege their current residencies. Mr. Llacua resides in Colorado. *Id.* ¶

16. Plaintiffs allege that two Defendants (Nottingham and Two Bar) have their principal places

of business in Colorado. *Id.* ¶¶ 26, 27. It therefore appears that complete diversity does not

exist. "When all federal claims have been dismissed, the court may, and usually should, decline

to exercise jurisdiction over any remaining state claims." *Koch v. City of Del City,* 660 F.3d

1228, 1248 (10th Cir. 2011). The court recommends declining to exercise jurisdiction over

Plaintiffs' state law claims in Counts VI-VIII.[25]

DATED at Denver, Colorado, this 3rd day of June, 2016.

BY THE COURT:

_s/ Craig B. Shaffer_____
United States Magistrate Judge

---

[25] Plaintiffs have not formally requested leave to amend their complaint a third time. When Plaintiffs do not formally seek leave to amend, the court need not provide for amendment upon dismissal. *See, e.g., McLain v. Dussart*, No. 12-CV-02504-REB-MEH, 2015 WL 970155, at *1 (D. Colo. Mar. 2, 2015). To obtain leave, Plaintiffs would have to show that a third amendment would likely enable them to plausibly allege the federal claims or diversity jurisdiction. *Id.* Nothing in the record indicates that a third amendment would enable Plaintiffs to do either. The court accordingly recommends dismissing without leave to amend.