**THIERMAN BUCK LLP**
MARK R. THIERMAN, Nev. Bar No. 8285
mark@thiermanbuck.com
JOSHUA D. BUCK, Nev. Bar No. 12187
josh@thiermanbuck.com
LEAH L. JONES, Nev. Bar No. 13161
leah@thiermanbuck.com
JOSHUA H. HENDRICKSON, Nev. Bar No. 12225
joshh@thiermanbuck.com
7287 Lakeside Drive
Reno, Nevada 89511
Telephone: (775) 284-1500
Facsimile: (775) 703-5027

**FAIRMARK PARTNERS, LLP**
JAMIE CROOKS, ESQ. (*Pro Hac Vice*)
jamie@fairmarklaw.com
1825 7th St NW, #821
Washington, DC 20001

**TOWARDS JUSTICE**
DAVID H. SELIGMAN, ESQ. (*Pro Hac Vice*)
NATASHA VITERI, ESQ. (*Pro Hac Vice*)
ALEXANDER HOOD, ESQ. (*Pro Hac Vice*)
alex@towardsjustice.org
1535 High Street, Ste. 300
Denver, CO 80218

*Attorneys for Plaintiff and the Putative Class*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| **CIRILO UCHARIMA ALVARADO, On Behalf of Himself and All Others Similarly Situated;** | Case No. 3:22-cv-00249-MMD-CLB |
| **Plaintiff,** | |
| **V.** | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR IN THE ALTERNATIVE MOTION TO TRANSFER VENUE (ECF 23)** |
| **WESTERN RANGE ASSOCIATION;** | |
| **Defendant.** | |

i

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

FACTUAL BACKGROUND ....................................................................................... 3

    A.    The H-2A Visa Program ........................................................... 3

    B.    WRA's Wage Fixing Scheme .................................................. 5

I.    THE COMPLAINT PLAUSIBLY ALLEGES THAT WRA HAS VIOLATED THE SHERMAN ACT ........................................................... 7

    A.    WRA's Collusion With its Members to Fix Wages Violates the Sherman Act ........................................................................... 7

    B.    The Complaint Plausibly Alleges the Existence of the Wage-Fixing Scheme ....................................................................... 10

    C.    WRA's Arguments to the Contrary Are Meritless ................. 13

        1.    The fact that ranches sometimes depart from the agreed-upon minimum wage does not preclude liability. ............... 14

        2.    The fact that the fixed wage WRA's member ranches pay complies with DOL's regulations is irrelevant to the antitrust analysis .................. 15

II.    WRA IS NOT ENTITLED TO ANTITRUST IMMUNITY ......................... 16

    A.    WRA Is Not Entitled to *Noerr-Pennington* Immunity ......... 17

    B.    WRA Is Not Entitled to *Parker* Immunity ........................... 19

III.    THE DOCTRINE OF RES JUDICATA DOES NOT APPLY TO ALVARADO'S CLAIMS ................................................................ 21

    A.    Brief Overview of *Llacua v. Western Range Association* Litigation .................. 21

    B.    *Llacua* Does Not Preclude Alvarado's Claims ..................... 23

        1.    Under Supreme Court and Ninth Circuit precedent, Alvarado was not in privity with or "adequately represented" by the Llacua plaintiffs. ............... 24

        2.    Even if Alvarado were in privity with the Llacua plaintiffs, there's no identity of claims because the two cases involve different time periods. ............... 28

IV.    ALVARADO HAS JOINED ALL INDISPENSABLE PARTIES ................. 29

V.    VENUE IS PROPER IN NEVADA, AND NEITHER CONVENIENCE NOR THE INTERESTS OF JUSTICE SUPPORT TRANSFERRING THIS CASE TO UTAH ................................................................ 30

    A.    Legal Standard ....................................................................... 32

    B.    Venue is Proper in Nevada ..................................................... 33

C.    Defendant Has Not Met its Burden to Establish that this Case Could Have Been Brought in Utah ............................................................................... 33

D.    Neither Convenience nor the Interests of Justice Support Transferring this Case to Utah ........................................................................................... 34

    1.    Judicial economy and the interests of justice weigh against transferring this case to the District of Utah. ............................... 34

    2.    The convenience of the parties and third-party witnesses, the availability of compulsory process, and the ease of access to sources of proof ........................................................................... 35

E.    None of the Additional *Jones* Factors Discussed by WRA Support Transfer to Utah ...................................................................................... 36

    1.    Location where agreements were executed ............................... 37

    2.    State most familiar with governing law ................................... 37

    3.    Plaintiff's choice of forum ....................................................... 37

    4.    The parties' contacts with the forum & the contacts relating to cause of action in the forum .................................................. 37

    5.    Differences in costs of litigation in the two forums ................. 37

CONCLUSION ............................................................................................... 38

## **TABLE OF AUTHORITIES**

### **CASES**

*Besinga v. United States*, 923 F.2d 133 (9th Cir. 1991) ..................................................26

*American Needle, Inc. v. NFL*, 560 U.S. 183 (2010)..................................................8, 9

*Anderson v. Shipowners' Ass'n of Pac. Coast*, 272 U.S. 359 (1926) .........................7, 9

*Asacaro, LLC v. Union Pac. R.R. Co.*, 765 F.3d 999 (9th Cir. 2014) .........................24

*Cf. Patrick v. Burget*, 486 U.S. 94 (1988).................................................................16

*Clipper Express v. Rocky Mountain Motor Tariff Bureau, Inc.*,
690 F.2d 1240 (9th Cir. 1982) ..................................................................................18

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984).........................9

*Dooley v. Nev. Gold Mines, LLC*, No. 2:21-cv-00420-GMN-DJA,
2022 U.S. Dist. LEXIS 51912, (D. Nev. March 22, 2022)......................................32, 37

*Ellis v. Salt River Project Agric. Improvement & Power Dist.*,
24 F.4th 1262 (9th Cir. 2022) .............................................................................19, 21

*FTC v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216 (2013) ..............................19, 21

*Gelboim v. Bank of Am. Corp.*, 823 F.3d 759 (2d Cir. 2016) ....................................15

*Georgia v. Penn. R.R.*, 324 U.S. 439 (1945)...........................................................30

*Goldfarb v. Va. State Bar*, 421 U.S. 773 (1975)......................................................7, 8

*Harkins v. Amusement Enters., Inc. v. Harry Nace Co.*,
890 F.2d 181 (9th Cir. 1989) ...............................................................................24, 28

*Hispanic Affairs Project v. Acosta*, 901 F.3d 378 (D.C. Cir. 2018) ...........................29

*In re Dynamic Random Access Memory (DRAM) Indirect*
*Purchaser Antitrust Litig.*, 28 F.4th 42 (9th Cir. 2022) ..............................................10

*In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651 (7th Cir. Ill. 2002)...............14, 15

*Jones v. GNC Franchising, Inc.*, 211 F.3d 495 (9th Cir. 2000)...............................33, 36

*Lens.com, Inc. v. 1-800 CONTACTS, Inc.*, 2012 U.S. Dist. LEXIS 48209
(D. Nev. Apr. 4, 2012) ....................................................................................34, 35, 37

*Llacua v. Western Range Ass'n*, 930 F.3d 1161 (10th Cir. 2019) ......................... passim

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081 (7th Cir. 1983)......................18-19

*Melbostad v. City of Cascade, Idaho*, No. 2:14-CV-350-JAD-VCF,
2014 WL 5410725 (D. Nev. Oct. 21, 2014) ................................................31

*Montana v. United States*, 440 U.S. 147 (1979) ................................................29

*Movie 1 & 2 v. United Artists Commc'ns, Inc*., 909 F.2d 1245 (9th Cir. 1990) ....................10

*Mull v. Motion Picture Indus. Health Plan*, 41 F.4th 1120 (9th Cir. 2022) ....................23

*N.C. Bd. of Dental Examiners v. FTC*, 574 U.S. 494 (2015)................................19, 20

*Nat'l Soc. of Pro. Engineers v. United States*, 435 U.S. 679 (1978) ........................7, 15

*NCAA v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85 (1984)............................9

*Parker v. Brown*, 317 U.S. 341 (1943) ................................................19, 20

*Patrick v. Burget*, 486 U.S. 94 (1988) ................................................20

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, (1985) ................................................26

*Plymouth Dealers' Ass'n of N. Cal. v. United States*, 279 F.2d 128 (9th Cir. 1960) ..............8, 15

*S. Cent. Bell Tel. Co. v. Alabama*, 526 U.S. 160 (1999)................................................27

*Smith v. Amir Kennedy & Chapar LLC*, No. 2:21-cv-01526-APG-BNW,
2022 U.S. Dist. LEXIS 73715 (D. Nev. Apr. 21, 2022) ................................................32

*Sonus Networks, Inc. v. Inventergy, Inc.*, No. C-15-0322 EMC,
2015 U.S. Dist. LEXIS 97748 ................................................17

*Steele Acquisitions LLC v. N. Nevada Bldg. & Constr. Trades Council Dev. Corp.*,
No. 3:16-cv-27, 2016 WL 11671945................................................14

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*,
322 F.3d 1064 (9th Cir. 2003) ................................................24

*Tao Grp. Holdings, LLC v. Emps. Ins. Co. of Wausau*,
2022 U.S. Dist. LEXIS 41520 (D. Nev. Mar. 8, 2022)................................................21

*Taylor v. Sturgell*, 553 U.S. 880 (2008)................................................ passim

*Thomas v. Devilbiss*, 408 F. Supp. 1357 (D. Ariz. 1973) ................................................29

*United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965) ................................17, 18

*United States ex rel. Maranto v. Maxxam, Inc.*, No. C 06-7497 CW,
2009 U.S. Dist. LEXIS 14375 (N.D. Cal. 2009) ................................................18

*United States v. Baltimore & O. R. R.*, 538 F. Supp. 200 (D.D.C. 1982)................................16

*United States v. Container Corp.*, 393 U.S. 333 (1969)................................................15

*United States v. DaVita Inc.*, No. 1:21-CR-00229-RBJ, 2022 WL 266759 (D. Colo. Jan 28, 2022) ...............................................10

*United States v. Joint-Traffic Ass'n*, 171 U.S. 505 (1898) ........................16

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940)............................15, 20

*United States v. Topco Assocs., Inc.*, 405 U.S. 596 (1972)........................10

*Vehimax Int'l, LLC v. Jui Li Enter. Co.*, No. CV 09-6437 SVW (JEMx), 2010 U.S. Dist. LEXIS 42801 (C.D. Cal. 2010)........................32, 34

*Ward v. Apple Inc.*, 791 F.3d 1041 (9th Cir. 2015) ........................30

*Webb v. Utah Tour Brokers Ass'n*, 568 F.2d 670 (10th Cir. 1977) ........................16

*Williams v. Bowman*, 157 F. Supp. 2d 1103 (N.D. Cal. 2001) ........................35

*Wright v. Shock*, 742 F.2d 541 (9th Cir. 1984)........................26

## STATUTES

15 U.S.C. § 22........................................................................................31, 32

28 U.S.C. § 1391....................................................................................31, 32

28 U.S.C. § 1404....................................................................................31, 32

Sherman Act.......................................................................................... passim

## OTHER AUTHORITIES

Ioana Marinescu, Eric A. Posner, *Why Has Antitrust Law Failed Workers?*, 105 Cornell L. Rev. 1343 (2020)........................................................................13

*Temporary Agricultural Employment of H-2A Aliens in the United States*, 75 Fed. Reg. 6,884 (Feb. 12, 2010).……...…………………………………....5, 8, 17

## RULES

Fed. R. Civ. P. 8.......................................................................................21

Plaintiff Cirilo Ucharima Alvarado ("Alvarado"), on behalf of himself and all others similarly situated, hereby responds in opposition to the Motion to Dismiss Plaintiff's Complaint or, in the Alternative, Motion to Transfer Venue, ECF 23 ("MTD"), filed by Defendant Western Range Association ("WRA").

## INTRODUCTION

WRA is an association made up of sheep ranches that should be competing with each other for the labor of sheepherders. If the market for sheepherders' labor functioned properly, WRA's members would compete for these workers by offering different wages, with more experienced and qualified sheepherders garnering a higher wage due to their higher productivity. But WRA's member ranches have decided not to compete; instead, they agree with each other, through WRA, to all pay the minimum wage that the Department of Labor ("DOL") permits immigrant sheepherders to be paid. They also allocate the market between themselves, declining to compete with one another for workers. This arrangement, which has existed for years and continues today, systematically depresses the wages sheepherders receive, and it violates § 1 of the Sherman Act in the exact same way as would an agreement between the ranches to fix the price of the wool they sell. Alvarado brings this suit to enjoin this unlawful conduct and to seek recoupment of the wages he would have earned absent WRA's wage-fixing scheme.

Likely recognizing that such a naked restraint is unlawful, WRA spends most of its brief arguing that the Court should decline to consider Alvarado's allegations on their merits. WRA's primary argument is that the case should be dismissed on res judicata grounds, because several years ago, other sheepherders brought antitrust claims against WRA in Colorado that were dismissed. But that case, *Llacua v. Western Range Association*, cannot preclude Alvarado's claims because it was never certified as a class action, and Alvarado has no legal relationship to any of *Llacua*'s plaintiffs, let alone one sufficiently close for preclusion to apply.

In any event, in *Llacua* the Tenth Circuit affirmed dismissal of those plaintiffs' antitrust claims because they lacked direct evidence that WRA's "members discussed or agreed among themselves how to pay foreign shepherds."  930 F.3d 1161, 1181 (10th Cir. 2019).  Here, by contrast, Alvarado's Complaint contains just such evidence: testimony from WRA's former director that the association directs all its members to pay the DOL minimum, and that all of the ranches agreed with each other to pay that same wage.  This evidence—which came to light after the antitrust claims in *Llacua* were dismissed—fundamentally distinguishes this case from *Llacua*.

Even if this case raised the same issues as *Llacua*, the Court should still deny WRA's motion.  WRA argues that it's economically rational for all ranches to pay the DOL-set minimum, therefore making Alvarado's alleged agreement implausible.  But this ignores the Complaint's well-pleaded allegations to the contrary regarding the conduct at issue, and, more importantly, WRA's former director's admission that its member ranches agreed with one another on the wage they would pay.  WRA next claims it can't be held liable for colluding because its members complied with DOL's minimum wage, implying that DOL required the ranches all to pay the same wage.  But DOL expressly notes that its wage floor is the *minimum* that ranches must pay, and that they are free to pay more.  In any event, WRA's argument that members of a regulated industry are immune from the antitrust laws flies in the face of decades of case law.

Finally—in a gambit that is borderline deceptive—WRA asks the Court in the alternative to transfer this case to Utah, because that is where Alvarado alleged WRA has its principal place of business.  The problem:  This allegation was a mistake, because WRA has been headquartered in Idaho since 2015.  Alvarado learned this fact when, two days after WRA filed its motion to dismiss, it then filed the required Certificate of Interested Parties, which lists its principal place of business as Idaho.  *See* ECF 25.  Yet, throughout its brief, WRA suggests to the Court that it's still headquartered in Utah by pointing to a mistaken allegation that WRA knows to be false.  *See, e.g.*,

MTD 19 ("[T]his matter is subject to transfer to Utah where Plaintiff alleges Western Range has its principal place of business.").

Alvarado regrets this inadvertent error, but the Court should not reward WRA's gamesmanship. It should take judicial notice that WRA's *actual* principal place of business is Idaho, which is easily verifiable based on WRA's own statements and corporate records. This fully disposes of WRA's venue argument. Indeed, WRA has more officers in Nevada than it does in Utah. And Nevada is where Alvarado was placed by WRA, where the member ranch he worked on is located, and where he was harmed by WRA's wage-fixing scheme.

This case is properly before the Court, and the Complaint's allegations more than satisfy Alvarado's burden at the pleading stage. WRA's motion should be denied.

## FACTUAL BACKGROUND

Sheep ranches in the western United States raise sheep to produce meat and wool—a roughly $600 million per year industry. ECF No. 1, Compl. ¶ 5. The industry, particularly in the Mountain West, is dominated by ranches that are members of WRA. *Id.* ¶ 10. Ranches depend upon thousands of highly skilled sheepherders to tend to their herds, including by providing professional medical care to the sheep. *Id.* ¶ 6. Alvarado is one such sheepherder. *Id.* ¶ 20.

Sheepherders work for some of the lowest wages in America; many earn approximately $4-$5 an hour for grueling 80+ hour work weeks. *Id.* ¶ 7. They are also commonly subject to abusive practices by their employers. *Id.* Because of the anticompetitive conduct of WRA and its member ranches, described in more detail below, they have no meaningful opportunity to shop between ranches for decent wages or better treatment. *Id.* ¶ 8.

### A.    The H-2A Visa Program

The H-2A Visa Program is an agricultural guest worker visa program administered by the Department of Labor ("DOL"). It contemplates the issuance of work visas to foreign workers

when employers cannot fill positions through the domestic labor market.  *Id.* ¶ 28.  As required by the Immigration and Nationality Act, before it can issue H-2A visas, DOL must certify that there is in fact a shortage of domestic workers able, willing, and qualified to fill the position that the employer is seeking to fill with foreign H-2A workers.  *Id.* ¶¶ 29-30.

As part of the certification process, DOL requires that an employer first offer the job to domestic workers through State Workforce agencies (known as "job orders").  *Id.* ¶ 32.  Employers must offer domestic workers "no less than the same benefits, wages, and working conditions that the employer is offering, intends to offer, or will provide to H-2A workers."  *Id.* (quoting 20 C.F.R. § 655.122(a)).  Only if domestic workers do not accept a position offered in this manner can the employer submit an H-2A Application to the DOL for certification.  *Id.* ¶ 35.

DOL can promulgate exceptions to the H-2A Visa Program, known as "special procedures," for agricultural industries such as sheep and goat herding.  *Id.* ¶ 37.  DOL has implemented special procedures governing the monthly wage floor for H-2A shepherds.  *Id.*  It refers to the wage floor that it sets as the "Adverse Effect Wage Rate," or "AEWR."  *Id.* ¶ 33.  (For simplicity, this brief generally refers to the AEWR as the "wage floor" or "DOL minimum wage.")  Per DOL's most recent guidance, the wage floor for most H-2A sheepherders is approximately $1,807.23 per month.  *Id.* ¶ 59.  This wage floor can be higher in individual states, such as Nevada, because of higher state-level minimum wage laws.  *Id.*  Though DOL sets a wage floor for foreign sheepherding services, nothing prevents ranches from offering a higher wage to H-2A workers.  *Id.* ¶ 40.  In fact, DOL is explicit about this in its regulations: "The AEWR is a wage floor, and its existence does not prevent the worker from seeking, or the employer from paying, a higher wage."  *Id.* ¶ 112 (quoting *Temporary Agricultural Employment of H-2A Aliens in the United States*, 75 Fed. Reg. 6,884, 6,891 (Feb. 12, 2010)).  In this sense, DOL's wage floor for H-2A sheepherders functions just like any other minimum wage.

DOL's regulations allow membership organizations like WRA to fill out visa applications on behalf of their members, but the regulations do not contemplate or permit such organizations to use DOL's procedures to fix the wages to be paid by competitors.  *Id.* ¶ 41.

### B.     WRA's Wage Fixing Scheme

The sheep ranching industry is highly concentrated under ranch associations like WRA.  *Id.* ¶ 42.  Member ranches enlist WRA's services to create job orders for domestic sheepherders and file H-2A applications for foreign sheepherders on their behalf.  *Id.* ¶ 54, 73.  In recent years, WRA has hired approximately two-thirds of all open range sheepherders on H-2A visas in the United States.  *Id.*  With respect to the recruitment of domestic and foreign sheepherders and the wages its member ranches pay these works, WRA acts as an illegal combination of competitors, *Id.* ¶¶ 53, 72, just as would a trade association that facilitated price fixing between competitors.

Although DOL does not require or authorize it to do so, WRA dictates the wage that all of its members will offer to the sheepherders that they employ.  *Id.* ¶ 54.  Its practice is to set the wage for both domestic and foreign workers at or near the wage floor set by DOL for foreign sheepherders. *Id.* ¶ 56.  It would be permissible for WRA to ask its members what wage they want to offer their sheepherders and then for WRA to fill in wage orders with the wage levels independently determined by the ranches. But that is not what WRA does.  Rather than ask its members what wage they would like to offer, WRA tells its members that they will all pay the minimum wage DOL requires, and WRA's members all jointly agree to pay this amount.  *Id.* ¶¶ 89-90 (testimony from former WRA director that members all receive from WRA "a letter saying what the wage will be").

In this way, WRA and its members agree not to compete when it comes fix sheepherders' wages.  *Id.* ¶ 44.  Such collusion has resulted in the wholesale elimination of the domestic sheepherder workforce in regions where WRA has a significant presence and an artificially

depressed wage level for foreign sheepherders. *Id.* ¶ 71. Absent this coordination, WRA's member ranches "would compete in the labor market for the best sheepherders, and sheepherders would compete in the labor market for the best sheepherding jobs. This competition would put an upward pressure on wages." *Id.* ¶ 47. Fixing wages in this matter thus results in a financial windfall for WRA ranches. *Id.* ¶ 46

WRA's actions have impacted sheepherder wages both in the immediate term and in the long term. While wages in other similar industries have continued to rise with normal inflation, sheepherder wages have lagged behind. *Id.* ¶ 117. This is because WRA's scheme has downstream impact on DOL's wage floor: DOL determines the appropriate wage floor by conducting wage surveys of sheepherders. Thus, the fact that sheepherders are all or nearly all paid the minimum exerts continuing downward pressure on the wage floor, to the great financial benefit of WRA ranches. *Id.* ¶ 116. It also deprives experienced sheepherders like Alvarado of the opportunity to pursue a higher wage based on superior skill and experience. *Id.* ¶ 79

One would expect to see a different wage arrangement absent anticompetitive collusion. In a competitive market, ranches would offer domestic workers a higher wage than foreign workers to account for the additional cost of bringing a foreign worker to the United States. *Id.* ¶ 62. Further, freely negotiated wages would likely result in differentiation among sheepherders, in recognition of differing skill, job location, experience, and work environment. *Id.* ¶ 63. Such freely negotiated wages, in turn, would be reflected in the surveys that DOL uses to calculate the wage floor for foreign sheepherders, which would increase DOL's wage floor. *Id.* ¶ 64.

WRA's scheme is evidenced not only by the fact that its ranches all pay the same wage; WRA's leadership has confirmed it. In a 2021 deposition, former WRA executive director Dennis Richins testified that WRA's members agreed with each other, through the association, all to offer the minimum wage. *Id.* ¶ 90. Richins testified that WRA members would "receive a letter [from

the WRA] about what the wage would be," and that that wage was always the minimum DOL permitted. *Id*. ¶¶ 88-89; *see also id.* ¶ 86 ("WRA members further agree with the WRA and each other, orally and otherwise, that this [minimum] wage will be offered.").

Count I of the Complaint alleges that WRA's members have colluded horizontally not to compete in the market for sheepherder labor by fixing the wages, through WRA, that every ranch will offer to sheepherders. *Id.* ¶¶ 149-161. Count II, based on the same conduct, alleges that WRA horizontally allocates the market for sheepherder labor among WRA members, allowing them to "avoid competing for labor, coercing sheepherders into agreements which remove sheepherders' ability to negotiate for better wages or wages commensurate with their experience, or to seek employment at other ranches." *Id.* ¶ 168; *id.* ¶ 162-177.

## I.   THE COMPLAINT PLAUSIBLY ALLEGES THAT WRA HAS VIOLATED THE SHERMAN ACT

The wage-fixing scheme just described is a *per se* violation of the Sherman Act, because WRA's member ranchers, which are competitors for sheepherders' labor, have agreed with each other to set wages in tandem, all at the DOL minimum, rather than compete with each other by offering wages commensurate with their needs and sheepherders' abilities.

### A.   WRA's Collusion With its Members to Fix Wages Violates the Sherman Act

The WRA's joint decision with its members not to compete for labor—to jointly fix the wages they will all pay to sheepherders—is a textbook violation of § 1 of the Sherman Act. It is long-settled law that associations are prohibited from setting prices for their members. *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679 (1978) (upholding antitrust action against association that imposed ethical rule prohibiting competitive bidding by members); *Goldfarb v. Va. State Bar*, 421 U.S. 773, 781 (1975) (concluding that bar associations violated antitrust laws by setting fee schedules for their members). The same is true for wages. *Anderson v. Shipowners' Ass'n of Pac. Coast*, 272 U.S. 359, 362 (1926) (declaring it a Sherman Act violation for

"associations [of ship owners to] fix the wages which shall be paid . . . seamen" by owners of merchant sea vessels).  Collusion with competitors—whether or not it's through an association, and whether it's to fix prices or wages—is the primary evil the Sherman Act prohibits.

Rather than independently determine what wage they will offer sheepherders, WRA's member ranches instead all received from WRA "a letter saying what the wage would be."  Compl. ¶ 89.  The rate WRA set for its members was always the DOL minimum, and members agreed with each other that this was the wage they would all pay.  Compl. ¶¶ 88-89.  This coordination is in no way required by DOL's rules, which expressly provide that the minimum is a "a wage floor, and its existence does not prevent the worker from seeking, or the employer from paying, a higher wage."  *Id*. ¶ 112 (quoting *Temporary Agricultural Employment of H-2A Aliens in the United States*, 75 Fed. Reg. 6,884, 6,891 (Feb. 12, 2010)).  What *does* prevent that competitive process from playing out, however, is the conscious commitment between WRA's members not to compete with one another for labor.  *Id*. ¶ 86 ("WRA members further agree with the WRA and each other, orally and otherwise, that [the minimum wage] will be offered.").

As an association, WRA can't set wages for its all members in this way any more than it could set the prices for the wool they sell on the market by sending them all "a letter saying what the [price] would be."  The fact that sheepherders' wages are fixed through an association does not render the scheme lawful.  *Goldfarb*, 421 U.S. at 782 (describing minimum fee set by state bar association "naked agreement . . ., and the effect on prices is plain"); *Plymouth Dealers' Ass'n of N. Cal. v. United States*, 279 F.2d 128, 130 (9th Cir. 1960) (*per se* unlawful where association "printed and published a price list and circulated it to its members" for them to use as starting price).  "A 'contract, combination, or conspiracy,' that is necessary or useful to a joint venture is still a 'contract, combination, or conspiracy' if it 'deprives the marketplace of independent centers of decision making.'"  *American Needle, Inc. v. NFL*, 560 U.S. 183, 199 (2010) (quoting

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769 (1984) (alterations omitted));

*NCAA v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 113 (1984) ("[J]oint ventures have no

immunity from the antitrust laws.").

In *American Needle*, the Supreme Court evaluated a joint venture that the teams of the NFL

had created and assigned all of their trademarks to, for that entity to license jointly on the teams'

behalf.  560 U.S. at 187.  The Court held that the joint venture, called NFLP, functioned as a cartel

subject to § 1 of the Sherman Act, because without it, the teams would compete with each other in

the licensing of trademarks.  *Id.* at 197 ("To a firm making hats, the Saints and the Colts are two

potentially competing suppliers of valuable trademarks.").  The teams' decision instead to jointly

assign all their trademarks to one vendor thus "deprive[d] the marketplace of independent centers

of decision making, and therefore of actual or potential competition."  *Id.* at 197 (citations omitted).

That is the situation here, with WRA's members delegating to the association the decision

to set wages for all of them.  Absent ranches' agreement that WRA will set wages for all of them,

they "would compete in the labor market for the best sheepherders, and sheepherders would

compete in the labor market for the best sheepherding jobs."  Compl. ¶ 47.  They would, for

purposes of hiring workers, be the "independent centers of decision making that competition

assumes and demands."  *Am Needle*, 560 U.S. at 190.  Instead, they have agreed with each other

to delegate wage-setting authority for all of them to a single entity, WRA, and deprived the market

of competition.  This is a *per se* violation of the Sherman Act.  *Anderson*, 272 U.S. at 362.

Alvarado also alleges that the WRA divides the market for sheepherders and sheepherder

visas, a separate violation of the Sherman Act.  Compl. ¶¶ 162-177 (Count II).  In a competitive

market, ranches would compete for sheepherders before they are on a visa and between visas, and

sheepherders would have the opportunity to shop between ranches for fair treatment, decent wages,

and workplace dignity.  But that is not what happens in the market for sheepherders.  Ranches

agree to allow the WRA to assign sheepherders to ranches before visas and between visas.  *Id*. ¶¶ 120-130.  Alvarado alleges that he was assigned to the ranch where he worked, without any opportunity to shop between ranches for one that would treat him fairly.  *Id*. ¶ 20.  This amounts to an agreement to divide the market for workers and is a *per se* violation of the Sherman Act. *United States v. Topco Assocs., Inc*., 405 U.S. 596, 608 (1972); *Movie 1 & 2 v. United Artists Commc'ns, Inc*., 909 F.2d 1245 (9th Cir. 1990) (applying *per se* treatment to an agreement between film exhibitors whereby "a normally competitive market [was divided] by allocating films to particular members with the understanding that there will be no bidding among members for licensing rights to the films assigned"); *United States v. DaVita Inc*., No. 1:21-CR-00229-RBJ, 2022 WL 266759, at *3 (D. Colo. Jan. 28, 2022) (in labor market antitrust case explaining that "[a] horizontal market allocation agreement is an agreement between competitors at the same level of the market structure to allocate a market order to minimize competition").

**B.    The Complaint Plausibly Alleges the Existence of the Wage-Fixing Scheme**

The Complaint more than plausibly establishes that WRA and its members have engaged in the unlawful conduct described above.  In a case alleging an antitrust conspiracy, "to state a plausible Section 1 claim, plaintiffs must include additional factual allegations that place that parallel conduct in a context suggesting a preceding agreement."  *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 47 (9th Cir. 2022).  The Complaint amply satisfies this standard, both by alleging direct evidence of the agreement and by alleging circumstantial evidence that is not consistent with independent economic decision making.

Most crucially, Alvarado's Complaint alleges that in a 2021 deposition, former WRA executive director Dennis Richins testified that WRA's members agreed with each other, through WRA, all to offer the minimum wage. *Id.* ¶ 90.  Specifically, Richins testified that WRA members

would "receive a letter [from WRA] about what the wage would be," and that that wage was always the minimum DOL permitted.  Compl. ¶¶ 88-89; *see also id.* ¶ 86 ("WRA members further agree with the WRA and each other, orally and otherwise, that this [minimum] wage will be offered."). Far from "wanton speculation," MTD 14, this testimony from a former executive director is precisely the type of "circumstance pointing toward a meeting of the minds" that renders a collusion claim plausible.  *Twombly*, 550 U.S. at 557.  Richins' admission precludes the inference that WRA's members each made an "independent decision."  *Id.* at 553.  It is hard to imagine an allegation more clearly evidencing that WRA's members agreed to let WRA set the wage than an admission from WRA's former executive director saying that is what happened.

The Complaint also offers circumstantial evidence demonstrating the existence of the scheme.  In addition to the very fact that WRA members all pay sheepherders at or very near the DOL minimum, the Complaint also explains why one wouldn't expect this to occur naturally, and why WRA and its members had an incentive to fix wages at that level.  Sheepherders vary considerably in terms of skill and experience, Compl. ¶¶ 92-93, with more skilled sheepherders being more profitable for their employers than less skilled sheepherders, *id.* ¶ 96.  And while WRA asserts (without explanation) that absent an agreement, its member ranches would all "naturally" pay the minimum, MTD 15, the Complaint directly refutes this:

> From an economic standpoint, offering a higher wage would attract a larger pool of additional qualified sheepherders, which would in turn increase the profits of each ranch that more qualified sheepherders would work at.  This is because each worker would bring in revenue surpassing the costs of paying them, and because there is a wide variety between sheepherders in terms of skill—some sheepherders are better than others due to their experience, and these sheepherders will perform better and generate more profits for their ranches than less talented sheepherders.

Compl. ¶ 96.  In other words, while a ranch would never pay a sheepherder more than the sheepherder earned for the ranch, it is economically rational to pay above the minimum wage

where, as here, it would attract more productive sheepherders. *Id.* Absent WRA's conspiracy, the competitive wage for sheepherders would be higher than the DOL wage floor. *Id.* ¶ 97.

WRA suggests that the Tenth Circuit's decision in *Llacua v. Western Range Ass'n*, 930 F.3d 1161 (10th Cir. 2019), precludes a finding of liability here, because the court there evaluated similar wage-fixing claims and held that they had not been plausibly pled. *See* MTD 12-15. But what WRA fails to notes is that the Tenth Circuit placed great weight on the fact that the complaint there "allege[d] no explicit agreement among the [WRA] or their members," and that there was "no allegation association members discussed or agreed among themselves how to pay foreign shepherds." *Llacua*, 930 F.3d 1180-81; *see also id.* at 1177 (concluding plaintiffs had not alleged direct evidence because "[t]here is no allegation of fact showing the Association Defendants controlled member ranches' decision-making processes to further a collective scheme"). Here, by contrast, Alvarado alleges—based on sworn testimony by WRA's former executive director— "that all of the WRA's members agreed to offer the same fixed minimum wage," Compl. ¶ 90, and that WRA members received a letter telling them what price all of them would pay for labor, *id.* ¶ 89. This is precisely the kind of evidence that *Llacua* held would plausibly establish a § 1 violation. 930 F.3d at 1174 n.24 ("Direct evidence of a § 1 agreement may take the form of a written contract or agreement, such as association rules, or *admissions of an agreement*." (emphasis added)).

In any event, *Llacua*'s reasoning about the circumstantial evidence before it has been criticized by prominent antitrust scholars and labor economists as misunderstanding basic market principles. For the Tenth Circuit, there was nothing inherently suspicious about all WRA members paying the DOL minimum wage, because "[a]ssuming a sufficient supply of qualified labor is available at this wage, no rancher would be logically inclined to offer more." *Id.* at 1181. But as Professors Herbert Hovenkamp (author of a leading antitrust treatise) and Eric Posner noted in a

later *amicus* brief:

> This argument misunderstands basic economics. There is no such thing as a "sufficient supply of qualified labor." Employers are assumed to hire the number of workers that maximize profits. While a firm that employs very few workers may be able to stay in operation, it will hire above the minimum scale when additional workers bring in revenues greater than labor costs even though it must increase wages to attract new workers. If a firm fails to do so, this creates the inference that it is engaging in anticompetitive behavior to keep wages artificially low. That inference is further strengthened if the firm collaborates with its competitors.

*See Llacua v. Western Range Ass'n*, No. 17-1113, Dkt. # 10680652 (10th Cir. Sept. 17, 2019); *see also* Ioana Marinescu, Eric A. Posner, *Why Has Antitrust Law Failed Workers?*, 105 Cornell L. Rev. 1343, 1379 (2020) ("But it is simply an economic error to claim that competitors are allowed to fix prices as long as those prices attract 'sufficient' customers. Competitors are supposed to bid against each other, so that they end up charging customers less than those customers are willing to pay and workers more than they are willing to work for. *The uniform wage—at the legal minimum, to boot—was overwhelming evidence of conspiracy*." (emphasis added)). Thus, the Tenth Circuit's incorrect conclusion that "no rancher would be logically inclined to offer more" than the minimum wage led it to wrongly disregard the circumstantial evidence before it.

In any event, as noted above, in this case the Complaint alleges the precise direct evidence the *Llacua* court said was missing: direct evidence that WRA sent its members letters telling them what to pay (always the minimum), and that WRA's members collectively agreed to follow this directive. Compl. ¶¶ 87-90. Alvarado has more than met his burden of alleging the conspiracy.

## C.   WRA's Arguments to the Contrary Are Meritless

The WRA dedicates only five pages of its brief to arguing why, on the merits, Alvarado's complaint should be dismissed. *See* MTD 11-16. WRA first argues in passing that Alvarado's allegations are all "conclusory statements that merely ask the Court to *infer* that illegal activity has occurred, without offering a shred of evidence or facts that it has." MTD 12. But as just noted, the Complaint alleges that a former executive director admitted that WRA dictates wages for all

of its ranches, and that all the members agree to follow WRA's instructions.  Compl. ¶¶ 88-90.

Far from "wanton speculation," MTD 14, that is direct evidence of an agreement to restrain trade.

WRA's remaining assertions—(1) that the fact the wages paid to sheepherders sometimes

varied means there can be no liability; and, (2) that complying with DOL's wage floor DOL for

sheepherders cannot be unlawful—both misunderstand the Complaint and what is necessary to

adequately plead a Sherman Act violation.[1]

### 1.   *The fact that ranches sometimes depart from the agreed-upon minimum wage does not preclude liability.*

WRA argues that the Complaint's allegations that sometimes member ranches "can and do

offer higher wages than those set by DOL," in the form of off-the-books bonuses, renders

Alvarado's claim implausible.  MTD 12; *see* Compl. ¶¶ 66-70.  WRA asserts that this occasional

variation from the agreed-upon minimum "completely vitiates and obviates the [Complaint's] legal

conclusions."  MTD 12.  WRA is wrong:  Even if the conspiracy's members sometimes depart

from the agreement, its effect is still to depress wages overall.  Most cartels have cheaters who

occasionally depart from the agreed upon price (or, in this case, wage)—this does not render the

initial agreement not to compete lawful.  *See, e.g.*, *In re High Fructose Corn Syrup Antitrust Litig.*,

295 F.3d 651, 656 (7th Cir. Ill. 2002) (Posner, J.) ("An agreement to fix list prices is . . . a *per se*

violation of the Sherman Act even if most or for that matter all transactions occur at lower prices").

---

[1] WRA also asserts—without support—that "the government-established minimum wage [(AEWR)] is greater than the natural, market equilibrium wage rate that would occur in the absence of an AEWR," making it rational for every rancher to pay the minimum.  MTD 13.  This bald assertion not only is disproven by the analysis of the antitrust and economic scholars cited above, *supra* p. 12-13; it also directly conflicts with the Complaint's plausible allegations that workers in similar industries are paid more than sheepherders at WRA ranches, and that H-2A sheepherders would make similar wages absent WRA's unlawful scheme.  *See, e.g.*, Compl. ¶ 63.  WRA's factual assertion must thus be disregarded at this stage.  *See, e.g.*, *Steele Acquisitions LLC v. N. Nevada Bldg. & Constr. Trades Council Dev. Corp.*, No. 3:16-cv-27, 2016 WL 11671945, at *2 (D. Nev. Sept. 28, 2016) ("Moreover, the defense to this claim is based on evidence that cannot be considered on a motion to dismiss.").

The Complaint alleges that, "in recognition . . . of the added value brought by an experienced sheepherder, [WRA members] sometimes pay these workers more than the wage offered to domestic sheepherders," *i.e.*, the DOL wage floor.  Compl. ¶ 103.  This refutes WRA's suggestion that the natural, equilibrium wage for all sheepherders is below the DOL wage floor; if that were true, WRA members would never pay bonuses.  When ranches pay bonuses, however, they don't report it to DOL, which allows WRA and its members to keep the DOL floor—which is set based on surveys of *reported* wages—artificially depressed.  Compl. ¶ 116.  Moreover, "bonuses are paid infrequently and are not the industry standard," and they do not alter the overall effect of WRA's scheme, which is to depress sheepherder wages across the board.  *Id.* ¶ 70.

WRA would have the Court believe that because of these "occasional departures," *id.*, there can be no unlawful agreement.  But unlawful price fixing—or wage fixing—"includes more than the mere establishment of uniform prices."  *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 222 (1940) (finding scheme *per se* illegal even though prices were not "uniform and inflexible"); *Plymouth Dealers' Ass'n of N. Cal. v. United States*, 279 F.2d 128, 130 (9th Cir. 1960) (association "printed and published a price list and circulated it to its members" for them to use as starting price).  Any "agreement that 'interfere[s] with the setting of price by free market forces' is illegal on its face."  *Nat'l Soc. of Pro. Engineers v. United States*, 435 U.S. 679, 692 (1978) (quoting *United States v. Container Corp.*, 393 U.S. 333, 337 (1969)).  When competitors tamper with the "starting point for the bargaining," that violates the Sherman Act.  *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d at 656; *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 771 (2d Cir. 2016) ("the fixing of a component of price violates the antitrust law").

### 2. The fact that the fixed wage WRA's member ranches pay complies with DOL's regulations is irrelevant to the antitrust analysis.

WRA next claims that the Complaint only alleges "actions that the member ranches were required to take," *i.e.*, paying the DOL-prescribed minimum.  MTD 15.  But the Complaint makes

clear—as do DOL's regulations—that WRA members are completely entitled to pay above the minimum.  *See* Compl. ¶ 112 ("The AEWR is a wage floor, and its existence does not prevent the worker from seeking, or the employer from paying, a higher wage." (quoting *Temporary Agricultural Employment of H-2A Aliens in the United States*, 75 Fed. Reg. 6,884, 6,891 (Feb. 12, 2010)).  The fact that the fixed wage WRA and its members agreed upon complied with DOL regulations doesn't immunize their collusion from antitrust liability.[2]

In any event, "the presence of regulation, by itself, does not dictate the antitrust standard; antitrust actions involving regulated industries have been repeatedly tried under a *per se* standard." *United States v. Baltimore & O. R. R.*, 538 F. Supp. 200, 210 (D.D.C. 1982); *see also United States v. Joint-Traffic Ass'n*, 171 U.S. 505, 565 (1898) (concluding that competing operators could not fix rates even though those rates were approved by the Interstate Commerce Commission); *Webb v. Utah Tour Brokers Ass'n*, 568 F.2d 670, 675 (10th Cir. 1977) (affirming judgment of liability association of tour brokers for attempting to exclude the plaintiffs from the tour broker market, notwithstanding the Interstate Commerce Commission's heavy regulation of the industry).

Nothing in DOL's regulations contemplates competitors agreeing with each other all to pay the minimum wage, and DOL doesn't supervise WRA's interactions with their members.  The fact, therefore, that WRA's actions complied with DOL's regulations says nothing about whether WRA violated the antitrust laws.  *Cf. Patrick v. Burget*, 486 U.S. 94, 101 (1988) ("[t]he mere presence of some state involvement or monitoring does not suffice" to confer antitrust immunity).

## II.   WRA IS NOT ENTITLED TO ANTITRUST IMMUNITY

WRA next claims that even if a conspiracy existed, it is immune from antitrust scrutiny.

---

[2] Indeed, as discussed in the following Section, antitrust law has several recognized immunities, two of which WRA argues apply to its conduct.  WRA cannot, without meeting those doctrines' requirements, simply make up a heretofore unheard of "we complied with regulations" immunity.

But neither immunity doctrine it raises is at all applicable.

### A. WRA Is Not Entitled to *Noerr-Pennington* Immunity

WRA first argues its wage-fixing scheme is protected by the First Amendment under the *Noerr-Pennington* doctrine.  MTD 15-16.[3]  Under that doctrine, individuals can't be held liable for petitioning the government, even if they conspire or collude with competitors in doing so.  A prime example is trade associations:  Normally, the Sherman Act prohibits competitors in an industry from agreeing on a concerted course of action, but when they do it to lobby for changes in the law that will benefit them all, that is protected speech.  *See, e.g.*, *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 669 (1965) (First Amendment prohibits Sherman Act liability for "conspiracy . . . consisting entirely of activities of competitors seeking to influence public officials").

WRA's argument appears to be that because the H-2A program requires "the sharing of wage data with the DOL," that is petitioning the government and therefore WRA is entirely immune for the conduct alleged in the Complaint. *Id.* at 16.  This misses the point—the Complaint doesn't allege that WRA violated the law by submitting H-2A applications or wage data to DOL; what *was* illegal was WRA's decision to collude with its members and all agree to pay the minimum wage DOL set.  The fact that an ancillary part of the scheme was submitting the applications and wage data to DOL after the unlawful wage-fixing agreement had been made is irrelevant.  "An antitrust violation does not enjoy immunity simply because an element of that violation involves an action which itself is not illegal. . . .  The reach of the *Noerr-Pennington* doctrine is not that extensive, and the antitrust laws are not that impotent." *Clipper Express v.*

---

[3] Notably, "courts rarely award *Noerr-Pennington* immunity at the motion to dismiss stage, where the Court must accept as true the non-moving party's well-pleaded allegations." *Sonus Networks, Inc. v. Inventergy, Inc.*, No. C-15-0322 EMC, 2015 U.S. Dist. LEXIS 97748, at *5 (N.D. Cal. 2015).

*Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1263-64 (9th Cir. 1982).  As another district court in the Ninth Circuit has stated:

> Plaintiffs seek to impose liability, not for the act of 'petitioning' the government, but for specific acts committed in the course of 'petitioning' the government.  This is a critical distinction.  The First Amendment provides that liability generally cannot be imposed on the basis that one has exercised his or her right to petition the government.  It does not provide that liability cannot be imposed for any conduct whatsoever that occurs during the course of petitioning the government.

*United States ex rel. Maranto v. Maxxam, Inc.*, No. C 06-7497 CW, 2009 U.S. Dist. LEXIS 14375, at *18 (N.D. Cal 2009).

Even *United Mine Workers v. Pennington*, 381 U.S. 657 (1965), one of the doctrine's foundational cases, makes clear the distinction between protected petitioning activity and unprotected collusion.  WRA claims that in *Pennington* the Supreme Court held that "defendants could not be liable for paying wages set by the Secretary of Labor, to whom the defendants had petitioned."  MTD 15.  That's simply not true:  The Court held that the lobbying activities of a union and several companies—asking the Secretary of Labor to set a new wage for certain coal contracts under the Walsh-Healey Act, and asking the Tennessee Valley Authority to change its coal purchasing practices—could not, *standing alone*, be the basis of a Sherman Act claim, even if done with the purpose of harming a competitor.  *Pennington*, 381 U.S. at 659-51; *see also id.* at 669-70 (Sherman Act liability could not be "based solely on the Walsh-Healey and TVA episodes").  What the defendants *could* be convicted for, however, were the other collusive acts they took to fix wages.  *Id.* at 669 ("Thus, the relevant labor and antitrust policies compel us to conclude that the alleged agreement between UMW and the large operators to secure uniform labor standards throughout the industry, if proved, was not exempt from the antitrust laws.").[4]

---

[4] Notably, the Court held that the conspirators' overtures to the government, while protected by the First Amendment, could nonetheless be admitted as evidence to demonstrate the unlawful purpose of the rest of the scheme.  *Id.* at 670 n.3; *see also MCI Commc'ns Corp. v. Am.*

Alvarado does not seek to hold WRA liable for the "sharing of wage data with the DOL," MTD 16; it seeks to hold WRA liable for the fixing of wages with its members before they sent their H-2A applications to DOL.  As in *Pennington* and the other authorities cited above, the mere fact that one aspect of collusion involved petitioning doesn't render the whole conspiracy immune.

**B.      WRA Is Not Entitled to *Parker* Immunity**

WRA next argues it is entitled to immunity under *Parker v. Brown*, 317 U.S. 341 (1943), also known as "state action" immunity.  MTD 15.  According to WRA, "[c]ompliance with official government action cannot create antitrust liability."  *Id*.  But WRA's "compliance" with DOL's wage floor isn't what Alvarado challenges—he challenges WRA's collusion with its members to fix wages at that level, something DOL neither requires nor oversees.  WRA could equally comply with DOL's regulations by submitting bids at varying, competitive levels without colluding with its members.  *Parker* immunity is thus wholly inapplicable.

The Ninth Circuit noted earlier this year that *Parker* immunity is "disfavored," and "applies only when it is clear that the challenged anticompetitive conduct is undertaken pursuant to a regulatory scheme that 'is the State's own.'"  *Ellis v. Salt River Project Agric. Improvement & Power Dist.*, 24 F.4th 1262, 1276 (9th Cir. 2022) (quoting *FTC v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216, 225 (2013)).  To make that showing, a defendant must satisfy two elements: "first that 'the challenged restraint be one clearly articulated and affirmatively expressed as state policy,' and second that 'the policy be actively supervised by the State.'"  *N.C. Bd. of Dental Examiners v. FTC*, 574 U.S. 494, 504 (2015) (citations and alterations omitted).

WRA can't meet either requirement.  Here, the "challenged restraint" is WRA's agreement

---

*Tel. & Tel. Co*., 708 F.2d 1081, 1160 (7th Cir. 1983) (accord).  Here, WRA's submissions to DOL are relevant evidence, as the fact that they are all at DOL's minimum is circumstantial evidence of WRA's agreement with its members universally to pay sheepherders that amount.  But the submission of the forms themselves is not the basis of Alvarado's claim.

to fix wages—and there's no government policy requiring (or even permitting) applicants to collude to fix wages at the floor.  To the contrary, DOL makes explicit that ranches can pay above the minimum.  *See* Compl. ¶ 113 (DOL minimum wage is "*intended as a floor* and not a ceiling.") Second, while DOL reviews the applications WRA submits, the Department doesn't "actively supervise" WRA's interactions with its members.  "[T]he active supervision requirement mandates that the State exercise ultimate control over the challenged anticompetitive conduct. . . .  The mere presence of some state involvement or monitoring does not suffice."  *Patrick v. Burget*, 486 U.S. 94, 101 (1988).  Here, there may be some "state" involvement in DOL's setting of the wage floors,[5] but DOL does not supervise in any way WRA's interactions with its members.

WRA resists this conclusion by arguing that wages are "actively supervised by the relevant state governments via minimum wage enforcement agencies."  MTD 16.  That misses the point. Those agencies supervise whether a company has failed to pay a minimum wage—they don't investigate whether a group of competitors has gotten together and agreed to each pay all their employees the minimum wage, which would clearly violate the Sherman Act.  Commodities traders are "actively supervised" by the Commodities Futures Trading Commission—but that doesn't grant them blanket antitrust immunity.  *E.g.*, *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940) ("Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se.").  Defendants are immune only if their conduct carries out a policy of the state's to displace competition, which state minimum wage laws do not.

---

[5] Every case cited herein and in WRA's brief establish another reason why WRA's state action immunity argument fails:  The doctrine, borne of federalism concerns, only immunizes conduct furthering policies and actively over seen by the *states*.  *See, e.g.*, *N.C. Bd. of Dental Examiners*, 574 U.S. at 503 (state action immunity "embod[ies] in the Sherman Act the federalism principle that the States possess a significant measure of sovereignty under our Constitution" (citation omitted)).  DOL, of course, is a federal agency.  WRA cites no case—and Alvarado is aware of none—applying *Parker* to immunize conduct when it's a federal agency involved.

*Salt River*, 24 F.4th 1262, 1276 (9th Cir. 2022) ("State-action immunity is inapplicable here because the State of Arizona has not articulated a 'policy to displace competition.'" (quoting *Phoebe Putney*, 568 U.S. at 226)).

## III.   THE DOCTRINE OF RES JUDICATA DOES NOT APPLY TO ALVARADO'S CLAIMS

WRA's primary argument is that the Court should dismiss this action on res judicata grounds due to the "Dismissal of Identical claims in *Llacua v. Western Range*." MTD 6; *see id.* 5-10. But this argument fails for several reasons. Alvarado was not a party to *Llacua*, which was never certified as a class action; Alvarado is not in privity with any of *Llacua*'s named plaintiffs; and, in any event, the relevant evidence and time period in this case are materially different from those in *Llacua*. WRA has fallen far short of meeting its burden on this affirmative defense. *See Taylor v. Sturgell*, 553 U.S. 880, 907 (2008) ("A party asserting [issue or claim] preclusion must carry the burden of establishing all necessary elements." (alteration omitted) (quoting 18 Wright & Miller § 4405, at 83)); *see also* Fed. R. Civ. P. 8(c).[6]

### A.   Brief Overview of *Llacua v. Western Range Association* Litigation[7]

In September 2015, sheepherders Rodolfo Llacua and Esliper Huaman filed a putative class action in the District of Colorado alleging that WRA, a second rancher association, and numerous

---

[6] While traditionally, the term "res judicata" referred to claim preclusion and "collateral estoppel" referred to issue preclusion, today, "res judicata" is often used to refer to both. *See Vazquez v. Jan-Pro Franchising Int'l, Inc.*, 986 F.3d 1106, 1114 (9th Cir. 2021). WRA raises a "res judicata" defense but doesn't specify whether it means to invoke claim or issue preclusion. Given that WRA's brief only discusses elements relevant to claim preclusion, *see* MTD 7—and doesn't identify a single "issue" that it argues is precluded, *see id.* at 8-9—it appears WRA means only to invoke claim preclusion. Thus, this brief focuses primarily on that doctrine. However, Alvarado briefly explains why issue preclusion is also inapplicable at n.12, *infra*.

[7] WRA attached to its motion to dismiss various documents from the *Llacua* litigation, then filed a separate motion asking the Court to take judicial notice of these documents. *See* ECF 24. Alvarado has no objection to this request, which was unnecessary in any event since these court filings and judicial decisions are all matters of public record. *See Tao Grp. Holdings, LLC v. Emps. Ins. Co. of Wausau*, 2022 U.S. Dist. LEXIS 41520, at *7 (D. Nev. Mar. 8, 2022).

member ranchers engaged in illegal wage fixing, in violation of the Sherman Act, and illegally deducted from sheepherders' pay, in violation of RICO.  *See Llacua v. Western Range Association*, 1:15-cv-01889-REB-CBS, ECF Nos. 1, 73 (D. Colo. 2015).[8]  Via subsequent complaint amendments, the existing plaintiffs added three additional named plaintiffs to the case: Leovegildo Vilchez Guerra, Liber Vilchez Guerra, and Rafael De La Cruz.  *Llacua* ECF No. 73.  Of the five named plaintiffs, four were hired by WRA to work at WRA member ranches—three in Colorado, and one in Utah.  *See id.* ¶¶ 16-20.  The fifth named plaintiff worked at a ranch in Nevada, but that ranch was not a WRA member but rather belonged to a different association.  *Id.* ¶ 20.

The plaintiffs alleged that WRA and its members conspired and agreed to fix the wages offered and paid to sheepherders at the minimum DOL wage floor.  Lacking direct evidence of an agreement, the plaintiffs alleged that a conspiracy could be inferred due to the fact that (1) all of WRA's job offers for domestic workers fixed the wage at DOL's wage floor; and (2) all of WRA's H-2A applications fixed the wage at DOL's wage floor.  *Id.* at ¶¶ 215-30.  The operative complaint defined the WRA wage fixing class as including sheepherders who worked at WRA member ranches beginning in September 2011.  *Id.* ¶ 162.

On June 3, 2016, the magistrate judge recommended that the antitrust claims be dismissed, because the complaint lacked facts directly establishing an agreement to restrain trade or commerce, "such as association rules, or admissions of an agreement."  *Llacua* ECF No. 125 at 10-12.  The district court adopted the magistrate judge's recommendation and dismissed the plaintiffs' antitrust claims with prejudice on March 7, 2017.  *Llacua* ECF No. 174.  No class was certified prior to the entry of judgment.  *See* Declaration of Jamie Crooks ("Crooks Decl."), Ex. 2 (*Llacua* D. Colorado Docket).

---

[8] For ease of reference, going forward, this brief will refer to documents from the *Llacua* litigation as "*Llacua* ECF No. __".

The Tenth Circuit affirmed the dismissal of the antitrust claims.  *Llacua v. Western Range Ass'n*, 930 F.3d 1161 (10th Cir. 2019).  The court concluded that "no allegation in the [operative complaint] directly established" an anticompetitive agreement:

> There were no factual allegations of agreements, no reports, memoranda, or tapes of meetings, no plainly anticompetitive association rules compelling certain behavior.  In other words, there are no factual allegations in the [complaint] that explicitly establish, without the need for inferences, the existence of an agreement to fix the wages of domestic or H-2A shepherds.

*Id.* at 1177-78.  In the Tenth Circuit's view, plaintiff's allegations that the WRA prepared and submitted job offers and H-2A applications for member ranchers which set the wage at the DOL minimum was circumstantial (not direct) evidence of agreement, and therefore insufficient.  *Id.* at 1178.  The court suggested it would view the plaintiffs' claim more favorably had their complaint alleged that "association members discussed or agreed among themselves how to pay foreign shepherds."  *Id.* at 1181.

In the same decision, the Tenth Circuit reversed the district court's dismissal of the plaintiffs' RICO claims, *id.* at 1190, which proceeded to litigation in the District Court and were ultimately resolved in 2021.  *See* Crooks Decl., Ex. 2.  The case is no longer active.  *Id.*

## B.    *Llacua* Does Not Preclude Alvarado's Claims

The doctrine of claim preclusion forecloses successive litigation where there has been a final judgment of the same claim involving the same parties or their privies.  *See Taylor v. Sturgell*, 553 U.S. 880, 892 (2008).  It applies "only where there is (1) an identity of claims, (2) a final judgment on the merits, and (3) privity between parties."  *Mull v. Motion Picture Indus. Health Plan*, 41 F.4th 1120, 1139-40 (9th Cir. 2022) (citation and internal quotation marks omitted).

Easiest to resolve here is the third element—Alvarado was not in privity with any of the litigants in *Llacua*.  Moreover, even if he were, there is not an "identity of claims" between his claim and theirs, because the antitrust claim in *Llacua* was dismissed in March 2017, yet

Alvarado's Complaint primarily involves conduct that took place after that date. *See Harkins v. Amusement Enters., Inc. v. Harry Nace Co.*, 890 F.2d 181, 183-84 (9th Cir. 1989) ("It is elementary that new antitrust violations may be alleged after the date covered by decision or settlement of antitrust claims covering an earlier period."). For both these reasons, *Llacua* has no preclusive effect here.

### 1. Under Supreme Court and Ninth Circuit precedent, Alvarado was not in privity with or "adequately represented" by the Llacua plaintiffs.

To ensure that every party has a "full and fair opportunity to litigate" his claims, *Taylor*, 553 U.S. at 892, a prior judgment can only preclude someone from bringing a future claim if that person was either a party in the first action or in privity with a party, *see, e.g.*, *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 322 F.3d 1064, 1081 (9th Cir. 2003). While WRA was a party in *Llacua*, Alvarado assuredly was not—he was not a named plaintiff, and the case was never certified as a class action, meaning the judgment only binds the named parties.[9] Nor was Alvarado in privity with any of the named plaintiffs in *Llacua*, none of whom has any sort of legal relationship with.

Nonetheless, WRA argues that Alvarado's claims are precluded because he was "adequately represented" by the *Llacua* plaintiffs. MTD 9-10. WRA cursorily relies on *Taylor v. Sturgell* for the proposition that a "nonparty may be bound by a previous judgment if it was adequately represented by someone with the same interests who was a party to the prior suit." MTD 10 (quoting 553 U.S. at 893). But WRA declines to note that *Taylor* carefully limited the

---

[9] Indeed, WRA has not even argued that Alvarado was a member of the *putative* class the plaintiffs in *Llacua* sought to represent. That's because he wasn't—*Llacua*'s antitrust claim was dismissed in 2017 (affirmed by the Tenth Circuit in 2019), and Alvarado did not arrive in Nevada on his H-2A visa until July 2020. Compl. ¶ 25. Should WRA attempt to dispute this fact, its affirmative defense could not be decided at the motion to dismiss stage. *See Asacaro, LLC v. Union Pac. R.R. Co.*, 765 F.3d 999, 1004 (9th Cir. 2014).

circumstances under which litigants can be bound by prior judgments to which they were not parties. The Court emphasized "the fundamental nature of the general rule that a litigant is not bound by a judgment to which she was not a party." 553 U.S. 880 at 898.  Contrary to WRA's arguments, *Taylor* makes clear why Alvarado cannot be bound by the *Llacua* judgment.

To begin, WRA argues that *Taylor* held that "representative suits with preclusive effect on nonparties include properly conducted class actions."  MTD 10 (quoting 553 U.S. at 893). The problem for WRA is that *Llacua* was *not* a "properly conducted class action"—it was never certified as a class under Rule 23.  The *Taylor* Court emphasized that Rule 23's safeguards are what permit an absent class member to be bound by a prior judgment:

> A party's representation of a nonparty is "adequate" for preclusion purposes only if, at a minimum: (1) The interests of the nonparty and her representative are aligned; and (2) either the party understood herself to be acting in a representative capacity or the original court took care to protect the interests of the nonparty. In addition, adequate representation sometimes requires (3) notice of the original suit to the persons alleged to have been represented.  **In the class-action context, these limitations are implemented by the procedural safeguards contained in Federal Rule of Civil Procedure 23.**

553 U.S. at 900-01 (citations, alterations, and footnote omitted, emphasis added).  The Court emphasized that binding a nonparty to a litigation she wasn't involved in, absent Rule 23's protections, would raise serious due process concerns.  *Id.* at 901.  Simply put, *Llacua* can have no preclusive effect here because it was never a "properly conducted class action." *Id.* at 894.

The Ninth Circuit recently rejected a similar res judicata argument in *Vazquez v. Jan-Pro Franchising Int'l, Inc.*, 986 F.3d 1106, 1115-16 (9th Cir. 2021).[10]  In *Vazquez*, the defendant asserted that the plaintiffs there were in privity with others who had brought a prior case that the district court had styled a "test case."  The Ninth Circuit disagreed, because the district court had

---

[10] In federal question cases like Alvarado's, preclusion is assessed under the federal common law.  *Taylor*, 553 U.S. at 891.  *Vazquez* was a diversity jurisdiction case, so the Ninth Circuit applied Massachusetts' common law of claim preclusion, but the court noted that Massachusetts follows federal common law on this issue.  *Id.* at 1115.

not certified a class at the time of judgment and thus never inquired whether the named plaintiff in that suit "would adequately protect the interests of the other" people defendant sought to preclude from bringing later litigation. *Id.* at 1115-16. Binding the new plaintiffs to such a judgment "would not accord with due process and common-law principles of fairness," because it would deny them their day in court. *Id.* at 1116 (internal quotation marks and citation omitted).

Vazquez's holding was in line with longstanding Supreme Court and Ninth Circuit precedent refusing to give preclusive effect to uncertified class actions. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985) ("If the forum State wishes to bind an absent plaintiff concerning a claim for money damages or similar relief at law, it must provide minimal procedural due process protection. The plaintiff must receive notice plus an opportunity to be heard and participate in the litigation, whether in person or through counsel."); *Wright v. Shock*, 742 F.2d 541, 544 (9th Cir. 1984) ("[A]s the matter now stands, defendants have prevailed only against the named plaintiffs. The judgment will not be res judicata as to other individual plaintiffs or other members of any class that may be certified. These individuals or class members remain free to assert any claims they may have against . . . defendants."); *see also Besinga v. United States*, 923 F.2d 133, 135-36 (9th Cir. 1991).

Thus, under binding precedent, cases dismissed before class certification—before Rule 23's procedural safeguards come into play—cannot, without more, bind nonparties. Because that's exactly what happened in *Llacua*, that case cannot preclude Alvarado's claims here.

WRA next suggests Alvarado can be bound by the *Llacua* judgment because he was "completely represented the plaintiffs in *Llacua*" and one member of Plaintiff's counsel team in this case also represented the plaintiffs in *Llacua*. But the relationship between the claims and litigants in *Taylor* (the only case WRA cites on this issue) was even closer—and the Supreme Court nonetheless held that claim preclusion *didn't* apply.

26

*Taylor* involved two successive Freedom of Information Act lawsuits seeking the same records from the Federal Aviation Administration.   In the first case, Greg Herrick had unsuccessfully sued to obtain the documents in Wyoming.   553 U.S. at 886.   Less than a month after the Tenth Circuit affirmed the denial of Herrick's FOIA request, Brent Taylor brought suit in the D.C. Circuit seeking the same documents.   *Id.* at 887.   Herrick and Taylor were "friend[s]," they were members of the same antique aircraft association, and they were represented by the same lawyer in both cases.   *Id.* at 887, 891.

The Supreme Court nonetheless held that Herrick's case couldn't preclude Taylor's.   *Id.* at 891.   The Court delineating six limited circumstances where a nonparty can be bound by a prior judgment.   The only one WRA asserts applies here is where the latter party was "adequately represented by someone with the same interests who was a party to the prior suit."   *Id.* at 894 (citations and alterations omitted).   The Court listed what constitutes "adequate representation": "properly conducted class actions, and suits brought by trustees, guardians, and other fiduciaries." *Id.* (citations omitted).   Because the relationship between Herrick and Taylor fit into none of these categories, the Court held there could be no preclusion.   It didn't matter that they shared an attorney, nor that they were friends.   *Id.* at 898.

As discussed above, *Llacua* wasn't a "properly conducted class action."   And WRA does not argue that anyone in *Llacua* was Alvarado's trustee, guardian, or fiduciary—indeed, unlike in *Taylor*, WRA has cited no evidence that Alvarado has any relationship with any of the named parties in *Llacua*.   Finally, WRA's insistence that preclusion should apply because *one* of Alvarado's nine attorneys was also involved in *Llacua* flies in the face of the relevant case law. *See Taylor*, 553 U.S. at 884; *S. Cent. Bell Tel. Co. v. Alabama*, 526 U.S. 160, 162 (1999) (refusing to find special representational relationship where later plaintiffs were aware of earlier litigation and one the same lawyers represented both plaintiff groups); *Vazquez*, 986 F.3d at 1115-16

(declining to find privity even though the same counsel represented both plaintiffs, asserted identical theories, and relied on similar evidence).[11]

In short, WRA has come nowhere close to meeting its burden to prove that Alvarado was in privity with or "adequately represented" by the plaintiffs in *Llacua*. This alone is sufficient to defeat WRA's assertion of res judicata.

> ### 2. Even if Alvarado were in privity with the Llacua plaintiffs, there's no identity of claims because the two cases involve different time periods.

WRA's claim preclusion argument fails for a second reason: There is not an "identity of claims" between Alvarado's case and *Llacua* because the two cases involved different time periods. Read in the light most generous to the WRA, the *Llacua* complaint alleged that WRA colluded to fix wages between September 1, 2011, and the date the complaint was dismissed by the district court on March 7, 2017. And while the Complaint in this case alleges that the WRA began conspiring before March 7, 2017, it also alleges that WRA engaged in continued overt acts of wage-fixing long after that date. *See, e.g.*, Compl. ¶¶ 88-90 (discussing activity in 2021).

Any conspiracies or ongoing antitrust violations that post-date *Llacua*'s dismissal cannot possibly be precluded by the *Llacua* judgment. "It is elementary that new antitrust violations may be alleged after the date covered by decision or settlement of antitrust claims covering an earlier period." *Harkins v. Amusement Enters., Inc. v. Harry Nace Co.*, 890 F.2d 181, 183-84 (9th Cir. 1989). The WRA did not "acquire immunity in perpetuity from the antitrust laws" by winning its motion to dismiss in *Llacua*. *Id.* Thus, just as with privity, WRA fails to demonstrate that there's an identity of claims between *Llacua* and this case.

Due both to the lack of privity and the differing factual and temporal circumstances

---

[11] WRA also implies that Alvarado's interests were adequately represented because one of the *Llacua* plaintiffs, Rafael De La Cruz, was located in Nevada. *See* MTD 9-10. But De La Cruz worked for a ranch that was a member of another association, not the WRA, and thus could not possibly represent Alvarado's interests. *Llacua* ECF No. 73 ¶ 20.

between this case and *Llacua*, claim preclusion does not apply to Alvarado's claims.[12]

## IV.   ALVARADO HAS JOINED ALL INDISPENSABLE PARTIES

WRA next argues that DOL is an indispensable party to this case.  Parties are indispensable if complete relief cannot be accorded in that party's absence or the party's interest in the action may be impeded in their absence or leave them in substantial risk of incurring inconsistent obligations.  *See* Fed. R. Civ. P. 19.  But Alvarado does not challenge DOL's wage floor—he challenges WRA's collusion with its members to offer the minimum wage legally permitted, regardless of sheepherder skill and experience or ranch location.  There is thus no relief DOL can grant Alvarado, and it has no legally protected interest that would be impeded if it did not join.

WRA cites *Thomas v. Devilbiss*, 408 F. Supp. 1357 (D. Ariz. 1973), as supporting its claim that DOL is an indispensable party.[13]  In *Thomas*, the plaintiffs were challenging a decision of the Secretary of Interior, which affirmed the decision of an administrative law judge, declaring that the defendants had standing to contest plaintiffs' mining claims on their land.  The court held that the Department of Interior was an indispensable party because the Secretary has decision making

---

[12] Should WRA argue that it meant to raise issue preclusion when it asserted its "res judicata" defense, the Court should not be persuaded.  To begin, WRA has not adequately raised this affirmative defense: WRA's motion does not point to a single "issue" it argues is precluded, leaving Alvarado guessing as to which issue(s) WRA believes he is estopped from relitigating.  In any event, much like with claim preclusion, a nonparty can only be subject to issue preclusion if, among other things, he had "a full and fair opportunity to litigate the issue" in the prior proceeding, which the Supreme Court treats the same as the privity analysis.  *Taylor*, 553 U.S. at 892.  WRA cannot satisfy this element, for reasons already stated.  Separately, "collateral estoppel [is] inapplicable in a subsequent action raising the same issues" when there have been "[c]hanges in facts essential to [the] judgment."  *Montana v. United States*, 440 U.S. 147, 159 (1979).  Alvarado's complaint alleges new essential facts, including an admission from a former WRA executive director that WRA and its members agreed all to pay the DOL minimum wage.  *See* Compl. ¶¶ 87-90.  These new facts, which emerged only after the antitrust claim in *Llacua* was dismissed, are yet another reason why *Llacua*'s judgment can have no issue preclusive effect here.

[13] WRA also inexplicably cites *Hispanic Affairs Project v. Acosta*, 901 F.3d 378 (D.C. Cir. 2018), to argue that a challenge to DOL's wage rates has already been litigated.  True, but irrelevant:  Alvarado does not challenge DOL's wage floor, nor does he contest that WRA ranches pay the minimum DOL requires.

power on this issue, including whether someone has a sufficient adverse interest to initiate a contest

against a mining claimant and whether there is a valid claim. *Id*. at 1360.

Here, DOL doesn't have analogous authority regarding WRA's collusive wage-fixing. This suit against WRA is not "in actuality against the Secretary and his administrative regulations." *Id.* DOL's presence is not necessary to end WRA's unlawful scheme, and any order from this Court granting that relief will not affect the H-2A program more broadly.

WRA also argues that all parties to the conspiracy (*i.e.*, WRA's member ranches) are indispensable parties. MTD 18. But the Supreme Court held long ago that "[i]n a suit to enjoin a conspiracy not all the conspirators are necessary parties," *Georgia v. Penn. R.R.*, 324 U.S. 439, 463 (1945), and the Ninth Circuit has affirmed this principle in the antitrust context, *Ward v. Apple Inc.*, 791 F.3d 1041, 1048 (9th Cir. 2015). This argument is meritless.

## V.   VENUE IS PROPER IN NEVADA, AND NEITHER CONVENIENCE NOR THE INTERESTS OF JUSTICE SUPPORT TRANSFERRING THIS CASE TO UTAH

WRA's final attempt to keep this Court from evaluating Alvarado's claims is to argue the case should be transferred to the District of Utah, pursuant to 28 U.S.C. § 1404. *See* MTD 18-24. But WRA comes nowhere close to meeting its burden on this issue, primarily because **the entire basis for WRA's venue argument is an allegation WRA knows to be false**: that WRA's principal place of business is Utah. *See* Compl. ¶ 27. Two days after filing its motion to dismiss or to transfer, WRA filed the required Certificate of Interested Parties, which admits that WRA's principal place of business is actually Idaho. *See* ECF 25 at 1 (identifying itself as "a California Non-Profit Corporation with its principal place of business in Idaho, formerly Utah").[14] Yet, at least seven times in its brief, WRA misleads the Court by suggesting it is still headquartered in

---

[14] Upon learning this fact, Alvarado confirmed that WRA has been headquartered in Idaho since December 2015, when WRA moved its headquarters there from Utah. *See* Crooks Decl., Ex. 3 (Statement of Change of Business Mailing Address).

Utah—sometimes going so far as to put in bold text *only* the part WRA knows to be false.  *See, e.g.*, MTD 19-20 ("Western Range conducts business in Utah and Plaintiff himself alleges that '**Western Range has its principal place of business in Utah.**'" (emphasis in original)); *id.* at 19 (section heading reading, "Plaintiff's Own Allegations Illustrate Defendant is a California Non-Profit Corporation with its's [sic] Principal Place of Business in Utah"); *see also* MTD 3, 18-23.

To be clear, WRA never outright lies; in every instance, it carefully phrases its representation to quote Alvarado's allegation.  But WRA's purpose is unmistakable: to mislead the Court into thinking that WRA is still headquartered in Utah in the hopes of getting this case transferred there on a premise WRA knows to be false.

Alvarado apologizes for mistakenly alleging where WRA is headquartered, but fortunately that mistake does not affect the venue analysis because "[t]he Court may consider evidence outside the pleadings when determining venue" and draw all reasonable inferences in the non-movant's favor.  *Melbostad v. City of Cascade, Idaho*, No. 2:14-CV-350-JAD-VCF, 2014 WL 5410725, at *1 (D. Nev. Oct. 21, 2014).  Thus, in addition to WRA's admission in its Certificate of Interested Parties, the Court may also consider the 2015 Statement of Change of Business Mailing Address and the Annual Report dated June 23, 2022 that WRA filed with the Idaho Secretary of State which Alvarado attaches to the declaration accompanying this brief.  *See* Crooks Decl., Ex. 3 (Statement of Change of Business Mailing Address) and Ex. 4 (Annual Report).  None of this evidence is reasonably disputable, and it conclusively demonstrates that WRA's principal place of business as Idaho, where it has been headquartered since 2015.

Ultimately, it is for the Court to determine whether WRA's brief violates its duty of candor.  Regardless, the fact that WRA is no longer headquartered in Utah eviscerates any argument for this case being transferred there.  It also disposes of WRA's suggestion that Alvarado is "circuit shopping," MTD 7, since Idaho, like this Court lies in the Ninth Circuit.

### A. Legal Standard

"The party seeking [a venue] transfer bears the burden of showing transfer is appropriate." *Smith v. Amir Kennedy & Chapar LLC*, No. 2:21-cv-01526-APG-BNW, 2022 U.S. Dist. LEXIS 73715, at *3 (D. Nev. Apr. 21, 2022). "A motion to transfer lies within the broad discretion of the district court, and is determined on an individualized, case-by-case consideration of convenience and fairness." *Dooley v. Nev. Gold Mines, LLC*, No. 2:21-cv-00420-GMN-DJA, 2022 U.S. Dist. LEXIS 51912, at *2 (D. Nev. March 22, 2022) (internal quotation marks omitted).

As a general matter, a federal civil action may be brought (1) where a defendant resides, or (2) where a substantial part of the events giving rise to the claim occurred. 28 U.S.C. § 1391. The Sherman Act's venue statute provides that an antitrust suit may be brought "in any district wherein [the defendant] may be found or transacts business." 15 U.S.C. § 22.

28 U.S.C. § 1404(a) permits a court to transfer a case to another venue "[f]or the convenience of the parties and witnesses, in the interests of justice," so long as the case could have originally been brought in the other venue. *Id.* The purpose of Section 1404(a) "is to prevent the waste of time, energy and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense." *Vehimax Int'l, LLC v. Jui Li Enter. Co.*, No. CV 09-6437 SVW (JEMx), 2010 U.S. Dist. LEXIS 42801, at *9 (C.D. Cal. 2010) (internal quotation marks omitted). "A transfer will not be ordered if the result is merely to shift the inconvenience from one party to another." *Id.*

The Ninth Circuit has offered several factors, known as the "*Jones* factors, that are often relevant to the venue analysis:

> (1) the location where the relevant agreements were negotiated and executed, (2) the state that is most familiar with the governing law, (3) the plaintiff's choice of forum, (4) the respective parties' contacts with the forum, (5) the contacts relating to the plaintiff's cause of action in the chosen forum, (6) the differences in the costs of litigation in the two forums, (7) the availability of compulsory process to compel attendance of unwilling non-party witnesses, and (8) the ease of access to sources

of proof.

*Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498-99 (9th Cir. 2000).  All of them weigh against WRA here.

> **B.     Venue is Proper in Nevada**

WRA cursorily states in its brief that venue is "improper" in Nevada.  *See* MTD 18.  Yet WRA files its motion to transfer based on 28 U.S.C. § 1404(a), *id.*, which only applies to cases where venue is *proper* in the original court, but where the case might be more conveniently litigated elsewhere.  Thus, based on the motion it chose to file, WRA is estopped from arguing venue is improper in Nevada.  In any event, venue is clearly proper in this Court.  WRA does not dispute that Alvarado was placed by the WRA at one of its member ranches in Nevada, where WRA transacts business.  *See* Compl. ¶ 2; MTD Ex. 1, Winograd Decl. ¶ 8.  This is adequate to establish venue in this Court under both 28 U.S.C. § 1391 and 15 U.S.C. § 22.  *Action Embroidery Corp. v. Atlantic Embroidery, Inc.*, 368 F.3d 1174, 1178 (9th Cir. 2004).

> **C.     Defendant Has Not Met its Burden to Establish that this Case Could Have Been Brought in Utah**

As noted above, *supra* p. 30-31, WRA's primary argument that this case could've been brought in Utah is based on an allegation it knows to be false: that WRA is headquartered there.  WRA's own corporate records dispose of this argument.  *See* Crooks Decl., Ex. 3 and Ex. 4.

WRA's only other argument on this front Utah makes clear that Utah is in no way special or central to this case:  "Plaintiff's claims also allege collusion among Western Range and its various members for horizontal wage-fixing agreements and horizontal market allocation, which would necessarily involve conduct of Western Range and its members in all states, including Utah."  *Id.* at 20.  Utah is no differently situated than any other state in which WRA has member ranches.  This is woefully insufficient to justify upending this matter and sending it to a venue where no party resides.

### D.   Neither Convenience nor the Interests of Justice Support Transferring this Case to Utah

Even assuming WRA has established that this case could have been brought in Utah, transfer would neither promote the interests of justice nor the convenience of the parties because (1) there is no related litigation in the District of Utah and (2) WRA and the majority of WRA leadership reside outside of Utah.

#### 1.   *Judicial economy and the interests of justice weigh against transferring this case to the District of Utah.*

In deciding a Section 1404(a) venue transfer motion, some district courts in this circuit treat the "interests of justice" factor—meaning "whether transfer will avoid duplicative litigation and inconsistent judgments"—as the most important factor for a court to consider. *Vehimax Int'l, LLC*, 2010 U.S. Dist. LEXIS 42801, at *1. "The Supreme Court has given great weight to this factor, stating that permitting 'two cases involving precisely the same issues . . . simultaneously pending in different District Courts leads to the wastefulness of time, energy, and money that § 1404(a) was designed to prevent.'" *Id.* at *14 (citation omitted).

Bizarrely, WRA cites this principle as supporting transfer to Utah based on *Llacua*—a case that was litigated not in Utah but in the District of Colorado. *See* MTD 21 ("Judicial economy *substantially* weighs in favor of transferring the present action to Utah. As discussed *supra*, the claims in the present action are nearly identical to the claims brought against Western Range in the District of Colorado."). It is unclear how judicial efficiency would be served by transferring this action to a court that had no involvement with the case WRA says is most relevant.

Moreover, the authority WRA relies on most for its judicial economy argument, *Lens.com, Inc. v. 1-800 CONTACTS, Inc.*, held that where, as here, the prior litigation has concluded, this factor does not weigh in favor of transfer. *See* MTD 20. While the court in *Lens.com* did ultimately transfer the case to Utah, it made clear that it was *not* doing so based on efficiency. 2012 U.S. Dist. LEXIS 48209, at *7-9 (D. Nev. Apr. 4, 2012) (because prior litigation had concluded, "[t]here

will be no opportunity for consolidation of the actions or shared discovery that would truly result in judicial economy.  Therefore, the court finds that this factor does not weigh in favor of transfer but that this factor would not preclude a transfer if there are other factors that favor it.").  In other words, the court held the judicial economy factor to be neutral.

In any event, even if *Lens.com* said what WRA claims it does, that would support transfer to the District of *Colorado*—where *Llacua* was litigated—not to Utah.  There is zero efficiency to be gained by transferring this case to Utah.[15]

WRA additionally argues that the interests of justice favor transfer because Alvarado is forum shopping.  MTD 23.  But if anyone here is forum shopping, it is WRA—by seizing on Alvarado's mistaken allegation that the association is headquartered in Utah, WRA desperately tries to bring this case within the Tenth Circuit, because it believes that court's decision in *Llacua* will save the day.  But, as discussed above, Alvarado has the direct evidence of an agreement that the Tenth Circuit in *Llacua* says was missing.  *Supra* p. 12.  Alvarado thus has no need to forum shop—he brought the case here because Nevada is where he worked at a WRA ranch.

The interests of justice, including concerns regarding judicial economy and forum shopping, weigh in favor of denying the motion to transfer.

### 2. The convenience of the parties and third-party witnesses, the availability of compulsory process, and the ease of access to sources of proof.

Utah would not be a more convenient venue for this case.  "To demonstrate inconvenience of witnesses, the moving party must identify relevant witnesses, state their location and describe their testimony and its relevance."  *Williams v. Bowman*, 157 F. Supp. 2d 1103, 1108 (N.D. Cal. 2001).  WRA identifies only one third-party witness in Utah, former executive director Dennis

---

[15] WRA states in a footnote that it would also be ok with this Court transferring the case to the District of Colorado.  MTD 21 n.15.  This footnote is plainly inadequate to satisfy WRA's burden to establish that transfer to Colorado is proper, where no party resides and nothing relevant to this action occurred.

Richins, asserting that Richins' testimony is key to Alvarado's case.  But Richins has not been WRA's executive director since 2014.  *Compare* Crooks Decl., Ex 5 (Annual Report to Idaho Secretary of State, July 6, 2014) *with* Crooks Decl., Ex. 6 (Annual Report to Secretary of State, July 9, 2015) (reflecting a new Executive Director in 2015).  Monica Youree has been executive director of WRA since January 2017, and she's located in Twin Falls, Idaho.  Crooks Decl., Ex. 7 (LinkedIn Profile for Monica Youree).  Richins' admission about WRA's wage-fixing activities is no doubt important, but more relevant testimony can be elicited from WRA's current leadership.  Indeed, Alvarado's hiring and work experience occurred after Youree became the WRA's director.

Overall, Nevada is more convenient for both the parties and the third-party witnesses.  As an initial matter, WRA has more employees in Nevada than Utah.  According to the most recent annual report it filed with the Idaho Secretary of State on June 23, 2022, WRA has officers and directors in Nevada (Vice President & one director), California (President, Treasurer, and two directors), Idaho (Executive Director and three directors), Wyoming (one Director), Colorado (one Director), Utah (one Director), and Montana (one Director).  Crooks Decl., Ex. 4.  Per WRA's corporate filings, there has only been one WRA officer or director operating out of Utah (Lane Jensen) since WRA's principal place of business changed in 2015.

What's more, the WRA ranch where Alvarado worked is in Nevada (and thus any third-party witnesses from that ranch will be located in Nevada); and WRA's counsel and the majority of Alvarado's attorneys are located in Nevada.  Moreover, any documentary sources of proof are likely either housed electronically or physically at WRA's headquarters in Idaho—it should not be any less convenient to produce them in Nevada than in Utah.  WRA has failed to establish that convenience in any way justifies transfer.

**E.  None of the Additional *Jones* Factors Discussed by WRA Support Transfer to Utah**

As noted above, in *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498-99 (9th Cir. 2000),

the Ninth Circuit listed several other factors to consider when weighing a motion to transfer.  They too fail to justify transferring this case to Utah.

### 1.     Location where agreements were executed

"This is an antitrust lawsuit; not a breach of contract lawsuit.  Thus, this element does not weigh for or against transfer."  *Lens.com*, 2012 U.S. Dist. LEXIS 48209, at \*11.

### 2.     State most familiar with governing law

Alvarado brings claims solely under federal law.  The districts of Nevada and Utah are equally knowledgeable regarding federal law.  This factor is thus neutral.

### 3.     Plaintiff's choice of forum

A plaintiff's choice of forum is typically entitled to "paramount consideration."  *Lens.com*, 2012 U.S. Dist. LEXIS 48209, at \*12.  WRA contends that Alvarado's choice of forum here should be disregarded because he resides in Peru and seeks to represent a multi-state class.  MTD 24.  While Nevada is no longer Alvarado's residence, Nevada is connected to the activities alleged in the complaint.  Thus, his choice is still entitled to some deference.  *See Dooley v. Nev. Gold Mines, LLC*, 2022 U.S. Dist. LEXIS 51912, at \*6 (D. Nev. March 22, 2022).

### 4.     The parties' contacts with the forum & the contacts relating to cause of action in the forum

As already discussed at length above, WRA no longer has any particularly strong connection to Utah.  It has greater connection to Nevada, where its vice president, a director, and counsel are all located.  Alvarado has no contacts with Utah, and his involvement in this case stems from his placement at a WRA ranch in Nevada.  This factor favors retaining venue in Nevada.

### 5.     Differences in costs of litigation in the two forums

WRA contends it will be cheaper to litigate this case in Utah because a Utah court will apply the Tenth Circuit's holding in *Llacua* to dismiss Alvarado's case.  MTD 22.  This is just a reformulation of WRA's losing res judicata arguments.  And, as explained above, *supra* pp. 12, 28-29, the allegations in this case are materially different from *Llacua*.  In any event, this Court is

perfectly capable of understanding and applying the Tenth Circuit's decision.

In short, transferring won't avoid any costs of litigation.  Indeed, it will be more costly to litigate in Utah since few if any necessary witnesses reside in Utah and no counsel resides in Utah (WRA's counsel is located in Nevada, while Alvarado's counsel is located in Nevada, Washington, D.C., and Colorado).  Given that transferring the case would presumably require both parties to obtain new counsel in Utah, this factor weighs against transfer.

## CONCLUSION

For the reasons given above, WRA's motion to dismiss and to transfer should be denied.

Dated: October 14, 2022             Respectfully submitted,

By: /s/ Jamie Crooks
Jamie Crooks (*Pro Hac Vice*)
FAIRMARK LAW LLP
jamie@fairmarklaw.com
1825 7th St NW, #821
Washington, DC 20001
Telephone: (619) 507-4182

MARK R. THIERMAN, ESQ., Nev. Bar No. 8285
mark@thiermanbuck.com
JOSHUA D. BUCK, ESQ., Nev. Bar No. 12187
josh@thiermanbuck.com
LEAH L. JONES, ESQ., Nev. Bar No. 13161
leah@thiermanbuck.com
JOSHUA H. HENDRICKSON, Nev. Bar No. 12225
joshh@thiermanbuck.com
7287 Lakeside Drive
Reno, Nevada 89511
Telephone: (775) 284-1500
Facsimile: (775) 703-5027

TOWARDS JUSTICE
ALEXANDER HOOD, ESQ.
alex@towardsjustice.org
DAVID H. SELIGMAN, ESQ. (*Pro Hac Vice*)
david@towardsjustice.org
NATASHA VITERI, ESQ. (*Pro Hac Vice*)
natasha@towardsjustice.org
1535 High Street, Ste. 300
Denver, CO  80218

***Attorneys for Plaintiff and the putative class***

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 14, 2022, a true and correct copy of the foregoing was served via the United States District Court CM/ECF system or email on all parties or persons requiring notice.

By: <u>*/s/ Jamie Crooks*</u>
Jamie Crooks

**WOODBURN AND WEDGE**
ELLEN JEAN WINOGRAD, Nev. Bar No. 815
KELSEY E. GUNDERSON, Nev. Bar No. 15238
JOSE TAFOYA, Nev. Bar No. 16011
6100 Neil Road, Ste. 500
Reno, NV 89511
ewinograd@woodburnandwedge.com
Telephone: (775) 688-3000
Facsimile: (775) 688-3088