**FABIAN VANCOTT**
DAVID M. SEXTON, ESQ.
Nevada Bar #14951
411 E. Bonneville Ave., Ste. 400
Las Vegas, Nevada 89101
(702) 233-4444
dsexton@fabianvancott.com
*Attorneys for Ellison Ranching Company*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| CIRILO UCHARIMA ALVARADO, On Behalf of Himself and All Others Similarly Situated, Plaintiff, <br><br> vs. <br><br> WESTERN RANGE ASSOCIATION, a California non-profit corporation; ELLISON RANCHING COMPANY, a Nevada corporation; JOHN ESPIL SHEEP CO., INC., a Nevada corporation; F.I.M. CORP., a Nevada corporation; THE LITTLE PARIS SHEEP COMPANY, LLC, a Nevada limited liability company; BORDA LAND & SHEEP COMPANY, LLC, a Nevada limited liability company; HOLLAND RANCH, LLC, a Nevada limited liability company; NEED MORE SHEEP CO., LLC, a Nevada limited liability company; and FAULKNER LAND AND LIVESTOCK COMPANY, INC., an Idaho corporation; Defendants. | Case No.: 3:22-cv-00249-MMD-CLB <br><br> **DEFENDANT ELLISON RANCHING COMPANY'S MOTION TO DISMISS FIRST AMENDED COMPLAINT** <br><br> ORAL ARGUMENT REQUESTED |

Pursuant to Federal Rules of Civil Procedure 7 and 12(b) and LR 7-2, Defendant ELLISON RANCHING COMPANY ("Ellison"), through counsel, moves the Court to dismiss the First Amended Complaint in its entirety for failure to state a claim on which relief can be granted. This motion is based on the following memorandum of points and authorities, the pleadings on file herein, and any oral argument heard by the Court.

FABIAN VANCOTT
411 E. Bonneville Ave., Ste. 400
Las Vegas, Nevada 89101
(702) 233-4444

1

FABIAN VanCott
411 E. Bonneville Ave., Ste. 400
Las Vegas, Nevada 89101
(702) 233-4444

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

Plaintiff's First Amended Complaint is not new. It is a regurgitation of prior suits and evolving legal theories, all with the same end—to challenge the United States Department of Labor's H-2A visa program. And while this Court previously denied a motion to dismiss filed by Defendant Western Range Association ("WRA"), that decision preceded Ellison Ranching Co.'s ("Ellison") inclusion as a defendant and was based on facts alleged against WRA. As applied to Ellison, in contrast, Plaintiff's First Amended Complaint ("FAC") fails to allege facts that state a claim *against Ellison* that is plausible on its face. Specifically, the FAC fails to allege facts that show (1) Ellison entered into an anti-competitive agreement with WRA or any other defendant and (2) such an agreement was an unreasonable restriction on trade. The FAC lacks specific and necessary factual allegations regarding Ellison, instead improperly lumping Ellison in a batch of conclusions including generally defined "WRA member ranches." The FAC fails to assert factual allegations against Ellison that allow the Court to reasonably infer that Ellison is liable for the misconduct alleged. The Court should, accordingly, dismiss the First Amended Complaint as to Ellison.

## II.

## STATEMENT OF FACTS REGARDING ELLISON[1]

1.    Plaintiff alleges Ellison is a Nevada corporation that "runs livestock and farming operations" and which "at all relevant times was a member of the WRA," and then,

---

[1]    The facts below are drawn from Plaintiff's First Amended Complaint, which Ellison assumes to be true solely for the purposes of this motion.  Ellison reserves the right to contest any or all these facts in later proceedings, including trial.

in conclusory fashion, alleges that Ellison "engages in all of the anticompetitive conduct" alleged in the FAC. ECF No. 50, ¶ 28.

2.        Other than the above, and allegations regarding jurisdiction and venue, *see id.* at ¶¶ 2-3, the FAC makes no other mention of Ellison or any Ellison-specific fact. Instead, the FAC refers to Ellison only collectively as one of the "WRA member ranches." *See, e.g., id.* at ¶¶ 14, 16, 47, 53, 61-62, 72, 79-80, 93-94, 96, 101, 106, 112, 116, 121-23, 130, 133-34, 136-38, 141, 159, 160-63, 17-75, 177, 180. Further, nothing in the FAC explains whether the eight named defendant members constitute all the WRA member ranches or why Plaintiff elected to identify these eight as opposed to any others. *See generally id.*

3.        The FAC specifically identifies the individuals and their related companies who were the WRA officers, directors, or executive directors during the FAC's alleged relevant time period (2017 to the present). Significantly, the lists do not include Ellison or any Ellison employee or representative. *Id.* at ¶ 58.

4.        The only named Plaintiff, Cirilo Ucharima Alvarado, worked for Defendant Little Paris Sheep Company, LLC, but did not work for Ellison. *Id.* at ¶¶ 2, 19-21, 24-25, 51-52. Plaintiffs do not allege any facts suggesting that Mr. Alvarado worked for or had any connection with Ellison. *See generally id.*

5.        The FAC alleges the following regarding the existence of an illegal anti-competitive agreement by the "WRA member ranches." Ellison notes in parenthesis which of these allegations is a conclusion not entitled to a presumption of truth.

a.        "they collude with and through the WRA," *Id.* at ¶ 11 **(conclusory)**;

FABIAN VANCOTT
411 E. Bonneville Ave., Ste. 400
Las Vegas, Nevada 89101
(702) 233-4444

b. "The ranchers who comprise the WRA, including Defendants, consciously commit to this wage suppression scheme by choosing to delegate the setting of wages and the placement of workers to the WRA," *Id.* at ¶ 12 **(conclusory)**;

c. "the WRA and its members, including Defendants, further their wage-suppression scheme by agreeing not to compete with each other for sheepherders," *Id.* at ¶ 13 **(conclusory)**;

d. by "agreeing not to hire sheepherders from each other," *Id.* at ¶ 15 **(conclusory)**;

e.
The concerted conduct creating these conditions includes but is not limited to: (1) agreements between the WRA and its members to fix the wages predominantly offered at or near the DOL minimum; (2) indemnification of the WRA by its members for any claims against the former related to wages and/or overtime; (3) the WRA's policy of assigning sheepherders to specific ranches while prohibiting sheepherders from seeking employment at other ranches; and (4) the collusion of WRA members in this market allocation conspiracy . . .

*Id.* at ¶ 16 **(conclusory as to (1), (3) and (4))**;

f. "ranchers have colluded to set baseline pay in line with the minimum permitted by the DOL, on information and belief, on occasion, individual ranchers may violate that agreement by offering some sheepherders more than the minimum," *Id.* at ¶ 47 **(conclusory)**;

g. "the ranches that are members of the WRA have conspired to fix one of their principal costs: sheepherders' wages," *Id.* at ¶ 56 **(conclusory)**;

h. "The WRA is not an independent organization and is little more than an alter-ego and vehicle for its members to collude with one another," *Id.* at ¶ 57 **(conclusory)**;

i.   "through the WRA [WRA's members] collude to fix sheepherder wages at or near precisely the wage set by the DOL. They do so through agreements with the WRA and with each other to offer the wage floor to workers instead of bidding for workers in a competitive process," *Id.* at ¶ 59 **(conclusory)**;

j.   "The WRA convenes regular membership meetings . . . Its members therefore have numerous opportunities to conspire with one another at those meetings and through other communications platforms set up by the WRA, including its blog," *Id.* at ¶ 60; *see also id.* at ¶¶ 177-79 **(conclusory)**;

k.   "WRA's members have agreed to indemnify the WRA against any suit relating to the employment of sheepherders," *Id.* at ¶ 63 **(conclusory)**;

l.   "The member ranches knowingly allocate decisions regarding the wages offered to domestic sheepherders to the WRA . . . The ranchers do so with the knowledge that the WRA uses job orders to illegally fix sheepherder wages predominantly at the wage floor in each state," *Id.* at ¶ 65 **(conclusory as to the phrase "illegally fix sheepherder wages predominantly at the wage floor in each state")**;

m.   "these job orders evidence concerted conduct among the WRA and its members to offer to compensate domestic sheepherders at the wage floor," *Id.* at ¶ 66; *see also id* at ¶ 162 **(conclusory)**;

n.   "These job orders clearly show WRA and its members' commitment to offering exactly the minimum wage," *Id.* at ¶ 69 **(conclusory)**; *see also id* at ¶ 162;

o.   "the WRA acts as an illegal combination of competitors," *Id.* at ¶ 81 **(conclusory)**;

p.   WRA members "allocate[e] decisions regarding foreign sheepherder wages to an association constituted of competitor ranches, and with the knowledge that the WRA uses job orders to fix sheepherder wages illegally at or near the DOL-set wage floor," *Id.* at ¶ 83; *see also id* at ¶ 162 **(conclusory as to the phrase "illegally at or near the DOL-set wage floor")**;

q.   "these H-2A Applications evidence concerted conduct among the WRA and its members," *Id.* at ¶ 84; *see also id* at ¶ 162 **(conclusory)**;

r.   "the WRA sets wages for its members because that is exactly what WRA says it does in a handbook provided to all its members. The WRA handbook outlines the 'wage rate' that WRA instructs its members to pay to sheepherders," *Id.* at ¶ 91;

s.   "The WRA handbook similarly establishes that members will use the minimum wage as the rate they use to pay their sheepherders. WRA members further agree with the WRA and each other, orally and otherwise, that this wage will be offered," *Id.* at ¶ 93 **(conclusory as to the second sentence)**;

t.   "WRA members have admitted as much. In a 2021 deposition, the former Executive Director of the WRA, Dennis Richins, was questioned about how the WRA and its member ranches set wages," *Id.* at ¶ 94 **(conclusory as to first sentence)**;

u.   "Richins testified that the WRA filled out the wage portion of the job orders, and that it always put in the minimum required by law," *Id.* at ¶ 95;

v.   "He also stated that as a member he received 'a letter saying what the wage would be.' When asked whether WRA members understand and agree that this is the wage they will pay he answered in the affirmative," *Id.* at ¶ 96 **(speculative)**;

**FABIAN VANCOTT**
411 E. Bonneville Ave., Ste. 400
Las Vegas, Nevada 89101
(702) 233-4444

w. "Richins also stated that he understood that all of the job orders for H-21 sheepherders offered the minimum wage, and that all of the WRA's members agreed to offer the same fixed minimum wage," *Id.* at ¶ 97 **(speculative and conclusory)**;

x. "The WRA divides the market for foreign H-2A sheepherders by assigning them to ranches," *Id.* at ¶ 127; *see also id.* at ¶¶ 177-79;

y. "on information and belief, the WRA requires an employment attestation from its H-2A sheepherders that states that once a sheepherder is placed at a WRA member ranch, that sheepherder will not seek employment elsewhere," *Id.* at ¶ 130; *see also id.* at ¶¶ 177-79;

z. "On information and belief, WRA members agree not to poach employees from one another," *Id.* at ¶ 133 **(conclusory)**; *see also id.* at ¶¶ 177-79;

aa. "On information and belief, this agreement is usually adhered to and, when it is not, the WRA threatens to and indeed sometimes does terminate the membership of violators," *Id.* at ¶ 135 **(conclusory)**; *see also id.* at ¶¶ 177-79;

bb. "On information and belief, this agreement is ongoing and involves concerted action between the WRA and members, the substantial terms of which were that the WRA would allocate sheepherders among its members, that sheepherders would be prohibited from transferring their place of employment, and that WRA members would not solicit each others' sheepherders," *Id.* at ¶ 136 **(conclusory)**; *see also id.* at ¶¶ 177-79;

cc. "On information and belief, the WRA members discussed these terms at WRA meetings," *Id.* at ¶ 137; *see also id.* at ¶¶ 177-79.

6.    The FAC contains no allegations of how, when, where, through whom, or in what specific manner Ellison actually participated in any of the above-identified alleged bad

**FABIAN VANCOTT**
411 E. Bonneville Ave., Ste. 400
Las Vegas, Nevada 89101
(702) 233-4444

acts. The FAC does not identify, even, the existence of any job orders or H-2A visa applications submitted by WRA on Ellison's behalf. *See generally* FAC.

### III.

### <u>LEGAL ARGUMENT</u>

**A.    STANDARD FOR DISMISSAL**

To establish a Section 1 Sherman Act claim, Plaintiff must prove "(1) an agreement, conspiracy, or combination; (2) intended to harm or unreasonably restrain competition; (3) which actually causes injury to competition, beyond the impact on the claimant." *Vangala v. St. Mary's Reg'l Med. Ctr.*, 31 F. App'x 537, 537-38 (9th Cir. 2002) (unpublished) (cleaned up) (citing *Austin v. McNamara,* 979 F.2d 728, 738 (9th Cir.1992)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim is plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 831 (9th Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. In fact, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* Accordingly, the Supreme Court has held that allegations such as the defendants "entered into a contract, combination or conspiracy to prevent competitive entry," or "have agreed not to compete with one another," or "agreements by [defendants] to refrain from competing against one another," *Twombly*,

FABIAN VANCOTT
411 E. Bonneville Ave., Ste. 400
Las Vegas, Nevada 89101
(702) 233-4444

550 U.S. at 551 were legal conclusions "not entitled to the assumptions of truth." *Iqbal*, 556 U.S. at 680.

**B.     PLAINTIFF HAS FAILED TO ADEQUATELY ALLEGE ELLISON PARTICIPATED IN AN ANTI-COMPETITIVE AGREEMENT**

To adequately allege a Section 1 Sherman Act claim, a plaintiff "must allege that Defendants' conduct was concerted action and was 'not merely parallel conduct that could just as well be independent action.'" *Id.* at 842 (quoting *Twombly*, 550 U.S. at 557). Indeed, "for plaintiffs bringing a claim under Section 1 of the Sherman Act . . . stating a plausible claim requires something more [than the general pleading standard]. Such plaintiffs must plead some further factual enhancement that places their allegations of parallel conduct in a context suggesting a preceding agreement." *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 45 (9th Cir. 2022). "Allegations of facts that could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy are insufficient to plead a violation of the antitrust laws." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1049 (9th Cir. 2008).

Further, the complaint must answer "the basic questions: who, did what, to whom (or with whom), where, and when?" *Id.* at 1048. In other words, to "allege an agreement between antitrust co-conspirators, the complaint must allege facts such as a 'specific time, place, or person involved in the alleged conspiracies' . . ." *Id.* at 1047 (quoting *Twombly*, 550 U.S. at 656 n. 10). "'An allegation of parallel conduct and a bare assertion of conspiracy will not suffice.'" *Id.* (quoting *Twombly*, 550 U.S. at 556). "This is because discovery in antitrust cases frequently causes substantial expenditures and gives the plaintiff the opportunity to extort large settlements even where he does not have much of a case." *Id.*

FABIAN VANCOTT
411 E. Bonneville Ave., Ste. 400
Las Vegas, Nevada 89101
(702) 233-4444

1    Here, while the FAC may sufficiently plead a Section 1 Sherman Act violation

2  against WRA, *see* ECF No. 43 at 11-15, it fails to allege sufficient facts against Ellison to

3  establish a claim that is plausible on its face. The FAC must sufficiently allege facts

4  demonstrating the assent of *all* named defendants, including Ellison, to an anti-competitive

5  scheme. It is not enough to allege a general conclusion that Ellison was "at all relevant times

6  was a member of the WRA, and engages in all of the anticompetitive conduct," ECF No. 50,

7  ¶ 28, or that Ellison falls within a group of generally defined "WRA member ranches"

8  alleged to have committed identical conclusory conduct, frequently "on information and

9  belief," *see generally* ECF No. 50.

10

11    In *Kendall*, 518 F.3d at 1048, in 2009, the Ninth Circuit rejected very similar

12  allegations as conclusory statements. The court stated: "[M]embership in [, management of,

13  or proprietary interest in] an association does not render an association's members

14  automatically liable for antitrust violations committed by the association." *Id.*[2] The court

15  went further, holding that conclusory allegations such as defendant "knowingly, intentionally

16  and actively participated in an individual capacity" with a group, or "there is an agreement

17  among all [defendants] to charge a minimum merchant discount fee set by" a group are not

18  enough. *Kendall*, 518 F.3d at 1048. Further, the court found that "adopting or following the

19

20

21

22

_____

23  [2]    *See also Kline v. Coldwell, Banker & Co.*, 508 F.2d 226, 232 (9th Cir. 1974) ("This does

24  not mean, however, that every member of the Association, by reason of his membership
    alone, becomes a co-conspirator. Knowledge and participation are required. Nor will proof

25  of parallel business behavior alone conclusively establish agreement.") (holding each
    defendant's assent to a trade association's recommended price schedule needed to be

26  demonstrated individually and that the trade association's preparation of "a suggested
    commissions schedule" which was "distributed to its members does not establish the illegal

27  conduct necessary for a recovery" under the Sherman Act).

fees set by a [group] is insufficient as a matter of law to constitute a violation of Section 1 of the Sherman Act." *Id.*

Instead, the FAC must include specific factual allegations regarding *Ellison's* assent to and participation in an anti-competitive agreement. As required by the courts in *Twombly* and *Kendall*, the FAC must provide facts alleging the "who, did what, to whom (or with whom), where, and when" that factually connects Ellison to the alleged agreement. The FAC wholly lacks these required Ellison-specific allegations. Additionally, the grand majority of the FAC's allegations regarding the generally defined WRA members' participation in an anti-competitive scheme, noted in Statement of Fact No. 5 above, are "merely legal conclusions resting on the prior allegations." *See Kendall*, 518 F.3d at 1048. And those allegations that rely on the WRA members purportedly adopting or following WRA's recommendation on what wage to pay or the transferability of sheepherders are by themselves also insufficient.

The FAC's allegations regarding Dennis Richins' testimony do not sufficiently plead Ellison's involvement in an anti-competitive agreement. First, the FAC does not show why Dennis Richins has authority to speak on behalf of WRA regarding the existence of any agreement, much less that he is able to speak on behalf of any of the WRA member ranches. Although the FAC alleges Mr. Richins was a "former Executive Director of the WRA," ECF No. 50 at ¶ 94, the FAC's tables of WRA's officers, directors, and executive directors for 2017 to the present show that Mr. Richins held none of those positions during the relevant time period, ECF No. 50 at ¶ 58. Rather, the FAC alleges Monica Youree held that position since 2017. ECF No. 50 at ¶ 58. Notably, not one individual associated with Ellison is alleged to have served in any of those positions. ECF No. 50 at ¶ 58. Further, there is no allegation

that Mr. Richins holds any position with Ellison (or any other WRA member ranch) or that he spoke to or corresponded with anyone from Ellison, much less in such a way that his statements could be evidence of Ellison's assent to an anti-competitive agreement. *See generally* ECF No. 50. Thus, there is no fact alleged that supports Plaintiff's allegation that Mr. Richins' testimony indicates "WRA members have admitted" an agreement exists. ECF No. 50 at ¶ 94. He does not speak for WRA, he does not speak for Ellison, and, thus, the allegations regarding Mr. Richins do not plead a Sherman Act violation against Ellison.

Second, even if the FAC asserted facts indicating Mr. Richins somehow had authority to indicate an agreement, the FAC's allegations regarding his testimony do not specifically implicate Ellison. The allegation that Mr. Richins testified that "*the WRA* filled out the wage portion of job orders, and that it always put in the minimum required by law," ECF No. 50 at ¶ 95 (emphasis added), on its face, relates only to *WRA*, not Ellison. Next, the allegation that *Mr. Richins*, "as a member" received "a letter [from WRA] saying what the wage would be," also does not implicate Ellison. ECF No. 50 at ¶ 96. It does not even indicate with what WRA member ranch Mr. Richins is affiliated. Thus, even if Ellison were alleged to have received such a letter, mere receipt of a letter is insufficient to plead agreement with the letter's terms or any other anti-competitive agreement. The following allegation that Mr. Richins affirmed "WRA members understand and agree that this is the wage they will pay," ECF No. 50 at ¶ 96, does nothing to identify Ellison specifically.[3] And it is just as easily explained by the "rational, legal business behavior" of WRA notifying its members of the

---

[3]      The statement on its face, even assumed to be his testimony, is pure speculation. The FAC provides no factual basis for how it is that Mr. Richins knows what the WRA members "understand" or to what they have "agreed."  Such statement wholly lacks foundation and cannot preclude dismissal in any event. *See Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level….").

**FABIAN VANCOTT**
411 E. Bonneville Ave., Ste. 400
Las Vegas, Nevada 89101
(702) 233-4444

DOL's wage floor and the WRA member ranchers' voluntary compliance with that legal requirement. *See Kendall*, 518 F.3d at 1049. The same is true for the last allegation regarding job orders offering the minimum wage and that "WRA's members agreed to offer the same fixed minimum wage." ECF No. 50 at ¶ 97. [4]  Significantly, the FAC does not identify any Ellison job order.

The FAC's allegations regarding WRA's handbook also do not sufficiently plead Ellison's involvement in an anti-competitive agreement. At best, the FAC alleges that the "WRA handbook outlines the 'wage rate' that WRA instructs its members to pay to sheepherders . . . [which] is the same as the [wage floor] offered to predominantly all H-2A sheepherders," ECF No. 50 at ¶ 91, and that "members will use the minimum wage as the rate they use to pay to their sheepherders. ECF No. 50 at ¶ 93. But this, too, is just as easily explained by the "rational, legal business behavior" of WRA notifying its members of the DOL's wage floor, that they must offer their sheepherders at least that wage, and the WRA member ranchers' voluntary compliance with that legal requirement. *See Kendall*, 518 F.3d at 1049.

Although the FAC contains no specific allegation that Ellison specifically offered only the DOL wage floor to its sheepherders, even if Ellison did so by "adopting or following" the guidance contained in the WRA handbook, that would not be sufficient to plead a Sherman Act claim. *See Kendall*, 518 F.3d at 1048. This Court suggested otherwise in its denial of WRA's motion to dismiss. There, the Court cited to *Goldfarb v. Virginia State Bar*, 421 U.S. 773 (1975), characterizing that decision as "finding a bar association's fee

---

[4]     For example, federal regulations specifically allow associations like WRA to submit job orders and H-2A visa applications on their members' behalf. 20 CFR § 655.131.

schedule constituted price-fixing where its members all 'adhered to the fee schedule' and did not ask 'for additional information in order to set an individualized fee.'" *See* ECF No. 50, at 13. Respectfully, Ellison asserts *Goldfarb* rested on a different, preceding holding: that the fee schedule in that case was not "merely advisory" or "only to provide legitimate information to aid member lawyers in complying with Virginia professional regulations." *Goldfarb*, 421 U.S. at 781. The Supreme Court found the "facts found by the trier belie these contentions," meaning compliance with the fee schedule was a mandatory requirement of membership for members of the Fairfax County Bar Association. This reading of the case is confirmed by the Supreme Court's next statement that a "purely advisory fee scheduled issued to provide guidelines, or an exchange of price information without a showing of an actual restraint on trade, would present us with a different question." *Id.*

The Court continued to explain the mandatory nature of the fee schedule, stating that it "[w]as enforced through the prospective professional discipline from the State Bar," *Id.*, the same state bar that had "issued two ethical opinions indicating that fee schedules cannot be ignored," *Id.* at 776-78. Although the Court did observe "every lawyer who responded to petitioners' inquiries adhered to the fee schedule," *Id.* at 781, this was not an indication of *voluntary adherence* that alone would be sufficient to demonstrate assent to an anti-competitive scheme. Rather, the *mandatory* nature of the fee schedules was what indicated a member of the bar association had agreed to an anti-competitive scheme.

The Ninth Circuit's 2008 *Kendall* decision confirms that mere "adherence" to a document issued by a group does not automatically equate to evidence of assent to an anti-competitive agreement. In no uncertain terms, the Ninth Circuit found that "adopting or following the fees set by a [group] is insufficient as a matter of law to constitute a violation

of Section 1 of the Sherman Act." *Kendall*, 518 F.3d at 1048. Thus, absent factual allegations that use of the DOL wage floor and compliance with the non-transferability of sheepherders are mandatory requirements of Ellison's WRA membership, Ellison's adoption or following of WRA's handbook or other guidance is insufficient as a matter of law to allege a Section 1 Sherman Act violation.

Plaintiff may claim the FAC includes allegations regarding the mandatory nature of WRA's guidance to its members. The FAC alleges (regarding the alleged agreement for the non-transferability of sheepherders) that "[o]n information and belief, WRA members monitor compliance with this agreement and report violators to the WRA," and that "[o]n information and belief, this agreement is usually adhered to and, when it is not, the WRA threatens to and indeed sometimes does terminate the membership of violators." ECF No. 50 at ¶¶ 134-35. These allegations fall far short of the mandatory requirement in *Goldfarb*.

First, the allegations themselves demonstrate such an agreement is not a mandatory requirement of WRA membership, as the alleged agreement is only "*usually* adhered to" and when not, the WRA may only "*sometimes*" terminate membership. Moreover, the allegations do not address whether Ellison actually adhered to the requirement or was one of the admittedly non-compliant ranches.

Second, both allegations are made on information and belief. While on-information-and-belief pleading may be appropriate in some circumstances, here, where case law has required factual allegations beyond merely parallel conduct or conduct otherwise explained by compliance with legal duty, this is insufficient. If on-information-and-belief pleading were permitted in the Sherman Act context on the essential elements of the claim—here, the

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

existence of an anti-competitive agreement—antitrust plaintiffs would shoulder no burden at all.[5]

In summary, Plaintiff has failed to adequately plead a Section 1 Sherman Act violation against Ellison. The Ninth Circuit's controlling decision in *Kendall* makes clear that this Court is "not required to accept [Plaintiff's] conclusion that [Ellison was a] co-conspirator[] of the [WRA] without any evidentiary facts alleged to support such conclusion." *Kendall*, 518 F.3d at 1050. Accordingly, the Court should dismiss the FAC as to Ellison.

## C.   PLAINTIFF HAS FAILED TO ADEQUATELY ALLEGE THAT ANY AGREEMENT WAS AN UNREASONABLE RESTRAINT ON TRADE.

If a plaintiff sufficiently alleges concerted action, the plaintiff must also sufficiently allege that the "restraint of trade [at issue] is unreasonable," the sufficiency of which is reviewed by the Court through one of three interpretive approaches: the *per se* approach, the rule of reason, or the quick look test. *PLS.Com, LLC*, 32 F.4th at 833; *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1134 (9th Cir. 2011).

/ / /

---

[5]     At the very least, antitrust plaintiffs must demonstrate on-information-and-belief allegations are "peculiarly within the [defendant's] knowledge" and accompany the allegations "by a statement of facts upon which the belief is founded." *Nayab v. Cap. One Bank (USA), N.A.*, 942 F.3d 480, 493–94 (9th Cir. 2019) (cleaned up); *see also Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017); *United States ex rel. Arik v. DVH Hosp. All., LLC*, No. 2:19-CV-01560-JAD-VCF, 2022 WL 980285, at *3 (D. Nev. Mar. 31, 2022). ("Allegations based on information and belief are generally insufficient to satisfy the FRCP 9(b) particularity requirement."). The FAC fails to do so here. The FAC contains no allegation that its on-information-and-belief allegations are peculiarly within defendants' knowledge, nor does the FAC contain a statement of facts upon which these guesses are based (for example, facts which cause Plaintiff to believe that WRA has ever threatened Ellison with termination or terminated another WRA member). Rather, these allegations are merely the furtherance of prior conclusory allegations regarding the existence of an anti-competitive agreement. They should be wholly disregarded.

FABIAN VANCOTT
411 E. Bonneville Ave., Ste. 400
Las Vegas, Nevada 89101
(702) 233-4444

The per se approach applies to practices that are:

> so harmful to competition and so rarely prove justified that the antitrust laws do not require proof that an agreement of that kind is, in fact, anticompetitive in the particular circumstances. These practices are *per se* violations of the Sherman Act, and [courts] presume that they are anticompetitive without inquiry into the particular market context in which they are found.

*PLS.Com, LLC*, 32 F.4th at 833 (cleaned up). "To justify per se condemnation, a challenged practice must have manifestly anticompetitive effects and lack any redeeming virtue. The Supreme Court has expressed reluctance to adopt *per se* rules where the economic impact of certain practices is not immediately obvious." *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1133 (9th Cir. 2011) (cleaned up). A "*per se* rule is appropriate only after courts have had considerable experience with the type of restraint at issue, and only if they can predict with confidence that the restraint would be invalidated in all or almost all instances under the rule of reason." *Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 877-78 (2007).

"Most restraints, however, are subject to the rule of reason." *PLS.Com, LLC*, 32 F.4th at 834.

> The rule of reason requires courts to conduct a fact-specific assessment of market power and market structure to assess the restraint's actual effect on competition. A three-step, burden-shifting framework guides courts' analysis. Under this framework, the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market. If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint. If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means.

> A plaintiff can establish a substantial anticompetitive effect for purposes of the first step of the rule of reason analysis either directly or indirectly. To prove a substantial anticompetitive effect directly, the plaintiff must provide

FABIAN VANCOTT
411 E. Bonneville Ave., Ste. 400
Las Vegas, Nevada 89101
(702) 233-4444

proof of actual detrimental effects on competition such as reduced output, increased prices, or decreased quality in the relevant market. When a plaintiff does so, no inquiry into market definition and market power is required. To prove a substantial anticompetitive effect indirectly, a plaintiff must show that the defendants have market power in the relevant market and that the challenged restraint harms competition.

*Id.*

Situated between the *per se* approach and the rule of reason is the "quick look" test.

The Supreme Court [has] explained . . . that [the] truncated rule of reason or "quick look" antitrust analysis may be appropriately used where an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets. The object is to see whether the experience of the market has been so clear, or necessarily will be, that a confident conclusion about the principal tendency of a restriction will follow from a quick (or at least quicker) look, in place of a more sedulous one. Full rule of reason treatment is unnecessary where the anticompetitive effects are clear even in the absence of a detailed market analysis. But if an arrangement might plausibly be thought to have a net procompetitive effect, or possibly no effect at all on competition, then a "quick look" form of analysis is inappropriate.

*Cal. ex rel. Harris*, 651 F.3d at 1134 (cleaned up and quotations omitted).

"To use the 'quick look' approach, [courts] must first determine whether an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Id.* at 1138. If so determined, the burden then shifts to the defendant "to produce evidence of procompetitive justification or effects and thus demonstrate the need for more extensive market inquiry." *Id.* For example, evidence of other competitive firms in the market, the limited duration or scope of an agreement, or other procompetitive external factors are enough to defeat implementing the "quick look" approach. *See id.* at 1139.

/ / /

/ / /

Here, regardless of whether the FAC adequately alleges Ellison assented to and participated in an anti-competitive agreement, the FAC fails to allege facts that demonstrate such an agreement was an unreasonable restraint on trade under any of the above approaches.

First, the FAC alleges that "the fixing of wages through the operation of the RWA amounts to a *per se* violation of the Sherman Act," and that the "horizontal agreement between competitors not to compete for sheepherder labor is a *per se* violation of the Sherman Act." ECF No. 50 at ¶¶ 161-62, 173, 176.Neither cause of action in the FAC merits application of the *per se* approach.

Plaintiffs may claim that alleged price-fixing agreements and market-allocation agreements are *per se* Sherman Act violations. But this case is clearly not a run-of-the-mill example of either. Rather, it presents the unique and novel overlay of federal and state statutory and regulatory schemes regarding immigration and wages for a highly specialized, regulated, and scrutinized niche sheepherding profession. Ellison will certainly raise defenses explaining that some or all its actions are compliant with, if not required, by the H-2A program for sheepherders. Thus, it cannot be said, based on the factual allegations of the FAC, that Ellison's practices "have manifestly anticompetitive effects and lack any redeeming virtue," nor that "the economic impact of [those] practices [are] immediately obvious." *See California ex rel. Harris*, 651 F.3d at 1133.

The law requires more of Plaintiff's pleadings because courts have *not* "had considerable experience with the type of restraint at issue" and this Court cannot "predict with confidence that the restraint would be invalidated in all or almost all instances under the rule of reason." *See Leegin Creative Leather Prod., Inc.*, 551 U.S. at 877-78. Rather, the only court to examine a Sherman Act violation involving the H-2A sheepherder program did

*not* apply the *per se* approach and dismissed the case as insufficiently pleaded. *See Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1177-82 (10th Cir. 2019).

Second, the FAC alleges "[i]n the alternative" that "Defendants' wage-fixing agreement is anticompetitive and illegal under the Quick Look Test," and "Defendants' market allocation agreement is anticompetitive and illegal under the Quick Look Test." ECF No. 50 at ¶¶ 163, 180. However, given the complexity of the H-2A sheepherder program and its interaction with minimum wages, the quick look test, too, is inapplicable to the causes of action alleged in the FAC. No lay observer with only a rudimentary understanding of economics could reach a "confident conclusion" that the Defendants' practices "would have an anticompetitive effect on customers and markets." *See Cal. ex rel. Harris*, 651 F.3d at 1134. The overlay of the H-2A sheepherder program adds too much complexity for any "quick look" conclusion. Even if such a conclusion were within the ken of a lay observer, such a finding would result in a burden shifting to Defendants to show a procompetitive justification or effects that would require a full rule of reason analysis involving extensive market inquiry. Where the Defendants will argue that their actions are compliant with, if not required, by the H-2A program for sheepherders, a governmental program by which base wages are set, this amounts to sufficient justification to require full rule of reason analysis.

Third, the FAC alleges "Defendants' wage-fixing agreement is anticompetitive and illegal under the Rule of Reason." ECF No. 50 at ¶¶ 164, 181. To properly plead either count in the FAC, Plaintiff must do so according to the standard set by the rule of reason. This Court is on firm ground analyzing the FAC under the rule of reason, as most Sherman Act violations apply this analysis. *See PLS.Com, LLC*, 32 F.4th at 834. Yet, the FAC lacks factual allegations to establish Plaintiff's initial burden under the test: that "the challenged restraint

FABIAN VANCOTT
411 E. Bonneville Ave., Ste. 400
Las Vegas, Nevada 89101
(702) 233-4444

has a substantial anticompetitive effect that harms consumers in the relevant market." *See id.*

The FAC contains no direct evidence of "actual detrimental effects on competition such as reduced output, increased prices, or decreased quality in the relevant market," *see id.*, only conclusory allegations speculating on how market and labor conditions would theoretically change absent the alleged anti-competitive agreement, *see, e.g.,* ECF No. 50 at ¶¶ 53, 62, 86, 102-06, 122, 138-42. Such speculation is insufficient.

Without allegations showing direct evidence, Plaintiff must point to factual allegations that indirectly show "defendants have market power" and that the alleged "restraint harms competition." *See PLS.Com, LLC*, 32 F.4th at 834. The FAC fails in this regard as well. While the FAC contains descriptions of WRA's reach in the market, the FAC fails to allege anything other than allegations that are equally (if not more probably) explainable by Ellison's voluntarily compliance with its legal duty to offer the DOL's wage floor to H-2A sheepherders. Thus, just as the FAC fails to allege more than Ellison's parallel conduct, the FAC also fails to adequately plead harm to competition. The Court should dismiss the FAC for this failure.

## **CONCLUSION**

For the foregoing reasons, Ellison requests the Court dismiss the First Amended Complaint as to Ellison.

Dated: August 10, 2023

**FABIAN VANCOTT**

*/s/ David M. Sexton*
DAVID M. SEXTON, ESQ.
Nevada Bar #14951
411 E. Bonneville Ave., Ste. 400
Las Vegas, Nevada 89101
(702) 233-4444
dsexton@fabianvancott.com
*Attorneys for Ellison Ranching Company*

**FABIAN VANCOTT**
411 E. Bonneville Ave., Ste. 400
Las Vegas, Nevada 89101
(702) 233-4444

**FABIAN VANCOTT**
411 E. Bonneville Ave., Ste. 400
Las Vegas, Nevada 89101
(702) 233-4444

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

## CERTIFICATE OF SERVICE VIA CM/ECF

I hereby certify that on the 10th day of August 2023, I electronically filed the above and foregoing **DEFENDANT ELLISON RANCHING COMPANY'S MOTION TO DISMISS FIRST AMENDED COMPLAINT** with the Clerk of the Court using the CM/ECF system which will then send notification of such to the following counsel of record:

**THIERMAN BUCK LLP**
LEAH L. JONES, Nev. Bar No. 13161
leah@thiermanbuck.com
7287 Lakeside Drive
Reno, Nevada 89511

**FAIRMARK PARTNERS, LLP**
JAMIE CROOKS, ESQ. (PHV)
jamie@fairmarklaw.com
1825 7th St NW, #821
Washington, DC 20001

**TOWARDS JUSTICE**
DAVID H. SELIGMAN, ESQ. (PHV)
NATASHA VITERI, ESQ. (PHV)
ALEXANDER HOOD, ESQ. (PHV)
alex@towardsjustice.org
1535 High Street, Ste. 300
Denver, CO 80218

**EDELSON PC**
YAMAN SALAHI, ESQ. (PHV)
ysalahi@edelson.com
150 California Street, 18th Floor
San Francisco, California 94111

Natasha Fernández-Silber (PHV)
nfernandezsilber@edelson.com
350 N La Salle Dr., 14th Floor
Chicago, IL 60654
*Attorneys for Plaintiff and Putative Class*

**WOODBURN AND WEDGE**
Ellen Jean Winograd
ewinograd@woodburnandwedge.com
Jose Tafoya
jtafoya@woodburnandwedge.com
6100 Neil Road, Suite 500
Reno, NV 89511
*Attorneys for Defendant Western Range Association*

**JERRY SNYDER LAW**
Jerry M. Snyder
429 Plumb Ln.
Reno, Nevada 89509
Jerry@Jerrysnyderlaw.com
*Attorney for F.I.M. Corporation,*
*Need More Sheep Co LLC., and Faulkner*
*Land Livestock Company, Inc.*

**SIMONS HALL JOHNSTON PC**
Anthony L. Hall
AHall@SHJNevada.com
Duncan G. Burk ESQ.
DBurke@SHJNevada.com
690 Sierra Rose Dr.,
Reno, Nevada 89511
*Attorneys for John Espil Sheep Co., Inc.,*
*The Little Paris Sheep Company, LLC,*
*Borda Land & Sheep Company, LLC, and*
*Holland Ranch, LLC*

Dated: August 10, 2023

*/s/ Anita Montoya*
An Employee of Fabian VanCott