**THIERMAN BUCK LLP**
LEAH L. JONES, Nev. Bar No. 13161
7287 Lakeside Drive
Reno, Nevada 89511
Telephone: (775) 284-1500
Facsimile: (775) 703-5027
leah@thiermanbuck.com

**FAIRMARK PARTNERS, LLP**
JAMIE CROOKS, ESQ. (*Pro Hac Vice*)
RUCHA DESAI, ESQ. (*Pro Hac Vice*
Forthcoming)
1825 7th Street NW, #821
Washington, DC 20001
Telephone: (619) 507-4182
jamie@fairmarklaw.com
rucha@fairmarklaw.com

**TOWARDS JUSTICE**
DAVID H. SELIGMAN, ESQ. (*Pro Hac Vice*)
ALEXANDER HOOD, ESQ. (*Pro Hac Vice*)
1535 High Street, Ste. 300
Denver, CO 80218
Telephone: (720) 248-8426
david@towardsjustice.org
alex@towardsjustice.org

**EDELSON PC**
YAMAN SALAHI, ESQ. (*Pro Hac Vice*)
150 California Street, 18th Floor
San Francisco, California 94111
Telephone: (415) 212-9300
Facsimile: (415) 373-9435
ysalahi@edelson.com

**EDELSON PC**
NATASHA FERNÁNDEZ-SILBER, ESQ.
(*Pro Hac Vice*)*
350 N. La Salle Street, 14th Floor
Chicago, IL 60654
Telephone: (312) 589-6370
Facsimile: (312) 589-6378
nfernandezsilber@edelson.com
* Admitted in Michigan and New York only

*Attorneys for Plaintiff and the proposed Class*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| **CIRILO UCHARIMA ALVARADO**, individually and on behalf of all others similarly situated, <br><br> *Plaintiff*, <br><br> v. <br><br> **WESTERN RANGE ASSOCIATION**, *et al.*, <br><br> *Defendants*. | Case No. 3:22-cv-00249-MMD-CLB <br><br> **PLAINTIFF'S OPPOSITION TO DEFENDANT ELLISON RANCHING COMPANY'S MOTION TO STRIKE (ECF NO. 100)** |

## TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................................. 5

II. BACKGROUND .................................................................................................................. 6

III. LEGAL STANDARD ........................................................................................................... 6

IV. ARGUMENT ........................................................................................................................ 7

    A. Allegations that WRA and Its Members Called Ex-Employees "Runaways" and Tried to Punish Them with Deportation Should Not Be Stricken ...................................................... 7

    B. The Word "Indentured" Has Been Used by Courts, Regulators, and Legislators to Describe the H-2A Program, and Should Not Be Stricken ............................................... 11

    C. Allegations About Sheepherders' Deplorable Working Conditions Should Not Be Stricken ............................................................................................................................ 13

V. CONCLUSION .................................................................................................................. 13

**TABLE OF AUTHORITIES**

**Cases**                                                                                                    **Page(s)**

*Americanwest Bank v. Banc of California*,
  No. SA CV 13-1914 DOC (ANx), 2014 WL 1347166
  (C.D. Cal. Apr. 4, 2014)..................................................................................11, 13

*Consumer Sols. REO, LLC v. Hillery*,
  658 F. Supp. 2d 1002 (N.D. Cal. 2009)...................................................................9

*Edwards v. Juan Martinez, Inc.*,
  506 F. Supp. 3d 1061 (D. Nev. 2020)......................................................................6

*Fantasy, Inc. v. Fogerty*,
  984 F.2d 1524 (9th Cir. 1993) ................................................................................6

*Gaines v. AT&T Mobility Servs., LLC*,
  424 F. Supp. 3d 1004 (S.D. Cal. 2019)........................................................... *passim*

*Griffin v. Gomez*,
  No. C 98-21038 JW (NJV), 2010 WL 4704448 (N.D. Cal. Nov. 12, 2010) ...........6

*Hernandez v. Stewart*,
  No. 1:20-cv-03241-SMJ, 2021 WL 6274440 (E.D. Wash. Mar. 1, 2021) .............12

*In re Baby Food Antitrust Litig.*,
  166 F.3d 112 (3d Cir. 1999).................................................................................10

*In re Tyson Foods, Inc. Sec. Litig.*,
  275 F. Supp. 3d 970 (W.D. Ark. 2017).................................................................10

*JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*,
  190 F.3d 775 (7th Cir. 1999) ...............................................................................10

*Kanaan v. Yaqub*,
  No. 21-cv-09591-BLF, 2022 WL 3357834 (N.D. Cal. Aug. 15, 2022) ..................7

*Novva Ausrustung Grp., Inc. v. Kajioka*,
    No. 2:17-cv-01293-RFB-VCF, 2017 WL 2990850
    (D. Nev. July 13, 2017)..................................................................6, 8, 9, 13
*Park v. Welch Foods, Inc.*,
    No. 5:12-cv-06449-PSG, 2014 WL 1231035 (N.D. Cal. Mar. 20, 2014)................7
*U.S. v. Beaver*,
    515 F.3d 730 (7th Cir. 2008) ..................................................................10
*U.S. v. Ritchie*,
    342 F.3d 903 (9th Cir. 2003) ..................................................................7, 8
*Whittlestone, Inc. v. Handi-Craft Co.*,
    618 F.3d 970 (9th Cir. 2010) ..................................................................8

**Rules**

Fed. R. Civ. P. 12.............................................................................. *passim*

**Miscellaneous Authorities**

Bryce W. Ashby, *Indentured Guests—How the H-2A and H-2B Temporary Guest Worker
    Programs Create the Conditions for Indentured Servitude and Why Upfront
    Reimbursement for Guest Workers' Transportation, Visa, and Recruitment Costs
    Is the Solution*, 38 U. MEM. L. REV. 893 (2007-2008)..........................................12
Daniel Farbman, *Resistance Lawyering*,
    107 CAL. L. R. 1877 (2019)................................................................11
Southern Poverty Law Center, *Close to Slavery: Guestworker Programs in the United States*
    (Feb. 19, 2013) https://www.splcenter.org/20130218/close-slavery-guestworker-
    programs-united-states...............................................................11, 12
U.S. Department of Labor, *Temporary Agricultural Employment of H-2A Aliens in the United
    States*, 75 Fed. Reg. 6884 (Feb. 12, 2010)..............................................12
Wright & Miller, 5C Fed. Prac. & Proc. Civ.,
    (3d ed. 2023)..........................................................................7

## I. INTRODUCTION

Civility and collegiality, properly understood, serve the important purpose of facilitating productive dialogue, intelligent discourse, and, in the judicial context, fair play. But those concepts are also sometimes mis-used to silence critics of the status quo and to protect the interests of a privileged elite. Defendant Ellison Ranching Company ("Ellison")'s motion to strike certain of Plaintiff's allegations is an example of the latter phenomenon.

Out of eight named defendants, Ellison is the only one to move to strike—that is, censor—allegations about Plaintiff Cirilo Ucharima Alvarado's experiences as a sheepherder. *See* ECF No. 50 ("First Amended Complaint" or "FAC"). Specifically, Ellison wishes to strike (1) references to a blog post by Defendant Western Ranch Association ("WRA") describing sheepherders who leave their place of employment as "runaways" and boasting about the "significant effort" WRA undertakes "to locate and deport herders that had jumped their contract" and "to penalize those [persons] that assisted contract breakers in finding employment," FAC ¶ 142; (2) a characterization of the degree of control exercised by ranch employers over migrant workers as akin to being "indentured," *Id.* ¶ 53; and (3) descriptions of Mr. Ucharima Alvarado's difficult working conditions.

Ellison's argument boils down to its belief that the allegations are untrue or unflattering. But neither is an appropriate basis to strike allegations under Rule 12(f). Factual disagreement is an issue for discovery. To the extent Ellison finds the allegations to be unflattering, that is because they are: Defendants' actions to suppress the wages of migrant sheepherders like Mr. Ucharima Alvarado are unjust and worthy of opprobrium. Nor are the allegations Ellison seeks to strike gratuitous or superfluous to the antitrust misconduct alleged. To the contrary, the cited allegations illustrate the degree of monopsony power exercised by Defendants, and help demonstrate the impact of the alleged wage-fixing conspiracy on Plaintiff and members of the proposed Class. They are thus not impertinent, immaterial, or scandalous within the meaning of Rule 12(f). Furthermore, Ellison makes no attempt to identify any prejudice it would suffer if the allegations in question—which do not specifically refer to Ellison—are not stricken. Its

5

motion should be denied.

## II. BACKGROUND

The Court is already familiar with the allegations in this case, which have not changed in a material way since the Court denied Defendant Western Range Association's motion to dismiss Plaintiff's first complaint. *See* ECF No. 43. To avoid redundancy and burden on the Court, Plaintiff incorporates his summary of this matter in the concurrently filed opposition to the Ranch Defendants' motions to dismiss.

## III. LEGAL STANDARD

Rule 12(f) authorizes a district court to "strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "The function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial . . . ." *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993) (cleaned up) (citation omitted), *rev'd on other grounds by Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994). "Rule 12(f) is not, however, 'an appropriate avenue to challenge the truth of an allegation.'" *Novva Ausrustung Grp., Inc. v. Kajioka*, No. 2:17-cv-01293-RFB-VCF, 2017 WL 2990850, at *2 (D. Nev. July 13, 2017) (citation omitted).

"Rule 12(f) motions are generally regarded with disfavor because of the limited importance of pleading in federal practice, and because they are often used as a delaying tactic." *Gaines v. AT&T Mobility Servs., LLC*, 424 F. Supp. 3d 1004, 1014 (S.D. Cal. 2019) (quotation omitted) (citation omitted); *see also Edwards v. Juan Martinez, Inc.*, 506 F. Supp. 3d 1061, 1077 (D. Nev. 2020) ("Nevada district courts frequently characterize Rule 12(f) motions as 'heavily disfavored,' 'extreme and drastic' remedies." (citations omitted)). Thus, "motions to strike are generally not granted unless it is clear that the matter sought to be stricken could have no possible bearing on the subject matter of the litigation." *Griffin v. Gomez*, No. C 98-21038 JW (NJV), 2010 WL 4704448, at *4 (N.D. Cal. Nov. 12, 2010).

"Given the disfavored status of motions to strike, 'courts often require a showing of prejudice by the moving party before granting the requested relief.'" *Gaines*, 424 F. Supp. 3d at

1014 (citation omitted); *see also* Wright & Miller, 5C Fed. Prac. & Proc. Civ. § 1382 (3d ed. 2023) ("[T]here appears to be general judicial agreement, as reflected in the extensive case law on the subject, that [motions to strike] should be denied unless the challenged allegations have no possible relation or logical connection to the subject matter of the controversy and may cause some form of significant prejudice to one or more of the parties to the action."). "Any doubt concerning the import of the allegations to be stricken weighs in favor of denying the motion to strike." *Park v. Welch Foods, Inc.*, No. 5:12-cv-06449-PSG, 2014 WL 1231035, at *1 (N.D. Cal. Mar. 20, 2014) (citation omitted).

## IV. ARGUMENT

Ellison's motion to strike should be denied in its entirety.

### A. Allegations that WRA and Its Members Called Ex-Employees "Runaways" and Tried to Punish Them with Deportation Should Not Be Stricken

The complaint alleges that "WRA's members rely on foreign sheepherders, over whom the ranches can exert substantial and anachronistic control, including through attempts to prevent 'runaways' and by abusing employees whose lack of familiarity with English and the United States legal system renders them less likely to complain about their deplorable working conditions." FAC ¶ 142. It cites a June 2014 blog post on WRA's website with a heading titled "Herder Runaways," where WRA wrote that "'[a] significant effort was made jointly between Western Range and Mountain Plains [another trade group] last summer *to locate and deport herders that had jumped their contract* as well as to penalize those that assisted contract breakers in finding employment.'" *Id.* (emphasis added)[1]. The complaint alleges that "[s]uch rhetoric and

---

[1] A copy of the blog post is attached as Exhibit A – WRA Blog Post to the Declaration of Yaman Salahi, quote at 3, and may be considered by the Court on a Rule 12 motion because it is incorporated-by-reference into the complaint. *See Kanaan v. Yaqub*, No. 21-cv-09591-BLF, 2022 WL 3357834, at *2 (N.D. Cal. Aug. 15, 2022) ("When evaluating a motion under Rule 12(b)(6) or Rule 12(f), the district court may consider only the allegations of the complaint, documents incorporated into the complaint by reference, and matters which are subject to judicial notice." (citations omitted)); *U.S. v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("Even if

tactics are reminiscent of the fugitive slave laws, premised on control over the bodies and labor value of workers.  Indeed, the WRA and its members' ability to implement this exploitative and racist wage-fixing scheme is a function of their collective monopsony power over the labor market for sheepherders." *Id.*

Ellison's motion argues that Paragraph 142 it should be stricken because it "draws an unfounded and inflammatory comparison between ranchers and slave owners searching for 'runaways' escaping 'deplorable working conditions.'" ECF No. 100 at 3.  To the extent that Ellison claims the allegation is "unfounded," Ellison not only ignores the rest of the paragraph— which cites WRA's *own blog post* describing former ranch workers as "runaways" and then WRA's *own description* of its organized efforts "to locate and deport herders that had jumped their contract" and "penalize" their supporters—but also the basic legal principle that "Rule 12(f) is not . . . 'an appropriate avenue to challenge the truth of an allegation.'" *Novva*, 2017 WL 2990850, at *2 (citation omitted).  Ellison is free to develop evidence to contradict Plaintiff's allegations in discovery.  But it cannot seek to have them stricken based on disagreement alone. *See Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010) (agreeing that "courts may not resolve 'disputed and substantial factual or legal issue[s] in deciding . . . a motion to strike'" (alteration in original)).

To the extent Ellison claims the allegation is "inflammatory," Plaintiff agrees, but for different reasons.  Plaintiff agrees it is inflammatory and outrageous for WRA or a member ranch to describe a quitting worker as a "runaway."  Plaintiff also agrees that it is inflammatory that ranches would come together, deputize themselves as immigration enforcers, and then undertake the task of "locat[ing] and deport[ing]" herders to retaliate against them for choosing to change their place of employment.  And Plaintiff agrees it is inflammatory that WRA and its members would seek to "penalize" ranches that then hire those sheepherders.

---

a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim.").

But the fact that WRA and its members' conduct is inherently inflammatory does not mean that Plaintiff's allegations concerning that conduct are "immaterial," "impertinent," or "scandalous" within the meaning of Rule 12(f). "An allegation is 'immaterial' if it 'has no essential or important relationship to the claim for relief or the defenses being pleaded.'" *Novva*, 2017 WL 2990850, at *2 (citation omitted). "'Impertinent' matters consist of statements that do not pertain, and are not necessary, to the issues in question." *Id.* And allegations are "scandalous" when they "unnecessarily reflect[] on the moral character of an individual or state[] anything in repulsive language that detracts from the dignity of the court." *Consumer Sols. REO, LLC v. Hillery*, 658 F. Supp. 2d 1002, 1020 (N.D. Cal. 2009) (citation omitted).

None of those criteria are met here. Plaintiff alleges that member ranches of the WRA, including Ellison, came together to form a labor cartel with the goal of suppressing sheepherder wages below the competitive level. FAC ¶¶ 12-18. The WRA ranches did this in two ways. One, the ranches allegedly agreed to fix wages at the same or similar levels, no higher than the minimum wage depending on the jurisdiction. *Id.* ¶¶ 64-97. As Plaintiff's complaint explains, employers normally have a natural incentive to offer competitive wages to retain and recruit the best workers. *Id.* ¶¶ 98-106. Elimination of wage competition removes an important incentive to change employers. Two, the ranches allegedly agreed to divide the labor market by agreeing that sheepherders would be assigned a ranch by the WRA, and that the ranches would not then attempt to poach one another's workers. *Id.* ¶ 127-37. Workers who wish to leave an employer due to unsatisfactory pay or working conditions normally vote with their feet. No-poach agreements, however, remove workers' alternative employment options and thus inhibit workers' ability to escape unfair or abusive working conditions.

Read against this backdrop, the allegations in Paragraph 142 are clearly material to Plaintiff's legal claim. The thrust of Plaintiff's complaint is that the WRA member ranches have acted through illicit agreements to pay sheepherders sub-competitive wages and limit sheepherders' ability to walk away from mistreatment at work. That WRA admitted on its own blog that it took retaliatory action against sheepherders who left the employ of a particular

9

ranch—calling them "runaways" and attempting to deport them—demonstrates WRA and its members' collective desire and motivation to prevent workers from switching jobs, supporting the plausibility of Plaintiff's allegations of a no-poach conspiracy.

Further, that WRA publicly admitted its goal of "penaliz[ing] those that assisted contract breakers in finding employment,'" FAC ¶ 142, also strengthens the plausibility of Plaintiff's allegations concerning the alleged no-poach scheme. It is widely understood that a mechanism for detecting and punishing cartel members who "cheat" on their co-conspirators is not only common in antitrust cases, but often necessary for a successful conspiracy. *See U.S. v. Beaver*, 515 F.3d 730, 734-35, 739 (7th Cir. 2008) (summarizing evidence that cartel members developed plan to detect and punish cheaters, and explaining that "[i]t is not uncommon for members of a price-fixing conspiracy to cheat on one another occasionally, and evidence of cheating certainly does not, by itself, prevent the government from proving a conspiracy."); *JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*, 190 F.3d 775, 777 (7th Cir. 1999) (agreeing that anti-competitive cartels are more likely when "cheating" is "readily observable and hence quickly checked"); *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 137 (3d Cir. 1999) (agreeing that having a "mechanism in place to detect conspirator cheating" is usually necessary for a conspiracy to "long endure"); *see also In re Tyson Foods, Inc. Sec. Litig.*, 275 F. Supp. 3d 970, 977 (W.D. Ark. 2017) (observing that conspirators' "abilities to monitor each other's activities" are "[c]rucial" "to any antitrust conspiracy"). Thus, evidence that cartel members have a means to detect and punish cheating bolsters an inference that there was an illicit conspiracy here. That WRA not only worked to punish cheaters, but also publicized its efforts to "penalize" them, serves a secondary purpose of warning WRA's member ranches *not* to cheat on the no-poach agreement by assisting sheepherders who want to switch their place of employment. The allegation is material to an issue disputed by the Ranch Defendants' pending motions to dismiss.

Given the clear relevance, the allegations in Paragraph 142 are not impertinent, immaterial, or scandalous within the meaning of Rule 12(f). As Ellison's own legal authorities observe, "[b]ackground or other historical information, when relevant to the claims at issue and

helpful to explaining the relationships between the parties, is appropriate." *Americanwest Bank v. Banc of California*, No. SA CV 13-1914 DOC (ANx), 2014 WL 1347166, at *4 (C.D. Cal. Apr. 4, 2014) (denying motion to strike).  That Ellison claims to be embarrassed by the conduct of its alleged co-conspirators is not a basis to strike the allegations, *see id.* (holding that allegations should not be struck merely because they are "unflattering").[2]  Finally, Ellison identifies no prejudice from the allegation, defeating its request. *Gaines*, 424 F. Supp. 3d at 1014.

### B. The Word "Indentured" Has Been Used by Courts, Regulators, and Legislators to Describe the H-2A Program, and Should Not Be Stricken

In Paragraph 53, Mr. Ucharima Alvarado explains that "[i]f [he] had been given the opportunity to offer his lengthy herding experience to different ranches, his experience participating in the H-2A visa program would have been very different.  [He] could have leveraged his knowledge and experience to secure a placement with a ranch of his own choosing that would have paid higher wages and that would have given him the tools he needed to fulfill the promises of the visa he went through so much to obtain.  Instead, the structure of the sheepherder labor market, shaped by the WRA-led collusion between WRA members, left him indentured and vulnerable to abuse at the hands of employers who paid him substantially less than minimum wage, and far less tha[n] he would have been paid in the absence of the

---

[2] To be clear, Plaintiff has no intention of suggesting that the H-2A program is the same as American slavery—that would be inaccurate and offensive.  But the rhetoric deployed by WRA and its members to describe their workers, as well as their effort to penalize workers who leave their employment, *is* reminiscent of the fugitive slave laws in certain ways.  *See* Daniel Farbman, *Resistance Lawyering*, 107 CAL. L. R. 1877, 1894-95 (2019) (describing how the Fugitive Slave Law of 1850 disincentivized people from providing aid to those who had escaped slavery with fines and other penalties).  The WRA itself used the term "runaway," which is not typically applied to workers who change employers.  And Plaintiff is not the only person to use similar language to describe the working conditions of H-2A laborers.  *See*, *e.g.*, Southern Poverty Law Center, *Close to Slavery: Guestworker Programs in the United States* (Feb. 19, 2013) (quoting former House Ways and Means Committee Chairman Charles Rangel as saying, "This guestworker program's the closest thing I've ever seen to slavery."), https://www.splcenter.org/20130218/close-slavery-guestworker-programs-united-states.

anticompetitive scheme alleged herein." FAC ¶ 53.

Ellison ignores all but three words in Paragraph 53, arguing that the reference to "indentured servitude . . . meet[s] the definition of immaterial, impertinent, and scandalous and should be stricken." ECF No. 100 at 4. "Indentured" means "required by contract to work for another for a certain period of time." Indentured, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/indentured (last visited Sep. 11, 2023). Because Defendants' no-poach scheme ensured each sheepherder could only work for the first ranch that hired them, the allegation is an accurate use of the word. Although Ellison takes issue with the use of the word "indentured" to describe the conditions of H-2A workers like Mr. Ucharima Alvarado, that word is often used to describe the program by courts, federal agencies, legislators, and advocates alike.[3] And in the context of Mr. Ucharima Alvarado's allegation, it is clear that the word "indentured" refers to the fact that he was bound to his particular ranch employer due to the alleged wage-fixing and no-poach conspiracies. The allegation is not immaterial or impertinent, and does not rise to the level of scandalous language. And Ellison identifies no prejudice that it suffers from the use of this word. *Gaines*, 424 F. Supp. 3d at 1014.

---

[3] *See, e.g.*, *Hernandez v. Stewart*, No. 1:20-cv-03241-SMJ, 2021 WL 6274440, at *1 (E.D. Wash. Mar. 1, 2021) ("Despite their crucial role, farmworkers have historically and consistently faced marginalization and poor working conditions. Workers under the Bracero program, the predecessor to the H-2A program, for example, endured conditions that have 'been likened by some to indentured slavery where employer exploitation was rampant and inhumane.'" (quoting H.R. Rep. 99-682, at 83 (1986))); *see also* U.S. Department of Labor, *Temporary Agricultural Employment of H-2A Aliens in the United States*, 75 Fed. Reg. 6884, 6925 (Feb. 12, 2010) ("The Department is concerned that workers who have heavily indebted themselves to secure a place in the H-2A program may be subject to exploitation in ways that would adversely affect the wages and working conditions of U.S. workers by creating conditions akin to indentured servitude, driving down wages and working conditions for all workers, foreign and domestic."); Southern Poverty Law Center, *supra* ("The H-2 guestworker system also can be viewed as a modern-day system of indentured servitude. But unlike indentured servants of old, today's guestworkers have no prospect of becoming U.S. citizens. When their temporary work visas expire, they must leave the United States."); Bryce W. Ashby, *Indentured Guests—How the H-2A and H-2B Temporary Guest Worker Programs Create the Conditions for Indentured Servitude and Why Upfront Reimbursement for Guest Workers' Transportation, Visa, and Recruitment Costs Is the Solution*, 38 U. Mem. L. Rev. 893 (2007-2008).

C. **Allegations About Sheepherders' Deplorable Working Conditions Should Not Be Stricken**

Finally, Ellison argues that Plaintiff's supposedly "extreme and derogatory allegations regarding the working conditions" he experienced should be stricken. ECF No. 100 at 3. Specifically, Ellison points to Mr. Ucharima Alvarado's allegations that he was made to live in "small, dilapidated one-room trailers without heating or air conditioning," FAC ¶ 7; that sheepherders are "subject to abusive practices by their employers, designed to make them feel even more trapped and isolated," *id.*; that his treatment was "abhorrent" and that he was "required . . . to sleep out in the open, exposed [to] the elements while herding sheep" and receiving "expired food to eat," *id.* ¶ 20; that his passport was confiscated to ensure he could not leave, *id.* ¶ 21; that he covered his own transportation and document costs, *id.* ¶ 50; and that his personal experience caused him "to understand why his fellow sheepherders were not only unhappy with their assignment, but feared their employer," *id.* ¶ 52.

Once again, Ellison moves to strike allegations merely because it challenges their veracity, or because it believes the allegations are unflattering. Neither is a proper basis for striking an allegation. *See Novva*, 2017 WL 2990850, at *2; *Americanwest Bank*, 2014 WL 1347166, at *4. These allegations, like those regarding WRA's efforts to punish workers and ranches who depart from its scheme, are directly relevant to Defendants' market power and the success of their conspiracy at eroding competition for sheepherders' labor. And it identifies no prejudice about these allegations, which pertain to Mr. Alvarado's employer, not Ellison. *Gaines*, 424 F. Supp. 3d at 1014.

V. **CONCLUSION**

Ellison's motion to strike should be denied.

Dated:  September 12, 2023          Respectfully submitted,

                                    */s/ Yaman Salahi*

                                    **EDELSON P.C.**

13

YAMAN SALAHI (*Pro Hac Vice*)
150 California Street, 18th Floor
San Francisco, CA 94109
Telephone: (415) 212-9300
Facsimile: (415) 373-9435

NATASHA FERNÁNDEZ-SILBER (*Pro Hac Vice*)
350 N. La Salle Street, 14th Floor
Chicago, IL 60654
Telephone: (312) 589-6370
Facsimile: (312) 589-6378

**FAIRMARK PARTNERS, LLP**

JAMIE CROOKS (*Pro Hac Vice*)
RUCHA A. DESAI (*Pro Hac Vice* Forthcoming)
1825 7th Street, NW, #821
Washington, DC 20001
Telephone: (619) 507-4182

**TOWARDS JUSTICE**

DAVID H. SELIGMAN (*Pro Hac Vice*)
ALEXANDER HOOD (*Pro Hac Vice*)
1535 High Street, Ste. 300
Denver, CO 80218
Telephone: (720) 248-8426

*Co-Lead Counsel for Plaintiff and the proposed Class*