**THIERMAN BUCK LLP**
LEAH L. JONES, Nev. Bar No. 13161
7287 Lakeside Drive
Reno, Nevada 89511
Telephone: (775) 284-1500
Facsimile: (775) 703-5027
leah@thiermanbuck.com

**FAIRMARK PARTNERS, LLP**
JAMIE CROOKS, ESQ. (*Pro Hac Vice*)
RUCHA DESAI, ESQ. (*Pro Hac Vice*)
1825 7th St NW, #821
Washington, DC 20001
Telephone: (619) 507-4182
jamie@fairmarklaw.com
rucha@fairmarklaw.com

**TOWARDS JUSTICE**
DAVID H. SELIGMAN, ESQ. (*Pro Hac Vice*)
ALEXANDER HOOD, ESQ. (*Pro Hac Vice*)
1535 High Street, Ste. 300
Denver, CO 80218
Telephone: (720) 248-8426
david@towardsjustice.org
alex@towardsjustice.org

**EDELSON PC**
YAMAN SALAHI, ESQ. (*Pro Hac Vice*)
150 California Street, 18th Floor
San Francisco, California 94111
Telephone: (415) 212-9300
Facsimile: (415) 373-9435
ysalahi@edelson.com

**EDELSON PC**
NATASHA FERNÁNDEZ-SILBER, ESQ.
(*Pro Hac Vice*)*
350 N. La Salle Dr., 14th Floor
Chicago, IL 60654
Telephone: (312) 589-6370
Facsimile: (312) 589-6378
nfernandezsilber@edelson.com
* Admitted in Michigan and New York only

*Attorneys for Plaintiff and the Putative Class*

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEVADA

|  |  |
|---|---|
| CIRILO UCHARIMA ALVARADO, individually and on behalf of all others similarly situated, | Case No. 3:22-cv-00249-MMD-CLB |
| *Plaintiff,* | **PLAINTIFF'S OPPOSITION TO RANCH DEFENDANTS' MOTIONS TO DISMISS (ECF NOS. 96, 99, 109)** |
| v. | |
| WESTERN RANGE ASSOCIATION, a California non-profit corporation, *et al.*, | |
| *Defendants.* | |

# TABLE OF CONTENTS

I.     **INTRODUCTION** ................................................................................. **8**

II.    **BACKGROUND** .................................................................................. **11**

III.   **LEGAL STANDARD** ......................................................................... **13**

IV.   **ARGUMENT** ....................................................................................... **15**

    **A.   Plaintiff Plausibly Alleges a Wage-Fixing Agreement** ......................... **16**

        1.  The Court already held that Mr. Alvarado pleads a horizontal wage-fixing agreement amongst all WRA members. ................................ 16

        2.  The Ranch Defendants, like all WRA members, are also liable for the alleged conspiracy. ...................................................................... 18

    **B.   The No-Poach/Market Allocatoin Agreement, Like the Wage-Fixing Agreement, Is Adequately Pled** ........................................................ **22**

    **C.   Price Fixing and Market Allocation Are "Unreasonable" Restraints of Trade** **26**

    **D.   Defendants Are Not Entitled to Immunity from Antitrust Scrutiny** ................. **29**

        1.  DOL regulations do not authorize antitrust conspiracies...................................... 29

        2.  The WRA is not an "agricultural organization" immune from antitrust scrutiny. 31

        3.  Whether Defendants are "joint employers" for wage-and-hour purposes is irrelevant to the antitrust claims alleged here. ...................................... 32

    **E.   The Court Has Personal Jurisdiction Over Faulkner** ......................... **35**

        1.  Faulkner transacts business in Nevada and has sufficient contacts with the United States to support jurisdiction under the Clayton Act. .............................. 35

        2.  Specific personal jurisdiction also exists under the traditional test. .................... 37

V.    **CONCLUSION**.................................................................................. **40**

# TABLE OF AUTHORITIES

## CASES

*Action Embroidery Corp. v. Atl. Embroidery, Inc.,*
    368 F.3d 1174 (9th Cir. 2004) ...............................................................35, 37

*Am. Needle, Inc. v. Nat'l Football League,*
    560 U.S. 183 (2010).............................................................................15, 33, 34

*Arizona v. Maricopa Cnty. Med. Soc.,*
    457 U.S. 332 (1982).....................................................................................28, 29

*Axiom Foods, Inc. v. Acerchem Int'l, Inc.,*
    874 F.3d 1064 (9th Cir. 2017) ...................................................................38, 39

*Badgley v. United States,*
    957 F.3d 969 (9th Cir. 2020) ...........................................................................33

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)...................................................................................13, 14

*Beltz Travel Serv. Inc. v. Int't Air Transp. Ass'n,*
    620 F.2d 1360 (9th Cir. 1980) ...................................................................15, 19

*Boschetto v. Hansing,*
    539 F.3d 1011 (9th Cir. 2008) .........................................................................36

*Brown v. Pro Football, Inc.,*
    518 U.S. 231 (1996).........................................................................................32

*Butcher's Union Loc. No. 498, United Food & Com. Workers v. SDC Inv., Inc.,*
    788 F.2d 535 (9th Cir. 1986) ...........................................................................39

*Cont'l Auto. Sys., Inc. v. Avanci, LLC,*
    No. 19CV02520, 2019 WL 6735604 (N.D. Cal. Dec. 11, 2019) ....................39

*Copperweld Corp. v. Indep. Tube Corp.,*
    467 U.S. 752 (1984) ........................................................................................32

*Doe v. Ariz. Hosp. & Healthcare Ass'n,*
    No. 07-cv-1292, 2009 WL 1423378 (D. Ariz. Mar. 19, 2009)........................27

*Flaa v. Hollywood Foreign Press Ass'n,*
    55 F.4th 680 (9th Cir. 2022) ............................................................................27

*Flagg v. Rouse,*
    No. 218CV01305, 2020 WL 854181 (D. Nev. Feb. 20, 2020)..........................................11

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.,*
    141 S. Ct. 1017 (2021).........................................................................................38, 39

*Go-Video, Inc. v. Akai Elec. Co. Ltd.,*
    885 F.2d 1406 (9th Cir. 1989) ........................................................................................37

*Goldfarb v. Virginia State Bar,*
    421 U.S. 773 (1975) ..................................................................................19, 28, 29

*Goodyear Dunlop Tires Operations, S.A. v. Brown,*
    131 S. Ct. 2846 (2011) ..........................................................................................37, 38

*Herbal Brands, Inc. v. Photoplaza, Inc.,*
    72 F.4th 1085 (9th Cir. 2023) ...............................................................................38, 39

*In re Animation Workers Antitrust Litig.,*
    123 F. Supp. 3d 1175 (N.D. Cal. 2015) ........................................................................27

*In re Baby Food Antitrust Litig.,*
    166 F.3d 112 (3d Cir. 1999) ............................................................................................25

*In re California Bail Bond Antitrust Litig.,*
    511 F. Supp. 3d 1031 (N.D. Cal. 2021) .........................................................................14

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
    MDL No. 1917, 2013 WL 5425183 (N.D. Cal. Sept. 26, 2013) .......................................14

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
    No. 07-cv-5944, 2010 WL 9543295 (N.D. Cal. Feb. 5, 2010).................................19, 21

*In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.,*
    28 F.4th 42 (9th Cir. 2022) ...........................................................................................17

*In re Gilead Scis. Sec. Litig.,*
    536 F.3d 1049 (9th Cir. 2008) .......................................................................................13

*In re Lithium Ion Batteries Antitrust Litig.,*
    No. 13-MD-2420 YGR, 2014 WL 4955377 (N.D. Cal. Oct. 2, 2014) ............................14

*In re Ry. Indus. Emp. No-Poach Antitrust Litig.,*
    395 F. Supp. 3d 464 (W.D. Pa. 2019).........................................................................28

*In re Static Random Access Memory (SRAM) Antitrust Litig.,*

580 F. Supp. 2d 896 (N.D. Cal. 2008) ..................................................9, 18, 19

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
   586 F. Supp. 2d 1109 (N.D. Cal. 2008) ...........................................17

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
   820 F. Supp. 2d 1055 (N.D. Cal. 2011) ............................................9

*In re Tyson Foods, Inc. Sec. Litig.,*
   275 F. Supp. 3d 970 (W.D. Ark. 2017)...........................................26

*In re W. States Wholesale Nat. Gas Antitrust Litig.,*
   715 F.3d 716 (9th Cir. 2013) ....................................................38, 39

*JTC Petroleum Co. v. Piasa Motor Fuels, Inc.,*
   190 F.3d 775 (7th Cir. 1999) ..........................................................25

*Kendall v. Visa U.S.A., Inc.,*
   518 F.3d 1042 (9th Cir. 2008) ..................................................21, 22

*Kline v. Coldwell, Banker & Co.,*
   508 F.2d 226 (9th Cir. 1974) ..........................................................22

*L.A. Int'l Corp. v. Prestige Brands Holdings, Inc.,*
   No. 18-6809, 2018 WL 6985235 (C.D. Cal. Dec. 7, 2018)...............37

*McGlinchy v. Shell Chem. Co.,*
   845 F.2d 802 (9th Cir. 1988) ..........................................................14

*Md. & Va. Milk Producers Ass'n v. United States,*
   362 U.S. 458 (1960)..........................................................................31

*Mendiondo v. Centinela Hosp. Med. Ctr.,*
   521 F.3d 1097 (9th Cir. 2008) .........................................................13

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma,*
   468 U.S. 85 (1984)......................................................................15, 17

*Nayab v. Cap. One Bank (USA), N.A.,*
   942 F.3d 480 (9th Cir. 2019) ..........................................................25

*Newcal Indus., Inc. v. Ikon Office Sol.,*
   513 F.3d 1038 (9th Cir. 2008) .........................................................29

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.,*
   20 F.4th 466 (9th Cir. 2021)............................................................23

*Overstreet v. Air Traffic Mgmt. Consulting, Inc.,*
No. 2:15-CV-01637, 2015 WL 5258761 (D. Nev. Aug. 28, 2015) ...................................11

*Pac. Tobacco Corp. v. Am. Tobacco Co.,*
338 F. Supp. 842 (D. Or. 1972) ...................................36

*Pacific Car & Foundry Co. v. Pence,*
403 F.2d 949 (9th Cir. 1968) ...................................35

*Palmer v. BRG of Georgia, Inc.,*
498 U.S. 46 (1990)...................................27

*Paramount Famous Lasky Corp. v. United States,*
282 U.S. 30 (1930)...................................20

*Ranza v. Nike, Inc.,*
793 F.3d 1059 (9th Cir. 2015) ...................................37

*Ray v. L.A. Cnty. Dep't of Pub. Soc. Servs.,*
52 F.4th 843 (9th Cir. 2022) ...................................32

*Relevent Sports, LLC v. U.S. Soccer Fed'n, Inc.,*
61 F.4th 299 (2d Cir. 2023) ................................... passim

*Rowe v. Educ. Credit Mgmt. Corp.,*
559 F.3d 1028 (9th Cir. 2009) ...................................13

*Starr v. Baca,*
652 F.3d 1202 (9th Cir. 2011) ...................................14

*Todd v. Exxon Corp.,*
275 F.3d 191 (2d Cir. 2001)...................................27

*United Nurses Ass'n of Cal. v. Nat'l Labor Rels. Bd.,*
871 F.3d 767 (9th Cir. 2017) ...................................33

*United States v. Beaver,*
515 F.3d 730, 734-35 (7th Cir. 2008) ...................................25

*United States v. DaVita Inc.,*
No. 21-cr-00229, 2022 WL 266759 (D. Colo. Jan. 28, 2022) ...................................23

*United States v. eBay, Inc.,*
968 F. Supp. 2d 1030 (N.D. Cal. 2013) ...................................23, 28

*United States v. Employing Lathers Ass'n,*
   212 F.2d 726 (7th Cir. 1954) ....................................................................31

*United States v. Get Eng'g Corp.,*
   No. 818CV00277, 2019 WL 4452968 (C.D. Cal. June 20, 2019).....................36

*United States v. Jindal,*
   No. 20-cv-00358, 2021 WL 5578687 (E.D. Tex. Nov. 29, 2021)....................27

*United States v. Kemp & Assocs., Inc.,*
   907 F.3d 1264 (10th Cir. 2018) ................................................................28

*United States v. Patel,*
   No. 21-cr-220, 2022 WL 17404509 (D. Conn. Dec. 2, 2022) ........................28

*United States v. Socony-Vacuum Oil Co.,*
   310 U.S. 150 (1940)................................................................................28

*United States v. Topco Assocs., Inc.,*
   405 U.S. 596 (1972) ...............................................................................27

*Waln v. Dysart Sch. Dist.,*
   54 F.4th 1152 (9th Cir. 2022) ..................................................................25

### STATUTES

15 U.S.C. § 17 ............................................................................................31

15 U.S.C. § 22 ............................................................................................35

### OTHER AUTHORITIES

Am. Bar Ass'n, *Model Jury Instructions in Civil Antitrust Cases,*
(2016 ed.).................................................................................................20

Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Applications,*
(Aug. 2022) ..............................................................................................28

### RULES

Fed. R. Civ. P. 8.........................................................................................13

Fed. R. Civ. P. 9.........................................................................................25

LR 7-2 .....................................................................................................11

LR IC 7-1 .................................................................................................11

1    **I.      INTRODUCTION**

2        This case concerns an alleged horizontal conspiracy among Western Range Association

3    ("WRA") member ranches to suppress the wages offered to migrant sheepherders.  WRA is an

4    association of sheep ranches.  In a functioning market, WRA member ranches would compete

5    against each other for the labor of skilled, experienced migrant sheepherders, including by

6    offering higher wages and better working conditions.  Instead, WRA member ranches collude

7    with one another through the WRA to fix the wages of migrant sheepherders in the H-2A visa

8    program at artificially low levels and to allocate the labor market by agreeing they will not hire

9    (or "poach") one another's sheepherders, thereby eliminating competition in the labor market

10   between and among themselves.

11       Plaintiff Cirilo Ucharima Alvarado was one of the H-2A sheepherders who was paid

12   artificially low compensation as a result of the alleged wage-fixing and no-poach agreements.

13   He brought this case on behalf of himself and a proposed Class of similarly-situated

14   sheepherders.  Initially, the WRA was the only defendant in this case.  The Court rejected

15   WRA's motion to dismiss the initial complaint, holding that "Plaintiff's allegations . . . 'contain

16   sufficient factual matter . . . to plausibly suggest that an illegal [horizontal] agreement was

17   made'" between WRA member ranches to fix wages.  ECF No. 43 ("MTD Order") at 15.

18   Subsequently, Mr. Alvarado amended his complaint.  *See* ECF No. 50 ("First Amended

19   Complaint" or "FAC").  The FAC alleges the same facts as the initial complaint, which the Court

20   already held suffice to support the allegations of conspiracy.  The only difference is that the FAC

21   also names eight WRA member ranches as named defendants (the "Ranch Defendants"[1]).  *See*

22   FAC ¶¶ 27-34.  Naming these ranches as defendants does not alter the character of the alleged

23   conspiracy.  The Ranch Defendants are merely additional parties from whom Mr. Alvarado can

24   collect damages on behalf of the proposed Class, as each member of an antitrust conspiracy is

25   ────────────────

26   [1] The Ranch Defendants include F.I.M. Corp., Inc. ("FIM"), Need More Sheep Co., LLC ("Need More Sheep"), Faulkner Land & Livestock Co. ("Faulkner"), Ellison Ranching Co. ("Ellison"),

27   John Espil Sheep Co., LLC ("Espil"), The Little Paris Sheep Co., LLC ("Little Paris"), Borda Land & Sheep Co., LLC ("Borda"), and Holland Ranch, LLC ("Holland").

"jointly and severally liable for any actions taken in furtherance of the conspiracy," *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 820 F. Supp. 2d 1055, 1059 (N.D. Cal. 2011), and Mr. Alvarado has always characterized the unlawful agreement here as one involving "all" WRA member ranches.  *See* ECF No. 1 ("Compl.") at ¶¶ 20, 84; FAC ¶¶ 19, 88.

"All" means all—including the Ranch Defendants.  The Ranch Defendants nevertheless request dismissal of the FAC on the basis that the allegations are insufficient to show each ranch's assent to and participation in an unlawful agreement.[2]  This argument—which largely repeats WRA's failed challenge to the sufficiency of Plaintiff's conspiracy allegations—is unsupported by law.  At the motion-to-dismiss stage, an antitrust plaintiff need not make detailed, defendant-by-defendant allegations; they must simply "make allegations that plausibly suggest that each [d]efendant participated in the alleged conspiracy."  *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 904 (N.D. Cal. 2008).  This is particularly true where, as here, a cornerstone of the alleged conspiracy is an anticompetitive policy promulgated by the WRA, a membership association of horizontal competitors, which "governs the conduct of members' separate businesses."  *Relevent Sports, LLC v. U.S. Soccer Fed'n, Inc.*, 61 F.4th 299, 309 (2d Cir. 2023).  In such cases, a plaintiff "need not allege" that each defendant participated in "an antecedent agreement to agree" because the association's "promulgation of the [anticompetitive] rule, in conjunction with the members' 'surrender[] . . . to the control of the association,' sufficiently demonstrates concerted action."  *Id*. (quoting *Associated Press v. United States*, 326 U.S. 1, 19 (1945)).  Here, the FAC alleges WRA members agreed to pay only the DOL minimum wage, and that all WRA members adhered to this anticompetitive policy as a condition of membership.  Such allegations plausibly suggest that each Ranch Defendant participated in the alleged conspiracy.

---

[2] The Ranch Defendants filed three motions to dismiss.  The first was filed by FIM, Need More Sheep, and Faulkner.  *See* ECF No. 96.  The second was filed by Ellison.  *See* ECF No. 99.  The third was filed by Espil, Little Paris, Borda, and Holland.  *See* ECF No. 109.  The Court authorized Mr. Alvarado to respond to all three motions in a single consolidated opposition brief. *See* ECF No. 116.

1   The Ranch Defendants' other arguments are equally meritless.  Defendant Ellison, for

2   example, argues that "regardless of whether the FAC adequately alleges Ellison assented to and

3   participated in an anti-competitive agreement, the FAC fails to allege facts that demonstrate such

4   an agreement was an unreasonable restraint on trade."  ECF 99 at 19.  Naked, horizontal

5   agreements to fix wages and allocate labor markets—like the conspiracy alleged in the FAC—

6   are unlawful *per se* under the Sherman Act, meaning that courts deem them to be "unreasonable"

7   as a matter of law.  Ellison advances no legitimate basis to abandon the *per se* rule here.

8   Separately, Defendants Espil, Little Paris, Borda, and Holland feign deference to the

9   Court's prior order by claiming it did not reach the question of whether Mr. Alvarado had

10  adequately alleged a market allocation agreement, and arguing that the FAC does not do so.  *See*

11  ECF No. 109.  Although the Court's prior order focused on the alleged wage-fixing agreement,

12  the initial complaint also alleged a no-poach agreement, and the latter is adequately alleged for

13  the same reasons the Court found that a wage-fixing agreement was alleged.  These Defendants

14  also argue that they are immunized from antitrust liability, but the arguments are specious and

15  should be rejected for many of the same reasons the Court cited in rejecting WRA's similar

16  immunity arguments—namely, that compliance with labor and immigration regulations does not

17  preclude antitrust liability.  MTD Order at 6-9.  Taken as true, the allegations of the complaint

18  sufficiently establish a naked, horizontal market allocation agreement, one that warrants *per se*

19  condemnation.

20  Finally, Defendant Faulkner also argues that it is not subject to personal jurisdiction in

21  this Court because it does not maintain sufficient contacts with the State of Nevada.  *See* ECF

22  No. 96 at 5-6.  Faulkner gets the legal analysis completely wrong.  In this antitrust case, all

23  Plaintiff needs to show is that Faulkner transacts business in Nevada and maintains minimum

24  contacts with the United States as a whole—a fact that Faulkner concedes given its annual

25  caravan of sheep through the entire State of Nevada, relying on the labor of sheepherders who

26  are members of the proposed Class.  Personal jurisdiction over Faulkner is proper.

27  Mr. Alvarado respectfully requests that the Court deny the Ranch Defendants' motions to

dismiss in their entirety.[3]

## II.     **BACKGROUND**

The U.S. sheep ranching industry depends upon labor performed by sheepherders in the H-2A Visa Program.  FAC ¶¶ 6, 9.  The H-2A Visa Program is an agricultural guest worker visa program administered by the U.S. Department of Labor ("DOL") that allows for the issuance of work visas to foreign workers to fill positions that employers cannot fill with domestic workers. *Id.* ¶ 35.  Migrant sheepherders in the H-2A program are highly skilled workers, who typically learn their profession beginning in childhood.  *Id.* ¶ 99.  Their responsibilities on U.S. ranches include tending to large herds of sheep (including by providing medical care), riding horses through acres of mountainous terrain, and navigating extreme weather conditions.  *Id.* ¶¶ 6, 20, 99.  The labor of these workers becomes more valuable as they gain experience managing large

---

[3]   On September 11, 2023, late in the day before Plaintiff's opposition brief was due, Ellison and WRA unexpectedly three filed notices attempting to expand the arguments they could have, but did not raise, in response to the FAC.  *See* ECF No. 117 at 2 (Ellison's "joinder" with Espil, Little Paris, Borda, and Holland's motion to dismiss, and "request[ing] the same relief stated therein be applied to Ellison"), ECF No. 118 (WRA's "non-opposition" to Ellison's motion to strike and requesting the same relief), ECF No. 119 (WRA's "joinder" in Ellison's motion to dismiss).  Then WRA filed a second notice of joinder on September 12, just hours before this opposition was filed.  *See* ECF No. 120 (WRA's "joinder" to Espil, Litle Paris, Borda, and Holland's motion to dismiss).  And then F.I.M. Corp., Faulkner, Need More Sheep, Borda, Holland, Espil, and Little Paris filed notices of joinder with Ellison's motion to strike *after* Plaintiff's opposition brief had already been filed.  *See* ECF Nos. 123 and 124.  Defendants did not meet and confer with Plaintiff before the filings, nor did they seek leave of Court.  Plaintiff is not aware of any rule authorizing the submissions.  To the contrary, "[a] party may not file supplemental pleadings, briefs, authorities, or evidence without leave of court granted for good cause."  LR 7-2(g).  The deadline for WRA to respond to the FAC passed on July 17, 2023, and WRA chose to file an answer rather than a Rule 12 motion.  *See* ECF No. 66.  The other Defendants' deadlines to respond passed on August 10, 2023 and August 14, 2023.  The motions defendants belatedly seek to "join" were filed on August 10 and August 14, 2023, but they waited until the eleventh hour—four weeks—to join, just before Plaintiff's deadline to respond to the motions, and in some cases after the response was filed.  These belated submissions are unauthorized and prejudicial, and should be stricken.  *See* LR IC 7-1 ("The court may strike documents that do not comply with these rules."); LR 7-2(g) ("The judge may strike supplemental filings made without leave of court."); *see also Flagg v. Rouse*, No. 218CV01305, 2020 WL 854181, at *1 (D. Nev. Feb. 20, 2020) (striking unauthorized filing); *Overstreet v. Air Traffic Mgmt. Consulting, Inc.*, No. 2:15-CV-01637, 2015 WL 5258761, at *2 (D. Nev. Aug. 28, 2015) (same).  In any event, the motions these defendants purport to join are meritless and should be denied for the reasons stated herein.

flocks for specific ranches and in specific locales throughout the Western United States. *Id.* ¶ 100.

Western Ranch Association ("WRA") is an association of ranches whose members dominate the U.S. sheep ranching industry. FAC ¶ 10. WRA is not an independent body; its directors and officers are all representatives of member ranches. *Id.* ¶ 57. Member ranches delegate the hiring of sheepherders to WRA; WRA in turn creates "job orders" for its members setting the wages for both domestic workers and foreign sheepherders in the H-2A program. *Id.* ¶¶ 64-5. On these job orders, WRA always offers the same wage, the DOL minimum. *Id.* ¶ 95. Member ranches also delegate to WRA the placement of workers. *Id.* ¶ 12. WRA thus requires workers to sign employment contracts that provide, "[D]uring the term of this contract, the employee must work exclusively for an employer in the Western Range Association, and that employer must be assigned by the Association." *Id.* ¶ 14; *see also id.* ¶ 89.

WRA member ranches compete in sale of products like meat and wool. FAC ¶ 56. They would also, in a functioning market, compete for labor, including by offering higher wages and better working conditions. *Id.* ¶ 62. However, ranches use WRA to conspire to fix sheepherder wages and allocate the labor market. *Id.* ¶ 56. Member ranches delegate the setting of wages to WRA with the knowledge that WRA uniformly fixes the wages of sheepherders to the lowest levels allowed by DOL. *Id.* ¶¶ 12, 95. The concerted action of WRA member ranches suppresses wages below competitive levels and denies workers the opportunity to shop between ranches to seek out those who may offer better pay and treatment. *Id.* ¶ 13.

Plaintiff Cirilo Ucharima Alvarado is a sheepherder from Peru who was harmed by WRA member ranches' conspiracy to suppress wages and allocate the market. FAC ¶¶ 19, 23. Mr. Alvarado came to the United States on a temporary H-2A visa in 2020 and was assigned by WRA to one of its member ranches—Defendant Little Paris Sheep Company, LLC, which operates Little Ranch in Spring Creek, Nevada. *Id.* ¶ 24. Despite his decades of experience, Mr. Alvarado received the DOL wage minimum wage from Little Ranch, which amounted to between $4 and $5 and hour. *Id.* ¶ 20. He also experienced deplorable treatment and working

conditions and was threatened with violence and deportation. *Id.* However, he was not able to change ranches to obtain better pay or treatment. *Id.* ¶ 53. In the absence of the wage-fixing and market allocation agreement, Mr. Alvarado, like other sheepherders, would have been able to leverage his skill and expertise for high wages and better working better conditions. *Id.*

On June 1, 2022, Mr. Alvarado filed a proposed class action against WRA alleging two counts under Sherman Act for price-fixing and market allocation. ECF No. 1. On August 16, 2022, WRA moved to dismiss the complaint for failure to state a claim (or, in the alternative, transfer venues). ECF No. 23. Thereafter, on March 21, 2023, this Court denied WRA's motion to dismiss or transfer; it held that Mr. Alvarado's allegations of a horizontal price-fixing conspiracy plausibly pled a Sherman Act violation. MTD Order at 11-15. The Court declined to rule on Plaintiff's market allocation claim because, in its view, WRA had not addressed it in its motion. *See id.* at 11 n.9. On June 16, 2023, Plaintiff filed an amended complaint containing the same wage fixing and market allocation claims as the initial complaint, but naming eight WRA member ranches—the Ranch Defendants—as defendants. ECF No. 50.

## III.   <u>LEGAL STANDARD</u>

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Dismissal "is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). A court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029-30 (9th Cir. 2009) (citations omitted).

*Twombly* requires a plaintiff to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint satisfies *Twombly* if the allegations, taken as a whole, are not "facially implausible." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008). "If there are two alternative explanations, one advanced by [the] defendant and the other advanced by [a] plaintiff, both of

which are plausible, [a] plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

> To establish a Section 1 violation under the Sherman Act, a plaintiff must demonstrate three elements: (1) an agreement, conspiracy, or combination among two or more persons or distinct business entities; (2) which is intended to harm or unreasonably restrain competition; and (3) which actually causes injury to competition, beyond the impact on the claimant, within a field of commerce in which the claimant is engaged (*i.e.*, 'antitrust injury').

*McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 811 (9th Cir. 1988).   "'[T]he crucial question' [prompting Section 1 liability] is whether the challenged anticompetitive conduct 'stem[s] from [lawful] independent decision or from an agreement, tacit or express.'" *Twombly*, 550 U.S. at 553.   Allegations of parallel conduct must "be placed in a context that raises a suggestion of a preceding agreement." *Id*. at 557.

"Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [an] illegal agreement." *In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, 2013 WL 5425183, at *2 (N.D. Cal. Sept. 26, 2013) (quoting *Twombly*, 550 U.S. at 556).   An antitrust complaint's allegations of parallel conduct need only be accompanied by a factual context sufficient to "nudg[e] th[e] [conspiracy] claim[] across the line from conceivable to plausible . . . ." *Twombly*, 550 U.S. at 570.   Such allegations "are not to be judged by dismembering [the conspiracy] and viewing its separate parts, but only by looking at it as a whole." *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2014 WL 4955377, at *30 (N.D. Cal. Oct. 2, 2014) (citation and quotation omitted); *see also Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (same).   Courts refrain from "indulg[ing] antitrust defendants who move to dismiss by 'tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.'" *In re California Bail Bond Antitrust Litig.*, 511 F. Supp. 3d 1031, 1041 (N.D. Cal. 2021) (quoting *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1118 (N.D. Cal. 2012)).   A

co-conspirator need not know of the existence or identity of the other members of the conspiracy or the full extent of the conspiracy. *Beltz Travel Serv. Inc. v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1366-67 (9th Cir. 1980). Moreover, "[p]articipation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability, for each conspirator may be performing different tasks to bring about the desired result." *Id*.

Courts also ensure "[c]ompetitors do not avoid antitrust liability by hiding behind or acting through third-party intermediaries." *Relevent Sports*, 61 F.4th at 306. Participation in a trade association that "prevents member[s]. . . from competing against each other"—including "on the basis of price"—"create[s] a horizontal restraint." *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 99 (1984). And courts, including the Supreme Court, "have repeatedly found instances in which members of a legally single entity violated [Section 1 of the Sherman Act] when the entity was controlled by a group of competitors and served, in essence, as a vehicle for ongoing concerted activity." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 191 (2010) (citing cases).

## IV.    **ARGUMENT**

The Ranch Defendants assert no valid basis for dismissal of the FAC.

*First*, this Court has already determined Plaintiff plausibly alleged a horizontal wage-fixing agreement between and among the WRA's members are plausible. Those members include the Ranch Defendants. Just as the initial complaint supported the allegations of conspiracy, the FAC contains facts from which to infer an unlawful agreement between all WRA member ranches, including the Ranch Defendants. There is no requirement that a complaint that plausibly states an antitrust conspiracy make elaborate defendant-by-defendant allegations.

*Second*, Defendants Borda, Holland, Espil, and Little Paris challenge whether Plaintiff has adequately alleged a horizontal no-poach/market allocation agreement. Just as the Court held that a plausible wage-fixing agreement has been pled, Mr. Alvarado also adequately pleads an unlawful market allocation agreement based on WRA members delegating decisions about the placement of sheepherders to the WRA and their agreement to abide by WRA rules requiring

sheepherders to work only at their assigned ranch.

*Third*, the horizontal wage-fixing and market allocation agreement alleged in the FAC is *per se* unlawful.  Defendant Ellison's claim that the alleged anticompetitive conspiracy, even if plausibly alleged, would not be an "unreasonable restraint" is nonsensical and refuted by a legion of precedent.

*Fourth*, the Ranch Defendants are not immune from antitrust liability.  Defendants Espil, Little Paris, Borda, and Holland's futile attempts to invoke such immunity fail.

*Finally*, Defendant Faulkner contests whether the Court may exercise personal jurisdiction over it.  Faulkner admits that its sheepherders perform labor in the State of Nevada and that they accompany thousands of sheep on an annual trek through the entire eastern side of the state.  Combined with Plaintiff's allegations that sheepherders are paid depressed wages throughout the entire geography in which WRA's members do business, Faulkner's payment of such depressed wages for labor performed in the State of Nevada suffices to support personal jurisdiction.

A.    **Plaintiff Plausibly Alleges a Wage-Fixing Agreement**

1.    **The Court already held that Mr. Alvarado pleads a horizontal wage-fixing agreement amongst all WRA members.**

The Court should stand by its prior holding that Plaintiff's allegations of a horizontal wage-fixing conspiracy involving WRA member ranches are plausible under *Twombly*.  *See* MTD Order at 15 ("Plaintiff's allegations, particularly those of [former WRA director] Richins's testimony and the WRA handbook, taken together, 'contain sufficient factual matter . . . to plausibly suggest that an illegal agreement was made' and to 'nudge [the price-fixing claim] across the line from conceivable to plausible.'").  The FAC, like the initial complaint, plausibly alleges a conspiracy involving all WRA members to fix H-2A sheepherder wages.

The FAC alleges that all WRA member ranches empower WRA to submit sheepherder job orders and H-2A applications on their behalf (with the understanding that WRA will set the wage offered), and in accordance with WRA's instructions, pay their H-2A sheepherders similar

rates at or near the DOL minimum.  FAC ¶¶ 10, 12, 13 14, 88, 89.  The FAC places these allegations of parallel conduct in the context of other facts suggesting the existence of a preceding agreement, including that absent an agreement it would otherwise be inconsistent with each ranch's economic self-interest to abide by this practice.  MTD Order at 12-15; *see also In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust  Litig.*, 28 F.4th 42, 47 (9th Cir. 2022).  As explained in the FAC, paying the DOL minimum to all sheepherders would not occur unilaterally because ranches have a strong economic incentive to compete against each other for the labor of the most skilled and experienced sheepherders, including by offering higher wages.  FAC ¶¶ 99-106.  Because such parallel conduct is against self-interest (and therefore unlikely to occur absent coordination), it represents strong evidence of a conspiracy.  *See*, *e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1115 (N.D. Cal. 2008) ("The complaint alleges complex and unusual pricing practices by defendants . . . which cannot be explained by the forces of supply and demand.").

The FAC also points to binding WRA policies that the Ranch Defendants must follow and which are designed to prevent competition for labor, which in and of themselves constitute "direct evidence of concerted action."  *Relevent Sports*, 61 F.4th at 307-09; *see also NCAA*, 468 U.S. at 99.  Most notably, WRA's handbook instructs all member ranches to pay guest workers only the DOL minimum wage, notwithstanding their skill or experience level.  FAC ¶ 93.  As this Court found in its prior order:

> [A]llegations that WRA members do in fact largely adhere to the prescribed minimum wage and do not seek additional information from sheepherders (*e.g.*, years of experience) in order to set an individualized wage . . . suggest that the WRA handbook wage rate was not 'purely advisory' and gave rise to some sort of agreement.

MTD Order at 13.  And, crucially, the FAC points to statements made by a former WRA executive director Dennis Richins confirming an agreement among members ranches to pay the same wage.  Richins testified in a 2021 deposition that "WRA fill[s] out the wage portion of [sheepherder] job orders" and "always put in the minimum required by law."  FAC ¶¶ 94-95.  He further stated that each member ranch receives "a letter saying what the wage would be" and

"understand[s] and agree[s] that this is the wage they will pay." *Id.* ¶ 96. Richins also testified that it was his understanding that "all of the job orders for H-2A sheepherders offered the minimum wage, and that all of the WRA's members agreed to offer the same fixed minimum wage." *Id.* ¶ 97. As this Court has already held, "Richins's alleged testimony suggests more than mere informing about the minimum allowable wage; it is the type of 'further circumstance pointing toward a meeting of the minds' that plausibly alleges at least a tacit agreement between WRA and its members." MTD Order at 13 (quoting *Twombly*, 550 U.S. at 557). Plaintiff's allegations do not depend—as Ellison argues they must—on Richins having "authority to speak on behalf of WRA" or "WRA member ranches." *See* ECF No. 99 at 11. Given his role as WRA director and member ranch principal, Richins plainly has knowledge of how WRA and its member ranches set sheepherder wages, and his testimony can serve as both direct and indirect evidence of an alleged agreement.

The alleged wage-fixing conspiracy is as plausible now as it was when the Court so held the first time. There is no reason to re-visit that ruling now.

### 2. The Ranch Defendants, like all WRA members, are also liable for the alleged conspiracy.

Notwithstanding the sufficiency of Plaintiff's conspiracy allegations, the Ranch Defendants move to dismiss the FAC because it lacks "specific factual allegations" as to each named defendant's assent to and participation in the alleged agreement. ECF No. 96 at 7; ECF No. 99 at 11; ECF No. 109 at 11. This argument fails for a host of reasons.

As an initial matter, the Ranch Defendants' "specificity" argument is merely a retread of WRA's failed challenge to Plaintiff's Section 1 claims—*i.e.*, that the facts alleged show only independent, parallel conduct on the part of ranches, not any preceding agreement. The Court need not reconsider its prior holding based upon previously-rejected arguments put forward as new by individual co-conspirators. *See, e.g. SRAM*, 580 F. Supp. 2d at 903-04 (rejecting individual defendants' arguments that "tend[ed] to repeat the issues already discussed regarding the sufficiency of Plaintiffs' allegations under *Twombly*").

In addition to being redundant and wasting judicial resources, the "specificity" argument misconstrues the pleading standard in antitrust conspiracy cases. An antitrust complaint—particularly one alleging a complex, industry-wide conspiracy—need not make detailed "defendant by defendant" allegations. *See*, *e.g.*, *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1142 n.7 (N.D. Cal. 2009) (citing *SRAM*, 580 F. Supp. 2d at 904)). "Indeed, such a requirement would be contrary to a general principle of conspiracy law that once a party becomes a member of a conspiracy[,] he is bound by all of the acts of the other conspirators." *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 07-cv-5944, 2010 WL 9543295, at *10 (N.D. Cal. Feb. 5, 2010). "Participation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability," much less to satisfy the pleading standard. *Beltz*, 620 F.2d at 1366-67; *accord CRT*, 2010 WL 9543295, at *10 ("It is one thing to compel the plaintiffs to plead that each defendant is a part of the conspiracy. It is another to require the plaintiffs to plead facts as to what each defendant did within the conspiracy.").

To survive a motion to dismiss, a complaint need only "make allegations that plausibly suggest that each Defendant participated in the alleged conspiracy." *SRAM*, 580 F. Supp. 2d at 904. Moreover, as is relevant here, "a plaintiff challenging an association rule that governs the conduct of members' separate businesses need not [even] allege an antecedent agreement to agree" on the part of all defendants; rather, "the promulgation of the [alleged anticompetitive] rule, in conjunction with the members' 'surrender[] . . . to the control of the association,' sufficiently demonstrates concerted action." *Relevent Sports*, 61 F.4th at 309 (quoting *Associated Press*, 326 U.S. at 19); *see also Goldfarb v. Virginia State Bar*, 421 U.S. 773, 781 (1975) (bar association's fee schedule constituted price fixing where its members all "adhered to the fee schedule" and did not ask "for additional information in order to set an individualized fee").[4]

---

[4] Ellison attempts to distinguish *Goldfarb* on the basis that, in certain places, Plaintiff states that the alleged agreements are "usually" followed. ECF No. 99 at 15. Ellison's point is, apparently, there cannot be a conspiracy if it is not followed at all times. That argument is specious. *See*

The Second Circuit's recent decision in *Relevent Sports* is instructive in this regard.  The plaintiff there, Relevent, was a U.S.-based soccer promoter who alleged that FIFA and the U.S. Soccer Federation ("USSF") adopted and enforced a geographical market allocation that prevented Relevent from co-hosting a Spanish League ("La Liga") soccer game in Miami.  *See* 61 F.4th at 304.  Relevent cited as "direct evidence" of the alleged horizontal agreement a 2018 FIFA policy prohibiting its member leagues (which included USSF and La Liga) from allowing any official season games to be held outside of the member's home territory.  *Id*. at 303-04.  The district court dismissed the suit, finding Relevent had alleged no evidence of an antecedent "agreement to agree" among FIFA's participant leagues to adopt the 2018 policy, and that their universal adoption of said policy was not enough to show a horizontal conspiracy.  *Id*. at 304-305.  The Second Circuit reversed, finding there was "no need" to show an "agreement to agree" on the part of defendant USSF (or any of the other FIFA participants) or any other separate conspiracy to adopt the 2018 policy.  *Id*. at 307.  Instead, the court held that "the adoption of the policy, combined with the member leagues' prior agreement, by joining FIFA, to adhere to its policies, constitutes an agreement on the part of all—whether they voted in favor of the policy or not—to adhere to the announced restriction on competition."  *Id*.; *see also id*. at 309 ("Because the member has already agreed to abide by all association rules, there would be no need for the member to agree to any particular rule to be bound by it." (citations omitted)).

The FAC easily meets this pleading standard.  As in *Relevent*, the FAC alleges that WRA promulgates policies—such as the wage instruction in WRA's member handbook, and the provision in WRA's standard employment contract that sheepherders cannot change ranches,

---

Am. Bar Ass'n, Model Jury Instructions in Civil Antitrust Cases (2016 ed.) at 31 ("[I]t is no defense that defendants actually competed in some respects with each other or failed to eliminate all competition between them."); *see also Paramount Famous Lasky Corp. v. United States*, 282 U.S. 30, 44 (1930) ("In order to establish violation of the Sherman Anti-Trust Act, it is not necessary to show that the challenged arrangement suppresses all competition between the parties[.]").  As explained below, *see* Section IV.B, *infra*, conspiracies often exhibit non-compliance by conspirators, which is why participants often come up with a way to detect and punish cheaters.

even after their visa expires—that curtail members' ability to compete for labor, and that all members ranches adhere to these policies as a condition of membership.  FAC ¶¶ 88-89, 135.  In other words, for purposes of the alleged conspiracy, WRA is a vehicle for member collusion, with ranches surrendering their wage-setting authority to WRA with the shared knowledge, understanding, and purpose that the organization will fix the wages of all H-2A sheepherders at the DOL minimum.  *Id.* ¶¶ 57-59; 65-66; 83; 88.

These facts, taken as true, would evidence a horizontal restraint on the part of all WRA ranches—including the Defendant Ranches (all of whom are alleged to have engaged in the asserted conspiracy)—even without elaborate "defendant-by-defendant" allegations.  But the Court should not "lose sight of the fact that the [FAC] [also] contain[s] many well pleaded allegations, against numerous of the named defendants, of their participation in the conspiracy."  *CRT*, 2010 WL 9543295, at *10.  For example, the FAC alleges that Defendant Little Ranch "recruits tens of sheepherders each year through the WRA," one of whom was Plaintiff Ucharima Alvarado, who received the DOL minimum wage (between $4 and $5 an hour) and was unable to change ranches even after he was threatened with violence and deportation.  FAC ¶¶ 20, 27.  The FAC also alleges that since 2017, Little Ranch's principal, David Little, served as WRA's director and treasurer.  *Id.* ¶ 27.  Similarly, the FAC alleges that Defendant Ellison runs livestock across two million acres throughout Nevada and recruits dozens of sheepherders each year through WRA, *id.* ¶ 28; that Defendant Espil's principal, John Espil, served as a director of the WRA between 2017 and 2018, *id.* ¶ 29; and that all Ranch Defendants are members of the WRA who partook in the challenged agreements, *id.* ¶¶ 27-34.  These specific facts likewise confirm the participation of the Defendant Ranches in the alleged conspiracy.  *See CRT*, 2010 WL 9543295, at *10.

The Ranch Defendants cite no legal authority suggesting these allegations, coupled with the allegations the Court has already held plausibly state a conspiracy, are insufficient.  Ellison relies on *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008), *see* ECF No. 99 at 10, but it is easily distinguishable.  Even after conducting depositions, the plaintiffs in *Kendall* did "not

allege any facts to support their theory that the [defendants] conspired or agreed with each

other . . . to restrain trade." 518 F.3d at 1048. As such, the Ninth Circuit held that the plaintiffs'

allegations of mere parallel conduct, without more, were insufficient to plead a Section 1

violation. *Id*. at 1049. Here, by contrast, this Court has already determined that Plaintiff alleges

much more than mere parallel conduct despite not having access to any discovery before filing

his complaints. And, indeed, the FAC answers "the basic questions: who, did what, to whom (or

with whom), where, and when?" *Id.* at 1048. The "who" are the WRA and its members,

including the Ranch Defendants; the "did what" is conspired to fix wages and allocate the labor

market; the "to whom" is the proposed Class of sheepherders; the "with whom" is with one

another; the "where" is throughout the Western United States; and the "when" is beginning at

latest in 2018, though details about the origin of the agreement are a question for discovery.

*Kline v. Coldwell, Banker & Co.*, 508 F.2d 226 (9th Cir. 1974), which Ellison also cites,

ECF No. 99 at 10, is likewise inapposite. *Kline* does not address the pleading requirements in a

Section 1 case, but rather whether it was appropriate under Rule 23 to certify a class of

defendants consisting of 2,000+ real estate brokers. The Ninth Circuit found that as to the

proposed defendant class, the predominance requirement had not been satisfied, noting that "[o]n

the question of the defendants' illegal conduct no adequate showing ha[d] been made that the

questions of law or fact common to the members of the class predominate over the questions

affecting individual members." 508 F.2d at 233. *Kline* has no bearing outside of the class

certification context, and does not address the dismissal standard under Rule 12.

The Court held that Plaintiff plausibly alleged a horizontal price-fixing conspiracy

amongst WRA's members. The Ranch Defendants are members of WRA. By necessary

corollary, they are co-conspirators who are jointly and severally liable for all harm caused by the

conspiracy.

**B.   The No-Poach/Market Allocation Agreement, Like the Wage-Fixing Agreement, Is Adequately Pled**

Four defendants—Espil, Little Paris, Borda, and Holland—join forces to argue that the

FAC does not plausibly allege a horizontal conspiracy to allocate the market for sheepherder labor. *See generally* ECF 109. Their argument mostly rehashes those that the Court rejected in its earlier dismissal order—namely, that the Complaint fails to plausibly allege an agreement between WRA's members, and that WRA's conduct is consistent with DOL regulations and therefore immune from antitrust scrutiny. These arguments should be rejected.

> A horizontal market allocation agreement is an agreement between competitors at the same level of the market structure to allocate a market order to minimize competition. . . . This can be accomplished by dividing geographic territory between competitors, by allocating or dividing customers between competitors, or by allocating or dividing an employment market.

*United States v. DaVita Inc.*, No. 21-cr-00229, 2022 WL 266759, at *3 (D. Colo. Jan. 28, 2022) (internal quotation marks, citations, and alterations omitted). Plaintiff's market-allocation claim is based on the agreement between WRA ranches to (1) delegate sheepherders' ranch assignments to the WRA and (2) refrain from hiring (or "poaching") one another's sheepherders. Courts have long recognized that such an agreement between competitors not to hire workers away from each other constitutes an unlawful market allocation. *Id.*; *see also United States v. eBay, Inc.*, 968 F. Supp. 2d 1030 (N.D. Cal. 2013). Like price-fixing agreements, horizontal market allocation agreements are also considered *per se* unlawful. *See, e.g.*, *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 479 (9th Cir. 2021) ("Horizontal price fixing and market allocation are *per se* Section 1 violations.").

Defendants' alleged market allocation agreement is accomplished through many of the same organizational mechanisms as their wage-fixing conspiracy, which this Court found to be plausibly alleged. *See* MTD Order at 11-15; Section IV.A. Indeed, as alleged, WRA member ranches not only delegate their wage-setting authority to WRA as a condition of membership, they also delegate to WRA decisions over where workers will be placed. FAC ¶ 89. WRA, in turn, implements policies that prevent ranches from competing for each other's workers. For example, WRA uses a standard employment contract that not only "sets the wage that the worker will be paid for their work," but which also states that sheepherders "cannot change or transfer"

their employment "even after the visa expires." *Id*.  WRA also requires an employment

attestation from all its H-2A sheepherders stating that once a sheepherder is placed at a WRA

member ranch, that sheepherder will not seek employment elsewhere, including from a

competing ranch that could offer a higher wage. *Id*. ¶ 130.  All ranches adhere to these

conditions, agreeing not to poach employees from one another. *Id*. at ¶¶ 133-135.  Member

ranches' surrender of their independence in the labor market to WRA—combined with WRA's

promulgation of policies restricting members' ability to compete for workers—gives rise to an

inference of a horizontal agreement to allocate the market in same way as it gives rise to an

inference of wage fixing. *See Relevent Sports*, 61 F.4th at 309.

The FAC goes into much more detail about the market allocation agreement, and the

economic reasons why such conduct is only consistent with a conspiracy, than Defendants

suggest.  For example, the FAC specifically alleges that "[w]hen a worker applies to work

through the WRA, the WRA assigns them to a ranch." FAC ¶ 13.  Then, "WRA requires

sheepherders to sign a standardized employment contract." *Id.* ¶ 14.  The FAC quotes the

contract provision in question in the original Spanish, and offers a translation: "during the term

of this contract, the employee must work exclusively for an employer in the Western Range

Association, *and that employer must be assigned by the Association*." *Id.* (emphasis added).

These specific allegations "reflect[] an agreement between the WRA member ranches to delegate

hiring decisions to the WRA, thus depriving the labor market of independent centers of

decisionmaking and the competition that would otherwise exist." *Id.*  Moreover, "[a]ll WRA

ranches"—including the Ranch Defendants—"are aware that the WRA requires sheepherders to

sign this attestation." *Id.*; *see also id.* ¶¶ 130-31 (same).  Mr. Alvarado's personal experience

confirms those general allegations.  He alleges that "he could not shop between ranches because

the WRA assigned him a ranch, he was required to sign an attestation providing that he could

only work for the ranch designated by the WRA, and the ranches agree not to hire sheepherders

from one another." *Id.* ¶ 19.

Plaintiff's allegations that the WRA's "stringent prohibitions against sheepherders

seeking alternative employment, including, on information and belief,[5] after a sheepherder's visa term expires," FAC ¶ 178, and that "[t]he WRA's members, including Defendants, conspire and assent to this conduct through meetings and through membership in the WRA," *id.* ¶ 179, are borne out by the facts.  For example, Mr. Alvarado alleges that the WRA had a mechanism in place to detect and punish WRA ranches that cheated on the no-poach agreement.  He quotes a blog post on the WRA's website boasting that "[a] significant effort was made jointly between Western Range and Mountain Plains [another trade group] last summer to locate and deport herders that had jumped their contract as well as to penalize those that assist contract breakers in finding employment." *Id.* ¶ 142.

Courts have long recognized that a successful antitrust conspiracy often requires a mechanism for detecting and punishing conspirators who "cheat" on the conspiracy.  *See United States v. Beaver*, 515 F.3d 730, 734-35, 739 (7th Cir. 2008) (summarizing evidence that cartel members developed plan to detect and punish cheaters, and explaining that "[i]t is not uncommon for members of a price-fixing conspiracy to cheat on one another occasionally, and evidence of cheating certainly does not, by itself, prevent the government from proving a conspiracy."); *JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*, 190 F.3d 775, 777 (7th Cir. 1999) (agreeing that anti-competitive cartels are more likely when "cheating" is "readily observable and hence quickly checked"); *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 137 (3d Cir. 1999) (agreeing that having a "mechanism in place to detect conspirator cheating" is usually necessary

---

5  Certain defendants argue that allegations made on information and belief are inappropriate. *See* ECF No. 99 at 15, 16 n.5; ECF No. 109 at 7-8.  They are wrong.  "[A] plaintiff may plead facts on information and belief 'where the belief is based on factual information that makes the inference of culpability plausible.'" *Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1161 (9th Cir. 2022).  That is the case here.  To the extent Ellison suggests such allegations are *only* permitted when the information at issue is only within the defendant's possession, ECF No. 99 at 16 n.5, it mis-interprets the case it relies on; that is only one circumstance where such allegations are accepted.  *Nayab v. Cap. One Bank (USA), N.A.*, 942 F.3d 480, 493-94 (9th Cir. 2019) ("[T]he plead[ing] is not required to allege facts that are 'peculiarly within the opposing party's knowledge,' and allegations 'based on information and belief may suffice . . . .'").  And Rule 9(b)'s particularity requirements do not apply here because this is not a case "alleging fraud or mistake."  Fed. R. Civ. P. 9(b).

for a conspiracy to "long endure"); *see also In re Tyson Foods, Inc. Sec. Litig.*, 275 F. Supp. 3d 970, 977 (W.D. Ark. 2017) (observing that conspirators' "abilities to monitor each other's activities" are "[c]rucial" "to any antitrust conspiracy").  Thus, evidence that cartel members here had a means to detect and punish cheating bolsters an inference that there was an illicit conspiracy.  Additionally, that WRA not only worked to punish cheaters, but also publicized its efforts to "penalize" them, serves a secondary purpose of warning WRA's member ranches *not* to cheat on the no-poach agreement by assisting sheepherders who want to switch their place of employment.  This allegation also bolsters the existence of a no-poach agreement.  Indeed it is hard to imagine why else the WRA and its members would come together to "penalize" ranches that employ other ranches' former employees.

Mr. Alvarado's complaint also explains why, as a matter of economics, the no-poach policy does not make sense unless it is adopted pursuant to an agreement, and has the effect of suppressing wages.  As explained in the FAC, no ranch would decide never to hire another ranch's sheepherders *unilaterally* because doing so would be inconsistent with its economic self-interest; if competitors did not follow suit, then the ranch acting unilaterally would be putting itself at a competitive disadvantage by artificially narrowing the available labor pool; thus, there is reason to infer the existence of an agreement.  FAC ¶¶ 98-106; MTD Order at 14 (finding Plaintiff's description of the scheme's anticompetitive motivations "economically plausible").

Finally, the no-poach agreement is also plausibly alleged because it is perfectly consistent with the wage-fixing agreement, which the Court has already addressed.  By limiting competition between various employers, the WRA ranches reduce pressure to raise wages for their workers as a way of retaining them and preempting or out-bidding their competitors.  *Id.* ¶ 103.  In this way, the agreement to fix wages is inextricably intertwined with the agreement not to poach sheepherders from one another.  The market allegation claim is adequately pled.

### C.   <u>Price Fixing and Market Allocation Are "Unreasonable" Restraints of Trade</u>

Ellison argues that the alleged agreements are not "an unreasonable restraint on trade."

ECF No. 99 at 19.  This argument is entirely frivolous.  As Ellison seems to concede, the FAC

alleges a naked horizontal wage-fixing and market-allocation conspiracy among WRA member

ranches with the purpose of suppressing wages by reducing or eliminating competition between

them in the labor market.  (A "horizontal" agreement is one between competitors at the same

level of the labor market (*i.e.*, they all hire sheepherders), *see* FAC ¶¶ 159; 173-174, and a

"naked" agreement is one with "no procompetitive virtues," *id.* ¶¶ 165, 182.)

Naked horizontal agreements to fix wages (like agreements to fix prices) are *per se*

unlawful under the Sherman Act—meaning they are "unreasonable" under the Sherman Act as a

matter of law—because they "always or almost always tend to restrict competition and decrease

output."  *Flaa v. Hollywood Foreign Press Ass'n*, 55 F.4th 680, 688 (9th Cir. 2022).  *See In re*

*Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1212 (N.D. Cal. 2015) (wage-fixing

schemes, including no hire agreements, are *per se* unlawful); *United States v. Jindal*, No. 20-cv-

00358, 2021 WL 5578687, at *6 (E.D. Tex. Nov. 29, 2021), *reconsideration denied sub nom.*

*United States v. Rodgers*, No. 20-cv-00358, 2022 WL 889942 (E.D. Tex. Mar. 25, 2022)

("[N]aked horizontal agreements to fix the price of labor, like the agreement here, are ordinarily

*per se* illegal."); *Doe v. Ariz. Hosp. & Healthcare Ass'n*, No. 07-cv-1292, 2009 WL 1423378, at

*3-4 (D. Ariz. Mar. 19, 2009) (allegation defendant-hospitals conspired to keep temporary

nursing wages below free market level should survive motion to dismiss because agreement was

a *per se* illegal price-fixing agreement); *see also Todd v. Exxon* Corp., 275 F.3d 191, 198 (2d Cir.

2001) ("If the plaintiff in this case could allege that defendants actually formed an agreement to

fix MPT salaries, th[e] *per se* rule would likely apply.").

The same is true of horizontal agreements to allocate markets.  *See United States v.*

*Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972) ("One of the classic examples of a per se violation

of § 1 is an agreement between competitors at the same level of the market structure to allocate

territories in order to minimize competition."); *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 49-

50 (1990) (horizontal market division agreement *per se* unlawful).  Market allocations are *per se*

unlawful regardless of whether they allocate territories or some other aspect of a market, such as

employees in a labor markets.  *See*, *e.g.*, *United States v. Kemp & Assocs., Inc.*, 907 F.3d 1264, 1273 (10th Cir. 2018) ("It is undisputed that 'an agreement to allocate or divide customers between competitors within the same horizontal market, constitutes a per se violation of § 1 of the Sherman Act.'"); *United States v. Patel*, No. 21-cr-220, 2022 WL 17404509, at *8-11 (D. Conn. Dec. 2, 2022) (alleged horizontal no-poach agreement constituted per se unlawful market allocation); *In re Ry. Indus. Emp. No-Poach Antitrust Litig.*, 395 F. Supp. 3d 464, 481 (W.D. Pa. 2019) (holding that alleged no-poach agreement constitutes *per se* unlawful market division scheme); *eBay,* 968 F. Supp. 2d at 1038-40 (same); *see also* Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Applications* ¶ 2013a (Aug. 2022) ("'Anti-poaching' agreements, in which each of multiple firms promises not to hire one another's employees of a certain type, in fact operate as market-division agreements.").

Despite the consensus that a naked agreement between horizontal competitors not to compete for labor is *per se* unlawful, Ellison attempts to argue that this case is "not a run-of-the-mill" one because it involves "a highly specialized, regulated, and scrutinized niche sheepherding profession."  ECF No. 99 at 19.  According to Ellison, this means that "it cannot be said" that the practices are "manifestly anticompetitive" and lacking "any redeeming virtue."  *Id.* (quotation omitted).  But the fact that this case involves the sheepherding industry, standing alone, does not change the laws of economics—or black-letter antitrust law.  The Supreme Court has emphatically rejected the notion that price-fixing and similar agreements need to be re-evaluated in every new industry or context before they can be condemned.  *See*, *e.g.*, *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 222 (1940) ("[T]he Sherman Act, so far as price-fixing agreements are concerned, establishes one uniform rule applicable to all industries alike."); *Arizona v. Maricopa Cnty. Med. Soc.*, 457 U.S. 332, 351 (1982) (rejecting "the argument that the *per se* rule must be rejustified for every industry that has not been subject to significant antitrust litigation" because it "ignores the rationale for *per se* rules, which in part is to avoid 'the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved'"); *cf. Goldfarb*, 421 U.S. at 787 ("The nature of an

occupation, standing alone, does not provide sanctuary from the Sherman Act." (citing *Associated Press*, 326 U.S. at 7)).  And although Ellison implies that perhaps there are procompetitive justifications for the alleged wage-fixing and no-poach schemes here, it stops short of enumerating any.  In any case, it would not matter if it could come up with one: "[t]he anticompetitive potential inherent in all price-fixing agreements justifies their facial invalidation even if procompetitive justifications are offered for some."  *Maricopa Cnty.*, 457 U.S. at 351.

Plaintiff plausibly pleads that the alleged agreements are unreasonable under the *per se* test.[6]

### D.     Defendants Are Not Entitled to Immunity from Antitrust Scrutiny

Four defendants—Borda, Holland, Espil, and Little Paris—argue that their conduct is immunized by the DOL's regulations, the Sherman Act's exemption for agricultural organizations, and the WRA's supposed status as a joint employer.  Those claims are unfounded.

### 1.     DOL regulations do not authorize antitrust conspiracies.

Defendants argue, as WRA did before, that "[t]he regulations governing the H-2A program specifically authorize associations such as WRA to conduct the task of creating and submitting job orders for its members."  ECF 109 at 12.  But while that may be true, no DOL regulation authorizes the WRA's members to enter into a wage-fixing or market allocation conspiracy.  That is why the Court rejected this very argument in its first dismissal order, explaining, "it can be simultaneously true that Defendant and its members are complying with

---

[6]  Although Plaintiff also pled, in the alternative, that the agreements are unlawful under the quick look and rule of reason tests, the Court need not undertake that analysis because a plausible claim is alleged under the *per se* test.  Moreover, Defendants have identified no reason to abandon the *per se* test here.  Nevertheless, Plaintiff has also stated a viable claim under those tests, too.  The FAC alleges the defendants' conduct had direct anticompetitive effects (*e.g.*, wage suppression, reduced competition for sheepherders) in a cognizable market (*i.e.*, for sheepherder labor in the United States), and that WRA ranches have market power because they hire "approximately two thirds of all open-range H-2A sheepherders in the United States" in recent years.  *See* FAC ¶¶ 163-166, 180-183, 55.  That's all that's required at the pleading stage.  *See, e.g., Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008) (holding that "[t]here is no requirement that these elements of the antitrust claim be pled with specificity" so a complaint should survive unless the alleged market "suffers a fatal legal defect").

DOL's minimum wage regulations *and* violating antitrust laws by agreeing together to only offer the minimum allowable wage."  MTD Order at 14; *see also* FAC ¶ 48 ("[DOL's] regulations do not contemplate employers who are members of an organization like the WRA agreeing *ex ante* on the wage they will all pay and allocating the market for workers between each other.").  Put simply, nothing in DOL's regulations requires or permits WRA and its members to agree with each other not to compete for sheepherders, via wage-fixing or market allocation.

Nor do DOL's regulations permit (or even contemplate) Defendants' agreements not to hire workers away from one another.  Defendants argue that "WRA may assign sheepherders to specific ranches," ECF 109 at 17, and that in order for a sheepherder to "transfer employment, he or she must find a new employer sponsor who has undergone all of [the required regulatory] steps and a transfer application must be filed with the Department of Homeland Security," *id.* at 19.   Even if this were true, it does not amount to the kind of wholesale ban on competition for labor that WRA has instituted and to which its members have agreed to adhere.  Under the DHS regulations Defendants cite, all a new employer needs to do is fill out the required paperwork.  Migrant workers in other contexts, such those on H-1A or H-1B visas, switch employers all the time in the absence of an unlawful market allocation agreement.  In any event, the no-poach agreement alleged in the FAC goes beyond the visa term of each worker, so could not be specifically required by DHS regulations.  *See* FAC ¶ 133.

Absent Defendants' unlawful scheme, ranches would seek out sheepherders from their would-be rivals, and entice higher-quality sheepherders to their ranches by offering higher wages.  Nothing in DOL's regulations would prohibit this competition.  *Cf.* MTD Order at 9 (endorsing Plaintiff's argument that "he is not challenging Defendant's 'compliance' with DOL's wage floor but challenging its 'collusion with its members to fix wages at that level, something DOL neither requires nor oversees'" (citation omitted)).  This argument fails for the same reasons the Court rejected it the first time.

2.      **The WRA is not an "agricultural organization" immune from antitrust scrutiny.**

Nor do Defendants enjoy special immunity from the antitrust laws by virtue of the fact that WRA is a "nonprofit agricultural organization."  ECF 109 at 13-14.  To support that argument, Defendants cite 15 U.S.C. § 17, which provides that "[n]othing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help . . . or to forbid or restrain individual members of such organizations from *lawfully* carrying out the *legitimate* objectives thereof . . . ."  15 U.S.C. § 17 (emphases added).

The plain text of the statute makes clear that it only applies when such organizations are "lawfully" carrying out "legitimate" objectives.  15 U.S.C. § 17.  And Defendants admit that they do not "intend[] to suggest that Defendants are immunized from antitrust liability for *illegal* activities."  ECF No. 109 at 13.  Because the activities alleged here have already been held to be illegal, Defendants effectively concede they are not immune from liability under this provision.  *See* MTD Order at 11-15; *see also* FAC ¶¶ 48, 133.

Tellingly, Defendants cite no case adopting the radical proposition that this statute makes their wage-fixing and market allocation agreements presumptively lawful—because none exists.  To the contrary, longstanding precedent makes clear that this statute "does not suggest a congressional desire to vest cooperatives with unrestricted power to restrain trade or to achieve monopoly."  *Md. & Va. Milk Producers Ass'n v. United States*, 362 U.S. 458, 466-67 (1960).  *Accord United States v. Employing Lathers Ass'n*, 212 F.2d 726, 730 (7th Cir. 1954) ("[T]here is nothing in [15 U.S.C. § 17] to exempt such an organization or its members from accountability where it or they depart from its normal and legitimate objects and engage in an actual combination or conspiracy in restraint of trade . . . .  [Nor] can it be taken as authorizing any activity otherwise unlawful, or enabling a normally lawful organization to become a cloak for an illegal combination or conspiracy in restraint of trade.").

Wage-fixing and market allocation are not lawful.  Wage suppression is not a legitimate objective when accomplished by agreement amongst competitors.  Defendants are not immune from antitrust liability.

3.      **Whether Defendants are "joint employers" for wage-and-hour purposes is irrelevant to the antitrust claims alleged here.**

Defendants Borda, Holland, Espil, and Little Paris next contend that WRA acts as a "joint employer" with each member-ranch when WRA submits job applications to the DOL.  ECF 109 at 14-16.  Although they spill much ink on this point, they do not explain why it matters.  The phrase "joint employer" is a term of art that has special meaning in the H-2A program by establishing who may submit an application for employment authorization to the DOL.  Similarly, it has a special meaning in wage-and-hour law generally, used to determine which entities may be liable to workers for wage-and-hour and similar employment law violations.  *See, e.g.*, *Ray v. L.A. Cnty. Dep't of Pub. Soc. Servs.*, 52 F. 4th 843, 847-48 (9th Cir. 2022) (describing consequences of joint employer status under Fair Labor Standards Act).  The term has no recognized import in the context of antitrust law, however, except in the very limited context of multi-employer bargaining units that are not at issue here.  *See Brown v. Pro Football, Inc.*, 518 U.S. 231, 236-237 (1996) (describing interplay between antitrust law and labor law in the context of collective bargaining).  There is no "joint employer" defense to antitrust liability and these Defendants cite no cases suggesting otherwise.

The closest these Defendants get to explaining why they think status as a joint employer matters is their conclusory assertion that no "agreement, conspiracy, or combination among two or more persons or distinct business entities" has been alleged.  *See* ECF No. 109 at 16.  Most importantly, that is wrong—even if WRA is a joint employer *with an individual ranch* when it submits an H-2A application on the ranch's behalf, the FAC alleges that the ranches collude *with each other*, not just with WRA, to fix wages and allocate the market, and there can be no argument that separate member ranches are joint employers with each other.  Moreover, these Defendants cite no case law to support their assertion and fail to explain the point in the context of the antitrust claims alleged here.  Perhaps these Defendants intended to invoke the "single enterprise" defense to antitrust liability, sometimes called the *Copperweld* doctrine.  *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771-73 (1984) (holding that parent

corporation and wholly-owned subsidiary, though legally distinct entities, should be treated as single enterprise for antitrust purposes because they have "a complete unity of interest" and "their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one"). If that is what these Defendants meant to signal, the argument should be deemed waived because they utterly fail to develop it or cite any supporting caselaw. *See Badgley v. United States*, 957 F.3d 969, 978-79 (9th Cir. 2020) (deeming arguments waived where they were presented "without a single citation to legal authority" in a "cursory manner"); *United Nurses Ass'n of Cal. v. Nat'l Labor Rels. Bd.*, 871 F.3d 767, 789 n.19 (9th Cir. 2017) (argument deemed waived due to its "brevity and lack of citation to authority").

Even if this undeveloped "single entity" defense is not deemed waived, it should be rejected. The lead case on this doctrine is the Supreme Court's decision in *Am. Needle,* 560 U.S. 183. There, the Supreme Court rejected the notion that the NFL's 32 member teams were immune from antitrust scrutiny for conduct they undertook through National Football League Properties (NFLP), a corporation they formed to develop, license, and market each team's intellectual property, for example for branded jerseys. The Court emphasized that what matters is substance, not form, and confirmed that "we have repeatedly found instances in which members of a legally single entity violated § 1 [of the Sherman Act] when the entity was controlled by a group of competitors and served, in essence, as a vehicle for ongoing concerted activity." *Id.* at 191. "[T]he question is not whether the defendant is a legally single entity or has a single name; nor is the question whether the parties involved 'seem' like one firm or multiple firms in any metaphysical sense. The key is whether the alleged 'contract, combination . . ., or conspiracy' is concerted action—that is, whether it joins together separate decisionmakers. The relevant inquiry, therefore, is whether there is a 'contract' combination . . ., or conspiracy' amongst 'separate economic actors pursuing separate economic interests,' such that the agreement 'deprives the marketplace of independent centers of decisionmaking,' and therefore of 'diversity of entrepreneurial interests.'" *Id*. at 195 (citation omitted). Thus, although NFLP was technically a single corporation, its actions were not insulated from antitrust

scrutiny because, in substance, NFLP was controlled by a group of disparate competitors. "Each of the teams is a substantial, independently owned, and independently managed business." *Id.* at 196. By banding together, they therefore deprived the marketplace of potential competition.

The same is true here. Although WRA is a stand-alone entity, it was formed by independently-owned and controlled ranches that would otherwise compete with one another. *See* FAC ¶¶ 57 ("The WRA is a membership association, and its directors and officers are all representatives of member ranches."), 58 (identifying various WRA directors and the ranch with which they were affiliated), 59 (explaining that WRA's members "do not share profits or distribute losses," meaning they have disparate economic interests). Much like the NFL teams' delegation of licensing of their intellectual property to NFLP deprived the marketplace of independent-decisionmaking with respect to licensing of the teams' trademarks, Plaintiff alleges that "[b]y having WRA set wages for all of its members, WRA's members surrender their economic independence and autonomy to WRA, depriving the marketplace—and particularly sheepherders—of the benefits of competition that come with independent decision-making." *Id.* ¶ 88. The same is true of the alleged no-poach agreement. *Id.* ¶ 12. Thus, *American Needle* squarely refutes any suggestion that the "single entity" defense applies here.

As the Court has already held, "even considered within the context of a regulatory scheme that authorizes WRA to coordinate with members to submit applications and *act as joint employers of H-2A shepherds*, . . . the Court finds Plaintiff's allegations, particularly those of Richins's testimony and the WRA handbook, taken together, contain sufficient factual matter to plausibly suggest that an illegal agreement was made and to nudge the claim across the line from conceivable to plausible." MTD Order at 14-15 (emphasis added, alterations, citations, and footnote omitted). That ranches are permitted to mitigate the burdens of the H-2A regulatory framework by centralizing certain tasks, like the submission of applications to the relevant federal authorities, does not carry with it permission to engage in naked wage-fixing and market allocation.

E.      **The Court Has Personal Jurisdiction Over Faulkner**

Faulkner argues that the Court lacks personal jurisdiction over it because it does not engage in sufficient activity relevant to this case within the State of Nevada.  ECF No. 96 at 8-10.  Faulkner dramatically understates its contacts with Nevada, but more importantly, it applies the wrong legal analysis.  Because this is an antitrust case, the Clayton Act creates personal jurisdiction over Faulkner so long as Faulkner transacts business in Nevada, regardless of whether that business is related to this case.  In any case, even if the Court applies the personal jurisdiction test that otherwise applies in non-antitrust cases, personal jurisdiction is satisfied because Faulkner has sufficient contacts with Nevada that are relevant to this litigation.

1.      **Faulkner transacts business in Nevada and has sufficient contacts with the United States to support jurisdiction under the Clayton Act.**

The analysis of personal jurisdiction differs in antitrust litigation than in most other cases. The federal Clayton Act authorizes nationwide service of antitrust defendants "in any district wherein [the defendant] may be found or transacts business."  15 U.S.C. § 22; *see also* FAC ¶¶ 2-3.  Federal courts may exercise personal jurisdiction over a defendant when a statute authorizes service of process on that defendant.  *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1177 (9th Cir. 2004).  Thus, if Faulkner "transacts business" in Nevada within the meaning of the Clayton Act, then the Court may exercise personal jurisdiction over it.

Faulkner's own submissions confirm that it transacts business in Nevada.  The term "transacts business" in the Clayton Act "is given a broader meaning than has traditionally been given the 'engaging in business' articulation of presence within a state." *Pacific Car & Foundry Co. v. Pence*, 403 F.2d 949, 953 (9th Cir. 1968).  The words are understood in their "ordinary and usual sense in which they may be used in the business world," and "are intended to substitute practical business conceptions for the previous hair-splitting legal technicalities." *Id.* (citations and quotations omitted).  "A corporation can transact business without ever entering a state; without having salesmen or agents present there . . . .  If the corporation in a practical business sense has business within the state it may be said to be in business there." *Id.* "This low bar

1   'does not demand that a corporation be engaged in a continuous course of business within the

2   forum state.  One act within, or with regard to, the forum state may be enough to constitute the

3   transaction of business required' to confer venue." *United States v. Get Eng'g Corp.*, No.

4   818CV00277, 2019 WL 4452968, at *3 (C.D. Cal. June 20, 2019) (holding that "shipping

5   goods" to the district is a "sufficient transaction[] of business").  Moreover, "the defendant's

6   activities need not be related to the cause of action in order to find Section 12 venue based upon

7   the transacting of business in the forum state." *Pac. Tobacco Corp. v. Am. Tobacco Co.*, 338 F.

8   Supp. 842, 844 (D. Or. 1972) (holding Clayton Act supported personal jurisdiction over

9   defendant who was alleged to engage in out-of-state conspiratorial activities that produced

10  antitrust injury within the forum state).

11      Faulkner undoubtedly "transacts business" in Nevada.  It admits that, every year, it

12  "transports approximately 6,000 ewes from Idaho to Arizona via truck" and that the "trucks pass

13  through the State of Nevada."  ECF No. 96-1 ("Faulkner Decl.") ¶ 4.  Those business activities in

14  Nevada are not random, but rather deliberate and continuous—Faulkner's caravan of sheep trek

15  through the state every year.  Moreover, Faulkner employs proposed Class Members to

16  supervise, tend to, and accompany the sheep as they pass through Nevada.  *Id.* ¶ 5.  That is why

17  Faulkner "list[s] certain Nevada counties as worksites with the paperwork submitted for the H-

18  2A program." *Id.* ¶ 6.[7]  The workers are performing work in Nevada and paid in accordance

19  with Nevada wage and hour laws, per requirements of the H-2A program.[8]  If nothing else, then,

---

20  [7]  Although Faulkner states only "certain" counties are designated, in fact, Faulkner identifies

21  Clark, Lincoln, White, Pine, and Elko counties as Nevada worksites, FAC ¶ 34.  These counties
    cover the entire eastern portion of the State of Nevada.

22  [8]  In addition to transacting business by employing sheepherders in Nevada and transporting its
    flock through the entire eastern portion of the State on an annual basis, Faulkner also transacts

23  business in Nevada through its WRA-related activities.  *See* FAC ¶¶ 26 ("WRA regularly holds
    meetings of its members in Nevada."), 60 ("The WRA convenes regular membership meetings,

24  including in Nevada," and "[i]ts members therefore have numerous opportunities to conspire
    with one another at those meetings").  Faulker's declaration does not dispute these allegations.

25  *See Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008) (when resolving dispute over
    personal jurisdiction on motion to dismiss, "[u]ncontroverted allegations in the plaintiff's

26  complaint must be taken as true.  'Conflicts between the parties over statements contained in
    affidavits must be resolved in the plaintiff's favor.'") (citation omitted).

27

1    employing workers in Nevada certainly counts as transacting business.

2              Given that Faulkner "transacts business" in Nevada within the meaning of the Clayton

3    Act, the only remaining question is whether "asserting jurisdiction [would] offend the principles

4    of Fifth Amendment due process." *Go-Video, Inc. v. Akai Elec. Co. Ltd.*, 885 F.2d 1406, 1413

5    (9th Cir. 1989).  To make that determination, the Court must perform a "minimum contacts"

6    analysis.  But unlike the traditional analysis which looks to a defendant's minimum contacts with

7    a specific *state*, "the relevant forum with which a defendant must have 'minimum contacts' in a

8    suit brought under Section 12 of the Clayton Act is *the United States*."  *Action Embroidery*, 368

9    F.3d at 1180 (citing *Go-Video*, 885 F.2d at 1416) (emphasis added).  "[T]he inquiry to determine

10   'minimum contacts' is thus 'whether the defendant has acted within any district of the United

11   States or sufficiently caused foreseeable consequences in this country.'"  *Id.* (citation omitted).

12             The answer to that question here is straightforward.  Faulkner admits that it is "a sheep

13   ranching operation in the State of Idaho" and that it "operates in the States of Idaho and

14   Arizona."  Faulkner Decl. ¶¶ 1-2.  By necessity, Faulkner has sufficient minimum contacts with

15   the United States to support the exercise of personal jurisdiction here.  *See*, *e.g.*, *L.A. Int'l Corp.*

16   *v. Prestige Brands Holdings, Inc.*, No. 18-6809, 2018 WL 6985235, at *2-3 (C.D. Cal. Dec. 7,

17   2018) (in antitrust case, personal jurisdiction analysis ends once minimum contacts with United

18   States are established).

19             **2.     Specific personal jurisdiction also exists under the traditional test.**

20             Even under the analysis that otherwise applies in non-antitrust litigation, the Court still

21   has personal jurisdiction over Faulkner.  "Specific jurisdiction exists when a case 'aris[es] out of

22   or relate[s] to the defendant's contacts with the forum.'"  *Ranza v. Nike, Inc.*, 793 F.3d 1059,

23   1068 (9th Cir. 2015) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408,

24   414 n.8 (1984)).  Specific jurisdiction "depends on an affiliation between the forum and the

25   underlying controversy, principally, activity or an occurrence that takes place in the forum State

26   and is therefore subject to the State's regulation."  *Goodyear Dunlop Tires Operations, S.A. v.*

27

*Brown*, 131 S. Ct. 2846, 2851 (2011) (alterations and quotations omitted).  The Ninth Circuit follows a three-part test for specific personal jurisdiction:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable.

*Herbal Brands, Inc. v. Photoplaza, Inc.*, 72 F. 4th 1085, 1090 (9th Cir. 2023).  Once the plaintiff meets their burden of proving the first two prongs, "the burden then shifts to the defendant to present a compelling case that the exercise of jurisdiction would not be reasonable." *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068-69 (9th Cir. 2017) (quotations omitted). The requirements of this test are met here.

Faulkner purposely directed its conduct towards the state.  *See In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 743 (9th Cir. 2013) (applying "purposeful direction" test to antitrust case, which requires that defendant "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state" (quotation omitted)).  It voluntarily and by design makes an annual voyage through the entire eastern portion of the State of Nevada with 6,000 sheep and a number of proposed Class Members, who it employs as sheepherders.  Faulkner Decl. ¶¶ 4-5.  It specifically applied for permission from DOL to employ sheepherders within five Nevada counties.  *Id.* ¶ 6; *see also* FAC ¶ 34.  It is alleged to have joined a conspiracy with numerous Nevada co-conspirators (including co-defendants here) that was designed to have an impact on sheepherders' wage employed within the State of Nevada and other affected states.  *Id.* ¶¶ 34, 60.  These activities show that Faulkner "deliberately 'reached out beyond its home'—by, for example, 'exploit[ing] a market' in the forum State," *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1025 (2021), and that the "effects" of its conspiracy "were felt [in Nevada], whether or not the [unlawful] actions themselves occurred within the forum," *Herbal Brands*, 72 F.4th at 1091.  *See*

*also In re W. States*, 715 F.3d at 743-45 (holding "purposeful direction" test was satisfied where defendant's participation in conspiracy to manipulate prices would have also impacted forum state); *Cont'l Auto. Sys., Inc. v. Avanci, LLC*, No. 19CV02520, 2019 WL 6735604, at *7-8 (N.D. Cal. Dec. 11, 2019) (same).

The second prong is also satisfied because Plaintiff's claims also "arise out of or relate to" Faulkner's forum contacts. *See Herbal Brands*, 72 F.4th at 1096. No causal relationship between Faulkner's contacts and Plaintiff's causes of action is required to demonstrate that its contacts "relate to" Plaintiff's claims. *See Ford Motor Co.*, 141 S. Ct. at 1025. It's enough that Plaintiff alleges that the proposed Class Members were paid artificially depressed wages as a result of an anticompetitive conspiracy, and Faulkner admits to employing sheepherders within the State of Nevada, where they were paid those wages tainted by the alleged conspiracy. Further, Plaintiff alleges that some of the conspiratorial activities took place within Nevada through the WRA's membership meetings. *See* FAC ¶¶ 26, 60, 137, 179.

Finally, the exercise of personal jurisdiction here comports with fair play and is reasonable. It is Faulkner's burden to demonstrate otherwise. *Axiom Foods*, 874 F.3d at 1068-69. Yet Faulkner makes no assertions in its declaration of undue burden, inconvenience, or expense if the case against it proceeds here. *See generally* Faulkner Decl. And such an assertion would be of doubtful credibility. If Faulkner can make at least one cross-state voyage in the company of 6,000 sheep every year, it can surely send one or two company representatives in the event it needs to appear personally for a hearing or trial, as opposed to through its Reno-based lawyer.

Whether applying the Clayton Act analysis or the traditional test, the Court has personal jurisdiction over Faulkner. Faulkner's motion to dismiss for want of jurisdiction should be denied.[9]

---

[9] Alternatively, Plaintiff requests the opportunity to take limited discovery regarding personal jurisdiction from Faulkner before the Court adjudicates the question. *See, e.g., Butcher's Union Loc. No. 498, United Food & Com. Workers v. SDC Inv., Inc.*, 788 F.2d 535, 540 (9th Cir. 1986)

V.   **CONCLUSION**

The Ranch Defendants present no reason why the Court should retreat from its earlier

conclusion that Mr. Alvarado has adequately pled a violation of the Sherman Act by the WRA

and its members.  Their motions to dismiss should be denied.

Dated:  September 12, 2023                   Respectfully submitted,

                                             **EDELSON P.C.**

                                             */s/ Yaman Salahi*
                                             YAMAN SALAHI (*Pro Hac Vice*)
                                             150 California St., 18th Floor
                                             San Francisco, CA 94109
                                             Telephone: (415) 212-9300
                                             Facsimile: (415) 373-9435

                                             */s/ Natasha Fernández-Silber*
                                             NATASHA FERNÁNDEZ-SILBER (*Pro Hac*
                                             *Vice*)
                                             350 N. La Salle St., 14th Floor
                                             Chicago, IL 60654
                                             Telephone: (312) 589-6370
                                             Facsimile: (312) 589-6378

                                             **FAIRMARK PARTNERS, LLP**

                                             */s/ Jamie Crooks*
                                             JAMIE CROOKS (*Pro Hac Vice*)
                                             RUCHA A. DESAI (*Pro Hac Vice* Forthcoming)
                                             1825 7th St NW, #821
                                             Washington, DC 20001
                                             Telephone: (619) 507-4182

                                             **TOWARDS JUSTICE**

                                             */s/ David Seligman*
                                             DAVID SELIGMAN (*Pro Hac Vice*)
                                             ALEXANDER HOOD (*Pro Hac Vice*)
                                             1535 High Street, Ste. 300
                                             Denver, CO 80218
                                             Telephone: (720) 248-8426

                                             *Co-Lead Counsel for Plaintiff and the proposed*
                                             *Class*

---

("Discovery should ordinarily be granted where 'pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary.'").

## CERTIFICATE OF SERVICE

In compliance with Rule 5 of the Federal Rules of Civil Procedure, I hereby certify that I caused a copy of the foregoing Plaintiff's Opposition to Ranch Defendants' Motions to Dismiss (ECF Nos. 96, 99, 109) for Plaintiff Cirilo Ucharima Alvarado to be electronically filed with the Clerk of the United States District Court for the District of Nevada by using CM/ECF and was served on all counsel or parties in manners indicated and addressed as follows:

## SERVICE LIST

Ellen Jean Winograd                                                  **VIA CM/ECF**
WOODBURN AND WEDGE
6100 Neil Road, Suite 500
Reno, NV 89511
ewinograd@woodburnandwedge.com

*Attorney for Defendant Western Range Association*

David Sexton
FABIAN VANCOTT
411 East Bonneville Avenue Suite 400
Las Vegas, NV 89101
dsexton@fabianvancott.com

Kirsten R. Allen
Scott M. Petersen
Tanner James Bean
FABIAN VANCOTT
95 South State Street Ste. 2300
Salt Lake City, UT 84111
kallen@ fabianvancott.com
spetersen@fabianvancott.com
tbean@fabianvancott.com

*Attorneys for Defendant Ellison Ranching Company*

Anthony L. Hall
Duncan George Burke
SIMONS HALL JOHNSTON
690 Sierra Rose Drive
Reno, NV 89511
ahall@shjnevada.com
dburke@shjnevada.com

PLF'S OPP. TO RANCH DEFS.'                    41                    Case No. 3:22-cv-00249-MMD-CLB
MOT. TO DISMISS

Jonathan A McGuire
SIMONS HALL JOHNSTON PC
6490 S. McCarran Blvd., Ste. F-46
Reno, NV 89509
jmcguire@shjnevada.com

*Attorneys for Defendant John Espil Sheep Co., Inc., Little Paris Sheep Company, LLC, Borda Land & Sheep Company, LLC, and Holland Ranch, LLC*

Jerry M. Snyder
JERRY SNYDER LAW
429 W. Plumb Lane
Reno, NV 89509
jerry@jerrysnyderlaw.com

*Attorney for Defendant F.I.M. Corp., Need More Sheep Co., LLC, Faulkner Land and Livestock Company, Inc.*

|  | Respectfully submitted, |
|---|---|
|  | **EDELSON PC** |

Dated: September 12, 2023

By: */s/ Yaman Salahi*

Yaman Salahi
ysalahi@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300

*Attorney for Plaintiff*