**THIERMAN BUCK LLP**
LEAH L. JONES, Nev. Bar No. 13161
leah@thiermanbuck.com
7287 Lakeside Drive
Reno, Nevada 89511
Telephone: (775) 284-1500
Facsimile: (775) 703-5027

**FAIRMARK PARTNERS, LLP**
JAMIE CROOKS, ESQ. (*Pro Hac Vice*)
jamie@fairmarklaw.com
RUCHA DESAI, ESQ. (*Pro Hac Vice*)
rucha@fairmarklaw.com
1001 G Street, Suite 400E
Washington, DC 20001

*Attorneys for Plaintiff and the Proposed Class*

**SALAHI PC**
YAMAN SALAHI, ESQ. (*Pro Hac Vice*)
yaman@salahilaw.com
505 Montgomery St., 11th Floor
San Francisco, California 94111
Tel: (415) 236-2352

**TOWARDS JUSTICE**
DAVID H. SELIGMAN, ESQ. (*Pro Hac Vice*)
ALEXANDER HOOD, ESQ. (*Pro Hac Vice*)
alex@towardsjustice.org
PO Box 371680, PMB 44465
Denver, Colorado 80237

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

CIRILO UCHARIMA ALVARADO, on behalf of himself and all others similarly situated;

     *Plaintiff*,

  v.

WESTERN RANGE ASSOCIATION, a California non-profit corporation; **ELLISON RANCHING COMPANY**, a Nevada corporation; **JOHN ESPIL SHEEP CO., INC.**, a Nevada corporation; **F.I.M. CORP.**, a Nevada corporation; **THE LITTLE PARIS SHEEP COMPANY, LLC**, a Nevada limited liability company; **BORDA LAND & SHEEP COMPANY, LLC**, a Nevada limited liability company; **HOLLAND RANCH, LLC**, a Nevada limited liability company; **NEED MORE SHEEP CO., LLC**, a Nevada limited liability company; and **FAULKNER LAND AND LIVESTOCK COMPANY, INC.**, an Idaho corporation,

     *Defendants*.

Case No. 3:22-cv-00249-MMD-CLB

**THIRD AMENDED CLASS ACTION COMPLAINT**

**SHERMAN ACT, 15 U.S.C. § 1 *et seq.***

**JURY TRIAL DEMANDED**

## TABLE OF CONTENTS

I. INTRODUCTORY STATEMENT ........................................................3

II. JURISDICTION AND VENUE ........................................................7

III. PARTIES ........................................................7

  A. Plaintiff........................................................ 7

  B. Defendants ........................................................ 9

IV. STATEMENT OF FACTS ........................................................11

  A. Regulatory Scheme Governing Importation of Foreign Sheepherder Labor .......... 11

  B. WRA's Member Ranches Are Horizontal Competitors.................................. 14

  C. The Market for Sheepherder Labor ........................................................ 21

  D. Arrangements and Agreements That Limit Competition in the Labor Market Hurt Workers ........................................................ 23

  E. Defendants' Collusive Scheme to Suppress Sheepherder Wages ............................ 26

    1. The Ranch Defendants Joined the Cartel by Joining the WRA and Agreeing to Its Anticompetitive Policies........................................................ 26

    2. WRA Members Suppress Wages by Suppressing Worker Mobility ......................... 28

      a. WRA Suppresses Competition During the Recruitment Process ......................... 29

      b. WRA's No-Transfer and No-Solicitation Policies Suppress Competition ........... 31

      c. WRA Maintains Similar No-Poach Agreements with Other Ranching Associations ........................................................ 37

      d. WRA and Its Members Gratuitously Punish Workers Who Leave......................... 40

    3. The WRA and Its Members Suppress Wages Through Wage-Fixing......................... 42

      a. The WRA and Its Member Ranches Share a Collective Desire to Suppress Wages 42

      b. The Ranch Defendants and Other WRA Members Cede Wage-Setting Authority to the WRA ........................................................ 47

      c. The WRA and its Members Coordinate Wages Offered to Domestic Workers..... 50

      d. The WRA and Its Members Coordinate Wages Offered to Foreign Workers....... 55

    4. WRA Members' Adherence to the Minimum Wage Is Economically Irrational and Unlikely Absent a Conspiracy ........................................................ 57

  F. Defendants' Collusive Scheme Hurts Sheepherders........................................ 59

V. CLASS ALLEGATIONS ........................................................60

Plaintiff Cirilo Ucharima Alvarado ("Plaintiff") individually, and on behalf of all others similarly situated, brings this action for damages and equitable relief against Defendants Western Range Association ("WRA"), Ellison Ranching Company ("Ellison Ranching"), John Espil Sheep Co., Inc. ("Espil"), F.I.M. Corp. ("F. I. M."), The Little Paris Sheep Company, LLC ("Little Ranch"), Borda Land & Sheep Company ("Borda"), Holland Ranch, LLC ("Holland Ranch"), Need More Sheep, Co., LLC ("Need More Sheep"), and Faulkner Land and Livestock Company, Inc. ("Faulkner") (collectively, "Defendants").

# I.    INTRODUCTORY STATEMENT

1.    This action is brought under Section 1 of the Sherman Act. 15 U.S.C. § 1 *et seq.* Plaintiff seeks class-wide damages, as well as injunctive and declaratory relief related to Defendants' unlawful restraint of trade.

2.    Sheep ranches in the western United States raise sheep to produce meat and wool, and generate roughly $600 million per year through this trade.

3.    The industry depends upon thousands of highly-skilled sheepherders, who are employed by ranches to tend to sheep herds. Among other forms of skilled labor, sheepherders tend to the health and medical needs of the herd, which requires substantial experience and training.

4.    Yet sheepherders work for some of the lowest wages in the U.S. economy. Many earn between $4 and $5 per hour to perform grueling work 80 to 90 hours per week. While on the range, they are isolated in remote and windswept corners of the West, often living in small, dilapidated one-room trailers without heating or air conditioning and surviving off canned foods and potatoes. Some, including Plaintiff, have been subjected to abusive practices by their employers, designed to make them feel even more trapped and isolated in their jobs.

5.    Notwithstanding the profits these workers generate for sheep producers, they have no meaningful opportunity to shop between ranches for better treatment or decent wages.

6.    This case principally concerns Sherman Act violations that have had the effect of artificially suppressing the wages below competitive levels for thousands of sheepherders,

most of whom come from Peru and work in the U.S. West on temporary agricultural visas, commonly called H-2A visas.

7.     Acting in concert through the WRA, sheep ranchers, including the Ranch Defendants, are determined to eliminate competition between themselves for labor, thereby suppressing sheepherder wages. Like all employers, ranches have a legal obligation to compete for labor in an open market, free from unlawful restraints or collusion between competitors. Instead, they collude with and through the WRA to suppress the wages ranches offer to sheepherders, fixing wages predominantly at or near the precise wage floor set by the United States Department of Labor (the "DOL") for foreign sheepherders working in the United States on temporary, H-2A visas. The legal minimum is far below what the competitive equilibrium wage would be but for Defendants' collusion.

8.     The sheep ranch industry is dominated by ranches that are members of the WRA. The ranchers who comprise the WRA, including Defendants, consciously commit to this wage suppression scheme by delegating the setting of wages and the placement of workers to the WRA with the knowledge that the WRA uniformly fixes the wages for sheepherders at the legal minimum, and acts to prevent competition in the labor market by allocating sheepherders to specific ranches and restraining workers' ability to switch ranch employers. Indeed, when a worker applies to work through the WRA, the WRA assigns them to a ranch. Due to this market allocation scheme, there is no opportunity to shop between ranches to seek out those who may offer better pay and treatment because the ranches have surrendered their independence in the labor market to the WRA.

9.     Defendants further undermine sheepherders' bargaining power by preventing them from moving between ranches and other employers in search of better treatment and wages after they are brought to the United States and assigned to a ranch. The WRA requires sheepherders to sign a standardized employment contract that provides: "*Durante la vigencia de este contrato, el Empleado deperá trabajar exclusivamente para un Empleador de la Asociación Western Range y dicho Empleader deberá ser designado por la Asociación.*" Translated into

English, this provision states that "during the term of this contract, the employee must work exclusively for an employer in the Western Range Association, and that employer must be assigned by the Association." This prevents workers from moving between employers even between seasonal or temporary visas, which sometimes last only a few months, reflecting an agreement between the WRA member ranches to delegate hiring decisions to the WRA, thus depriving the labor market of independent centers of decisionmaking and the competition that would otherwise exist. All WRA ranches are aware that the WRA requires sheepherders to sign this attestation.

10.    By effectively dividing the market in this manner and agreeing not to hire sheepherders from each other, the WRA and its members, including Defendants, artificially suppress sheepherders' wages and exacerbate the risk of dangerous and exploitative working conditions. Sheepherders are effectively forced to work for a single ranch.

11.    Defendants' concerted conduct includes but is not limited to: (1) agreements between and amongst the WRA and its members to fix the wages predominantly at or near the DOL minimum; (2) indemnification of the WRA by its members for any claims against the former related to wages and/or overtime; (3) the WRA's policy of assigning sheepherders to specific ranchers while prohibiting sheepherders from seeking employment at other ranches; and (4) the collusion of WRA members in this market allocation conspiracy.

12.    Defendants' anticompetitive scheme results in wages for sheepherders that are far below competitive levels. In fact, they are strikingly low even relative to the most low-wage employment opportunities in the rest of the U.S. economy. Few domestic workers at that wage level have the skill or desire to work as sheepherders, yet non-immigrant guestworker sheepherders earn poverty wages for their work notwithstanding its importance and the skills and experience needed to perform it.

13.    Defendants collude to ensure that wage offerings to domestic workers are kept unreasonably low, ensuring an artificial shortage of domestic workers that allows the industry to rely on the importation of foreign H-2A sheepherders whose immigration status only increases

their risk of exploitation. Indeed, at that wage level, domestic workers have much more attractive employment options that are not as dangerous, demanding, or strenuous as sheepherding on the range. The ranchers' collusion with the WRA in assigning sheepherders to certain ranches and preventing competition over wages ensures that these subminimum wage workers have no ability to shop between ranches for decent treatment and pay, notwithstanding the value of their services to sheep ranches.

14. Plaintiff Cirilo Ucharima Alvarado, a citizen of Peru, had decades of experience sheepherding before he was assigned a ranch by the WRA. Notwithstanding his expertise, he had no opportunity to shop between ranches for decent wages; all of the ranches offered precisely the DOL minimum wage allowable in their state, and in all cases, that amount was less than the federal minimum hourly wage. He could not shop between ranches because the WRA assigned him a ranch, he was required to sign an attestation that he could only work for the ranch designated by the WRA, and the ranches agreed to abide by WRA policies prohibiting them from hiring sheepherders from one another. He was bound to that ranch, no matter how badly he was treated.

15. Mr. Ucharima Alvarado's treatment at the hands of his WRA-assigned member ranch was abhorrent. At all times, his wages were between $4 and $5 an hour, to perform grueling work. On more than one occasion, his employers at the Little Ranch required him to sleep out in the open, exposed to the elements while herding sheep, gave him expired food to eat, and refused to provide clothing and medical attention when he needed it most. The Little Ranch also threatened Mr. Ucharima Alvarado constantly with physical violence and with sending him back to Peru before the end of his contract term.

16. Mr. Ucharima Alvarado was forced to endure this poor treatment because he feared that he would not be paid if he left his placement, and because he had no opportunity to leave even if he had wanted to do so given WRA and its member ranches' conspiracy not to hire sheepherders from one another. His host ranch confiscated his passport and visa to ensure he could not leave.

17.     Without this Court's intervention, Defendants will continue their anticompetitive conduct and to depress wages and create conditions that allow for the persistent exploitation of this vulnerable labor market.

## II.   JURISDICTION AND VENUE

18.     This Court has jurisdiction over all claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 15(a).

19.     Venue is proper pursuant to 28 U.S.C. § 1391, 18 U.S.C. § 1965(a), 15 U.S.C. §§ 15(b) & 22. Mr. Ucharima Alvarado was placed by the WRA at a WRA member ranch in Nevada called the Little Ranch. The WRA transacts business in Nevada. Defendants Ellison, Espil, F. I. M., the Little Ranch, Borda, Holland, and Need More Sheep are Nevada corporations or companies with their headquarters in Nevada, and transact business in Nevada. Defendant Faulkner also transacts business in Nevada. Further, a substantial part of the events or omissions giving rise to the claims against the Defendants occurred in Nevada.

20.     The Court has *in personam* jurisdiction over Defendants because, among other things, they: (a) transacted business in the United States, including in this District; (b) worked with WRA's members to artificially fix and suppress the wages of Plaintiff and members of the Class (defined herein) throughout the United States, including in this District; or (c) had substantial aggregate contacts with the United States as a whole, including in this District. Further, the Court has *in personam* jurisdiction over Defendants Ellison, Espil, F. I. M., the Little Ranch, Borda, Holland, and Need More Sheep because they reside within this District.

## III.  PARTIES

### A.   Plaintiff

21.      Plaintiff Cirilo Ucharima Alvarado ("Plaintiff") is a sheepherder from Centro Poblado de Chala in the Junín region of Peru.

22.     Plaintiff is a Peruvian citizen and came to the United States on a temporary H-2A visa to work as a sheepherder on the Little Ranch in Spring Creek, Nevada. Plaintiff worked at

the Little Ranch from July 4, 2020 until December 2020. At all relevant times, Plaintiff was a resident of and was domiciled in Nevada.

23.      Plaintiff Ucharima Alvarado came to the United States on a temporary H-2A visa with the hope of using his extensive experience and knowledge as a sheepherder to make a decent living for himself and his children and grandchildren. He had been a sheepherder since he was a school-aged child. Mr. Ucharima Alvarado has herded sheep, cows, and other livestock for decades in his home country of Peru. When he discovered he could do what he knew best in another country for what he believed to be better pay, he decided to apply for work through the WRA.

24.      As part of the application process with the WRA, Mr. Ucharima Alvarado completed all the steps necessary to secure an H-2A visa. He made the long journey from his home province of Concepcion to Lima, the capital city of Peru, where WRA offices are located. He went through the process of securing his passport, interviewing for his visa, presenting his marriage license and all of his children's birth certificates, and making other necessary preparations for his journey to the United States. Mr. Ucharima Alvarado paid for most of these costs himself, including transportation and document fees.

25.      While Mr. Ucharima Alvarado was applying to work with the WRA, he heard from other sheepherders about their experiences on different ranches in the United States. He believed that both wages and treatment might vary between placements, and did not know if ranch pay varied based on the state in which the ranch was located. He hoped to be assigned to a ranch that would treat him with dignity and respect, and compensate him fairly and in accordance with his substantial experience as a herder. But he did not have any control over what ranch he was placed with by the WRA. WRA placed Mr. Ucharima Alvarado with the Little Ranch in Nevada.

26.      It was not until Mr. Ucharima Alvarado arrived in Nevada that he learned about the poor treatment sheepherders on the Little Ranch were forced to endure. He soon came to

understand why his fellow sheepherders were not only unhappy with their assignment, but feared their employer.

27.     If Mr. Ucharima Alvarado had been given the opportunity to offer his lengthy herding experience to different ranches, his experience participating in the H-2A visa program would have been very different. Mr. Ucharima Alvarado could have leveraged his knowledge and experience to secure a placement with a ranch of his own choosing that would have paid higher wages and that would have given him the tools he needed to fulfill the promises of the visa he went through so much effort to obtain. Instead, the structure of the U.S. sheepherder labor market, shaped by the WRA-led collusion between WRA members, left him indentured and vulnerable to abuse at the hands of employers who paid him substantially less than minimum wage, and far less that he would have been paid in the absence of the anticompetitive scheme alleged herein.

28.     Mr. Ucharima Alvarado's experience is representative of those of other sheepherders and members of the proposed Class.

**B.     Defendants**

29.     Defendant WRA is a California non-profit corporation with its principal place of business at 1245 Brickyard Rd., Salt Lake City, Utah, 84106. The WRA transacts business in Nevada by, among other things, recruiting sheepherders and setting wages for several of its member ranches in the State, including the ranch where Plaintiff worked. WRA regularly holds meetings of its members in Nevada.

30.     Defendant Little Ranch is a Nevada limited liability company with its principal place of business in Jiggs, Nevada. The Little Ranch is and at all relevant times was a member of the WRA and engages in all of the anticompetitive conduct alleged herein. Its principal, David Little, has been a Director of the WRA since at least 2017, and became its Treasurer in or around 2020. The Little Ranch recruits tens of sheepherders each year through the WRA.

31.     Defendant Ellison is a Nevada corporation with its principal place of business in Tuscarora, Nevada. Ellison runs livestock and farming operations across some two million acres throughout Nevada via the Spanish Ranch, PX Ranch, 71 Ranch, and the Fish Creek Ranch. Ellison is and at all relevant times was a member of the WRA, and engages in all of the anticompetitive conduct alleged herein. Through the WRA, Ellison recruits dozens of sheepherders each year.

32.     Defendant Espil is a Nevada corporation with its principal place of business in Sparks, Nevada. Espil is and at all relevant times was a member of the WRA, and engages in all of the anticompetitive conduct alleged herein. Its principal, John Espil, was also formerly a director at the WRA, a post he held in 2017 and 2018. Like other WRA members, Espil recruits dozens of sheepherders each year through the WRA.

33.     Defendant F. I. M. is a Nevada corporation with its principal place of business in Smith, Nevada. F. I. M. is and at all relevant times was a member of the WRA, and engages in all of the anticompetitive conduct alleged herein. Through the WRA, F. I. M. recruits tens of sheepherders each year.

34.     Defendant Borda is a Nevada limited liability company with its principal place of business in Gardnerville, Nevada. It runs about 3,000 Merino/Rambouillet sheep each year, and another 3,500 lambs. Borda is and at all relevant times was a member of the WRA, and engages in all of the anticompetitive conduct alleged herein. Through the WRA, Borda recruits over a dozen sheepherders each year.

35.     Defendant Holland Ranch is a Nevada limited liability company with its principal place of business in Elko, Nevada. Holland Ranch is and at all relevant times was a member of the WRA, and engages in all of the anticompetitive conduct alleged herein. Like other WRA members, it recruits over a dozen sheepherders through WRA each year.

36.     Defendant Need More Sheep is a Nevada limited liability company with its principal place of business in Ely, Nevada. It has a flock of approximately 10,000 sheep (nearly 14% of all sheep in Nevada) on a ranch comprising roughly 1.5 million acres of land. Need More

Sheep is and at all relevant times was a member of the WRA, and engages in all of the anticompetitive conduct alleged herein. It recruits numerous sheepherders through WRA each year.

37.     Defendant Faulkner is an Idaho corporation with its principal place of business in Gooding, Idaho. Faulkner has multiple sheepherder worksites, including in Clark, Lincoln, White Pine, and Elko Counties in Nevada. Faulkner is and at all relevant times was a member of the WRA, and engages in all of the anticompetitive conduct alleged herein. Through WRA, Faulkner recruits dozens of sheepherders each year.

## IV.    STATEMENT OF FACTS

### A.    Regulatory Scheme Governing Importation of Foreign Sheepherder Labor

38.     The H-2A Visa Program is an agricultural guest worker visa program administered by the DOL that allows for the issuance of work visas to foreign workers to fill positions that employers cannot fill with domestic workers.

39.     Pursuant to the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, before issuing H-2A visas, the DOL is charged with ensuring that there is in fact a shortage of domestic workers willing and able to fill the positions that employers seek to fill with foreign H-2A workers.

40.     Specifically, before permitting the entry of foreign workers into the United States under H-2A visas, the INA requires the DOL to certify that:

(A)    there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition, and

(B)    the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed.

41.     To implement its statutory duty under the INA, the DOL has promulgated regulations. *See* 20 C.F.R. §§ 655.100 *et seq.*

42.    Under those regulations, before a foreign worker can be imported under an H-2A visa, an employer must first offer the job to domestic workers through State Workforce Agencies. 20 C.F.R. § 655.121. Because H-2A visas are only issued for positions that cannot be filled by domestic workers, DOL regulations prescribe that employers offer domestic workers "no less than the same benefits, wages, and working conditions that the employer is offering, intends to offer, or will provide to H-2A workers." 20 C.F.R. § 655.122(a).

43.    Additionally, ranchers or membership associations acting on their behalf must offer domestic workers, among other things, "at least the AEWR [Adverse Effect Wage Rate], the prevailing hourly wage rate, the prevailing piece rate, the agreed-upon collective bargaining rate, or the Federal or State minimum wage rate, in effect at the time work is performed, whichever is highest, for every hour or portion thereof worked during a pay period." 20 C.F.R. § 655.122(l).

44.    Jobs offered to domestic workers under these terms are called "job orders."

45.    Only if domestic workers do not accept a position offered through a job order can the employer submit an Application for Temporary Employment Certification (an "H-2A Application") to the DOL for certification.

46.    The DOL can promulgate exceptions to the H-2A Visa Program, known as "special procedures," for certain agricultural industries.

47.    The DOL has implemented special procedures in the sheep and goat herding industries. The DOL implemented one set of special procedures in 2011 that were in effect until November 16, 2015. *See* Training and Employment Guidance (TEGL) Letter No. 32-10: Special Procedures: Labor Certification Process for Employers Engaged in Sheepherding and Goatherding Occupations Under the H-2A Program, 76 Fed. Reg. 47256 (Aug. 4, 2011). As of November 16, 2015, the wage floor for most H-2A shepherds was raised by the DOL to $1,206.31 per month. *See* Labor Certification Process for the Temporary Employment of Aliens in Agriculture in the United States: Adverse Effect Wage Rate for Range Occupations Through 2016, 80 Fed. Reg. 70840, 70840 (Nov. 16, 2015). This monthly wage floor has been raised in

subsequent guidance that the DOL has issued. The wage floor can be higher in individual states, such as California, Nevada, and Oregon, based on higher state-level minimum-wage laws. Per the DOL's 2022 guidance, the minimum for most H-2A sheepherders is approximately $1,807.23 per month. As of January 2023, the minimum for most H-2A sheepherders is approximately $1,901.21 per month.

48.    While previously the DOL could grant repeated 364-day visas for sheepherders—a practice that resulted in sheepherders working in the United States for years or decades doing labor that was purportedly seasonal or temporary—pursuant to a 2019 Settlement Agreement with the DOL, the DOL no longer authorizes visas lasting 364 days for sheepherders and will scrutinize every visa for temporary or seasonal need. All employers applying for temporary agricultural labor certifications must individually demonstrate that their need for the agricultural labor or services to be performed is temporary or seasonal in nature, regardless of occupation.

49.    Although "[t]he employer's job offer must offer to U.S. workers no less than the same benefits, wages, and working conditions that the employer is offering, intends to offer, or will provide to H-2A workers," 20 C.F.R. § 655.122(a), the converse is not true: Ranchers are permitted to offer higher wages to domestic workers in the job orders than they do to H-2A workers in the H-2A Applications.

50.    Indeed, there is no statute or regulation that prevents ranchers from offering H-2A workers more than the minimum wage established by DOL.

51.    To the contrary, DOL has maintained a regulatory policy that explicitly recognizes—and even encourages—offering foreign workers more than the minimum wage established by DOL.

52.    As DOL stated in enacting the current H-2A rules, "[t]he AEWR is the minimum wage rate that agricultural employers seeking nonimmigrant foreign workers must offer to and pay their U.S. and foreign workers." In other words, "[t]he AEWR is a wage floor, and its existence does not prevent the worker from seeking, or the employer from paying, a higher

wage." Temporary Agricultural Employment of H-2A Aliens in the United States, 75 Fed. Reg. 6884, 6891 (Feb. 12, 2010).

53.    Likewise, in 2015, DOL unequivocally reiterated that principle in the context of H-2A sheepherders, noting that "[t]he terms and conditions of herder employment established in this Final Rule are intended as a floor and not a ceiling." Temporary Agricultural Employment of H-2A Foreign Workers in the Herding or Production of Livestock on the Range in the United States, 80 Fed. Reg. 62958, 62962 n.9 (Oct. 16, 2015) (codified at 20 C.F.R. pt. 655).

54.    The only requirement when offering wages higher than the minimum, of course, is to offer the same salary and benefits to domestic workers that are offered to H-2A workers.

55.    Although ranchers have colluded to set baseline pay in line with the minimum permitted by the DOL, on occasion, individual ranchers may violate that agreement by offering some sheepherders more than the minimum. But all sheepherders' wages would be higher if wages were set by competitive forces, rather than at the artificial level established by the WRA members' conspiracy.

56.    Moreover, nothing in the above-described DOL regulations provides for or condones employers colluding to fix wages and agreeing not to compete with one another for H-2A workers. While DOL regulations allow membership organizations to fill out applications on behalf of their members, the regulations do not contemplate employers who are members of an organization like the WRA agreeing *ex ante* on the wage they will all pay and allocating the market for workers between each other. Put differently, the DOL's regulations do not in any way seek to displace or lessen competition between employers for H-2A workers.

**B.    WRA's Member Ranches Are Horizontal Competitors**

57.    The WRA is a membership association, and its directors and officers are all representatives of member ranches. The WRA is not an independent organization and is little more than an alter-ego and vehicle for its members to collude with one another.

58.    The tables below, for example, identify WRA's directors, officers, and executive director from 2017 to the present, all of whom are associated with  ranches.

**Table 1:  WRA Officers, Directors, and Executive Director, 2017**

| Title | Name | Affiliated Ranch |
| --- | --- | --- |
| Executive Director | Monica Youree | Youree Land & Livestock |
| President | Henry Etcheverry | Etcheverry Sheep Company |
| Vice President | Ryan Indart | Indart Solar Sheep Grazing |
| Secretary | Truman Julian | Julian Land & Livestock |
| Director | Raymond A. Talbott | Talbott Sheep Company |
| Director | Lane Jensen | Eph Jensen Livestock |
| Director | Frank Shirts | Shirts Sheep Company |
| Director | John Espil | John Espil Sheep Company |
| Director | Steve Raftopoulos | Two Bar Sheep Company |
| Director | Ben Elgorriaga | Elgorriaga Livestock |
| Director | Nick Etcheverry | Eureka Livestock |
| Director | David Little | Little Paris Sheep Company |
| Director | Ken Wixom | Ken Wixom |
| Director | Tom W. Helle | Helle Rambouillet Ranch |

**Table 2:  WRA Officers, Directors, and Executive Director, 2018**

| Title | Name | Affiliated Ranch |
| --- | --- | --- |
| Executive Director | Monica Youree | Youree Land & Livestock |
| President | Henry Etcheverry | Etcheverry Sheep Company |
| Vice President | Ryan Indart | Indart Solar Sheep Grazing |
| Secretary | Truman Julian | Julian Land & Livestock |
| Director | Raymond A. Talbott | Talbott Sheep Company |

| Director | Lane Jensen | Eph Jensen Livestock |
|---|---|---|
| Director | Frank Shirts | Shirts Sheep Company |
| Director | John Espil | John Espil Sheep Company |
| Director | Steve Raftopoulos | Two Bar Sheep Company |
| Director | Ben Elgorriaga | Elgorriaga Livestock |
| Director | Nick Etcheverry | Eureka Livestock |
| Director | David Little | Little Paris Sheep Company |
| Director | Ken Wixom | Ken Wixom |
| Director | Tom W. Helle | Helle Rambouillet Ranch |

**Table 3:  WRA Officers, Directors, and Executive Director, 2019**

| **Title** | **Name** | **Affiliated Ranch** |
|---|---|---|
| Executive Director | Monica Youree | Youree Land & Livestock |
| President | Henry Etcheverry | Etcheverry Sheep Company |
| Vice President | Ryan Indart | Indart Solar Sheep Grazing |
| Director | Lane Jensen | Eph Jensen Livestock |
| Director | Frank Shirts | Shirts Sheep Company |
| Director | Steve Raftopoulos | Two Bar Sheep Company |
| Director | Stephen Elgorriaga | Elgorriaga Livestock |
| Director | Nick Etcheverry | Eureka Livestock |
| Director | David Little | Little Paris Sheep Company |
| Director | Ken Wixom | Ken Wixom |
| Director | Tom W. Helle | Helle Rambouillet Ranch |
| Director | Andree Talbott Soares | Star Creek Land Stewards |
| Director | Hank Dufurrena | Dufurrena Sheep Company |

**Table 4:  WRA Officers, Directors, and Executive Director, 2020**

| Title | Name | Affiliated Ranch |
|---|---|---|
| Executive Director | Monica Youree | Youree Land & Livestock |
| President | Ryan Indart | Indart Solar Sheep Grazing |
| Vice President | Nick Etcheverry | Eureka Livestock |
| Treasurer | David Little | Little Paris Sheep Company |
| Director | Lane Jensen | Eph Jensen Livestock |
| Director | Frank Shirts | Shirts Sheep Company |
| Director | Steve Raftopoulos | Two Bar Sheep Company |
| Director | Stephen Elgorriaga | Elgorriaga Livestock |
| Director | Henry Etcheverry | Etcheverry Sheep Company |
| Director | Tom W. Helle | Helle Rambouillet Ranch |
| Director | Andree Talbott Soares | Star Creek Land Stewards |
| Director | Hank Dufurrena | Dufurrena Sheep Company |
| Director | David Julian | Julian Land & Livestock |
| Director | Robert Ball | Ball Bros. Sheep Co. |

**Table 5:  WRA Officers, Directors, and Executive Director, 2021**

| Title | Name | Affiliated Ranch |
|---|---|---|
| Executive Director | Monica Youree | Youree Land & Livestock |
| President | Ryan Indart | Indart Solar Sheep Grazing |
| Vice President | Nick Etcheverry | Eureka Livestock |
| Treasurer | David Little | Little Paris Sheep Company |
| Director | Lane Jensen | Eph Jensen Livestock |
| Director | Frank Shirts | Shirts Sheep Company |

| Director | Steve Raftopoulos | Two Bar Sheep Company |
|---|---|---|
| Director | Stephen Elgorriaga | Elgorriaga Livestock |
| Director | Henry Etcheverry | Etcheverry Sheep Company |
| Director | Andree Talbott Soares | Star Creek Land Stewards |
| Director | Hank Dufurrena | Dufurrena Sheep Company |
| Director | David Julian | Julian Land & Livestock |
| Director | Treston Vermandel | Bair Ranch |
| Director | Harry Soulen | Soulen Livestock Company |

**Table 6:  WRA Officers, 2022**

| **Title** | **Name** | **Affiliated Ranch** |
|---|---|---|
| Executive Director | Monica Youree | Youree Land & Livestock |
| President | Nick Etcheverry | Eureka Livestock |
| Vice President | David Little | Little Paris Sheep Company |
| Treasurer | Andree Talbott Soares | Star Creek Land Stewards |
| Director | Lane Jensen | Eph Jensen Livestock |
| Director | Frank Shirts | Shirts Sheep Company |
| Director | Ernie Etchart | Etchart Livestock |
| Director | Stephen Elgorriaga | Elgorriaga Livestock |
| Director | Henry Etcheverry | Etcheverry Sheep Company |
| Director | Ryan Indart | Indart Solar Sheep Grazing |
| Director | Hank Dufurrena | Dufurrena Sheep Company |
| Director | David Julian | Julian Land & Livestock |
| Director | Treston Vermandel | Bair Ranch |
| Director | Harry Soulen | Soulen Livestock Company |

59.     The WRA's members, including Defendants, do not share profits or distribute losses.  Rather, they are all independent ranches that compete, and have the potential to compete, in many markets, including the market for sheepherder labor. The WRA has nearly 200 member ranches in 13 states. The member ranches are independently owned and operated, and identify as independent businesses to the public, as well as to their customers and employees.

60.     Each ranch is legally distinct and separate, and has the capacity to make its own independent decisions about the material terms of employment, such as pay rates and other employment benefits. From the perspective of workers and potential workers, each ranch has the potential to compete with the others on wages, benefits, conditions, and other metrics.

61.     Indeed, each of the WRA's member ranches holds itself out as a distinct economic enterprise and employer. For example, Ellison Ranching Company's website discusses its history at length, stating that it was established in May 1910 by E.P. Ellison; that it became the largest ranching operation in the state of Nevada by 1969; and that today, it "runs livestock and farming operations across some two million acres throughout Nevada . . . ."

62.     Similarly, the Little Paris Sheep Company has discussed its history in industry publications, with its roots in a partnership between Pete Paris and David Little, who went into business together after buying a flock that had previously been managed for three generations by the Corta family.

63.     The Borda Land & Sheep Company also has a Facebook page where it holds itself out as an independent company, stating, "[f]or over 100 years, we have operated our sheep ranch, raising quality lamb and wool. Started in 1914 and keeping Basque traditions and heritage alive today." In other outlets, the company discusses its "family's heritage and tradition."

64.     Need More Sheep Co. also holds itself out as an independent company, with its founder discussing how he "started his sheep flock with a few animals given to him as payment for a bum cheque a cowboy gave him in a poker game" and that "he grew the flock to 10,000 in 40 years."

65.     Faulkner Land and Livestock Company also boasts about its independence, with news reports explaining that "[t]he Faulkner family has been in Gooding County raising livestock since the height of the Great Depression" and that they "have raised sheep, cows, and crops for southern Idaho" "ever since."

66.     Indeed, all of the Ranch Defendants and members of the WRA similarly hold themselves out as independent businesses.

67.     Thus, to the public, including potential workers, each ranch is a distinct economic enterprise with the potential to compete with other ranches.

68.     As independent ranches, the WRA's members, including the Ranch Defendants, all hire the same types of workers to tend to their sheep: people with relevant skills and experience sheepherding. That makes them horizontal competitors in the labor market for sheepherders. And although they are spread across 13 states, they also all compete for labor in the same geographic market. No ranch has a sufficient supply of labor in its local environment, so they all look across the states they are in and beyond—even all the way to Peru—for skilled labor.

69.     From a worker or potential worker's perspective, each of the WRA's member ranches are different competing employers with the potential to offer different wages, benefits, and intangibles related to employment. Each WRA member ranch is free to offer higher wages than the other ranches, for example. And a worker at one ranch would be able to seek employment with other ranches, or to leverage alternative employment opportunities to obtain better wages at their current ranches, but for the anticompetitive agreement alleged herein.

70.     Although each ranch is a separate and independent decision-maker, by joining the WRA, they have all agreed to surrender their independent decision-making authority to the WRA. The WRA thus acts as a combination of the competitor ranches that artificially centralizes economic decision-making about wages and hiring decisions, and thus eliminates competition in the labor market between and amongst its member ranches. Indeed, the WRA has no purpose other than to facilitate collusion between its members in the labor market: it describes itself as

"a non-profit member association of ranchers from 13 Western states who help facilitate the employment of H-2A foreign workers for herding or production of livestock on the range."

## C.    The Market for Sheepherder Labor

71.    The sheep ranching industry is highly concentrated under the WRA and similar associations. In recent years, the WRA hired approximately two thirds of all open-range H-2A sheepherders in the United States.

72.    Although ranches compete in the sale of their products, principally meat and wool, the ranches that are members of the WRA have conspired to suppress one of their principal costs: sheepherders' wages.

73.    In the areas they operate, the WRA's member ranches are the primary employers for sheepherders. As such, each of the WRA's member ranches are also one another's main rivals for sheepherder labor. There is high demand for a limited supply of employees with experience or skills that are relevant to sheepherding.

74.    Sheepherding is a skilled line of work, and employers, including WRA's member ranches, value workers with the requisite skills and experience. The importance of relevant experience to ranch employers is reflected in Defendants' H-2A applications and job postings. For example, in describing the type of services or labor to be performed, Defendants emphasize that the individual requires "experience with 800 – 1000 head flocks." Duties include "Attends sheep and/or goat flock grazing on range or pasture: Herds flock and rounds up strays using trained dogs. Attend to sheep grazing on the range to include: Herding sheep on the range or in pastures while riding on horseback, riding ATVs, or walking on foot. Beds down flock near evening campsite. Guards flock from predatory animals and from eating poisonous plants. Drenches sheep and/or goats. May examine animals for signs of illness and administer vaccines, medications and insecticides according to instructions." Job postings emphasize that "[a] range herder requires knowledge and maintenance of rangeland in order to avoid overgrazing of the range land and prevention of animals ingesting noxious weeds . . . .  Experienced employees

hired for this type of position would need to have the knowledge of maintaining a herd on a range so the animals don't disperse in large open areas, be able to promote proper grazing of rangeland, and predator control on the range."

75.     Similarly, in lobbying letters, WRA has also described the work of sheepherders as arduous and difficult: "[H]erders can tend a large 'band' or 'herd' of 1,000 head of livestock or more, often in rugged high altitude terrain or dry desert conditions, hauling water for the animals, herding them to grazing areas and making sure they have enough to eat, keeping them from going astray, and protecting them from the constant threat of natural predators like coyotes, mountain lions, and wolves, harmful or poisonous plants, and man-made dangers like highways and domesticated dogs. During lambing, calving or kidding season, the herders assist the animals in the birthing process, and at all times, the herders provide for the health and medical needs of the herd."

76.     The WRA has also conceded as much in comments on H-2A rulemaking, where, in conjunction with Mountain Plains Agricultural Service (MPAS), another association of ranches, the WRA noted that, "unlike some farmworker jobs in crop agriculture, for which no experience is required or a brief training session would suffice, the unique skills required of this job make it impossible for someone to walk off the street and begin working. The H-2A workers who comprise the current workforce have grown up doing this work, riding horses, tending herds, and living in the mountains."

77.     Given how challenging the work is, it is very difficult to recruit qualified sheepherders. As WRA has described in its lobbying materials, "Dating back to World War II, sheep producers found it first difficult and later impossible to find United States workers able and willing to perform the difficult work of 'range' sheepherding. In recent years, the number of U.S. born sheepherders has essentially dropped to zero. For example, in 2012, Western Range's members sought to hire nearly 1,000 sheepherders. Out of that number, only 22 U.S. workers even applied, and only 2 met the qualifications and were hired. Neither completed the job contract."

78.     Thus, there is virtually no market for domestic sheepherder labor, at least not at the wages that the ranch employers have offered. The absence of a labor supply at a low wage rate would normally imply that the competitive wage rate is higher than the amount being offered. Indeed, the way to attract workers, particularly to difficult or arduous roles, is to offer appropriate compensation. But if the wage for a dangerous and difficult job is very similar to safer, easier, or more comfortable jobs, then workers will naturally seek those alternatives out instead.

79.     Because there is virtually no domestic supply of sheepherders at or near the minimum wage, the WRA and its members instead procure labor from international markets through the H-2A program. Overwhelmingly, WRA and its members hire sheepherders from Peru to perform these jobs. Once they arrive in the United States, however, many of those workers begin to understand that what might have seemed like an attractive wage in Peru's local economy, is actually a below-market wage in the United States. Thus, they often seek out better compensation and employment, but those efforts are thwarted by the anticompetitive schemes alleged herein.

**D.      Arrangements and Agreements That Limit Competition in the Labor Market Hurt Workers**

80.     Labor markets differ from commodity markets in many ways. In commodity markets, market-wide demand and supply tend to determine a single market price for a good. But in labor markets, other factors can significantly impact what workers are paid for their labor. This is especially true for jobs requiring specialized skills and experience, such as in the sheepherding industry. For these skilled jobs, a worker with more relevant skills and experience is more valuable, and should be able to obtain a higher wage, from employers.

81.     But labor markets have many frictions. Workers are not always fully informed about the alternatives available to them, moving between employers may be costly, and there may be only a limited number of similar positions available at any one time. These frictions tend to provide market power to employers, as is well-recognized in the field of labor economics.

Still, even with these frictions, the wages paid to workers in a healthy and functioning labor market should reflect competition among employers to recruit the most experienced skilled individuals.

82.    Defendants' unlawful arrangement limits competition in the market for the labor of sheepherders like Plaintiff and members of the proposed Class. Because ranches value people with relevant skills and experience, people who are already employed in the industry are a key source of potential talent to fill those roles. Moreover, it is very difficult to recruit qualified sheepherders, making cross-employer competition a key mechanism for such recruitment.

83.    One of the most efficient ways to recruit sheepherders is to solicit them from other sheepherder ranches. Soliciting involves direct outreach to a competitor's employees, even if they have not affirmatively expressed interest or attempted to apply. Nonetheless, as part of its wage suppression conspiracy, the WRA and its member ranches have taken active steps to snuff out this sort of competition.

84.    In a properly functioning and competitive labor market, ranches would compete with one another to attract and retain sheepherders for their needs. This competition among employers would determine the level of compensation. Competition would also improve the employees' ability to negotiate for better salaries and other terms of employment.

85.    In the absence of a collusive arrangement or agreement, ranches like the Ranch Defendants and WRA's member ranches would solicit and hire employees from other ranches in the same industry, because those employees have the training and experience that are valued most and that are lacking in hires from other industries. Hiring someone from a different industry, or with no experience, requires the ranch to invest significant resources in training employees and is generally undesirable, particularly given how difficult the job is as well as the amount of knowledge required to perform it successfully. For these reasons and others, hiring from within the industry would generally be a key form of competition. But, as described further below, Defendants prevented that competition here through their illegal combination and conspiracy.

86.    Competition for workers has a significant impact on compensation in several ways. Through competition, employees who are solicited or interviewed by another employer can learn what other employers typically pay or are willing to pay to induce them to leave their current employer. This information is not otherwise readily available to employees, who generally rely on these kinds of encounters and word-of-mouth from peers and colleagues for such information. Discovering market prices for wages is already difficult in the labor context, and collusion between employers makes it even harder by eliminating or reducing the kinds of communications that support the flow of information. That affects not only employees who would have actually applied to or been offered other jobs, but other employees, too. Employees typically share such information with their co-workers, particularly in the tightly-knit community of migrant sheepherders. This tends to result in wage increases for all employees.

87.    Competition also affects compensation because employers react to the threat of losing employees to competitors by preemptively increasing compensation, or maintaining it at an appropriately high level, to promote retention, productivity, and morale. Employees who feel underpaid are more likely to seek better compensation elsewhere or be receptive to recruitment by other employers; low morale may also affect productivity. When employees receive better offers from other employers, an employer needs to increase compensation to retain that employee, and increase compensation for other employees, too, to stave off the threat that they may be poached too, and to avoid feelings of unfairness. In a competitive labor market, preemptive measures like these result in better compensation for workers. However, in the sheepherding industry, collusion between WRA and its members, including the Ranch Defendants, allowed them to avoid taking those steps, resulting in artificially low pay for sheepherders.

### E.    Defendants' Collusive Scheme to Suppress Sheepherder Wages

#### 1.    The Ranch Defendants Joined the Cartel by Joining the WRA and Agreeing to Its Anticompetitive Policies

88.    Each of the WRA's member ranches, including all of the Ranch Defendants, joined the cartel by joining the WRA.

89.    As a condition of joining WRA, the Ranch Defendants and other WRA members must explicitly agree to comply with association policies and to cede their authority to set wages and to hire workers to the Association.

90.    These agreements are evident in the packet of application forms that ranches must complete in order to join WRA. One of these forms is an Application and Membership Agreement, under which a joining ranch "agrees to be bound by the By-Laws of the Association as they now exist or may hereafter be amended." When changes are made to WRA's policies, the WRA sends notices to its members, stating "AS A REMINDER IT IS YOUR RESPONSIBILITY TO ABIDE BY . . . WRA BYLAWS AND MEMBERS MANUAL." Compliance with WRA's policies and rules is a condition of membership to which every member, including each Ranch Defendant, has agreed.

91.    Another form completed by a prospective member is a Job Assurances form indicating that the ranch delegates its authority to hire sheepherders to WRA. By signing this document, a member recognizes that applications will be "made by Western Range Association on [the member's] behalf" for the hiring of sheepherders and that WRA will prepare and advertise job orders.

92.    As a condition of membership, WRA's members also agree to indemnify the WRA against any suit relating to the employment of sheepherders, including any claim for damages brought against the WRA by sheepherders relating to wages

93.    WRA's members, including the Ranch Defendants in this case, signed these agreements.

a. <u>Defendant Borda</u>: Ted Borda signed the Application and Membership Agreement form on October 25, 2006 in his capacity as Borda's Manager. He also signed both the Job Assurances form and Assurances form on October 19, 2006.

b. <u>Defendant Ellison</u>: William H. Evans signed the Application and Membership Agreement form on October 3, 1984 in his capacity as Ellison's Secretary.

c. <u>Defendant Espil</u>: John Espil signed the Application and Membership Agreement form on October 5, 1984 in his capacity as Espil's President. He also signed both the Job Assurances and Assurances forms on January 28, 1991.

d. <u>Defendant Faulkner</u>: John L. Faulkner signed the Application and Membership Agreement form on October 29, 1984 in his capacity as Faulkner's President. He also signed both the Job Assurances and Assurances forms on October 15, 1984.

e. <u>Defendant F.I.M.</u>: Fred Fulstone Jr. and Marianne F. Leinassar signed the Application and Membership Application form on October 8, 1984 in their capacities as President and Vice President, respectively.

f. <u>Defendant Holland</u>: Mitchell Goicoechea signed the Application and Membership Agreement, Job Assurances, and Assurances forms on October 31, 2020 in his capacity as Holland's Owner. Defendant Holland also received the Job Assurances form in or around July 2018 and, on information and belief, signed and returned these forms to WRA. Mr. Goicoechea is also one of the owners of another member ranch, T&W Sheep LLC, which was approved for full WRA membership in June 2018.

g. <u>Defendant Little Ranch</u>: David and Bonnie Little signed the Application and Membership Agreement on October 21, 2003 in their capacity as Little Ranch's Owners. They also signed the Job Assurances and Assurances forms on September 5, 2003. Pete Paris and Mark Paris are also involved in the partnership that owns and manages Little Ranch.

h.  Defendant Need More Sheep: Cheryl F. Vogler signed the Application and Membership Agreement in her capacity as Need More Sheep's Co-owner around December 26, 1990. She signed the Job Assurances and Assurances forms on October 14, 1984.

94.  Once ranches join the WRA, they cede their wage-setting authority to the Association and agree to comply by the association's anticompetitive policies regarding recruitment, solicitation, and transfer of H-2A workers. In so doing, they cease to compete with one another for labor and no longer exercise independent economic decision-making in the labor market, instead reaping the benefits of cartel behavior. Moreover, each ranch delegates their authority with respect to wages to WRA as a condition of membership, with the full knowledge that all other WRA members (who are horizontal competitors in the market for sheepherder labor) do the same.

95.  None of the Ranch Defendants has taken affirmative steps to withdraw from any of these agreements, or from the anticompetitive schemes alleged herein.

## 2.  WRA Members Suppress Wages by Suppressing Worker Mobility

96.  The WRA and its member ranches use virtually every tool at their disposal to restrain competition for labor, including by suppressing worker mobility. Indeed, they have eschewed use of the normal market mechanism for promoting worker retention—paying competitive wages—in favor of other draconian and anticompetitive tactics. By joining the WRA, the member ranches, including the Ranch Defendants, submit to a market allocation scheme that is reflected in the way WRA recruits workers and channels them to particular ranches rather than allowing ranches to compete for them; orchestrates and enforces a no-transfer and no-solicitation policy; and spearheads gratuitous efforts to penalize both workers and ranches that violate those anti-competitive policies.

### a.  WRA Suppresses Competition During the Recruitment Process

97.    The way WRA offers potential recruits to its member ranches limits inter-ranch competition for sheepherder labor.

98.    As noted above, WRA works with contractors to identify overseas candidates for employment. Rather than share a list of all available recruits with all ranch members so that they can compete for the workers they wish to hire, WRA instead attempts to channel all recruitment into a single, centralized process under its own control by presenting a list of potential recruits to just a single member ranch at a time. WRA makes clear it isn't simultaneously offering those same recruits to any other ranch looking to hire. This centralized hiring process ensures that competition between ranches during the initial recruitment process is minimized.

99.    For example, in an email to employees of Defendant F.I.M., staff from WRA attached a list of herders and instructed: "Here is the list of workers, please let me know which workers you will be requesting, I will add the ones you don't want to our list so I can send them to other ranchers." Defendant F.I.M. picked the worker on the list with the highest grade and told WRA that it "would like him to come ASAP." Upon information and belief, WRA follows a similar procedure when matching sheepherders with its other ranch members.

100.    In another example, between December 12, 2018 and January 9, 2019, WRA sent a series of six emails to six different member ranches, one at a time, starting from the same roster of available herders but removing names as those herders were selected for employment by member ranches.

   a.  On December 12, 2018, WRA sent a list of thirteen herders to Elte Jon Sheep. Co.

   b.  On December 17, WRA sent the same list, now narrowed down to ten herders, to Wixom Livestock Co. Three of the top-rated herders were no longer on the list.

c.  On December 20, WRA sent the same list, but now down to nine herders, to rancher Aaron M. Jones.

d.  On December 21, WRA sent that same list of nine herders back to Wixom Livestock Co.

e.  On January 9, 2019, WRA sent the same list, now down to seven herders, to Need More Sheep.

f.  On January 15, WRA sent the same list, now down to six herders, to rancher Julie Hansmire.

101.    By segmenting recruitment in this sequential manner, WRA ensures that ranches cannot compete with one another for many available herders, particularly those with the highest ratings who are often selected first. In a functioning competitive market where skilled labor is scarce, ranches with a similar need for sheepherder labor would compete to obtain the labor of skilled workers by trying to outbid each other on terms of employment, like wages. But because of WRA's control over the recruitment of sheepherders and allocation of those sheepherders to its members, the Ranch Defendants and other WRA member ranches are insulated from competition and can pay wages well below what a functioning, competitive market for sheepherder labor would provide.

102.    Each of the Ranch Defendants has received lists of available herders from WRA in this manner, meaning that all the Ranch Defendants mutually understand WRA's hiring process to be sequential and centralized in this manner rather than competitive.

103.    By allocating workers to specific ranches, WRA limits competition between its member ranches, including the Ranch Defendants, to the detriment of the workers. The Ranch Defendants' and other member ranches' acquiescence in allowing WRA to make those assignments also reflects their agreement to cede hiring decisions to WRA, something no rational ranch would do except on the assurance that its competitors had also done so. Indeed, the WRA and its member ranches recognize that sheepherders vary in skill level and experience, and that this experience is valuable. Nonetheless, the WRA and its member ranches commit to their wage

suppression scheme by committing to offer only the lowest wage to all sheepherders, regardless of experience, and by structuring the recruitment process to avoid opportunities for ranches to compete over the same workers.

### b.    WRA's No-Transfer and No-Solicitation Policies Suppress Competition

104.    WRA also stifles competition by prohibiting solicitation by its members of other ranches' sheepherders, and by highly regulating any inter-employer transfers.

105.    For example, the WRA requires an employment attestation from all H-2A sheepherders stating that the sheepherder "will be assigned to a place of work (ranch) that [the sheepherder] will not be able to change or transfer because [the sheepherder] desire[s] to do so."

106.    Instead of allowing workers to choose where they want to work, WRA assigns workers to ranches based on the preference of the employing ranches. If a worker wishes to transfer to a different ranch, WRA's policies require the employing rancher to consent to the transfer and also require the use of WRA's centralized transfer mechanism.

107.    In a June 2019 write-up for its monthly newsletter (which goes out to all members), a WRA employee explained that it controls the transfer of workers between ranches by "maintain[ing] a list of workers that are available to be transferred as well as a list of ranchers that need workers." In addition, when sheepherders employed at a WRA member ranch request to be transferred to another ranch, WRA will not entertain those requests without first reaching out to the employing ranch to ask their consent. Consistent with this approach, the WRA advises herders seeking transfers that they "cannot leave without [the] consent" of their current employer. The purpose of the centralized process is not solely to ensure that ranches comply with applicable regulations by filing the appropriate paperwork to transfer workers; it is also to ensure that no member ranch hires another member ranch's workers without the latter's consent, which, as WRA knows, is not legally required. Requiring the current employer's consent is a major impediment to competition in the labor market and is designed to prevent ranches enticing workers with better wage offers.

108.    This policy and practice have been in place for decades. In a letter to a member in 1986, for example, WRA stated that a herder could transfer to a different member's ranch only after WRA determined that the herder's reasons for leaving his current employer were "sufficient." In that same letter, WRA stated that even if it allowed transfer, it would not permit the worker to go to a particular ranch of his choosing—again making sure that ranches with a need to hire are not competing with one another. Instead, the worker "will be transferred" at WRA's discretion "to another member from the top of the list of members requesting herders."

109.    Similarly, in 1997, WRA sent a letter sent to all its members reminding them of WRA's binding policy that "any transfer of a herder <u>must</u> be processed by the Western Range Association," and that "[m]embers have no authority to arrange for any transfers" on their own. Violators, the WRA warned, would "be subject to a fine of up to $1,000 per violation, loss of herder, and/or termination of membership." WRA promised further: "This policy will be enforced."

110.    The policy remains in effect today. An email sent by WRA in January 2022 indicates that when a sheepherder desires to transfer between WRA member ranches, the sheepherder's current employer must "agree to the transfer" before WRA will begin the formal transfer process for the herder.

111.    Transfers can be blocked by a worker's current employer. For example, in October 2022, WRA informed a member ranch seeking to hire a WRA herder from another member that the "planned transfer . . . did not go through as the member did not want to release the worker after all." An internal WRA log noted that the herder's current employer "CANCELLED THE TRANSFER."

112.    Similarly, in August 2023, Monica Youree, the Executive Director of WRA, emailed David Little, principal of Defendant Little Ranch, another member ranch, and several other WRA employees concerning a pending transfer of a herder between Little Ranch and the other member ranch, to confirm the Little's consent to the transfer. In the email, Youree asked whether all three parties, "you [the transferee ranch], David Little [the current employer], and

the worker…still want the transfer to happen," and that "[i]f not," the transfer should be withdrawn. She then offered to facilitate coordination between the two competing ranches regarding the worker's transfer, stating that if "you [the transferee ranch] and David need to visit [i.e., communicate], please call our office for contact numbers."

113.    Nothing in the relevant regulations authorizes or provides for such naked market division. Rather, the regulations allow for workers employed through the H-2A visa program to be transferred to new employers. To effectuate a transfer, all that the regulations require is the new employer to submit a petition to U.S. Citizenship and Immigration Services (USCIS). Approval of a transfer petition does not require consent of the pre-transfer employer. WRA is well aware that a H-2A worker's current employer's consent is not required by any law or regulation in order to initiate the process for transferring employment.

114.    Nevertheless, the WRA imposes that requirement on its members and on sheepherders. Before allowing any transfers, the WRA requires the employing ranch to consent to the transfer, even though this is not required by any government regulations and even if another member ranch (or employer outside of the WRA) would be willing to compensate the sheepherder more.

115.    Many of the Ranch Defendants have demonstrated their acquiescence to WRA's control and regulation of the transfer of workers by participating in it. For instance, internal WRA transfer logs show that the following Ranch Defendants engaged with WRA regarding potential transfers of sheepherders, demonstrating their awareness of and compliance with WRA's restrictions:

> a.    Defendant Little Ranch: David and/or Bonnie Little (principals of the Little Ranch) engaged with WRA regarding the potential transfer of sheepherders to or from their ranch to another WRA member in at least March 2020, May 2020, January 2021, March 2021, April 2022, January 2023, April 2023, May 2023, June 2023, September 2023, January 2024, and March 2024.

   b. <u>Defendant Need More Sheep</u>: Need More Sheep engaged with WRA regarding the potential transfer of sheepherders to or from their ranch to another WRA member in at least March 2022, May 2022, and January 2023.

   c. <u>Defendant Espil</u>: Espil engaged with WRA regarding the potential transfer of sheepherders to or from their ranch to another member ranch in at least April 2022, January 2023, January 2024, and March 2024.

   d. <u>Defendant Holland:</u> Holland engaged with WRA regarding the transfer of sheepherders from their ranch to or from other member ranches in at least July 2021 and May 2023.

   e. <u>Defendant Ellison:</u> In May 2023, Defendant Ellison engaged with WRA regarding a potential transfer of a sheepherder from Defendant Holland.

   f. <u>Defendant Borda</u>: Borda engaged with WRA in or around May 10, 2016 in connection with the transfer of a sheepherder to another member ranch.

116. WRA's internal communications make clear that the purpose of WRA's no-transfer and no-solicitation policy goes beyond ensuring compliance with regulations, but is rather intended to "create and maintain a courteous and cooperative spirit among our members, and it helps the workers respect the contracts that they have signed with their current employers." The purpose of WRA's "employer consent" policy is thus to suppress competition, not to comply with the regulatory regime.

117. Not only does the WRA guard against transfers initiated by workers without the consent of their current employers, but it also has a decades-long practice of prohibiting its members from soliciting one another's sheepherders.

118. Very early on in WRA's existence, at Western Range Association's Annual Membership Meeting in 1966 in Fresno, California, WRA members convened for, among other things, "a discussion of pirating labor by growers, with the offer of higher wages to contract herders." A motion was made, and unanimously approved by WRA members, stating: "That in the event any Association member encourages or in any way attempts to influence [a]

sheepherder to violate his contract that this would be considered sufficient reason for the Board of Directors, after investigation and report, to expel such member from the Association." Many individuals with connections to the current Ranch Defendants or the current WRA were present at this meeting, including Ben Elgorriaga (a WRA board member until 2018, at which time he was replaced by his son, Stephen Elgorriaga), Pete Espil and his spouse (of the same family that operates Defendant Espil), and Jess Goicoechea (previous owner of the Holland Ranch), among others.

119.   All member ranches, of course, including the Ranch Defendants, agree to abide by WRA policies as a condition of membership, per the association's by-laws, which mandate that all members abide by the organization's requirements.

120.   This no-solicitation policy has never been rescinded and has been continually enforced by the WRA for decades. For example, in 1986, Defendant Espil complained to the WRA that another member ranch had solicited one of its sheepherders. The WRA then sent a letter warning the soliciting ranch that "[w]hen a member goes directly to the herder and not through the Western Range Association, we look upon this as 'pirating.' This is strictly against Western Range Association policy." The "pirating" issue "was discussed by the Board of Directors" and the warning letter was "part of their directive."

121.   This policy has never ceased. Today, WRA continues to police members that solicit other ranches' sheepherders. For example, on October 9, 2018, WRA sent a letter to Joey Broadbent, owner of a member ranch called Imperial Lamb. In this letter, WRA stated that it had received three complaints from other members in the past six months that "Imperial Lamb was recruiting Western Range Association members away from our other members" in part by offering herders "more money than they are currently getting." WRA stated that "[t]hese recruiting actions are strictly prohibited by Western Range Association Board of Directors. The board could revoke your membership if you continue to actively recruit workers from other members." WRA demanded that Imperial Lamb's attempt to recruit workers at a higher wage "stop immediately."

122.    The WRA sent another letter the next day, October 10, 2018, to both Imperial Lamb and another member rancher, Robert Lizarraga, owner of Lizarraga Farms. The letter noted an "ongoing" issue "regarding transfers and recruiting of workers between your two ranchers" that had persisted for several months and had begun to "cause heartache between our members and Western Range Association." WRA stated that "recruitment of our workers from other members is a prohibited practice by our Board of Directors," and that "to prevent future issues, Western Range Association will not be transferring workers between Lizarraga Farms and Imperial Lamb without the consent of both of you." If, for instance, Mr. Broadbent continued to contact Lizarraga Farms herders and offer higher wages at Imperial Lamb, but Lizarraga Farms refused to consent to those transfers, Western Range Association stated that "we will not be fulfilling their request to go to the other ranch [*e.g.*, Imperial Lamb], instead they would be transferred to another member." To further police these no-poach and no-solicitation policies, WRA reminded both ranchers of the threat of expulsion, stating: "Any future complaints will be directed to our Board of Directors for your membership review." The only possible purpose of this letter, which was accompanied by "calls" and "conversations" between Western Range Association and the two ranchers, was to threaten Mr. Broadbent with expulsion from WRA for offering herders a higher salary to transfer to his ranch and to prevent these transfers from happening by making them contingent on the consent of the lower-paying ranch.

123.    As another example, in or around August 2022, the WRA learned that a sheepherder employed by Defendant Need More Sheep had spoken to his previous employer (another WRA member ranch) about returning to work there. After learning about the prospective transfer, WRA employee Angel Sanchez sent this warning to the former employer:

> [W]e do want to give a word of caution about reaching out to workers directly to ask if they want to come work. While we definitely respect the rights of workers to request a transfer, we do ask our members that need workers to be respectful of not enticing workers to request transfers from their current employers to fill that need. This helps create and maintain a courteous and cooperative spirit among our members, and it helps the workers respect the contracts that they have signed with their current employers.

In the same email, WRA instructed the member ranch to reach out to Hank Vogler, co-owner of Defendant Need More Sheep, the sheepherder's current employer, to "avoid any issues" by ensuring that "both parties agree to the transfer."

124.    The WRA's anticompetitive policy is enforced by keeping out non-compliant ranches or threatening to eject violators from the association. For example, in a letter from August 1989, WRA's leadership sent a letter to a prospective ranch member, indicating that WRA would not approve its membership application because WRA had been "notified" that the prospective member ranch had "hired former Western Range Association H-2A herders who violated the terms of their contract" and that the ranch's "foreman contacts Western Range H-2A herders in the area and tries to get them to leave their current employers to work for him."

125.    This practice of requiring the current employer's consent to transfers has been the WRA's mandatory policy—to which all Ranch Defendants and other member ranches agree as a condition of membership—since at least the late 1960s, and it continues to this day.

126.    The Ranch Defendants are all aware of and consent to WRA's policy, evidenced by the fact that they comply with WRA's requirement to process all transfers through WRA and have communicated with WRA regarding pending transfers of herders.

### c.    WRA Maintains Similar No-Poach Agreements with Other Ranching Associations

127.    In addition to its internal no-poach and no-solicitation agreements between members, WRA also coordinates and enforces external no-poach agreements between itself and other associations of sheep ranchers, including Mountain Plains Agricultural Service ("MPAS") and Peak Season Labor, Inc. ("Peak Season"). MPAS is based in Wyoming and, like WRA, is a membership-based association of sheepherder ranches. Together, MPAS and WRA represent virtually all employers of H-2A sheepherders in the United States. Peak Season is a farm labor contractor that recruits seasonal H-2A workers for ranchers and farmers in the United States. WRA's involvement in these external agreements confirms that it and its members are highly motivated to reduce or eliminate competition in the labor market for sheepherder labor.

128.    Even though WRA leadership has referred to MPAS as its "competition," WRA and MPAS "have built a relationship that we don't poach worker [sic] from one another." Pursuant to this agreement, the transfer of a herder between a WRA ranch and an MPAS ranch requires the consent of both trade associations. Even though H-2A regulations allow for such transfers at the worker's request, even mid-contract, WRA and MPAS enforce their no-poach agreement by refusing to file new visa applications for a worker seeking to transfer between the two associations' ranches mid-contract "unless the rancher agrees or the worker is in a situation" that the associations agree he "needs to leave." As with WRA's internal no-transfer and no-solicitation rules, the purpose of controlling worker mobility in this manner is to preclude open competition on the basis of wages. Further, WRA and MPAS punish workers who try to find better jobs on their own: if the worker had attempted to make the transfer on their own, the two associations "would report as absconded," knowing that "then [the worker] may have a hard time getting a visa" in the future. Both WRA's executive leadership and at least some WRA members were aware of and approved of this no-poach agreement.

129.    The two associations continue to enforce their no-poach agreement. For instance, in August 2020, a WRA herder had finished a contract and requested transfer to an MPAS ranch after alleged mistreatment by his current WRA employer. When the WRA rancher "did not take the news well," leaders of both associations felt they were "caught between a rock & a hard spot." MPAS began "trying to get [its] member to back off and has not committed to doing the transfer," and attempted to "help defend" WRA by "deter[ing its own] employer and employee from any further actions." Admitting that this no-poach agreement was not required by H-2A regulations, WRA's Executive Director Monica Youree told one of WRA's other leaders that "[e]ven if [MPAS] refuses to transfer, we would still have a worker who is upset with WRA and has growing allegations, who could legally go to the new [MPAS] rancher anyways and get what he wants."

130.    Similarly, in June 2021, WRA instructed a member ranch seeking to employ a current MPAS worker that the WRA ranch "would need to speak with Kelli at MPAS to see if she would be agreeable to the move as well."

131.    Further, in March 2022, an MPAS employee indicated he would effectuate transfer of several WRA herders to an MPAS ranch only "[a]s long as that is all ok with Western Range."

132.    In December 2022, after a WRA member requested to hire an MPAS herder, WRA's executive director stated that "MPAS may not allow for the move."

133.    WRA has a similar arrangement with Peak Season. In November 2021, Peak Season emailed WRA regarding a herder seeking transfer from a WRA ranch to a Peak Season ranch. WRA Executive Director Monica Youree responded with "concerns" that "more of [the WRA ranch's] workers" might be "recruited to the new [Peak Season] employer, especially as it gets harder to get workers in the US with the vaccination mandates that just went into effect. I don't think any of us want that kind of environment." Diane Thibeault, owner of Peak Season, responded, "I agree, this is a difficult time to get workers here" and that as "mentioned before, we are not in business to take workers from other agent's [sic] employers." In response to Youree's request for "assurances that the [Peak Season] employer will not attempt to recruit any more [WRA] employees," Thibeault wrote back "of course I can assure you [the Peak Season member ranch] will not recruit any other [WRA] workers."

134.    These trade associations of ranchers have opportunities to meet and collude. For example, in November 2015, MPAS and WRA co-hosted a reception at the Idaho/Nevada/Utah/Wyoming Wool Growers Association's annual convention. Upon information and belief, they regularly communicate, meet, and collaborate on issues related to the employment of H-2A workers.

### d.   WRA and Its Members Gratuitously Punish Workers Who Leave

135.    To further their anticompetitive scheme, the WRA and its members also go to great lengths to punish H-2A sheepherders that seek better work and compensation outside of the WRA's membership. The WRA and its members label these sheepherders "absconders," "contract breakers," and "runaways."

136.    Under the law, all WRA is required to do when a H-2A sheepherder leaves their work before their visa period concludes is to notify the Department of Labor and USCIS. *See* 20 CFR § 655.122(n)(1). There is no further requirement for the WRA or its members to track down workers or to provide any other assistance to federal regulators with respect to such workers.

137.    But for years, the WRA has gone beyond just notifying the relevant agencies about absent workers, because its intent, like that of its members, is not merely to comply with the law, but rather to stifle worker mobility. Limiting worker mobility is a means of suppressing competition for those workers' labor.

138.    For example, WRA hired a private investigator to identify employers that had hired H-2A workers that had left their work at WRA member ranches. On behalf of its member ranches, it has also contemplated taking legal action to punish absconders and the people who hire them, has sought ways its members could assist in the criminal prosecution of absconding workers, and has celebrated the fact that efforts like the "identification of smugglers ha[ve] slowed down the number of workers who have absconded." These actions reflect a desire to limit sheepherders' alternative employment actions, not a desire to discharge any legal obligations.

139.    The WRA described some of its efforts to punish workers who leave its member ranches on its website in a June 2014 blog post about "Herder Runaways," where it explained that "[a] significant effort was made jointly between Western Range and Mountain Plains [another trade group] last summer to locate and deport herders that had jumped their contract as well as to penalize those that assisted contract breakers in finding employment." The WRA's

rhetoric and tactics are reminiscent of the fugitive slave laws, premised on control over the bodies and labor value of workers.

140.    The same month as that blog post, at a meeting of the WRA Board of Directors, WRA's then-Executive Director Dennis Richins expressed frustration that "[t]here is no assistance from Immigration officials or the Department of Labor to penalize, deport, or even make contact with any worker who has broken his contract." WRA's Board then discussed the departure of some H-2A sheepherders that left employment at WRA member ranches to work for dairy farms, and decided to "provide the names of H-2A workers who abscond to the Dairyman's Association" and also "reported [them] to ICE." These gratuitous efforts to encourage police and other law enforcement intervention—by agencies other than those to whom notification was required, like DOL and USCIS—continued for years: in 2017, for example, the WRA discussed mobilizing local law enforcement and ICE to find and punish recruiters of its H-2A workers, and decided to meet again with the Dairyman Association to complain about its members hiring away WRA sheepherders looking for greener pastures. These efforts are intended to chill worker mobility and suppress competition for labor.

141.    In the same vein, an email from Mountain Plains leadership to WRA leadership in 2014 stated that the organizations had spent over $200,000 on private investigators in a "joint effort" to track down "absconding workers." This, too, is gratuitous, and is only undertaken for the purpose of punishing workers or their new employers. H-2A employers are not required to locate absconding workers; they are required only to notify USCIS when workers leave their employment.

142.    Penalizing and deporting workers that dare to seek better work is part of the WRA's scheme to maintain monopsony power over a highly skilled but politically vulnerable pool of foreign laborers. The WRA and its members rely on foreign sheepherders to perform skilled work in deplorable living conditions for 80 to 90 hours a week. Nonetheless, the WRA and its member ranches feel entitled to pay H-2A sheepherders no more than the legal minimum wage. For this reason, many H-2A sheepherders leave to work for employers other than the

WRA's member ranches, likely because they realize other employers will compensate them better for their skills and labor, or will pay them the same or more for less grueling work. In other words, the WRA and its members are willing to resort to nearly anything *but* paying competitive wages to maintain control over their workers, including no-poach and wage-fixing arrangements.

143.    Were H-2A sheepherders freer to pursue better opportunities, the WRA and its member ranches would have no choice but to pay higher, competitive wages to entice workers to stay. In this light, the WRA's efforts to hunt down absconding sheepherders and accelerate their deportation may be seen for what it is: a way to terrorize the sheepherders and limit their employment options, in service of the WRA's and its member ranches' unlawful monopsony.

### 3.    The WRA and Its Members Suppress Wages Through Wage-Fixing

#### a.    The WRA and Its Member Ranches Share a Collective Desire to Suppress Wages

144.    The WRA has always been a vehicle used by its member ranches to suppress sheepherder wages below competitive levels. That much is clear from numerous internal email exchanges.

145.    For example, one internal email exchange demonstrates that the WRA and its members work collectively to coordinate on wages and to restrain the labor market. Former WRA Director, Ben Elgorriada, declared in an email to a group including other WRA Directors, high-level WRA personnel, a lobbyist, and representatives of the American Sheep Industry Association, asked "WHY ARE WE ALWAYS REACTING TO ACCUSATIONS THAT WE AS AN INDUSTRY ARE ABUSING, MISTREATING OR TAKING ADVANTAGE OF THE MEN WHO COME TO WORK FOR US?" He boasted that "WE BUY THEIR GROCERIES, SEND MONEY HOME TO THEIR FAMILIES, TAKE THEM TO THE DOCTOR, GUARANTEE EMPLOYMENT AND SUPPLY THEM WITH A PLACE TO LIVE AS WELL AS GUARANTEE THEM EMPLOYMENT FOR THE DURATION OF THEIR CONTRACT." Confirming that the WRA controls any movement of sheepherders between

ranches, he even bragged, "WE ALSO OFFER TO TRANSFER THEM TO ANOTHER COMPANY IF THEY'RE UNHAPPY." After setting the stage, Mr. Elgorriada proclaimed, "IT'S TIME TO TAKE A PRO-ACTIVE AND AGGRESSIVE APPROACH TO THE [WAGE] GUIDELINES WHICH OUTLINE OUR SHEEPHERDER PROGRAM AND IT NEEDS TO START WITH WAGES. **WE SHOULD BE SETTING OUR OWN STANDARDS AND NOT WAIT FOR DOL TO DO SO.**" (emphasis added). Interestingly, Mr. Elgorriada proposed that the industry act collectively to adopt higher wage rates than those required by DOL—a candid admission that the wages currently offered by WRA members at the DOL minimum were below what the market level would and could be. He proposed that WRA use its "MONTHLY NEWSLETTER" to promote this "NEW LEVEL," further demonstrating a desire to coordinate what all the competitors in the WRA pay their workers. It does not appear that Mr. Elgorriada's proposal was ever implemented.

146.    Mr. Elgorriada's email confirms WRA members' collective intent to coordinate wages that are paid to sheepherders. In connection with those efforts, Mr. Elgorriada also suggested the organization push to "GO AFTER THE ABSCONDERS WITH CONGRESSIONAL INQUIREY [sic] ON I.C.E.'S LACK OF ENFORCEMENT . . . BUT ALSO WITH INFORMATION OBTAINED FROM WRA/MPAS PRIVATE INVESTIGATOR TO NOTIFY NEW POST-SHEEPHERDING EMPLOYERS THAT WE HAVE REASON TO BELIEVE THAT THEY ARE HIRING ABSCONDERS AND WILL BE TURNED IN TO I.C.E. [. . .] CURRENT EMPLOYERS OF ABSCONDS NEED TO BE INFORMED THAT WE HAVE REASON TO BELIEVE (POINT BLANK THEM) THAT THEY ARE HIRING MEN OUT OF STATUS WHO ARE HERE ILLEGALLY AND CONTRACT BREAKERS."

147.    Moreover, WRA and its members—including Ranch Defendants—regularly convene board and membership meetings that provide opportunities to conspire regarding wages. These meetings provide a regular venue for WRA's members to discuss their wage suppression scheme, as wage rates, compensation, and the punishment of absconding workers are regularly

topics of discussion. Indeed, minutes of WRA meetings reveal Board-level discussions of wage issues in 2013, 2014, and every year from 2019 to 2023.  For instance, in 2013, the Board discussed "the number of members and herders . . . that were affected by the wage increase" issued by the Department of Labor, while in 2019, Board members discussed "concern with the yearly wage increases" with respect to H-2A workers and proposed lobbying to "implement a cap on wages."  Similarly, punishment of absconding workers was discussed in 2013, 2014, and every year from 2017 to 2023. Many of these discussions occurred while principals from Ranch Defendants—including Mr. John Espil Jr. of Defendant Espil and Mr. David Little of Defendant Little—served on the WRA's Board.

148.    Even WRA members who are not on the Board are actively engaged in the organization, attending annual membership meetings and other periodic gatherings. For example, in November 2014, Joyce Borda and John Gavin, principals of Defendant Borda, stated in an email to WRA employee Leonora Melendez that they had "told David Little [of Defendant Little Ranch] to make [Melendez] the new director of WRA."  Similarly, in June 2020, another principal of Defendant Borda, Ted Borda, agreed to run for a position on WRA's Board, demonstrating his familiarity with the association and its operations.

149.    The WRA's various meetings are also sometimes attended by non-board member employees of Defendants. These meetings provide regular opportunities to collude with competitors. For example,

    a.    A WRA-organized meeting in August 2015 with a Nevada congressman concerning the "H2-A community" was attended by principals of Defendants Ellison, F.I.M, Little Ranch, Need More Sheep, and Borda.

    b.    The WRA's annual meeting in June 2017 was attended by Bonnie Little, a principal of Defendant Little Ranch; Ted Borda, a principal of Defendant Borda; and Aulene Ratliff, a principal of defendant Ellison. At this meeting, one of the subjects discussed was "WRA support for . . . Template Forms & Job Orders," indicating that each of these Ranch

Defendants knew that WRA was setting identical wages for all of its member ranches through its centralized processes.

c. The WRA's Board meeting in February 2018 was attended by Bonnie Little, a principal of Defendant Little Ranch. At that meeting, WRA officials discussed "concerns about the challenges we've experienced when trying to transfer a worker to another member," "the implementation of Board approved policies," and using WRA's semi-annual meetings for "member training."

d. Principals of Defendant Borda, including Joyce Borda and John Gavin; principals of Defendant F.I.M., including Fred Fulstone, Marianne Leinassar, and Kristofor Leinassar; principal of Defendant Holland, Mitchell Goicoechea; principal of Defendant Little Ranch, Bonnie Little; and unnamed principals of Defendant Need More Sheep sent RSVPs to attend the WRA's June 2019 Board meeting.

e. Principals of Defendant F.I.M., Fred Fulstone, Marianne Leinassar, and Kristofor Leinassar; and principals of Defendant Borda, including John Gavin, were invited to attend a WRA-organized dinner in June 2021. Upon information and belief, they in fact attended the dinner.

f. Unnamed principals of Defendants Little Ranch, Borda, F.I.M., Need More Sheep, and Ellison were invited to attend a small, Nevada-specific meeting in conjunction with the WRA's larger January 2022 meeting and a parallel American Sheep Industry Association convention.

g. Mitchell Goicoechea, principal of Defendant Holland, attended WRA's Board meeting in June 2022.

h. Bonnie Little, a principal of Defendant Little Ranch; principals of Defendant Borda, including John Gavin, and unnamed principals of

Defendant Ellison and Defendant F.I.M. attended the WRA's annual meeting in June 2023.

150. Upon information and belief, representatives of the Defendants have attended other regular meetings of the WRA and its members where sheepherder wages were discussed. The Ranch Defendants' consistent attendance at these WRA-organized meetings over the span of many years makes it highly unlikely that they are unaware of WRA's policies and practices concerning its no-transfer and no-solicitation rules as well as its centralized processes to control herder wages.

151. The Ranch Defendants are also sufficiently familiar with one another to communicate directly, outside of the auspices of the WRA. In August 2023, Hank Vogler, a principal at Defendant Need More Sheep, emailed Bonnie Little, a principal at Defendant Little Ranch, a copy of a memo and report about the competitive threat to the U.S. sheep industry posed by foreign-imported mutton. Vogler asked Little to send the report to "everyone and ask them to send it to Congress and media or any where [sic] they think we can get help." Little then forwarded the report to other Ranch Defendants, including Mark and Pete Paris of Defendant Little Ranch; Ted Borda of Defendant Borda; Fred Fulstone, Marianne Leinassar, and Kristofor Leinassar of Defendant F.I.M.; and unnamed principals of Defendant Ellison. In her email, Little indicated the "hopes" of Vogler and herself "that we can all band together and support this great mission to protect our industry." "Band[ing] together" to "protect our industry" from free market competition is indeed the whole point of joining the WRA.

152. Through various means—including coordination on job orders submitted by the WRA, policies directed to prevent competitive solicitation by member ranches and movement of H-2A workers between ranches, and gratuitous efforts to punish H-2A workers that seek greener pastures elsewhere—the WRA and its member ranches realize their wage suppression scheme.

**b.**    **The Ranch Defendants and Other WRA Members Cede Wage-Setting Authority to the WRA**

153.    As explained below, the WRA's members have WRA set the wages that each will offer to sheepherders—whether domestic or foreign—at or near the minimum legal wage. By having WRA set wages for all its members, those members (including the Ranch Defendants), surrender their economic independence and autonomy to WRA, depriving the marketplace—and particularly sheepherders—of the benefits of competition that come with independent decision-making.

154.    The WRA's standard processes for completing immigration and employment paperwork on behalf of ranches functionally eliminate any opportunity for member ranches to set their own wages at rates higher than the respective state minimums. And because each member ranch, including the Ranch Defendants, understands that other member ranches also adhere to WRA's centralized processes for paperwork, including WRA's use of state minimum wage rates, no member ranch has incentive to break rank and offer higher wages to herders. The member ranches would need to offer higher wages to remain competitive but for the collusion guaranteed by WRA's coordinating activities.

155.    As described in more detail in the following section, WRA's standard procedure for completing the Department of Labor's Form ETA-790 (referred to colloquially as "job orders") involves requesting herders for multiple ranch members at a time, all on the same form, with WRA prescribing identical wages across all member ranches based on the minimum allowable rates in the states where those members are located. When the Department of Labor contacts WRA to confirm receipt and approval of those job orders, that approval is forwarded on to all member ranches included in the communication. This means that every member ranch who uses WRA to complete its applications knows which of its horizontal competitors are also offering the same wages to their herders.

156.    The Ranch Defendants participate in the WRA's centralized job order process and are therefore individually aware that many of their horizontal competitors also allow WRA

to set their wages at the respective state minimums. For instance, the job order submitted for WRA's Nevada member ranches to cover the period from January 10, 2014 to January 9, 2015, included Defendants Ellison, F.I.M., Borda, Espil, and Need More Sheep. Through WRA's centralized process for completing job orders, the principals of these Ranch Defendants were all informed about which of their horizontal competitors adhered to WRA's practice of fixing herder wages at the state minimum.

157.    Similarly, WRA has a practice of filling out the wage term on member ranches' USCIS-required I-129 forms and sending members only the "<u>signature pages</u>" of these forms for completion, rather than asking ranches to determine the wage term themselves. For instance, in March 2023, WRA employee Angel Sanchez sent a completed I-129 to member Veal Black Angus Ranch with the wage term already completed, seeking only the member's signature. The same occurred in a January 2024 email sent to Birdwell and Clark Ranch. Similarly, in June 2024, Angel Sanchez sent only the signature page of Form I-129 to member Bell Brand Cattle for completion. Upon information and belief, the same procedure is used with each of the Ranch Defendants. These and additional similar instances make clear that as a standard practice, WRA declines to send its member ranches the portion of the I-129 form where those members could select their own preferred wage rate.

158.    In an email from WRA to Defendant Borda in November 2014, WRA explained that it "prepare[s] the I-129 applications and all the required documentation in order to submit the applications to USCIS." WRA asked Borda to "[p]lease remember that your application is not the only one being prepared. We submit all applications with the same date of need at the same time. Therefore for the month of November, we had 96 applications being prepared at the same time."

159.    WRA admits this practice in its communications with new members. In June 2023, Debbie Brito, WRA's Member Relations Director, onboarded a new ranch member and sent that member a series of forms to be filled. One of the documents WRA sent was a blank Form I-129 in its entirety. But WRA specifically told the member that "[a]ll I need returned are

the signature pages," not the wage rates. Later, Brito told the member "[o]nce we have your seasons in place and know if you will be paying salary or hourly wages we can get an application in place," suggesting that the member's only choice is between paying salary or hourly wages. If the member opts to pay hourly wages, WRA will simply apply the state minimum wage by default.

160.    In an email from Defendant Borda to the WRA in November 2014, Borda stated that it had "sent the information WRA needed" for the requisite immigration forms, including I-129 forms, and requested a modification to the start date of visas for returning herders, indicating WRA members' understanding that WRA controls the process of completing the information on its standard immigration forms.

161.    In addition, the WRA's standard employment contract, which is used by the member ranches, including the Ranch Defendants, sets the wage that the worker will be paid for their work. For example, in a 2017 email to a new ranch member, Monica Youree, WRA's Executive Director, noted that WRA was working to "get[] your Labor Certification/Job Order application completed," and explained that "[a] change from before is that we no longer offer vacation pay in our contracts." This makes clear that it is the WRA—and not any individual rancher—that determines what compensation will be paid to sheepherders.

162.    The WRA's member handbook confirms that it takes on the role of setting wages. The WRA handbook outlines the "wage rate" that WRA instructs its members to pay to sheepherders. The wage rate established in the WRA handbook is the same as the AEWR offered to predominantly all H-2A sheepherders, and is the minimum wage allowed by DOL for H-2A sheepherders.

163.    When a state's minimum allowable wages increase, WRA communicates these mandatory wage increases simultaneously to all members in that state, sometimes instructing all members to replace the pages of their member manuals that establish the wage rates. For example, in a letter to "ALL MEMBERS OF WESTERN RANGE ASSOCIATION" from the WRA Executive Director in 2004, WRA instructed all members simultaneously of a change in

wage rates. This simultaneous broadcast of increases in mandatory minimum wages makes clear that WRA and its members know that most WRA members pay their herders the state minimum rate.

164.    The WRA handbook similarly establishes that members will use the minimum wage as the rate they use to pay to their sheepherders. WRA members further agree with the WRA and each other that this is the wage that will be offered.

165.    Indeed, WRA members have admitted as much. In a 2021 deposition, the former Executive Director of the WRA, Dennis Richins, who also owned and operated his own member ranch, was questioned about how the WRA and its member ranches set wages. Richins testified that the WRA filled out the wage portion of the job orders, and that it always put in the minimum required by law. He also stated that as a member he received "a letter saying what the wage would be." When asked whether WRA members understand and agree that this is the wage they will pay he answered in the affirmative. Richins also stated that he understood that all of the job orders for H-2A sheepherders offered the minimum wage, and that all of the WRA's members agreed to offer the same fixed minimum wage.

166.    As explained further below, the WRA's processes and procedures confirm that the ranches exercise virtually no independent discretion when it comes to the wage offers WRA makes on their behalf.

### c.    The WRA and its Members Coordinate Wages Offered to Domestic Workers

167.    As noted above, before ranches can hire workers from abroad through the H-2A program, they must first demonstrate that no domestic labor supply is available.

168.    One of the WRA's principal purposes is to create job orders for and on behalf of its members for purposes of offering work to domestic laborers.

169.    The WRA does not ask its member ranches, including the Ranch Defendants, what wages they wish to offer domestic workers in those job orders. Instead, it is understood that WRA will only offer the legal minimum to both domestic workers and foreign workers.

170.     Thus, the WRA decides what wage rate in the listed job orders, not its members. When a new member seeks to join, the WRA sends a "Job Order for Prospective Member of WRA" that asks the ranch to specify, among other things, the number of H-2A workers it needs, for how long, and the states in which the ranch operates. WRA does *not* ask the ranch to specify, in this or any other form, what wages it plans to offer H-2A workers. And when a new member is inducted into the WRA, it is the WRA that instructs the ranch what should be paid, not the other way around. For example, in a 2017 email sent to a new member, the WRA's Executive Director instructed that "the current wage is $1389.67."

171.     In practice, WRA members do not instruct WRA to offer higher wages for them, because both the WRA and its member ranches wish to avoid competition, and thus only utilize the minimum legal wage, as reflected in job orders. As confirmed in a 2015 email from WRA to one of its members, the job order "is prepared by Western Range on behalf of all the employers who are requesting new employment (workers to return back to the States) or extensions of stay for those workers that are currently working for employers," and it reflects "what we offer to all workers" on a state-by-state basis.

172.     By delegating the responsibility of preparing and submitting job orders on their behalf to the WRA, the Ranch Defendants and other member ranches act through the WRA to coordinate the wages that will be offered to both domestic and foreign sheepherders hired through the H-2A visa program, allowing the WRA to use job orders to illegally fix sheepherder wages predominantly at the wage floor in each state.

173.     The wage offers in the job orders prepared by the WRA evidence concerted conduct among the WRA and its members to offer to compensate domestic sheepherders at the wage floor set by the DOL for foreign sheepherders—known as the Adverse Effect Wage Rate, or AEWR—or by state minimum wage requirements.

174.     Based upon a review of recent job orders associated with WRA H-2A Applications, the job orders to U.S workers that preceded these H-2A Applications offered the

same wages as the H-2A Applications and therefore offered exactly the DOL H-2A wage

floors for each state as a fixed wage to potential U.S. workers.

175.    In a review of all 148 current sheepherder job orders posted by the WRA as of

2022, for example, only one guaranteed a wage higher than the minimum at all worksites, 125

guaranteed exactly the minimum wage, and fourteen offered wages below the legal minimum

allowed.

176.    Each job order is for a single ranch, which can have multiple worksites. At least

fifteen recent job orders were for ranch employers that have worksites in more than one state,

including in states with differing minimum wages. These job orders clearly show WRA and its

members' commitment to offering exactly the minimum wage. In the job orders, WRA writes:

"Wages will be paid in accordance to the state in which the work is done." Each order proceeds

to promise exactly the minimum wage at worksites in each state. For example, one order reads:

"Washington, Idaho and Montana wages will be $1807.23 and Oregon wages will be $2080.00."

| 8b. Wage Offer * | 8c. Per * | 8d. Piece Rate Offer § | 8e. Piece Rate Units/Special Pay Information § |
|---|---|---|---|
| $ 1807 . 23 | ☐ HOUR  ☑ MONTH | $ 00 . 00 | Employer shall provide housing and board in accordance with the rules and regulations of the federal government of the United States of America. Discretionary performance-based bonuses may be available. Payroll advances may be available |

| 9. Is a completed **Addendum A** providing additional information on the crops or agricultural activities and wage offers attached to this job offer? * | ☐ Yes  ☑ No |
|---|---|

10. Frequency of Pay. *   ☐ Weekly    ☐ Biweekly    ☐ Monthly    ☑ Other (specify): SEMI-MONTHLY

11. State all deduction(s) from pay and, if known, the amount(s). *
*(Please begin response on this form and use Addendum C if additional space is needed.)*
Social Security, Federal and State Income Tax withholding's may be deducted from wages.

Wages will be paid in accordance to the state in which the work is done. Washington, Idaho and Montana wages will be $1807.23 and Oregon wages will be $2080.00. State Income Tax will be withheld for workers while they are working in the State of Idaho, Montana and Oregon. When the workers are working in the State of Washington there is no State Income Tax withheld

| Form ETA-790A | FOR DEPARTMENT OF LABOR USE ONLY | | | Page 1 of 8 |
|---|---|---|---|---|
| H-2A Case Number: H-300-22041-894099 | Case Status: Full Certification | Determination Date: 03/15/2022 | Validity Period: _____ to _____ | |

**C. Place of Employment Information**

| 1. Address/Location *<br>738 RYDER LN | | | |
|---|---|---|---|
| 2. City *<br>WHITE BIRD | 3. State *<br>Idaho | 4. Postal Code *<br>83530 | 5. County *<br>Idaho |

6. Additional Place of Employment Information *(If no additional information, enter "NONE" below)* *
Multiple worksites in Idaho, Benewah and Kootenai Counties Idaho, Benton County, Walla Walla County, and Adams County Washington, Wheatland and Gallatin Counties Montana, and Umatilla County Oregon will be used. Worksites locations varies depending on season, weather and grazing rotation. Please contact the employer at the headquarters address listed above for specific directions to the current worksite.

| 7. Is a completed **Addendum B** providing additional information on the places of employment and/or agricultural businesses who will employ workers, or to whom the employer will be providing workers, attached to this job order? * | ☑ Yes   ☐ No |
|---|---|

177.     Other job orders contain similar offers that differ across work sites based on the legal minimum wage: "Nevada wages will $1807.23 and California wages will be $2488.97." Still others go as far as to specify the minimum wage down to the county level in Oregon, where the legal minimum wage varies between urban and rural areas. These orders read: "Wages will be paid based upon the county in which the work will be performed. Non-urban counties will be $2080.00 per month plus room and board. Standard counties will be $2210.00 per month plus room and board."

178.     As most of these orders explain, "Worksites locations varies [sic] depending on season, weather, and grazing rotation." This means, for example, a sheepherder who stepped across the border from Nevada to California—due to weather, season, or normal grazing rotations—would face a nearly 50% difference in wage. A sheepherder in Oregon could similarly experience a drop in wages simply by crossing a county line.

179.     As discussed above, in 2022, the DOL minimum for most H-2A sheepherders was $1,807.23 per month for most range workers. In the absence of the WRA members' combination and agreement to fix sheepherder wages, ranchers would have to compete with one another to hire qualified sheepherders, and such increased competition would result in wages above this minimum level.

180.     The WRA sets wages offered to domestic sheepherders at irrationally low levels because its members know that if the positions are not filled domestically, they can look to an international market for foreign workers with little to no power to advocate for higher wages or

safer working conditions. At least until they arrive in the United States, these workers are willing to work for wages that are aberrational in the U.S. labor market and that, due to the WRA-led conspiracy, are artificially depressed to the bare minimum allowable by law.

181.   Further, under the laws governing the H-2A visa program, members of the WRA are required to disclose the precise wage terms—including bonuses—that they intend to pay to the workers they hire. In other words, if they intend to offer higher wages than those required by the DOL-imposed wage floor or if they intend to offer a particular incentive bonus, they must disclose these facts in the job offers made to domestic workers.

182.   It is a violation of the laws governing the H-2A program to fail to disclose such intended higher wages and the existence of such bonuses.

183.   The WRA's members, however, sometimes violate this law. They make an offer of lower wages even though, on occasion, they provide some foreign workers with special bonuses. Obscuring bonuses furthers the WRA's goal of maintaining an artificial shortage of domestic workers so that more sheepherders can be hired through the H-2A system where the WRA's members have more control. It also demonstrates that the market would bear higher wages absent Defendants' anticompetitive scheme.

184.   This practice, which further demonstrates the WRA's members' disregard for the law, can result from, *inter alia*, familiarity with a recurring worker.

185.   Even though WRA member ranches sometimes do offer such bonuses, the total compensation received by sheepherders, including those who receive bonuses, are nonetheless artificially depressed by this unlawful scheme, because the baseline wage level at which sheepherders working under an H-2A visas are paid is lower than it would be in a competitive market. That is, even with the occasional departures (through undisclosed bonuses) from the agreed-upon wage, setting the baseline through collusion impedes normal competitive pressures and results in wages across the industry being lower than they would be absent the WRA's wage-fixing scheme. On information and belief, bonuses are paid infrequently and are not the industry standard.

186.    The result of the collusion between WRA members regarding domestic job orders and the wages offered to H-2A sheepherders is the effective wholesale elimination of the domestic sheepherder workforce in regions where the WRA has a significant presence and an artificially depressed wage level for H-2A workers in the industry.

### d.    The WRA and Its Members Coordinate Wages Offered to Foreign Workers

187.    The WRA and its members' collusion begins with the job orders regarding domestic workers, and it continues to the H-2A applications that govern foreign workers.

188.    As noted, one of the principal purposes of the WRA is to prepare and file with the DOL H-2A applications on behalf of its members.  But the WRA takes on more than a ministerial role: it also uses job orders to fix sheepherder wages paid by its members illegally at or near the DOL-set wage floor for each state. By fixing this floor at the DOL minimum, WRA and its members artificially suppress the wages all such workers can obtain.

189.    For instance, WRA prepared a H-2A Application for DOL to certify 188 sheepherders to work at its member ranches—including Defendants Ellison, Little, Borda, Espil, and Need More Sheep—from January 10, 2014 to January 9, 2015. In this application, WRA represented to DOL that all sheepherders at all ranches would be offered the same exact wage rate based on the state they would be working in, *i.e.* the state-level wage floor. Thus, ranches that might otherwise exercise independent economic judgment and decision-making and therefore compete for sheepherder labor instead ceded their economic independence to the WRA, which made a singular wage decision for all the competing ranches.

190.    Similarly, the next year, WRA prepared an H-2A Application for DOL to certify 93 sheepherders for work at its member ranches—including Defendants Ellison and Faulkner—from December 10, 2015 to December 10, 2016. As before, WRA represented to DOL that all sheepherders assigned would be offered the same exact wage rate, that is, the state-level wage floor, no matter what ranch they worked at.

191.    These applications demonstrate two things. First, WRA's members, including the Ranch Defendants, all ceded their power to set wages to WRA, thus depriving the marketplace of independent centers of economic decision-making. Second, WRA deploys that authority to coordinate the wage rates offered by its member ranches to H-2A sheepherders, eliminating competition between WRA's member ranches for labor and ensuring that sheepherder wages are kept low.

192.    In recent years, WRA's member ranches—including Ranch Defendants—continued to offer identical wage rates to all H-2A sheepherders working within a single state, and to advance those rates in lockstep. For sheepherder work in 2019, employment agreement, and labor certification documents associated with Defendants Borda, Ellison, Espil, Faulkner, F.I.M., Little, and Need More Sheep all offered an identical wage rate of $1584.22. Each of Defendants Borda, Espil, Ellison, Faulkner, F.I.M., Little, and Need More Sheep switched to a wage rate in those job offers of $1682.33 in 2020, to $1727.75 in 2021, and to $1807.23 in 2022. Given the extreme shortage of skilled labor, these lockstep moves would be highly unlikely in the absence of concerted activity through WRA.

193.    This is the case for all WRA members, not just the Ranch Defendants. The DOL releases statistics each year on H-2A utilization. From October 1, 2020 to September 29, 2021, the WRA submitted H-2A Applications on behalf of its members for approximately 1,400 sheepherders. The vast majority of these WRA H-2A Applications offered at or near the DOL-prescribed H-2A wage floors as the relevant wage term.

194.    There is also evidence suggesting that WRA shares the wages that different ranches pay their workers with other ranches. Such information would normally be considered competitively sensitive. For example, Defendant Ellison produced from its possession an Annual Master Job Order authored by Western Range Association and member surveys filled by WRA's member ranches regarding the wages they pay between May and September 2014. These survey forms are associated with WRA members—including Defendants Borda, Ellison, Espil, F.I.M., and Need More Sheep—and contain the monthly wages paid to H-2A sheepherders by those

members. In other words, WRA was not simply gathering the information to carry out its own function of facilitating labor certification and other H-2A application processing, but was also sharing it between and amongst its member ranches. With the WRA functioning as a conduit to share competitively sensitive information, member ranches could be secure knowing that nobody else was out-bidding them for workers.

195.    In the absence of a conspiracy whose members have committed to the scheme, the joint decision by the WRA and its members to always or almost always offer the minimum wage required by law to H-2A sheepherders would be irrational.

196.    Instead, in a free market, ranchers would compete with one another for the labor of H-2A sheepherders, who would receive higher wages because of such competition commensurate with their skill, job location, experience, and the work environment. Each rancher would obtain enough sheepherders with the skill and experience that the rancher was willing to pay for in the form of wages.

### 4.    WRA Members' Adherence to the Minimum Wage Is Economically Irrational and Unlikely Absent a Conspiracy

197.    The fixed wage rates established in the WRA's form employment contracts and in membership handbooks are designed to suppress the pay of skilled sheepherders who are critically important to the industry.

198.    Sheepherding is a skilled profession learned essentially from childhood, as noted above. These skilled workers only become more valuable to their employers (and other potential employers in the same industry) as they gain experience in managing the large flocks in their charge in the Western United States.

199.    Through the WRA, WRA member ranches predominantly offer wages at or near the government-set wage floor for each sheepherder, whether the sheepherder has fifteen years of experience or one year and whether the sheepherder retains 90 percent of his flock or 70 percent of his flock through the summer herding season.

200.    While it may be tempting to think that there is no reason for a rancher to offer more than the legal minimum if a sufficient supply of qualified laborers is available at that wage, this is not the case.

201.    Employers acting independently have a natural economic incentive to preemptively offer wage increases to retain their workers and forestall the threat of poaching by their competitors. Further, absent the anticompetitive scheme alleged herein, a sheepherder could attempt to secure a better offer from another ranch, and then use that to negotiate with their current ranch to match or beat that offer. When employers make such adjustments for one worker, they typically adjust their other workers' wages, too, to ensure internal equity and to preemptively retain those workers. Retention is less expensive than losing a skilled employee and having to spend time and money recruiting a new one, not to mention the possibility of lost productivity during a vacancy. Through the alleged wage-fixing and market allocation agreement, however, WRA and its member ranches, including Defendants, were able to eliminate that threat of competition, and thus the incentive to offer wages to their sheepherders at a competitive level. This caused wages to remain artificially low.

202.    Additionally, from an economic standpoint, offering a higher wage would attract a larger pool of additional qualified sheepherders, which would in turn increase the profits of each ranch employing more qualified sheepherders. This is because each worker would bring in revenue surpassing the costs of paying them. Absent the WRA's unlawful scheme, ranches would still never pay sheepherders more than they earned for the ranch in revenue—instead, ranches would only hire additional sheepherders if those sheepherders would bring in more revenue than they cost to employ. Thus, the more laborers a ranch can retain at rates that maximize its profits, the more it should do so based purely upon profit-motive.

203.    Failure to compete for sheepherders on wages, particularly in light of the high-skilled nature of the job, evidences anticompetitive behavior to keep wages artificially low, compounded by the collaboration discussed herein, because it goes against the unilateral economic interests of each ranch.

204.     Moreover, the WRA-led wage-fixing conspiracy between WRA members is economically rational for each rancher involved even though it depresses the labor costs of its competitors, solely because each rancher knows that every other WRA rancher is also part of the conspiracy—in the same way in which it is economically rational for a seller of goods to enter a price-fixing conspiracy even though it raises the profits of the seller's competitors. All members of a wage-fixing conspiracy enjoy higher, illicit profits at the expense of all of the workers affected by the conspiracy. Indeed, the failure to compete and the common practice of adhering to the DOL wage floor would otherwise be inconsistent with each rancher's independent self-interest, because doing those things unilaterally as opposed to collectively would put individual ranchers at a competitive disadvantage and under threat of their sheepherders being poached by other ranches offering higher wages.

## F.     Defendants' Collusive Scheme Hurts Sheepherders

205.     The WRA members' wage-suppression conspiracy has unreasonably restrained trade in the United States labor market for sheepherders generally, as well as in the markets for domestic sheepherders and H-2A sheepherders separately.

206.     With regard to the market for sheepherders generally, the result of this conspiracy is artificially depressed and historically stagnant wages for all sheepherders in the United States. As a consequence, sheepherders working on U.S. sheep ranches are deprived of the reasonable fruits of their labor and there is little incentive for the labor pool to expand.

207.     One sign that the wages offered by the WRA's members, including the Ranch Defendants, are economically irrational but for collusion is that other workers beyond the reach of the cartel are paid more for similar work.

208.     For example, one can compare the wages of sheepherders in regions dominated by the WRA-led wage-fixing cartel with the wages of sheepherders in regions where the cartel has less influence.

209.     Sheepherders outside of regions controlled by the WRA are paid more than sheepherders within the WRA's sphere of influence.

210. This stands to reason—absent the WRA members' wage suppression—sheepherders are better able to negotiate for appropriate wages and to receive fair wage offers commensurate with experience level.

211. Indeed, in other industries that value skills and experience similar to those possessed by sheepherders, workers are paid significantly more. For example, as noted above, WRA members were frequently upset that their workers were poached by the dairy industry. The average wages paid to dairy herdsman are significantly higher than those WRA members pay to their sheepherders, often well over 50% more. Similarly, all other H-2A ranch workers in non-range positions are higher paid than sheepherders, even though range work is considered significantly more challenging. Such workers on average earn nearly double the amount earned by WRA sheepherders.

212. The WRA's wage-suppression scheme has also artificially depressed the number of domestic sheepherders, who are effectively deprived of their right to work as sheepherders in the domestic labor market because WRA-affiliated ranches know they can obtain cheaper labor through their unlawful scheme.

213. Ranchers historically have claimed that there is an insufficient supply of domestic sheepherders and, therefore, that they must look to the foreign labor market to recruit workers. While there was a true labor shortage during the Second World War which gave rise to the Bracero program (a precursor to today's H-2A visa program), the dearth of domestic sheepherders today is not the result of an unwilling or incapable workforce; rather, the cause is the WRA members' concerted efforts to suppress wages well below the fair market value of a sheepherders' work.

V.   **CLASS ALLEGATIONS**

214. Plaintiff incorporates by reference all previous paragraphs of this Complaint as if realleged herein.

215. Pending any modifications necessitated by discovery, the named Plaintiff defines the "Class" pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) as follows:

ALL PERSONS WHO WORKED AS A SHEEPHERDER FOR THE WRA OR ANY OF THE MEMBER RANCHES OF THE WRA THROUGH THE H-2A VISA PROGRAM AT ANY TIME ON OR AFTER JUNE 1, 2018.

216.     The members of the putative class are so numerous that joinder of all potential classes members is impracticable. Plaintiff does not know the exact size of the classes because that information is within the control of the WRA. However, WRA claims to recruit a substantial portion of the roughly 2,000 to 2,500 sheepherders employed in the United States each year.

217.     There are questions of law and fact common to the classes that predominate over any individual issues that might exist. Common questions include, but are not limited to, whether the WRA and its members conspire to suppress sheepherder wages through unlawful agreements not to compete for labor and through the operation of joint ventures that recruit workers and set wages at the minimum required by law.

218.     The class claims asserted by Plaintiff are typical of the claims of all of the potential members of the classes because all potential class members suffered suppressed wages as a consequence of the WRA-led wage fixing and market allocation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because numerous identical lawsuits alleging similar or identical causes of action would not serve the interests of judicial economy.

219.     Plaintiff will fairly and adequately protect and represent the interests of the class. Plaintiff's wages were artificially depressed in the same way that those of all class members were depressed, as a result of the same conspiracy.

220.     Plaintiff is represented by counsel experienced in antitrust law and complex litigation on behalf of low-wage workers and in class actions.

221.     The prosecution of separate actions by the individual potential class members would create a risk of inconsistent or varying adjudications with respect to individual potential class members that would establish incompatible standards of conduct for the WRA's members.

222.    Plaintiff is unaware of any members of the putative class who are interested in presenting their claims in a separate action.

223.    Plaintiff is unaware of any pending litigation commenced by members of the putative class concerning the instant controversies.

224.    It is desirable to concentrate this litigation in this forum because many of the WRA's members, as well as Plaintiff and many other class members, are located in or do business in Nevada, and H-2A sheepherders operate exclusively in the Western United States.

225.    This class action will not be difficult to manage due to the uniformity of claims among the class members and the susceptibility of the claims to class litigation and the use of representative testimony and representative documentary evidence.

226.    The contours of the classes will be easily defined by reference to WRA records and government records.

## CAUSES OF ACTION

## COUNT I: HORIZONTAL WAGE-FIXING AGREEMENT

## (RESTRAINT OF TRADE, 15 U.S.C. §§ 1, ET SEQ.)

### Plaintiff and the Class

227.    Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully re-written herein.

228.    As set forth above, Plaintiff asserts this count on Plaintiff's own behalf and on behalf of all other similarly situated employees pursuant to Fed. R. Civ P. 23(b)(2) and (b)(3).

229.    The conduct of Defendants, as described herein, substantially affected interstate and international commerce and caused antitrust injury.

230.    WRA members, including Defendants, are competitors in the labor market and should be competing with each other to attract the most capable sheepherders. They do not share profits or risk of loss, other than through their agreement to indemnify the WRA for claims related to the wages paid to sheepherders.

231.    WRA members, including Defendants, by and through the WRA, conspired and agreed to offer all sheepherders wages fixed at or near the minimum required by DOL regulations, with any variance attributable almost entirely to the state in which the ranch is located.

232.    WRA members, including Defendants, by and through the WRA, conspired and agreed to fix the wages offered to sheepherders predominantly at the minimum DOL wage floor. This fixed rate is artificially low, and the fixing of wages through the operation of the WRA amounts to a per se violation of the Sherman Act.

233.    The WRA and its members, including Defendants, conspired and agreed to fix wages offered to sheepherders at the DOL wage floors through the WRA's filing of (a) job offers for domestic workers, and (b) applications for certifications of H-2A workers that both predominantly offered exactly or nearly the same wage set at exactly the wage floors set by the DOL. The fixing of wages amounts to a per se violation of the Sherman Act, and the fixed rate set by the WRA has remained artificially low because it has continually put downward pressure on the DOL's wage surveys and, thus, the basis for the fixed wages the WRA's member ranches pay.

234.    In the alternative, Plaintiff alleges that Defendants' wage-fixing agreement is anticompetitive and illegal under the Quick Look Test. The explicit purpose and effect of wage-fixing is to make the wages paid by the WRA's members to sheepherders non-responsive to market competition, and to insulate each WRA member from competition on wages from other WRA members. Even a person with a rudimentary understanding of economics would understand such an agreement to have anticompetitive effects.

235.    In the alternative, Plaintiff alleges that Defendants' wage-fixing agreement is anticompetitive and illegal under the Rule of Reason. For purposes of the Rule of Reason, the relevant geographic market for the claim alleged in this Count is the United States, and the relevant market is the labor market for sheepherders in the United States.

236.    Defendants' conspiracy to fix wages unreasonably restrains trade in the sheepherder labor market. The wage fixing is not essential to the H-2A program and has no procompetitive virtues.

237.    Defendants' collusive activity had and has the effect of:

a.    fixing the compensation of sheepherder Plaintiff and the Class at an artificially low level;

b.    eliminating, to a substantial degree, competition for sheepherder labor;

c.    restraining trade in that sheepherders are not able to negotiate their wage rates above the DOL wage floors; and

d.    restraining trade by artificially lowering the H-2A sheepherder wage floors resulting from the DOL's surveys.

238.    Defendants' unreasonable restraint or restraints of trade have damaged the Plaintiff and the members of the Class.

239.    As a result, Plaintiff and those similarly situated suffered injuries and are entitled to treble damages, attorneys' fees, and costs as set forth by law.

240.    Plaintiff and those similarly situated are also entitled to injunctive relief to end the wage-fixing scheme, and to force Defendants to take affirmative steps to correct the market.

## COUNT II: HORIZONTAL MARKET ALLOCATION
## (RESTRAINT OF TRADE, 15 U.S.C. §§ 1, ET SEQ.)
### Plaintiff and the Class

241.    Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully re-written herein.

242.    As set forth above, Plaintiff asserts this count on Plaintiff's own behalf and on behalf of all other similarly situated employees pursuant to Fed. R. Civ P. 23(b)(2) and (b)(3).

243.    The conduct of Defendants, as described herein, substantially affected interstate and international commerce and caused antitrust injury.

244.    The horizontal agreement between competitors not to compete for sheepherder labor is a per se violation of the Sherman Act.

245.    WRA members, including Defendants, are competitors in the labor market and absent an unlawful agreement would be competing with each other to attract the most capable sheepherders. They do not share profits or risk of loss, other than through their agreement to indemnify the WRA for claims related to the wages paid to sheepherders.

246.    But through the collusive conduct described herein, the WRA and its members, including Defendants, ensure that sheepherders are assigned to specific ranches and the WRA members avoid competing for labor.

247.    The WRA and its members, including Defendants, conspired and agreed to avoid competing for labor, coercing sheepherders into agreements which remove sheepherders' ability to negotiate for better wages or wages commensurate with their experience, or to seek employment at other ranches. This market allocation scheme amounts to a per se violation of the Sherman Antitrust Act.

248.    The WRA and its members, including Defendants, conspired and agreed to this scheme through the WRA's assignment of sheepherders to ranches and the restraint the WRA places on sheepherders' ability to seek alternate employment. In effect, WRA members have agreed, through the WRA and its policies, not to compete for labor.

249.    The WRA accomplished this agreement, *inter alia*, through its interviewing, hiring, and assigning of shepherds and its stringent prohibitions against sheepherders seeking alternative employment, including, on information and belief, after a sheepherder's visa term expires.

250.    The WRA's members, including Defendants, conspire and assent to this conduct through meetings and through membership in the WRA.

251.    In the alternative, Plaintiff alleges that Defendants' market allocation agreement is anticompetitive and illegal under the Quick Look Test. The explicit purpose and effect of assigning workers to particular ranches is to make the labor market for their labor non-responsive

to competition, and to insulate each WRA member from competition from other WRA members. Even a person with a rudimentary understanding of economics would understand such an agreement to have anticompetitive effects.

252. In the alternative, Plaintiff alleges that Defendants' wage-suppression agreement is anticompetitive and illegal under the Rule of Reason. For purposes of the Rule of Reason, the relevant geographic market for the claim alleged in this Count is the United States, and the relevant market is the labor market for sheepherders in the United States.

253. Defendants' relevant conduct—market division—unreasonably restrains trade in the sheepherder labor market. The market division is not essential to the H-2A program and has no procompetitive virtues.

254. The collusive activity between the WRA and its members, including Defendants, had and has the effect of:

- fixing the compensation of sheepherder Plaintiff and the Class at an artificially low level;
- eliminating, to a substantial degree, competition for foreign sheepherder labor;
- restraining trade in that sheepherders are not able to negotiate their wage rates above the DOL wage floors; and
- restraining trade by removing incentives for employers to compete for labor, artificially lowering the H-2A sheepherder wage floors resulting from the DOL's surveys.

255. Defendants' unreasonable restraint of trade has damaged the Plaintiff and the members of the Class.

256. As a result, Plaintiff and those similarly situated suffered injuries and are entitled to treble damages, attorneys' fees, and costs as set forth by law.

257. Plaintiff and those similarly situated are also entitled to injunctive relief to end the market allocation scheme, and to force Defendants to take affirmative steps to correct the market.

**PLAINTIFF DEMANDS A JURY TRIAL**

**PRAYER FOR RELIEF**

258.    WHEREFORE, Plaintiff respectfully requests that judgment be entered in Plaintiff's favor and in favor of those similarly situated as follows:

    a.   Certifying and maintaining this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3), with Plaintiff as designated class representatives and with his counsel appointed as class counsel;

    b.   Declaring Defendants in violation of each of the counts set forth above;

    c.   Awarding treble damages for antitrust injuries to Plaintiff and those similarly situated;

    d.   Awarding pre-judgment, post-judgment, and statutory interest;

    e.   Awarding attorneys' fees;

    f.   Awarding costs;

    g.   Ordering equitable relief, including a judicial determination of the rights and responsibilities of the parties;

    h.   Awarding such other and further relief as the Court may deem just and proper.

Dated: January 14, 2025          Respectfully Submitted,

By: */s/ Yaman Salahi*

THIERMAN BUCK LLP
LEAH LIN JONES
leah@thiermanbuck.com
325 W Liberty Street
Reno, NV 89501
Tel: 775-284-1500

SALAHI PC
Yaman Salahi (*Pro Hac Vice*)
yaman@salahilaw.com
505 Montgomery St., 11th Floor
San Francisco, CA 94111
Tel: (415) 236-2352

FAIRMARK PARTNERS, LLP
JAMIE CROOKS, ESQ. (*Pro Hac Vice*)
RUCHA ABHAY DESAI, ESQ. (*Pro Hac Vice*)
jamie@fairmarklaw.com
rucha@fairmarklaw.com
1001 G Street NW, Suite 400E
Washington, DC 20001

TOWARDS JUSTICE
DAVID H. SELIGMAN, ESQ. (*Pro Hac Vice*)
ALEXANDER HOOD, ESQ. (*Pro Hac Vice*)
david@towardsjustice.org
alex@towardsjustice.org
PO Box 371680, PMB 44465
Denver, CO 80237

*Attorneys for Plaintiff and the Proposed Class*