1

2

3        UNITED STATES DISTRICT COURT

4        DISTRICT OF NEVADA

5        * * *

6    CIRILO UCHARIMA ALVARADO,              Case No. 3:22-cv-00249-MMD-CLB

7                              Plaintiff,            ORDER
              v.
8
     WESTERN RANGE ASSOCIATION, *et*
9    *al*.,

10                            Defendants.

11

12   **I.    SUMMARY**

13          Plaintiff Cirilo Ucharima Alvarado, on behalf of himself and all others similarly

14   situated, alleges that Defendants Western Range Association ("WRA") and eight

15   individual WRA member ranches[1] (collectively, "Ranch Defendants") unlawfully

16   restrained trade in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, *et*

17   *seq*. ("Sherman Act"). (ECF No. 254 ("Third Amended Complaint" or "TAC").) Before the

18   Court are Defendants' motions to dismiss the TAC (ECF Nos. 262, 263, 265, 265, 266)[2]

19

20

21   _____

22          [1]Ranch Defendants are Borda Land & Sheep Company, LLC, Ellison Ranching
     Company, Faulkner Land and Livestock Company, Inc., F.I.M. Corp., Holland Ranch,
     LLC, John Espil Sheep Co., Inc., Little Paris Sheep Company, LLC ("Little Ranch"), and
23   Need More Sheep Co., LLC.

24          [2]These include WRA's motion to dismiss (ECF No. 263); Espil, Borda, and
     Holland's joint motion to dismiss (ECF No. 262); F.I.M., Need More Sheep, and Faulkner's
25   joint motion to dismiss (ECF No. 264); Ellison's motion to dismiss (ECF No. 265); and
     Little Ranch's motion to dismiss (ECF No. 266). Each Ranch Defendant also joined the
26   other dismissal motions. (ECF Nos. 268, 269, 271, 274.) With leave from the Court (ECF
     No. 276), Plaintiff responded to all five motions to dismiss in a single consolidated
27   opposition (ECF No. 277). WRA and Ranch Defendants replied (ECF Nos. 278, 279, 280,
     281, 282). The Court determined that a hearing was not necessary to resolve the motions.
28   *See* LR 78-1 ("All motions may be considered and decided with or without a hearing.").

1    and Ellison's motion to seal (ECF No. 267)[3]. For the reasons explained below, the Court

2    finds that Defendants are not entitled to antitrust immunity and that Plaintiff has now

3    sufficiently alleged Sherman Act claims against both WRA and Ranch Defendants. The

4    Court thus denies Defendants' motions to dismiss.

5    **II.    BACKGROUND[4]**

6        Plaintiff is a Peruvian citizen who came to the United States on a temporary H-2A

7    visa to work as a sheepherder at Little Ranch in Spring Creek, Nevada, from July 2020

8    to December 2020. (ECF No. 254 at 7-8.) WRA is a non-profit association of member

9    sheep ranches located in various states in the Western United States. (*Id.* at 20-21, 37.)

10   Ranch Defendants are members of WRA and are all independent businesses based in

11   Nevada, with the exception of Faulkner, which is based in Idaho. (*Id.* at 11.) Plaintiff seeks

12   to represent a class of "all persons who worked as a sheepherder for the WRA or any of

13   the member ranches of the WRA through the H-2A visa program at any time on or after

14   June 1, 2018." (*Id.* at 61.)

15       Plaintiff filed his original complaint in June 2022, suing only WRA and alleging that

16   the association violated Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*, by making

17   an unlawful agreement with its members to fix sheepherder wages and horizontally

18   allocating the market for foreign sheepherders. (ECF No. 1.) The Court denied WRA's

19   motion to dismiss (ECF No. 23), finding that Plaintiff plausibly alleged an unlawful wage-

20   fixing agreement (ECF No. 43).

21       In June 2023, Plaintiff filed a first amended complaint (ECF No. 50 ("FAC")),

22   alleging essentially the same facts as the original complaint but naming eight WRA

23

24       [3]Ellison represents that Exhibit H has been marked as "confidential" and subject to the stipulated protective order. (ECF No. 267.) However, to overcome the strong presumption in favor of public access, Ellison must make particularized showings as to
25   why Exhibit H should be sealed and provide compelling reasons, supported by specific factual findings, for their request. *See Kamakana v. City & Cty. of Honolulu*, 447 F.3d
26   1172, 1178 (9th Cir. 2006); *Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 678 (9th Cir. 2010). Accordingly, the Court denies Ellison's motion without prejudice. Ellison did not file
27   Exhibit H under seal so denying Ellison's motion would not result in the unsealing of Exhibit H.

28

       [4]The following allegations are adapted from the TAC unless otherwise noted.

1   member ranches as additional defendants. (ECF No. 125 at 8.) Ranch Defendants moved

2   to dismiss the claims asserted against them in the FAC (ECF Nos. 96, 99, 109) and the

3   Court granted their motions, finding that while Plaintiff pled viable claims against WRA,

4   he failed to sufficiently allege how each individual Ranch Defendant specifically assented

5   to the purported anticompetitive agreements. (ECF No. 173.) Attempting to cure these

6   deficiencies, Plaintiff filed a second amended complaint (ECF No. 232) and then moved

7   for leave to file a third amended complaint (ECF No. 244). The Court granted that request

8   (ECF No. 253[5]) and Plaintiff filed the operative TAC (ECF No. 254).

9       In the TAC, Plaintiff retains the following core allegations, tracking previous

10  versions of the complaint, but adds new facts about Ranch Defendants. (*Id.*)

11      The H-2A visa program is an agricultural guest worker program administered by

12  the U.S. Department of Labor ("DOL") under which temporary work visas are issued to

13  foreign workers to fill positions that employers cannot fill through the domestic labor

14  market. (*Id.* at 11-12.) DOL regulations require that employers offer domestic workers "no

15  less than the same benefits, wages, and working conditions that the employer is offering,

16  intends to offer, or will provide to H-2A workers." (*Id.* at 12.) *See* 20 C.F.R. § 655.122(a).

17  DOL has implemented "special procedures" governing the wage floor for H-2A

18  sheepherders. (ECF No. 254 at 12.) The regulations specifically require ranchers, and

19  the membership organizations acting on their behalf, to offer "at least the AEWR [Adverse

20  Effect Wage Rate], the prevailing hourly wage rate, the prevailing piece rate, the agreed-

21  upon collective bargaining rate, or the Federal or State minimum wage rate, in effect at

22  the time work is performed, whichever is highest," during any pay period. (*Id.* at 12.) *See*

23  20 C.F.R. § 655.122(l). WRA creates job orders for domestic sheepherders and files H-

24  2A applications for foreign sheepherders on behalf of its members. (*Id.* at 18, 21.)

25      Plaintiff alleges that WRA and its members, including Ranch Defendants,

26  conspired and agreed to fix the wages offered to both domestic and foreign sheepherders

27

28      [5]In granting leave to file the TAC, the Court also granted Defendants full
opportunity to move for dismissal of the further-amended complaint and thus denied then-
pending motions to dismiss the second amended complaint as moot. (ECF No. 253.)

at or near the wage floor set by DOL. (*Id.* at 5, 23, 47.) He asserts that WRA instructs its members that they will all pay the minimum allowable wage for H-2A sheepherders, and Ranch Defendants each agree to offer and pay that wage, thereby effectively "surrender[ing] their economic independence and autonomy to WRA." (*Id.* at 23, 47.)

Plaintiff also alleges that WRA horizontally allocates the market for foreign H-2A sheepherders among its members by assigning them to ranches and not allowing them to seek employment elsewhere without the consent of their current employer, and that WRA members agree not to poach employees from one another. (*Id.* at 64-66.) He asserts that each Ranch Defendant acquiesced to and participated in these no-transfer and no-solicitation schemes, thus "conspire[ing] and agree[ing] to avoid competing for labor, coercing sheepherders into agreements which remove sheepherders' ability to negotiate for better wages or wages commensurate with their experience, or to seek employment at other ranches." (*Id.* at 65.)

Plaintiff asserts violations of Section 1 of the Sherman Act based on (1) the horizontal wage-fixing agreement and (2) the horizontal market allocation scheme. (*Id.* at 62-66.)

## III.   DISCUSSION

Defendants now move to dismiss the TAC under Fed. R. Civ. P. 12(b)(6). (ECF Nos. 262, 263, 264, 265, 266.) *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (requiring a complaint to contain "enough facts to state a claim to relief that is plausible on its face"); *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 811 (9th Cir. 1988) (citations omitted) ("To establish a section 1 violation under the Sherman Act, a plaintiff must demonstrate three elements: (1) an agreement, conspiracy, or combination among two or more persons or distinct business entities; (2) which is intended to harm or unreasonably restrain competition; and (3) which actually causes injury to competition, beyond the impact on the claimant, within a field of commerce in which the claimant is engaged (i.e., 'antitrust injury').")

4

The Court first addresses WRA's motion (ECF No. 263), as many of the association's arguments also bear on the viability of claims against Ranch Defendants. The Court rejects WRA's new asserted bases for antitrust immunity and finds that Plaintiff's allegations are sufficient to support claims against the association under either a *per se* or rule of reason analysis. The Court then turns to Ranch Defendants' motions (ECF Nos. 262, 264, 265, 266) and considers whether the additional facts alleged in the TAC overcome the deficiencies in the FAC as to each individual member's acquiescence to the anticompetitive schemes alleged.

### A.    Antitrust Immunity

The Court previously rejected WRA's antitrust immunity arguments under the *Parker v. Brown* state-action immunity doctrine and the *Noerr-Pennington* lobbying doctrine. (ECF No. 43 at 6-9.) WRA now argues that its activities are immune from Sherman Act liability under several new theories, pointing to (1) the *Copperweld* doctrine; (2) the express provisions of Section 6 of the Clayton Act; and (3) implied immunity created by the H-2A regulatory protocol. (ECF No. 263 at 13-19.) None of these theories are meritorious.

### 1.    *Copperweld* Doctrine & single entity status

WRA first argues that the association and its members constitute a single entity incapable of a Section 1 conspiracy under *Copperweld Corp. v. Independence Tube Co.*, 467 U.S. 752 (1984). (ECF No. 263 at 8-13.) But the single entity doctrine does not apply here, where WRA is an organization composed of and run by competitors in the sheepherding industry.

In *Copperweld*, the Supreme Court addressed the "narrow issue" of whether a parent corporation could be guilty of conspiring with its subsidiary, concluding that because "[a] parent and its wholly owned subsidiary have a complete unity of interest," their activity must be viewed as that of a single enterprise and accordingly cannot be subject to Section 1 liability. 467 U.S. at 753, 71 (dismissing claims involving a parent tubing steel corporation and its subsidiary manufacturer brought under the so-called

1    "intra-entity conspiracy doctrine"). The *Copperweld* court reasoned that, whereas Section

2    2 of the Sherman Act governs a single firm's conduct in the context of monopolization,

3    Section 1 tracks the "basic distinction between concerted and independent action,"

4    reaching only unreasonable restraints of trade between separate entities and not "wholly

5    unilateral" activity. *Id.* at 753, 767-68 (citations omitted) ("[Parent-subsidiary] objectives

6    are common, not disparate, and their general corporate objectives are guided or

7    determined not by two separate corporate consciousnesses, but one.").[6] In determining

8    that parent and subsidiary corporations were incapable of an "intra-entity conspiracy," the

9    Supreme Court found no risk of "crippl[ing] antitrust enforcement," noting its decision

10   would "simply eliminate treble damages from private state tort suits masquerading as

11   antitrust actions." *Id.* at 777.

12        In *American Needle, Inc. v. National Football League*, 560 U.S. 183 (2010), the

13   Supreme Court further defined the limits of the single entity doctrine, addressing antitrust

14   claims brought by a corporation which designed and sold trademarked gear with logos of

15   athletic teams against an unincorporated association of professional football teams and

16   a corporation established by the association and its member teams. The Supreme Court

17   reaffirmed its overarching holding in *Copperweld*, but held that the *association*'s licensing

18   activities *could* constitute concerted action within the purview of Section 1. *See id.* The

19   *American Needle* Court emphasized that the relevant inquiry is "one of substance, not

20   form, which does not turn on whether the alleged parties . . . are part of a legally single

21   entity or seem like one firm or multiple firms in any metaphysical sense," but rather on

22   whether the agreement joins together "separate economic actors pursuing separate

23   economic interests" such that it "deprives the marketplace of independent centers of

24   decisionmaking . . . and therefore of diversity of entrepreneurial interests and actual or

25   potential competition." *Id.* at 195 (citing *Copperweld*, 467 U.S. at 769). As separately-

26   _____

27         [6]This analysis is a logical extension of the general principle that a corporation
     cannot conspire with its unincorporated divisions, because "a business enterprise
28   establishes divisions to further its own interests in the most efficient manner" and does
     not "bring together economic power that was previously pursuing divergent goals," *Id.* at
     769.

6

managed businesses acting together through an unincorporated association, football teams do not possess "either the unitary decisionmaking quality or the single aggregation of economic power characteristic of independent action." *Id.* at 196.

In the instant case, WRA is made up of a constellation of member ranches which have no "unity of interest" to parallel a parent and its subsidiary. Like in *American Needle*, each of WRA's members is a "substantial, independently owned, independently managed business" with a "separate corporate consciousness" and separate measures of corporate success not necessarily aligned with other ranches operating in the same market. *Am. Needle*, 560 U.S. at 196. It is quite clear, in other words, that Ranch Defendants are *competitors*. The fact that WRA is itself a single legal body which may "pursue [its member's] common interests" (ECF No. 263 at 8) does not provide the cover of a single-entity defense over a fundamentally competitive market dynamic. *Am. Needle*, 560 U.S. at 186 (holding that "[a]lthough the NFL respondents may be similar in some sense to a single enterprise, they are not similar in the *relevant functional sense*" because "[w]hile teams have common interests such as promoting the NFL brand, they are still separate, profit-maximizing entities, and their interests in licensing team trademarks are not necessarily aligned") (emphasis added).

In essence, WRA asks the Court to find that the very existence of a unifying organizational vehicle which might *enable* separate economic actors to engage in anticompetitive concerted conduct also automatically immunizes that anticompetitive conduct. But this conclusion would run counter to the purpose of the Sherman Act, and the *Copperweld* doctrine does not protect WRA here.

## 2. Section 6 of the Clayton Act

Neither is the Court persuaded by WRA's argument that, notwithstanding the holding in *American Needle*, WRA should be treated as a single entity or otherwise afforded specific immunity as a qualifying "agricultural organization, instituted for the purpose of mutual help," under Section 6 of the Clayton Act, 15 U.S.C. § 17. (ECF No. 263 at 8-10.) For support, WRA primarily turns to the Supreme Court's 1962 decision

applying Section 6 of the Clayton Act in *Sunkist Growers, Inc. v. Winkler & Smith Citrus Products*, 370 U.S. 19 (1962), cited briefly in *American Needle*, 560 U.S. at 193. But WRA mischaracterizes the language and meaning of Section 6, as well as the implications of *Sunkist* and its relevance to *American Needle*. Section 6 does not entitle Defendants to a single-entity or statutory immunity defense.

Enacted in 1914, Section 6 of the Clayton Act specifically provides that the antitrust laws may not be construed "to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help . . . or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade." 15 U.S.C. § 17. Section 6 thus prevents agricultural cooperatives and labor unions from being "held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws, as they otherwise might have been." *Maryland & Virginia Milk Producers Ass'n v. U.S.*, 362 U.S. 458, 465 (1960) (internal quotations omitted). *See also id.* at 464 (noting that Congress inserted Section 6 because "[i]n the early 1900's, when agricultural cooperatives were growing in effectiveness, there was widespread concern because the mere organization of farmers for mutual help was often considered to be a violation of the antitrust laws"). By its plain language, however, the statute only forbids restraints on the *activities* of these organizations and their members when they "*lawfully carry[] out the legitimate objects thereof.*" 15 U.S.C. § 17 (emphasis added). "[N]either the language nor the legislative history of the section indicates a congressional purpose to grant any broader immunity to agricultural cooperatives" than that granted to labor unions, and the Supreme Court "has held that the provisions . . . relating to labor unions do not manifest a congressional purpose wholly to exempt them from the antitrust laws." *Milk Producers Ass'n*, 362 U.S. at 464-65 (finding Section 6 did not give an agricultural cooperative unrestricted power to monopolize where otherwise prohibited by Section 2 of the

Sherman Act). Section 6 does not give "an entity full freedom to engage in predatory trade practices at will." *Id.* at 465-66.

Thus, the central question before the Court is whether declining to treat WRA's members as a single entity and imposing antitrust liability would "forbid or restrain [WRA's members] from lawfully carrying out . . . *legitimate objects*." 15 U.S.C. § 17 (emphasis added). Plaintiff argues that Section 6 should be narrowly construed to provide an exemption only where agricultural associations act in their capacity as *producers*, i.e. where "legitimate objects" encompass "activities related to the sale of products." (ECF No. 277 at 39-43.) The Court largely agrees.

As Plaintiff notes, Section 6 of the Clayton Act must be read in conjunction with the Capper-Volstead Act, 7 U.S.C. § 291, which "sets out [Section 6] immunity in greater specificity" and provides that agricultural producers "may act together in associations" to "process[]," "prepare[] for market," "handle[]," and "market[]" their products. *Sunkist*, 370 U.S. at 28 (quoting 7 U.S.C. § 291). WRA fails to point to any case in which a court has held that Section 6 or Capper-Volstead immunity extends to labor-market restraints. On the contrary, the Supreme Court has largely relied on narrower "producer" language and has cautioned against overbreadth. *See, e.g.*, *United States v. Borden Co.*, 308 U.S. 188, 204-05 (1939) (holding that neither Section 6 of the Clayton Act nor the Capper Volstead Act granted immunity from liability under Section 1 of the Sherman Act for the combination of a cooperative with others and noting that "[t]he right of these agricultural producers thus to *unite in preparing for market and in marketing their products* . . . cannot be deemed to authorize any combination or conspiracy with other persons in restraint of trade that these producers may see fit to devise") (emphasis added); *Milk Producers Ass'n*, 362 at 466-67 (citing 7 U.S.C. § 291) (emphasizing that Section 6 and the Capper-Volstead Act were intended to "make it possible for farmer-producers to organize together, set association policy, fix prices at which their cooperative will sell their produce, and otherwise carry on like a business corporation without thereby violating the antitrust laws"

1  but this "does not suggest a congressional desire to vest cooperatives with unrestricted

2  power to restrain trade").

3      Here, Plaintiff's central allegations do not relate to collective processing,

4  preparation, or marketing of products, but rather to manipulation of the labor market by

5  separately-owned competitors. WRA fails to convincingly argue that the "legitimate

6  objects" of its members engender "full freedom" to manipulate the labor market; indeed

7  that construction would risk improperly repurposing immunity statutes designed to

8  increase labor bargaining power vis-à-vis purchasers. *See* 15 U.S.C. § 17 ("The labor of

9  a human being is not a commodity or article of commerce"); *Milk Producers Ass'n*, 362

10 U.S. at 466-67 (purpose of the Clayton and Capper-Volstead Acts is not to "grant[] a class

11 privilege," but to "equalize existing privileges by changing the law applicable to the

12 ordinary business corporations so the farmers can take advantage of it"). *See also Group*

13 *Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 231 (1979) ("It is well settled that

14 exemptions from the antitrust laws are to be narrowly construed.").

15     WRA insists that the Supreme Court's decision in *Sunkist* controls and directs the

16 application of Section 6 here. (ECF No. 263 at 6-10.) But *Sunkist* is fully consistent with

17 a narrower statutory construction. There, the Supreme Court found that three agricultural

18 organizations owned by the same citrus farmers—including Sunkist Growers, its wholly

19 owned subsidiary, and a cooperative processing association "owned and operated

20 exclusively by a number of lemon-grower associations all of which are members of

21 Sunkist Growers"—constituted a single organization.[7] *Sunkist*, 370 U.S. at 20, 29

22 (reasoning that "the 12,000 growers here involved are in practical effect and in

24     [7]Notably, as relevant to the single-entity defense, the fact that the agricultural
organizations forming the association in *Sunkist* were owned by the *same* farmers reflects
a structural difference from this case. *See id.* at 29 ("There is no indication that the use of
separate corporations had economic significance in itself or that outsiders considered and
dealt with the three entities as independent organizations."). The *Sunkist* court took issue
with reliance on arbitrary legal distinctions between entities which were not in reality
independent, as evident in their shared ownership. But those are not the circumstances
here, where WRA's members have independent market status with clear economic
significance.

1  contemplation of the statutes one 'organization' or 'association'" despite constituting

2  legally-distinct entities). The Court then found that under both Section 6 of the Clayton

3  Act and the Capper-Volstead Act, the association could not be held liable for challenged

4  activities involving "collective processing and marketing of their fruit and fruit products."

5  *Id.* at 28. But again, processing and marketing activities are *squarely covered* by the

6  express language of the Capper-Volstead Act. *See* 7 U.S.C. § 291; *Milk Producers Ass'n*,

7  362 at 466-67. In other words, unlike in this action, in *Sunkist* there was no question that

8  the agricultural cooperative was advancing "legitimate objects" within the meaning of the

9  statute.[8]

10  Accordingly, the Court does not find that Section 6 of the Clayton Act bolsters

11  WRA's single-entity defense or provides immunity from liability under the Sherman Act.

### 3.    Joint employer status & agency relationship

13  WRA further argues it should be treated as a single entity because, "[f]or a

14  significant part of the time period alleged in the TAC, the WRA filed its H-2A applications

15  as a joint employer with, and later as an agent for, its rancher members." (ECF No. 263

16  at 10.) WRA reasons that "[b]y definition, a joint employer constitutes one entity," and "an

17  agent cannot conspire with its principal in violation of the antitrust laws." (*Id.*) These

18  arguments are unavailing.

19  To start, even assuming WRA is a joint employer with Ranch Defendants under

20  relevant regulations, WRA fails to support the leap from that proposition to its conclusion

21  that the association must be considered a single entity under the separate legal regime

---

25  [8]Similarly, the *American Needle* court cited to *Sunkist* only for its early recognition that, to focus only on formal legal status in determining whether entities are separate "would be to impose grave legal consequences upon organizational distinctions that are of *de minimis* meaning and effect to these growers who have banded together *for processing and marketing purposes* within the purview of the Clayton and Capper-Volstead Acts." *Am. Needle*, 560 U.S. at 193 (quoting *Sunkist*, 370 U.S. at 29) (emphasis added). WRA's assertion that, by citing *Sunkist*, *American Needle* adopted a broad view of Section 6 which controls in this action is unpersuasive.

1   created by the antitrust laws.[9] As Plaintiff aptly notes, the test for what constitutes a "joint

2   employer"—most often relevant to the application of wage and hour laws—is distinct from

3   the test for a "single economic enterprise" under the antitrust laws. (ECF No. 277 at 13-

4   14.) *Compare* 22 C.F.R. § 655.103(b) (defining "joint employers" as "employers [that]

5   have sufficient definitional indicia of being a joint employer of a worker under the common

6   law of agency") and *U.S. Equal Emp. Opp. Comm. v. Global Horizons, Inc.*, 915 F.3d 631,

7   638 (9th Cir. 2019) (describing the central joint employment inquiry as "the extent of

8   control that one may exercise over the details of the work of the other"), with *Am. Needle*,

9   560 U.S. at 195 (describing the single entity inquiry as whether an alleged conspiracy

10  "joins together separate decisionmakers"). Moreover, in practice it is clear that corporate

11  entities' status as joint employers does not automatically resolve the single enterprise

12  question. *Compare, e.g.*, *In re Jimmy John's Overtime Litig.*, 877 F.3d 756, 769 (7th Cir.

13  2017) (observing that "plaintiffs frequently sue both their franchisee employer and the

14  franchisor for FLSA violations under a joint employer theory"), with *Arrington v. Burger

15  King Worldwide, Inc.*, 47 F.4th 1247 (11th Cir. 2022) (holding that a franchisor and its

16  franchisees are capable of concerted action).[10]

17      WRA also emphasizes that, for at least part of the time covered in the TAC, it filed

18  job orders as an authorized agent for its rancher members. (ECF No. 263 at 12-13.) *See*

19  20 CRF 655.131. Here, WRA points to *United States v. Gen. Elec. Co.*, 272 U.S. 476

20  (1926), a century-old case in which the Supreme Court held that an antitrust conspiracy

21  cannot exist between a principal and its agent. *See id.* at 488 ("The owner of an article

22

23      [9]WRA cites to various regulations and cases for the proposition that it is a joint
    employer with its member ranches, but it does not cite to any case going to the impact of
24  this joint employer status here—indeed, the very nature of a "joint employer" relationship
    implies a legally cognizable distinction between an association and its members.

25      [10]WRA also points to *Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1176 (10th Cir.
26  2019), where the Tenth Circuit found WRA was not sufficiently distinct from its members
    to support RICO claims. However, the distinction between "persons" and "enterprises" in
27  the context of civil RICO claims does not imply that WRA must be treated as
    indistinguishable from its members in all circumstances. Indeed, addressing Sherman Act
28  conspiracy claims, the *Llacua* court determined only that plaintiffs failed to adequately
    allege facts supporting an agreement between member ranches and WRA, but did not
    suggest that WRA is a single entity wholly immune from liability. *See id.*

patented or otherwise is not violating the common law or the Anti-Trust Act by seeking to dispose of his articles directly to the consumer and fixing the price by which his agents transfer the title from him directly to such consumer."). But even setting aside that a principal-agent relationship is not clearly apparent on the face of the TAC, *General Electric* only supports the proposition that a principal-agent relationship establishes a single entity defense when "a party challenges an agreement between a principal and its agent" within the context of the agency relationship itself. *See* 272 U.S. at 485 (analyzing terms of arrangement between patent-holding manufacturer and its sales agents to determine whether they were "genuine agents"). *See also, e.g.*, *Calculators Hawaii, Inc. v. Brandt, Inc*., 724 F.2d 1332, 1336 (9th Cir. 1983) ("In sum, Hallett was Brandt's sales agent and, in that capacity, was incapable of conspiring with Brandt . . . ."). Here, Plaintiff does not challenge a bilateral agency agreement *between* WRA and each member rancher, but rather an agreement *amongst* WRA's members, who are horizontal competitors, allegedly "orchestrated by WRA." (ECF No. 277 at 38.)

Accordingly, WRA is not immune from antitrust liability because of its status as a joint employer with Ranch Defendants or its agency relationship with those Defendants.

### 4.    Implied immunity

WRA next argues that even in the absence of express statutory immunity, there is implied immunity because Plaintiff's claims "arise from the WRA's compliance with DOL regulations" and "application of the antitrust laws is inconsistent with the H-2A Visa regulatory scheme." (ECF No. 263 at 17-19.) WRA asserts that under Supreme Court and Ninth Circuit precedent, "[i]f an industry practice is heavily regulated under a federal statute," and "antitrust challenges to that practice . . . conflict with the regulatory scheme that authorized it," courts must consider that "Congress, in passing the regulatory scheme, impliedly repealed the application of the antitrust laws to that practice." (*Id.* at 13-14.) Plaintiff counters that implied antitrust immunity is appropriate only where there is a clear and direct conflict between a specific regulatory scheme and the antitrust laws—

a conflict which cannot be identified between H-2A regulations and Section 1 of the Sherman Act in this case. The Court again agrees with Plaintiff.

"Implied antitrust immunity is not favored, and can be justified only by a convincing showing of clear repugnancy between the antitrust laws and the regulatory system." *United States v. Nat'l Ass'n of Sec. Dealers, Inc.*, 422 U.S. 694, 719 (1975). Indeed, courts have a "responsibility to reconcile the antitrust and regulatory statutes where feasible." *Id.* at 720 (citing *Silver v. New York Stock Exchange*, 373 U.S. 341, 356-57 (1963)). Implied immunity exists "only where necessary to ensure that the regulatory scheme works, and even then only to the minimum extent necessary." *Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1056 (9th Cir. 1983). *See also Carnation Co. v. Pac. Westbound Conference*, 383 U.S. 213, 218 (1966) ("[C]ourts cannot lightly assume that the enactment of a special regulatory scheme for particular aspects of an industry was intended to render the more general provisions of the antitrust laws wholly inapplicable to that industry"). Regulation does not automatically "displace the antitrust laws by implication." *Nat'l Ass'n of Sec. Dealers, Inc.*, 422 U.S. at 695.

This case does not present one of the rare and discreet instances in which an implied repeal of the Sherman Act is "necessary to make [a] (regulatory scheme) work." *Id.* at 734 (quoting *Silver*, 373 U.S. at 357). WRA insists that Plaintiff's claims arise directly "from the WRA's compliance with DOL regulations." (ECF No. 263 at 16.) But in rejecting WRA's previous immunity arguments, the Court essentially already found that no conflict exists between the H-2A regulatory regime and application of antitrust laws here—let alone the kind of "clear repugnancy" justifying implied immunity. (*See* ECF No. 43 at 9) ("As Plaintiff argues and the Court agrees, 'there is no government policy requiring (or even permitting) applicants to collude to fix wages at the floor'—the 'challenged restraint' here—nor does the DOL actively supervise Defendant's interactions with its members."). The same reasoning applies now.

Notably, the cases to which WRA turns for examples of implied antitrust immunity only underscore why finding a similar exemption would be inappropriate here, as those

14

cited cases involve significantly more "pervasive" regulatory schemes. *See, e.g.*, *Nat'l Ass'n of Sec. Dealers*, 422 U.S. at 730-35 (finding that the Security and Exchange Commission's ("SEC") exercise of regulatory authority over the National Association of Securities Dealers was "sufficiently pervasive . . . to confer implied immunity" where the statutory scheme authorized the SEC to "determine whether an association satisfies . . . strict statutory requirements [,] submit for Commission approval any proposed rule changes," and "request supplementation of association rules"); *Pan Am. World Airways, Inc. v. United States*, 371 U.S. 296 (1963) (dismissing an antitrust action against airline and steamship companies because combinations between carriers were entrusted by statute to the Civil Aeronautics Board, which is tasked with applying standards for the "public interest"); *Brown v. Pro Football, Inc.*, 518 U.S. 231, 242 (1996) (finding a professional football league's conduct in unilaterally imposing a fixed salary fell within a nonstatutory exemption where "needed to make the collective-bargaining process work," and where "[t]he labor laws give the [National Labor Relations] Board . . . primary responsibility for policing the collective bargaining process"); *Gold Medal LLC v. USA Track & Field*, 899 F.3d 712 (9th Cir. 2018) (finding that, while statute did not explicitly provide antitrust immunity to USA Track & Field and United States Olympic Committees, its establishment of Olympic mission authority in the Olympic Committee and national governing bodies implied antitrust immunity for those entities).

In the instant action, Congress has not tasked a regulatory body with overseeing the "public interest" in contrast to, for example, the broad oversight role of the SEC related to security dealings. *See Nat'l Ass'n of Sec. Dealers*, 422 U.S. at 730-35; *Pan Am.*, 371 U.S. at 296. Nor does application of the antitrust laws to the wage-fixing and market allocation claims here impede on the collective bargaining process or risk "duplicative and inconsistent standards" or "conflicting judgments." *Nat'l Ass'n of Sec. Dealers*, 422 U.S. at 735 ("[M]aintenance of an antitrust action for activities so directly related to the SEC's responsibilities poses a substantial danger that appellees would be subjected to duplicative and inconsistent standards."); *Brown*, 518 U.S. at 242. Indeed, WRA's

1    emphasis on "a conflicting web of rules" underlying the H-2A program obscures the

2    relatively simple distinctions at issue; Defendants do not identify any specific statute or

3    regulation that would be affected by a judgment in Plaintiff's favor. (ECF No. 277 at 28.)

4         With regard to DOL's promulgation of minimum wage standards, WRA cites the

5    D.C. Circuit's decision in *Hispanic Affairs Project v. Acosta*, 901 F.3d 378 (D.C. Cir. 2018)

6    and the Tenth Circuit's holding in *Llacua*, 930 F.3d 1161. (ECF No. 263 at 16-17.) But in

7    *Acosta*, the D.C. Circuit concluded simply that it had no basis to challenge the DOL's

8    reasonable judgment setting a *general* applicable AEWR wage rate floor; the case did not

9    involve specific conduct related to wage-fixing above that floor.[11] *See* 901 F.3d 378. And

10   the Court has already analyzed and distinguished *LLacua*—which did not recognize any

11   immunity from the antitrust laws but merely concluded that plaintiffs failed to allege

12   sufficient facts—in finding that Plaintiff adequately supported his claims against WRA in

13   previous complaints. (*See* ECF No. 43 at 14-15 ("[E]ven considered within the context of

14   a regulatory scheme that authorizes WRA to 'coordinate with members' to submit

15   applications and act as 'joint employers of H-2A shepherds,' as Defendant urges the

16   Court to do, the Court finds that Plaintiff's allegations . . . taken together, 'contain sufficient

17   factual matter . . . to plausibly suggest that an illegal agreement was made[.]'").) WRA

18   also cites 20 CFR 655.210(g), which provides that "[t]he [H-2A] employer must offer,

19   advertise in its recruitment, and pay a wage rate that is at least the highest of the

20   [applicable] rates in effect," to argue that an association filing a job order master

21   application must post a wage rate. (ECF No. 263 at 18.) But the limited requirement to

22   post a wage rate at or above the minimum does not, as WRA extrapolates, suggest

23   congressional intention to immunize all conduct related to such wage postings.

24        With regard to Plaintiff's market allocation claims, WRA asserts that transfer

25   restrictions "are required by the H-2A regulations" and emphasizes that the labor market

26

27        [11]WRA also cites *Acosta* to emphasize that the DOL has determined a higher general wage rate would result in fewer sheepherding jobs overall. (ECF No. 263 at 16-

28   17.) But the agency's exercise of its mandate to consider the viability of the program as a whole in setting minimums is hardly irreconcilable with antitrust laws forbidding conspiring to create what is effectively a *maximum* wage.

for foreign H-2A workers is "not open and unfettered." (ECF No. 263 at 18.) Of course, it is true that unlike domestic workers, H-2A workers are subject to restrictions imposed by DOL. But again, it is not clear how the special procedures for visa-holder employment transfers identified by WRA are "at odds" with imposition of the antitrust laws in circumstances where employers impose restrictions on transfer which go significantly beyond the baseline DOL requirements. *See* DOL's form Approval of H-2A Temporary Labor Certification (providing only that an approved application "may not be transferred from one employer to another unless the employer to which it is transferred is a successor in interest to the employer to which it was issued" without explicitly authorizing any further limitation). Here, Plaintiff alleges that Defendants do not permit H-2A visa holders to transfer between ranches unless their original ranch gives permission to do so. That restriction is additional to and separable from the DOL's basic transfer procedures.

In sum, the Court does not find that by authorizing a regulatory regime for H-2A visas under which DOL sets a minimum AEWR rate, Congress implied a repeal of the Sherman Act for the type of anticompetitive conduct alleged in this action. See *Nat'l Ass'n of Sec. Dealers, Inc*., 422 U.S. at 695, 735-36 (emphasizing courts' affirmative obligation to reconcile antitrust laws with regulatory schemes wherever possible). "Nothing about the DOL of USCIS's regulatory scheme would be displaced or frustrated if Plaintiff obtains the relief he seeks in this action." (ECF No. 277 at 33.)

### B.    *Per Se* and Rule of Reason Standards

The Court now turns to WRA's argument that even if the H-2A regulatory context does not preclude liability altogether, it mandates that Plaintiff's claims be gauged under the rule of reason rather than as *per se* violations.[12] (ECF No. 263 at 19-24.) WRA further contends that under the rule of reason standard, Plaintiff has not alleged sufficient facts to prove a relevant market. (*Id.*) Plaintiff counters that he has sufficiently alleged *per se* violations based on the horizontal nature of the agreements in question, but maintains

---

[12]Several Ranch Defendants also argue that the rule of reason should apply in their respective motions. (*See, e.g.*, ECF No. 262 at 20-23.)

1  that the TAC also includes adequate facts to support rule of reason claims, which he

2  pleads in the alternative. (ECF No. 277 at 43-47.)[13] Viewing the allegations in the TAC in

3  the light most favorable to Plaintiff, the Court finds Plaintiff has adequately pled violations

4  under either theory.

5      Absent unique circumstances, the "rule of reason" [is] the prevailing standard of

6  analysis" for Section 1 claims. *Cont'l T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49

7  (1977). In a rule of reason inquiry, "the factfinder weighs all of the circumstances of a

8  case in deciding whether a restrictive practice should be prohibited as imposing an

9  unreasonable restraint on competition." *Id.* (citing *Chicago Board of Trade v. United*

10  *States*, 246 U.S. 231, 238 (1918) ("The true test of legality is whether the restraint

11  imposed is such as merely regulates and perhaps thereby promotes competition or

12  whether it is such as may suppress or even destroy competition.")). There are, however,

13  "certain agreements or practices which because of their pernicious effect on competition

14  and lack of any redeeming virtue are conclusively presumed to be unreasonable and

15  therefore illegal without elaborate inquiry as to the precise harm they have caused or the

16  business excuse for their use." *Northern Pac. R. Co. v. United States*, 356 U.S. 1, 5

17  (1958). "*Per se* rules of illegality" apply to such "manifestly anticompetitive" conduct in

18  place of the rule of reason. *Cont'l T. V.*, 433 U.S. at 49-50. Consistent with this foundation,

19  courts impose the *per se* analysis to restraints "that would always or almost always tend

20  to restrict competition and output," where "the need to study an individual restraint's

21  reasonableness in light of real market forces is eliminated." *Leegin Creative Leather*

22  *Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 877 (2007) (quoting *Business Electronics Corp.*

23  *v. Sharp Electronics Corp.*, 485 U.S. 717, 723 (1988)).

24  _____

25  [13]In the TAC, Plaintiff alleges that "the fixing of wages through operation of the
   WRA" and the "horizontal agreement between competitors not to compete for
   sheepherder labor" are *per se* violations of the Sherman Act and also alleges, in the

26  alternative, that that Defendants' wage-fixing and wage-suppression agreements are
   illegal under either the abbreviated rule of reason "quick look" test, or under the full rule

27  of reason. (ECF No. 254 at 63-64, 65-66.) In his opposition, Plaintiff primarily focuses on
   his *per se* allegations, but does not concede that his claims would fail under an alternate

28  rule of reason analysis. (ECF No. 277.)

In determining the appropriate standard, antitrust courts "can and do consider the particular circumstances of an industry and therefore adjust their usual rules to the existence, extent, and nature of regulation." *Phonetele, Inc. v. Am. Tel. & Tel. Co.*, 664 F.2d 716, 740-42 (9th Cir. 1981) (modified Mar. 15, 1982) (discussing allegations of "tying" AT&T customers to interconnected devices and noting history of cases permitting "interposing of a substantive justification" for conduct which, "but for the regulatory setting, would have been deemed *per se* illegal") (quoting I P. Areeda & D. Turner, Antitrust Law P 214b4 (1978)). *See also Leegin*, 551 U.S. at 877 (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)) (noting that courts may consider "specific information about the relevant business" and "the restraint's history, nature, and effect"); *Silver*, 373 U.S. at 360-61, 365; *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 900 (9th Cir. 1983).

Here, WRA argues that the conduct alleged does not fall under the purview of the *per se* rule because "[c]ourts have much less experience in assessing antitrust claims by foreign guest workers in the heavily regulated H-2A labor market" than claims arising in less-regulated industries. (ECF No. 263 at 19.) *See Leegin*, 551 U.S. at 877 ("[A] *per se* rule is appropriate only after courts have had considerable experience with the type of restraint at issue."). WRA further asserts that its role in "set[ting] and enforce[ing] the wage rate which its rancher members must pay to their Sheepherders" is "akin to a vertical price restraint in a product market, where a manufacturer forces its distributors not to sell below a certain price," which is normally subject to a rule of reason analysis. (ECF No. 263 at 22.) In his opposition, Plaintiff focuses primarily on the latter argument, asserting that the wage-fixing and market allocation schemes alleged against all Defendants in this action are *horizontal*—not vertical—and thus fall within a category of agreements normally garnering a *per se* analysis, regardless of the H-2A regulatory scheme. (ECF No. 277 at 43-47.)

Starting with structure of the alleged restraints, the Court agrees with Plaintiff that the wage-fixing and market-allocation restraints set out in the TAC are horizontal and not vertical. *See United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972) (describing

a "horizontal" restraint is one agreed upon "between competitors at the same level of the market structure," whereas a "vertical restraint" involves "combinations of persons at different levels of the market structure, e.g., manufacturers and distributors"). As the Court has already discussed in rejecting the application of WRA's *Copperweld* doctrine defense, WRA is an association composed of and led by "competitors at the same level of the market structure;" Plaintiff alleges that Ranch Defendants all recruit and hire the same kinds of workers, and "WRA has no independent economic character or existence." (ECF No. 277 at 44.) Because the relevant inquiry is into the nature of the *restraint itself* and not to the "identity of each party who joins," the fact that WRA does not own a ranch itself and enters individual vertical contracts with Ranch Defendants does not turn an otherwise horizontal agreement between competitors into a vertical one.[14] *See United States v. Apple, Inc.*, 791 F.3d 290, 297, 321-25 (2d Cir. 2015), *cert denied*, 577 U.S. 1193 (2016) (holding *per se* liability appropriate for agreement amongst e-book publishers with Apple, notwithstanding the fact that Apple had vertical contracts with publishers). *See also Am. Needle*, 560 U.S. at 191; *Toys 'R' Us, Inc. v. F.T.C.*, 221 F.3d 928, 934-36 (7th Cir. 2000) (applying *per se* test where claims were based on alleged horizontal agreement coordinated by Toys 'R' Us among toy manufacturers through various vertical agreements).

Courts regularly treat horizontal restraints as manifestly anticompetitive and analyze them as *per se* violations. *See Apple, Inc.*, 791 F.3d at 312-14, 326 (2d Cir. 2015) ("'[H]orizontal' agreements to set prices . . . are, with limited exceptions, *per se* unlawful.").[15] Indeed, "[h]orizontal price-fixing conspiracies traditionally have been, and

---

[14]WRA points to *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 899 (9th Cir. 1983), where the Ninth Circuit found no horizontal agreement existed in the context of an employee noncompete agreements because a departing employee does not compete at the same market level as an employer. But in *Aydin*, there was no evidence that any competitor of the former employer participated in the formation of the noncompete agreement.

[15]By contrast, vertical restraints "imposed by agreement between firms at different levels of distribution"—even those which restrict prices—are more likely to have procompetitive benefits. *See Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018); *Leegin*, 551 U.S. at 882.

remain, the 'archetypal example' of a *per se* unlawful restraint on trade." *Id.* at 321 (quoting *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980)). *See also United States v. Socony-Vacuum Oil*, 310 U.S. 150, 223-24 (1940) (finding any conspiracy "formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity ... is illegal *per se*" regardless of the "machinery employed"). In the same vein, horizontal "no-transfer" and "no-solicitation" schemes akin to market division agreements are regular subjects of a *per se* analysis. *See Topco*, 405 U.S. at 608 ("One of the classic examples of a *per se* violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition.").

With this in mind, the Court does not find that the H-2A regulatory environment precludes Plaintiff from stating a *per se* claim, given the otherwise "archetypally" anticompetitive horizontal restraints alleged. While antitrust courts do "consider the particular circumstances of an industry" to occasionally allow "interposing of a substantive justification" to what would otherwise constitute a *per se* claim, *see Phonetele*, 664 F.2d at 742, "the argument that the *per se* rule must be rejustified for every industry that has not been subject to significant antitrust litigation ignores the rationale for *per se* rules," *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 351 (1982). *See also Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 100 n. 21 (1984) ("[T]he likelihood that horizontal price and output restrictions are anticompetitive is generally sufficient to justify application of the *per se* rule without inquiry into the special characteristics of a particular industry.").[16] Horizontal restraints, including agreements between competitors not to hire or solicit one another's workers, or agreements on the maximum wage to be paid to those workers, have been examined under a *per se* analysis *across* industries. *See, e.g.*, *Topco*, 405 U.S. at 608; *United States v. eBay, Inc.*, 968

---

[16]Espil, Borda, and Holland argue that the *per se* rule does not apply unless there is a "shortage of international workers." (ECF No. 262 at 10.) But the inquiry begins with the type of restraint—not the specific industry. (ECF No. 277 at 47.)

F.Supp.2d 1030, 1038-40 (N.D. Cal. 2013); *In re Animation Workers Antitrust Litig.*, 123 F.Supp.3d 1175, 1212 (N.D. Cal. 2015); *Doe v. Arizona Hosp. & Healthcare Ass'n*, No. CV 07-1292-PHX-SRB, 2009 WL 1423378, at *2-3 (D. Ariz. Mar. 19, 2009).[17]  In addition, there is no indication in this case that "restraints on competition are essential if the product is to be available at all." *Am. Needle*, 560 U.S. at 203 (quoting *NCAA*, 468 U.S. at 101) (internal quotation marks omitted).

Regardless, even if the Court precludes a *per se* evaluation to account for the regulatory context surrounding sheepherding, *see Llacua*, 930 F.3d 1161[18], Plaintiff has also adequately pled his claims under the modified "quick look" rule of reason standard and/or the full rule of reason. *See, e.g.*, *Apple*, 791 F.3d (denying dismissal where there was sufficient evidence to support both *per se* claims and an alternate abbreviated rule of reason analysis). Under the typical rule of reason, "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in a relevant market." *See Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018). "[T]he Supreme Court has applied an abbreviated version of the rule of reason— otherwise known as "quick look" review—to agreements whose anticompetitive effects are easily ascertained," even in arenas where the economic impact of an agreement is

---

[17]WRA cites the Ninth Circuit's discussion of the propriety of "interposing" a regulatory justification in *Phonetele*, which involved the unique context of "tying" *per se* claims. *See id.* But there, the Ninth Circuit made clear that although it "agree[d] with the Second Circuit's choice of a standard of reasonableness, we read *Silver* to imply that the burden of maintaining a regulatory justification lies on the defendant." *Id.* at 741. To the extent remaining factual questions related to the regulatory scheme place a burden *on Defendants* to interpose a justification, the Court finds dismissal at this stage is inappropriate.

[18]In *Llacua*, the Tenth Circuit did not explicitly comment on the *per se* vs. rule of reason analysis, but did consider the H-2A regime in evaluating whether the factual allegations gave rise to an inference of an agreement, stating that "[t]he regulatory overlay is a critical backdrop that provides relevant economic context to the Association Defendants' and Rancher Defendants' alleged conduct." 930 F.3d at 1181-82 (10th Cir. 2019) ("For example, federal law governing the H-2A program explicitly and specifically authorizes associations to coordinate with members to submit 'Master Applications' and to act as joint employers of H-2A shepherds… so the mere process of utilizing joint applications and acting as joint employer does not give rise to a plausible inference of an improper agreement."). The Court acknowledges that consideration of the H-2A scheme may be relevant to interpreting factual allegations, but it does not extend the *Llacua* court's reasoning to prohibit Plaintiff's *per se* claims.

"not immediately obvious." *Apple*, 791 F.3d at 329-30 (quoting *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 779-80 (1999); *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 459 (1986)). "This 'quick look' effectively relieves the plaintiff of its burden of providing a robust market analysis . . . by shifting the inquiry directly to a consideration of the defendant's procompetitive justifications." *Id*. *See also NCAA*, 468 U.S. at 101, 109 (applying modified rule of reason approach after finding that the "case involves an industry [college football] in which horizontal restraints on competition are essential if the product is to be available at all" but emphasizing that "when there is an agreement not to compete in terms of price or output, no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement") (internal quotations omitted).

Here, Plaintiff has alleged horizontal restraints which have "easily ascertain[able] anticompetitive effects." *See Apple*, 791 F.3d at 329-30. The Court thus finds that "proof of market" is not required under a rule of reason analysis. *See NCAA*, 468 U.S. at 109-10 ("As a matter of law, the absence of proof of market power does not justify a naked restriction on price or output."). As a result, WRA's argument that Plaintiff's claims must be dismissed because he fails to allege relevant geographic and labor markets is unconvincing. Moreover, even applying the full rule of reason instead of the hybrid quick look approach, "[t]here is no requirement that [the relevant market] be pled with specificity." *Newcal Indus., Inc. v. Ikon Office Sol*., 513 F.3d 1038, 1045 (9th Cir. 2008). "[S]ince the validity of the 'relevant market' is typically a factual element rather than a legal element, alleged markets may survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial." *Id*.[19]

---

[19]For both of his claims, Plaintiff alleges that "the relevant geographic market . . . is the United States, and the relevant market is the labor market for sheepherders in the United States." (ECF No. 254 at 66.) The Court finds that definition sufficient and more than merely conclusory viewed in the context of Plaintiff's allegations as to domestic supply and demand for skilled sheepherder labor and considering that Plaintiff has plead anticompetitive effects. *See PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 838 (9th Cir. 2022) (holding that a plaintiff is "not required to define a particular market . . . for a rule of reason claim based on evidence of the actual anticompetitive impact of the challenged practice").

1    Accordingly, the Court finds Plaintiff has adequately alleged anticompetitive

2  agreements under either the *per se* test or, alternatively, under the rule of reason. To the

3  extent outstanding factual questions bear on the appropriate standard, the Court need

4  not and does not reach a further determination as to the applicable rule at this stage.

5        **C.    Antitrust Injury and Damages**

6    Plaintiff has also adequately alleged an antitrust injury and damages. *See, e.g.*,

7  *Sommers v. Apple*, 729 F.3d 953 (9th Cir. 2013) (requiring antitrust plaintiffs to

8  demonstrate an injury and viable measure of damages); *Dreamstime.com, LLC v. Google*

9  *LLC*, 54 F.4th 1130, 1136 (9th Cir. 2022) ("[A]n antitrust complaint need only allege

10  sufficient facts from which the court can discern the elements of an injury resulting from

11  an act forbidden by the antitrust laws.") (internal quotations omitted).

12    WRA argues that Plaintiff fails to plead sufficient facts regarding damages and

13  improperly relies only on "speculative statements" that WRA sets sheepherder wages at

14  an artificially low level. (ECF No. 263 at 24-25.) *See Sommers*, 729 F.3d 953. But WRA

15  does not cite any authority suggesting that at the motion to dismiss stage, Plaintiff is

16  required to provide more detailed monetary estimates in order to show non-speculative

17  damages.  And the use of expert analysis to prove antitrust damages is common practice.

18  *See, e.g.*, *Nitsch v. DreamWorks Animation SKG Inc.*, 315 F.R.D. 270, 304-05 (N.D. Cal.

19  2016). WRA itself previously appeared to acknowledge that Plaintiff focuses, as a

20  measure of damages, on "the differential between the DOL wage rate and the wages paid

21  in a 'competitive' market." (ECF No. 235 at 15.)

22    Defendants Espil, Holland, and Borda assert that Plaintiff lacks standing because

23  he does not specifically allege that he was himself denied a transfer between ranches

24  and thus fails to demonstrate an injury. (ECF No. 262 at 23.) But as Plaintiff notes, "[t]he

25  theory of harm is not that Plaintiff or any proposed class member lost a specific job

26  opportunity—it is that the absence of competition amongst WRA members, including

27  Ranch Defendants, caused market-wide suppression of wages." (ECF No. 277 at 47.) It

28  is sufficient that Plaintiff alleges the wages he and other proposed class members worked

were lower than they would have been in the absence of an agreement among Defendants. *See, e.g.*, *Dreamstime.com*, 54 F.4th at 1136; *Le v. Zuffa*, LLC, 216 F.Supp.3d 1154, 1169 (D. Nev. 2016). No more is needed to show injury and damages.

In sum, the Court denies WRA's motion to dismiss (ECF No. 263). To the extent Ranch Defendants adopt arguments which are the same or related to WRA's, the Court similarly finds no basis for dismissal as to those defendants.

### D.    Ranch Defendants

The Court now turns to the claims asserted against Ranch Defendants. In their respective motions to dismiss, Ranch Defendants argue that despite additional opportunity discovery, Plaintiff's TAC is still unsuccessful in implicating WRA's individual members in any conspiracy. (ECF Nos. 262, 264, 265, 266.) Plaintiff argues that he has now provided facts supporting each Ranch Defendant's participation in the alleged agreements to fix wages and restrict transfers, remedying deficiencies in the FAC. (ECF No. 277 at 49-59.) The Court finds that as amended and bolstered in the TAC, Plaintiff's claims against Ranch Defendants survive Rule 12(b)(6) dismissal. *See Twombly*, 550 U.S. at 570.

In its March 2024 order addressing the FAC, the Court dismissed with leave to amend all claims against Ranch Defendants because, although Plaintiff successfully alleged the existence of an anticompetitive agreement involving WRA, he alleged only sparse facts pertaining to named member ranches and did not support their actual "assent to and participation in" an agreement. (ECF No. 173 at 12-14 (citing *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 904 (N.D. Cal. 2008)).) At the pleading stage, an antitrust plaintiff need not allege detailed facts as to what each defendant did within a purported conspiracy, and "an agreement may be implied from conformity to a contemplated pattern of conduct." (ECF No. 173 at 13.) *See Moore v. James H. Matthews & Co.*, 473 F.2d 328, 330 (9th Cir. 1972). But mere parallel conduct is not enough: "[A] complaint [should] answer 'the basic questions' of "who, did what, to whom (or with whom), where, and when?" (ECF No. 173 at 13 (quoting *Kendall v. Visa*

*U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008)).) Besides naming Ranch Defendants, referring to their status as WRA members, and stating that some of the ranches' principals were also WRA directors, Plaintiff's FAC did not include *any* specific allegations about the ranches' role in the conspiracy whatsoever. (ECF No. 173 (noting absence of foundational facts, such as "who from the Ranch Defendants entered into the purported agreements with WRA"); ECF No. 50.)

In its March 2024 order, the Court compared the reasoning in *Kendall*, 518 F.3d at 1048—where the Ninth Circuit reaffirmed that "membership in an association does not render an association's members automatically liable for antitrust violations committed by the association" —with the reasoning in *Relevent Sports, LLC v. United States Soccer Fed'n, Inc.*, 61 F.4th 299, 303 (2d Cir. 2023)—where the Second Circuit found allegations adequate to demonstrate concerted action when association members agreed to "comply fully" with membership policies and thus "surrender[ed] [themselves] completely to the control" of an organization. (ECF No. 173 at 12-13.) Declining to apply *Relevant*, the Court noted that in the FAC, Plaintiff had not alleged that Ranch Defendants agreed to "comply fully" with WRA's anticompetitive policies as a condition of their membership. (*Id.*)

In the further-amended TAC, however, Plaintiff has alleged new facts about Ranch Defendants which adequately answer the "basic questions" — "who, did what, to whom (or with whom), where, and when?" *See Kendall*, 518 F.3d at 1048.

As a foundational matter, Plaintiff now alleges facts suggesting that all Ranch Defendants agreed to "comply fully" with WRA's policies.[20] *See Relevent*, 61 F.4th at 303. He alleges that as "a condition of joining WRA," member ranches execute a packet of application forms and "explicitly agree to comply with association policies and to cede their authority to set wages and to hire workers to the Association." (ECF No. 254 at 26.) Under the Application and Membership Agreement, a joining ranch "agrees to be bound

---

[20]Plaintiff alleges when each Ranch Defendant joined WRA and names the agents who signed membership and job assurances. (ECF No. 254 at 27-28 (listing membership start dates between 1984 and 2018).)

by the By-Laws of the Association as they now exist or may hereafter be amended." (*Id.*) The by-laws, in turn, require members to abide by WRA's other policies; they provide that members may be expelled or otherwise disciplined if they fail to comply with WRA "rules and regulations," or are "in default of any obligation to . . . the Association whether or not such obligation or rule arises by virtue of membership." (ECF Nos. 262-1 at 3; 277 at 49.) The by-laws warn ranches against "disturb[ing] . . . harmony . . . of the association" in conjunction with their member status. (ECF Nos. 262-1 at 3; 277.)

As detailed below, Plaintiff specifically alleges the existence of binding restrictions on transfers/solicitation and collective wage-setting practices which require Ranch Defendants to cede authority to the Association in meaningful ways that go beyond "mere membership."[21] *See Relevent*, 61 F.4th at 303.

### 1.    No-transfer and no-solicitation allegations

Plaintiff alleges a "segment[ed]" and "sequential" system by which WRA allocates sheepherders, asserting that "[e]ach of the Ranch Defendants has received lists of available herders" in accordance with this process, signaling their "mutual[] understand[ing]" of the "centralized…rather than competitive" structure. (ECF No. 254 at 29-30 (describing email exchange between WRA and F.I.M. in which WRA provided a list of workers and asked F.I.M. to inform the Association "which workers you will be requesting" so it could "add the ones you don't want to our list [and] send them to other ranchers"); *id.* (describing WRA's selection-process email to six ranches, including Defendant Need More Sheep, "starting from the same roster of available herders but removing names as those herders were selected for employment").)

Plaintiff also alleges a similarly-centralized mechanism for inter-employee transfers, under which WRA advises herders at all of its member ranches that they are

---

[21]Defendant Ellison cites to *Kendall*, as well as to *Kline v. Coldwell, Banker & Co.*, 508 F.2d 226, 232 (9th Cir. 1974), for the proposition that distribution of a membership association's policies, procedures, or rules is not enough, and that even generic adoption of those policies by members is also insufficient. (ECF No. 280 at 8-9.) Here, however, Plaintiff has alleged that with membership in WRA, each Ranch Defendant delegated particularly substantial, non-generic authority over labor practices to the association.

generally prohibited from leaving their current employer. (*Id.* at 31 (alleging sheepherders are required to sign an employment attestation which provides that they "will be assigned to a place of work (ranch)" and "that [the sheepherder] will not be able to change or transfer because [the sheepherder] desire[s] to do so"). And Plaintiff alleges that WRA's longstanding official policy was to prohibit its members from soliciting one another's sheepherders, stating that "pirating labor" was enshrined as grounds for expulsion. (*Id.* at 35-36 (citing discussions of "pirating labor" as grounds for termination of membership at WRA's 1966 Annual Membership Meeting, attended by individuals associated with Espil and Holland Ranches).)[22]

Plaintiff Further cites evidence that WRA's transfer and solicitation policies were explicitly conveyed to, relied on, and/or enforced by all Ranch Defendants on one or more occasions. (*See, e.g.*, ECF No. 254 at 31 (June 2019 newsletter to all member ranches describing transfer process); *id.* at 32 (1997 letter to all members, which at that time included Defendants Ellison, Espil, Faulkner, F.I.M., and Need More Sheep, stating that "any transfer of a herder must be processed by the Western Range Association," that "[m]embers have no authority to arrange for any transfers" and that violators would "be subject to a fine of up to $1,000 per violation, loss of herder, and/or termination of membership"); *id.* (January 2022 communications from WRA on requirement for a current employer to "agree to transfer"); *id.* at 32-33 (August 2023 communications between WRA and Little Ranch regarding potential transfer and whether Little Ranch "want[ed] the transfer to happen"); *id.* at 33-34 (dates on which six Ranch Defendants—Little Ranch, Need More Sheep, Espil, Holland, Ellison, and Borda— mediated sheepherder allocation and transfers through WRA); *id.* at 35 (1986 complaint from Espil to WRA about another member soliciting its members and subsequent warning letter to that member cautioning

---

[22]Espil, Borda, and Holland argue that the 1966 WRA meeting did not include current Ranch Defendants and involved only a "lawful measure to create a penalty for those who encourage sheepherders to violate their contract," noting that interference is a tort. (ECF No. 262 at 13.) However, the alleged agreement to counter "pirating" plausibly extends beyond mere interference (for example, to transfers without solicitation). And notwithstanding its participants, the 1966 meeting is relevant primarily because it goes to a policy which Plaintiff alleges was never rescinded.

the soliciting ranch that "[w]hen a member goes directly to the herder and not through the

Western Range Association, we look upon this as 'pirating'… strictly against Western

Range Association policy"); *id.* at 36 (2022 communications between WRA and a

sheepherder's former employer after his current employer, Defendant Need More Sheep,

complained about solicitation).[23]

### 2. Wage-fixing allegations

With regard to the wage-fixing claims, the Court "has already held that Plaintiff

plausibly alleges that WRA orchestrates and enforces an unlawful wage-fixing agreement

between and amongst its members," and the Court finds no reason to reassess that prior

determination. (ECF Nos. 43 at 14-15; 277 at 54.)  The Court agrees with Plaintiff that the

TAC adequately answers the remaining question—Ranch Defendant's acquiescence to

an anticompetitive scheme—through "a combination of parallel conduct and plus factors."

(ECF No. 277 at 54) (citing *Honey Bum, LLC v. Fashion Nova, Inc.*, 63 F.4th 813, 822

(9th Cir. 2023)). *See also In re Dynamic Random Access Memory (DRAM) Indirect

Purchaser Antitrust Litig.*, 28 F.4th 42, 46 (9th Cir. 2022) (citing *Twombly*, 550 U.S. at 553

(parallel conduct must be placed "in a context suggesting a preceding agreement"); *In re

Musical Instruments & Equipment Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015)

("[P]lus factors are economic actions and outcomes that are largely inconsistent with

unilateral conduct but largely consistent with explicitly coordinated action.").

As for parallel conduct, Plaintiff alleges that Ranch Defendants uniformly set

sheepherder wages at or near the minimum legal wage, as reflected in recent job orders

for domestic sheepherders and H-2A applications.[24] (ECF No. 254 at 47 ("Based upon a

---

[23]As additional circumstantial evidence, Plaintiff points to the presence of Little Ranch's principal on WRA's Board of Directors since 2017 and participation in meetings specifically about transfer issue; Borda and Holland's ties to Little Ranch and WRA Board; and email chains between Borda, Little Ranch, Need More Sheep, F.I.M. and Ellison. (ECF No. 277 at 60 n. 11.)

[24]To the extent Ranch Defendants argue that WRA members are not prohibited from offering higher than the minimum allowable wage and sometimes do so in the form of bonuses (*see, e.g.*, ECF No. 281 at 3), the Court has already noted that "minor departures from the agreed-upon wage do not defeat Plaintiff's allegations of an unlawful

1   review of recent job orders associated with WRA H-2A Applications, the job orders to U.S

2   workers that preceded these H-2A Applications offered the same wages as the H-2A

3   Applications and therefore offered exactly the DOL H-2A wage floors for each state as a

4   fixed wage to potential U.S. workers"); 51-52 ("In a review of all 148 current sheepherder

5   job orders posted by the WRA as of 2022…only one guaranteed a wage higher than the

6   minimum.").)

7        Plaintiff next points to plus factors including (1) action against self-interest; (2)

8   motive to conspire; (3) opportunities to collude; and (4) additional contextual factors

9   viewed in a holistic context. (ECF No. 277 at 54-59.) First and most importantly, with

10  regard to actions against self-interest, Plaintiff argues that "the uniformity of the Ranch

11  Defendants' wage offerings makes no economic sense," given the nature of the

12  specialized-skill market, absent collective acquiescence to an anticompetitive agreement

13  allowing WRA to coordinate and structure wages at the floor. (*Id.* at 59.) Notably, Plaintiff

14  alleges that WRA does not consult with Ranch Defendants about the wage they seek to

15  offer in its questionnaires before simply setting the wage at the floor for both domestic

16  and foreign workers and submitting job orders to that effect. (*See, e.g.*, ECF No. 254 at

17  47-48 (alleging WRA submitted wage rates for Ellison, F.I.M., Borda, Espil, and Need

18  More Sheep in a single joint application); *id.* at 55 (similar joint application for Ellison and

19  Faulkner).) The Court finds it plausible to infer that Ranch Defendants' willingness to defer

20  to WRA on selecting a wage when submitting job orders, as a matter of normal practice,

21

22  agreement or overall wage-fixing scheme" (ECF No. 43 at 14 (citing *Socony-Vacuum Oil*
23  *Co.*, 310 U.S. at 222). In addition, Little Ranch requests that the Court take judicial notice
    of DOL Form ETA-790A General Instructions (ECF No. 266-11) for the purpose of
24  showing that DOL's instructions *require* WRA to "enter the minimum wage offer in item
    A.8b." (ECF No. 266 at 17.) The Court finds judicial notice of these form instructions
25  appropriate. *See* Fed R. Evid. 201(b)(2) & (c)(2). And the Court agrees with Little Ranch
    that with the form instructions in mind, uniform wage entries in section A.8b do not, by
26  themselves, indicate a wage-suppression agreement. But most fundamentally, Plaintiff
    alleges parallel conduct because domestic and foreign workers at WRA member ranches
27  are in practice offered the same wages, excluding bonuses, and ranches do not give their
    input on a wage rate at any part of the job-order process run by WRA. Plaintiff also alleges
28  that WRA provides, in the comment section of the ETA-790A form, that "wages *will be*
    paid in accordance to the state in which the work is done," (ECF No. 254 at 52.) The Court
    finds that this is enough.

is dependent on the belief and understanding that WRA will apply the same low wage across competitors by default, thereby obviating the need to consider the nuances of competing for skilled labor. This understanding is reflected in the alleged pattern of uniformity in wage offerings across almost all of WRA's dozens of members. *See Moore*, 473 F.2d at 330, 332.

With regard to an expressed common motive to conspire and opportunities to collude, Plaintiff emphasizes facts which generally go to the insular nature of sheepherding industry in Nevada and the overlapping relationships between Ranch Defendants. (ECF No. 277 at 56-57.) He highlights, *inter alia*, discussions among WRA's Board of Directors about the possibility of adopting its own wage standards distinct from DOL rates (ECF No. 254 at 42-43); instances in which some Ranch Defendants have "organiz[ed] against competitive threats" (*id.* at 46 (describing emails between Need More Sheep and Little Ranch, forwarded to Borda, F.I.M., and Ellison, regarding the threat of imported mutton and the need to "band together and….protect our industry")); and occasions on which Ranch Defendants have directly communicated with one another professionally and personally (*id.* at 45-46). (ECF No. 277 at 56-57.) The Court has already cautioned that "participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement." (ECF 173 at 13-14 (quoting *Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d at 1196 (9th Cir. 2015)).) *See also, e.g.*, *Kendall*, 518 F.3d at 1048 (presence on a Board of directors is not sufficient). The Court does not, therefore, give undue weight to circumstantial motive and opportunity allegations as either "direct proof" or plus factors. Nevertheless, viewed alongside allegations about WRA's binding rules and adoption of those rules by Ranch Defendants, the historically close collaboration between and amongst WRA and its members could be inferred to exceed "typical" trade association activity and "render the allegations of knowing collusion more plausible." (ECF No. 277 at 57.) *See In re Graphics Processing Units Antitrust Litig.*, 527 F.Supp.2d 1011, 1023-24 (N.D. Cal. 2007)

1   (dismissing claims where plaintiffs placed undue emphasis on defendants' attendance at

2   conferences but clarifying that direct allegations of "back-room" deals are not required).

3           Finally, as an additional factor leading to a plausible inference of acquiescence,

4   Plaintiff points to the allegation that WRA shared information about several ranches' wage

5   rates before that information became public (ECF No. 254 at 56-57). (ECF No. 277 at 58.)

6   While posting rates where that information would otherwise be publicly available in

7   another format or at a later time does not carry significant weight on its own, it is relevant

8   in the limited sense that it bolsters an inference that Ranch Defendants expected to

9   participate in and benefit from WRA's practices of collectivizing and sharing a

10  determination of wages.

11                          **3.      Ranch Defendants' Arguments**

12          With this full set of allegations in mind, Ranch Defendants' attacks on the TAC are

13  unpersuasive or otherwise premature.

14          First, most Ranch Defendants argue that the TAC "misrepresent[s] the contents of

15  documents [such as the Membership Agreement, By-Laws, and deposition testimony] it

16  incorporates by reference." (*See, e.g.*, ECF Nos. 262 at 2-3 (Espil, Borda, and Holland's

17  Motion) ("[O]nce the allegations that constitute material misrepresentations are

18  disregarded, the Complaint contains few targeted allegations as to the Ranch

19  Defendants."); 265 at 2 (Ellison's Motion) ("Many of Plaintiff's quoted documents flatly

20  contradict his allegations."); 266 at 3-4 (Little Ranch's Motion); 264 at 9 (F.I.M., Need

21  More Sheep, and Faulker's Motion) ("Plaintiff has not identified a single instance in which

22  WRA took some punitive action against a member for paying more than the minimum

23  wage.").) It is true that no document cited by Plaintiff includes an explicit requirement to

24  adhere to an anticompetitive scheme or to pay only the AEWR. But Plaintiff does not—

25  and need not—allege as much. Rather, Plaintiff reads the documents in conjunction with

26  one another, making inferences in light of WRA's broad authority to terminate

27

28

membership and preserve harmony among member ranches.[25] Defendants may dispute

Plaintiff's inferences and accuse him of cherry-picking, but on the whole the Court does

not find "contradictions." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th

Cir. 2018). *See also In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420, 2014 WL

4955377, at *30 (N.D. Cal. Oct. 2, 2014) ("[T]he character and effect of a conspiracy are

not to be judged by dismembering it and viewing its separate parts, but only by looking at

it as a whole."). Defendants' assertions about the documents' weight and meaning largely

go to factual disputes not appropriate for resolution at this stage. *See Khoja*., 899 F.3d at

1002 (holding that defendants may not "use the [incorporation-by-reference] doctrine to

insert their own version of events into the complaint to defeat otherwise cognizable

claims").

Similarly, some Ranch Defendants take issue with the age of Plaintiff's cited

communications and documents, many of which are several decades old. (*See, e.g.*, ECF

No. 265 at 16 (Ellison's Motion).) But the Court agrees with Plaintiff that these documents

are relevant to the extent they go to the *commencement* of an agreement that has not

been terminated; the Court need not weigh the strength of that evidence now. *See United

States v. Recio*, 371 F.3d 1093, 1096 (9th Cir. 2004) ("[A] conspiracy continues until there

is affirmative evidence of abandonment, withdrawal, disavowal, or defeat of the object of

the conspiracy.") (quotations omitted)).

Finally, Ranch Defendants argue that dismissal is appropriate because Plaintiff's

allegations are equally likely to be consistent with lawful conduct as they are to indicate

conspiracy. *See, e.g.*, *Graphics Processing Units*, 527 F. Supp. 2d at 1023 (dismissing

claims when there was an "equally plausible" lawful explanation). Espil, Borda, and

---

[25]Many Ranch Defendants, including Ellison, take particular issue with Plaintiff's representations of the membership manual. (*See, e.g.*, ECF No. 265 at 14-15 (describing the membership manual and noting it provides only a table of minimum wages with "at least" caveat). The Court agrees with WRA that Plaintiff implies that the manual sets salaries at the AEWR *as a ceiling*, which exaggerates its text. But here again, the Court considers the manual in conjunction with other allegations about the practice of setting identical or similar wages, standardized employment contracts, USCIS I-129 forms, emails about the onboarding process, etc. (ECF No. 254 at 48-49.) Defendants attempt to contest its persuasive value by overstating its centrality to the Court's prior decisions.

Holland assert, for example, that "the Court must consider, as an obvious alternative explanation for Ranch Defendants' behavior, that the wages paid to sheepherders by Ranch Defendants are attractive because they exceed wage rates in the sheepherder's native countries," and that "transfers are not only lawfully conducted according to the complex regulations associated with the H-2A visa program, but are only possible because of WRA." (ECF No. 262 at 3.) (*See also* ECF Nos. 265 at 2 (Ellison's Motion) (arguing similarly that the Court must consider the equally-likely rationale that "Plaintiff's iterations show nothing more than Ellison's voluntarily compliance with the complex regulations that control sheepherder employment"); 266 at 2-3 (Little Ranch's Motion).)

Even acknowledging that there are plausible lawful explanations for Ranch Defendants' conduct, where setting wages at the AEWR could simply be an expected economic outcome, the Court must review the allegations in the TAC in the light most favorable to Plaintiff and draw all reasonable inferences in his favor. *See Manzarek v. St. Paul Fire & Marine Ins. Co*., 519 F.3d 1025, 1031 (9th Cir. 2008). Doing so, the Court cannot conclude that any alternative lawful inferences are straightforwardly more likely or "obvious" such that dismissal is warranted.[26] Plaintiff is not subject to a heightened pleading standard. *See Graphics Processing Units*, 527 F.Supp.2d at 1019-20 (discussing the requirements under *Twombly* and emphasizing that allegations of conspiracy are not subject to Rule 9(b)'s more exacting pleading requirements). The Court has already analyzed lawful and unlawful explanations for the agreements alleged

---

[26]Some Ranch Defendants, including Espil, Borda, Holland, F.I.M., Need More Sheep, and Faulkner, insist that Plaintiff obscures the lack of labor shortage when considering the international, rather than solely domestic, supply of sheepherders. (*See, e.g*., ECF Nos. 281 at 11-12; 282.) But a discussion of market supply-and-demand goes beyond the pleading requirements under *per se* analysis and, as discussed above, Plaintiff has adequately pled the market elements of a rule of reason analysis. More fundamentally, while Defendants across *all* industries could claim that setting low wages is economically logical, that does not absolve them of antitrust liability.

on prior occasions—weighing, for example "the variance in skill and experience of sheepherders"—and will not rehash that analysis here.[27]

In sum, Plaintiff pleads particularized facts going beyond "mere membership in an association," *Kendall*, 518 F.3d at 1048, and plausibly suggests that all Ranch Defendants acquiesced to the market allocation and wage-fixing schemes, *see Relevent*, 61 F.4th at 307. *See also PLS.Com*, 32 F.4th at 838 ("All that [a plaintiff] must allege is that [the defendant] adhered to a common scheme."). Accordingly, the Court denies Ranch Defendants' respective motions to dismiss (ECF Nos. 262, 264, 265, 266).[28]

## IV.    CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the motions before the Court.

It is therefore ordered that Defendants' motions to dismiss (ECF Nos. 262, 263, 264, 265, 266) are denied.

It is further ordered that Ellison Ranching Co.'s motion to seal (ECF No. 267) is denied without prejudice to refiling.

DATED THIS 8th Day of August 2025.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE

---

[27]In its order addressing Plaintiff's original complaint, the Court declined to dismiss claims against WRA after finding economically plausible WRA's argument that "uniform wages at the minimum wage are precisely the expected economic outcome," but weighing Plaintiff's countervailing arguments regarding "the variance in skill and experience of sheepherders, and Plaintiff's assertion that Defendant and its members 'had an incentive to fix wages at that level' to gain higher profits." (ECF No. 43 at 14.)

[28]Little Ranch also moves for a more definite statement. (ECF No. 266 at 22.) Such motions "should not be granted unless the defendant literally cannot frame a responsive pleading," *Underwood v. O'Reilly Auto Parts, Inc.*, 671 F.Supp.3d 1180, 1188 (D. Nev. 2023) (internal citations omitted), A more definite statement is not merited here.